**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) | Case No. 1:20-cv-04176 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Townstone Financial, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TOWNSTONE FINANCIAL, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

Date: October 23, 2020

Respectfully submitted,

*/s/ Sean P. Burke*
Sean P. Burke #6277203
E. Brenda Kpotufe # 34084-49
Mattingly Burke Cohen & Biederman LLP
155 E. Market St., Suite 400
Indianapolis, IN 46204
Sean.Burke@mbcblaw.com
Brenda.Kpotufe@mbcblaw.com

*Attorneys for Defendant Townstone
Financial, Inc.*

i

# TABLE OF CONTENTS

I.     INTRODUCTION. ...........................................................................................1

II.    FACTS PLEAD AND NOT PLEAD IN THE COMPLAINT ............................1

III.   ARGUMENT...................................................................................................3

   A.  **Rule 12(b)(6) Standard.** ............................................................................ 3

   B.  **Reg. B and the Bureau Improperly Attempt to Expand ECOA's Reach.** ................... 3

       (1) The Complaint Seeks to Punish Behavior that Is Not Regulated by ECOA. ................3

       (2) Precedent Holds that ECOA Cannot Be Extended to Reach Persons Who Are Not "Applicants," And Thus, the Bureau's Complaint Must Fail ...........................................5

       (3) ECOA Does Not Mandate Advertising Practices, Demographic Hiring Quotas, or Business Success, so the Complaint Should be Dismissed.................................................7

   C.  **The Bureau Alleged No Other Violations of Federal Consumer Financial Law, and Thus, Count II Fails.** .................................................................................... 8

   D.  **Even if a Claim of Potential Discouragement of "Prospective Applicants" Existed under ECOA, It Runs Afoul of the First Amendment.** .................................... 9

       (1) Reg. B and the Bureau's Enforcement Violate the First Amendment Because They Are Content and Viewpoint-Based Bans of Free Speech that Are Not Narrowly Tailored to Serve Compelling State Interests. ...................................................10

       (2) Reg. B and the Bureau's Enforcement Violate the First Amendment Because It Is Unconstitutionally Vague and Overbroad as Applied to Townstone and Facially......12

          i.  Reg. B Violates the First Amendment as Applied to Townstone ......................... 14

          ii. Reg. B Violates the First Amendment Because It Is Facially Invalid................... 16

   E.  **The Bureau's Use of Reg. B Violates the Fifth Amendment.** ....................................... 17

IV.   CONCLUSION ...........................................................................................18

# TABLE OF AUTHORITIES

## CASES

*Auer v. Robbins*, 519 U.S. 452 (1997) ................................................................ 5

*Bartucci v. Wells Fargo Bank N.A.,* No. 14 CV 5302, 2015 WL 6955482, at *2 (N.D. Ill. Nov. 10, 2015) ...................................................................................... 6

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ........................................ 3

*Brumfield v. City of Chicago*, 735 F.3d 619, 626 (7th Cir. 2013) ...................... 4

*Buckley v. Valeo*, 424 U.S. 1 (1976) .............................................................. 12, 16

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 842-43, (1984)4

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ....................... 9

*Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012) ............ 12

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)....................... 13, 17

*FEC v. Wisconsin Right to Life*, 551 U.S. 449, 567 (2007) ............................... 13

*Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 942 (8th Cir. 2014) .................. 6

*Iancu v. Brunetti*, 139 S. Ct. 2294, 2302, 204 L. Ed. 2d 714 (2019) .................... 10

*Kisor v. Wilkie*, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019) ............................... 5

*Lake v. Neal,* 585 F.3d 1059, 1060 (7th Cir. 2009) ......................................... 3

*Moran Foods v. Mid-Atlantic Market Development*, 476 F.3d 436 (7th Cir. 2007)..................... 5

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376, 201 L. Ed. 2d 835 (2018) ................................................................................... 12

*New Louisiana Holdings, LLC v. Arrowsmith, No. 11 C 5031, 2012 WL 6061710, at *5 (N.D. Ill. Dec. 4, 2012)* ...................................................................... 7

*R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992) .............................................. 10, 11

*Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 155, (2015)................................ 10, 11

*Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1193 (11th Cir. 2019)............... 6

*RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 385 (6th Cir. 2014)............................................................................ 6

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995)...................... 10

*Skidmore v. Swift Co*, 323 U.S. 134 (1944) ................................................ 5

*Snyder v. Phelps,* 562 U.S. 443, 451 (2011) ............................................... 9

*Texas Dep't of Hous. and Comty. Affairs v. Inclusive Communities Project, Inc.*, 135 S.Ct. 2507, 2518 (2015) .......................................................... 8

*United States v. Williams*, 553 U.S. 285, 292 (2008) ........................................................ 13, 17

**STATUTES**

15 U.S.C. § 1691(a)(1)............................................................................................................ 3

15 U.S.C. § 1691a(b). ............................................................................................................. 3

15 U.S.C. §§ 1691–1691f ....................................................................................................... 1

APA, 5 U.S.C. § 553 ............................................................................................................... 8

**REGULATIONS**

12 C.F.R. § 1002.4 .............................................................................................................. 4, 10

12 C.F.R. Part 1002................................................................................................................ 4

I.     **Introduction.**

The Bureau of Consumer Financial Protection's ("Bureau") complaint (the "Complaint") against Townstone Financial, Inc. ("Townstone") is flawed and must be dismissed for the following reasons: (1) contrary to the express language used in the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, the Bureau seeks to improperly expand the reach of ECOA to reach "prospective applicants", to regulate behavior before a "credit transaction" even begins, and to create affirmative advertising and hiring requirements, which cannot be squared with the unambiguous language of the statute; (2) contrary to the First Amendment of the United States Constitution, the Bureau seeks to regulate the content and viewpoint of protected speech and does so in a way that is unconstitutionally overbroad and vague both as applied to Townstone and facially; and (3) similarly, the regulation the Bureau seeks to enforce is unconstitutionally vague in violation of the Fifth Amendment's due process clause both as applied to Townstone and facially.

II.     **Facts Plead and Not Plead in the Complaint.**

The Bureau's Complaint is devoid of any factual allegation that Townstone behaved improperly towards any applicant or with respect to any actual credit transaction that falls within the purview of ECOA. Instead, the Complaint alleges that Townstone acted or failed to act with regard to ***prospective applicants***, which are not regulated under ECOA. For example, Doc. 1, ¶ 13 alleges: "Townstone engaged in acts or practices directed at ***prospective applicants*** that discouraged, on the basis of race, ***prospective applicants*** from applying to Townstone for credit in the Chicago MSA." *See also,* Doc. 1, ¶¶14, 15, 30, 41-44, and 51, each of which only complain about actions or inactions relating to "prospective applicants".[1] Part of Townstone's advertising

---

[1] Townstone – as it must – treats the Bureau's factual allegations as true for purposes of this motion only.

efforts include producing the Townstone Financial Show, a community-based talk radio show and "podcast" available on the internet. On the show, Townstone's team educates listeners on financial and real estate issues involving home purchasing and mortgage loans, but also frequently touches on topics of public and political interest such as food, sports, politics, including crime and policing in Chicago.

Despite no statutory basis to regulate Townstone's speech, the Bureau excerpts a few comments out of context from hundreds of broadcasting hours and alleges that those comments somehow "discourage prospective applicants living in African-American neighborhoods from applying to Townstone". (Doc. 1, ¶¶*30, 33-39*[2]). For example, in one show segment there was a discussion of crime rates on the southside of Chicago in which a speaker equated the rush one gets from skydiving to walking through the southside at 3 a.m. in the morning. Doc.1, ¶35. The Bureau alleges that discussion somehow discouraged prospective African-Americans from applying to Townstone. The Bureau also alleges that, because Townstone did not affirmatively target advertising specifically to African-Americans, and because Townstone allegedly had no African-American loan officers, Townstone discouraged prospective African-American applicants.

Because the Complaint contains no allegations that Townstone engaged in inappropriate

---

Townstone disputes the Bureau's allegations that Townstone engaged in any discriminatory behavior and provided the Bureau with independent, objective evidence demonstrating Townstone's marketing efforts encourage, rather than discourage African-American applicants to apply to Townstone and that Townstone was not an outlier in terms of generating applications from majority African-American neighborhoods in Chicago. In addition, Townstone's marketing efforts targeted the widest possible geographic area, including all of Chicago, which is the polar opposite of redlining.

[2] In Paragraphs 37 and 39, the Bureau recounts statements of Townstone's former president that were made in January 2014 – well beyond the five-year statute of limitations period under ECOA. The Bureau appears to include these dated, and wholly out of context, statements of social commentary made by a former employee as a means to inflame the Court, not because they can be legally actionable.

behavior that is governed by ECOA, and because ECOA and Reg. B cannot constitutionally regulate these alleged behaviors, the Complaint should be dismissed.

## III.   Argument.

### A.   Rule 12(b)(6) Standard.

A complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). While the Court must accept all well-pled factual allegations in the Complaint as true, the factual allegations in the Bureau's Complaint do not raise a right to relief above the speculative level and should be dismissed. *Lake v. Neal,* 585 F.3d 1059, 1060 (7th Cir. 2009).

### B.   Reg. B and the Bureau Improperly Attempt to Expand ECOA's Reach.

#### (1) The Complaint Seeks to Punish Behavior that Is Not Regulated by ECOA.

ECOA does not regulate behavior relating to "*prospective* applicants". Rather, ECOA makes it "unlawful for any creditor to discriminate against any ***applicant*** with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age…" 15 U.S.C. § 1691(a)(1) (emphasis added). ECOA defines the term "applicant" to mean "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). There is no ambiguity in ECOA's reach. Under the heading "Scope of prohibition", ECOA unambiguously prohibits discrimination against an "applicant", or a "person who applies" for credit. 15 U.S.C. § 1691(a). There is no language in this section of ECOA that regulates any behavior relating to "prospective applicants" who have not applied for credit. While ECOA Section 1691 uses the word "applicant" twenty-six (26) times, it never uses the phrase "prospective applicant" or

proscribes any conduct prior to the filing of an application.

ECOA's implementing regulation – Regulation B at 12 C.F.R. Part 1002 ("Reg. B") – purports to expand ECOA's purview to include not just "applicants" but "prospective applicants", *i.e.*, individuals who have not applied and may never apply for credit. Reg. B goes even further by prohibiting "[d]iscouragement" of "prospective applicants":

> (b) Discouragement. A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

12 C.F.R. § 1002.4. The Complaint seeks to further expand ECOA by claiming that ECOA affirmatively mandates specific targeted advertising to certain racial and ethnic groups and affirmative action-like hiring practices. By attempting to extend ECOA's reach beyond the express and unambiguous language of the statute, Reg. B and the Bureau overreach.

When a statue is unambiguous, agency regulations, or statutory interpretations are not entitled to deference. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *Brumfield v. City of Chicago*, 735 F.3d 619, 626 (7th Cir. 2013) ("if the statute is unambiguous on the question, we give effect to the unambiguous statutory language and the inquiry goes no further."). If the statute is ambiguous, "the second step is to determine whether the agency has promulgated a reasonable interpretation of the statute; if so, we defer to that interpretation." *Brumfield*, 735 F.3d at 626.

To the extent Reg. B and/or the Bureau attempt to regulate behavior relating to "prospective applicants", no deference should be given to Reg. B or the Bureau's interpretation. Even if there were some ambiguity regarding the term "applicant," which there is not, there is

no reasonable, or even plausible interpretation of the term "applicant" under ECOA that would include a "prospective applicant," which, as interpreted by the Bureau in the Complaint, can include an individual (or a business, as ECOA is also applicable to business credit) who has not yet started to engage in any "credit transaction" with any creditor. The scope of liability created by an expansion of ECOA to include "prospective applicants" is unreasonable and unworkable.[3] Such an absurd result cannot have been intended by Congress.[4] The Complaint is in excess of the Bureau's statutory jurisdiction, limitations, and authority, contrary to constitutional rights and privileges, and thus, is unlawful and void under the Administrative Procedures Act, 5 U.S.C. § 706 ("APA") and must be dismissed.

(2) Precedent Holds that ECOA Cannot Be Extended to Reach Persons Who Are Not "Applicants," And Thus, the Bureau's Complaint Must Fail.

Multiple circuits, including the Seventh Circuit, have rejected attempts to expand ECOA's reach beyond "applicants," based on the express, unambiguous language used in the statute. The Seventh Circuit refused attempts to expand the definition of "applicant" in *Moran Foods v. Mid-Atlantic Market Development*, 476 F.3d 436 (7th Cir. 2007). There, the Court did not allow an expansion of "applicant" to include guarantors of credit applications, who were included within the version of Reg. B in effect at the time. The Seventh Circuit had no trouble finding this regulatory expansion had no basis in the statute. The Court succinctly stated, "there

---

[3] Similarly, the Bureau's interpretation in Reg. B is not deserving of deference, because the term "discriminate" under ECOA is unambiguous and does not include "discouragement," and it would be unreasonable to interpret it to do so.

[4] In addition, where Reg. B or the Bureau's interpretation of ECOA fails the test for *Chevron* deference, it also fails the test enunciated by the Supreme Court for *Auer* deference to an agency's interpretation of its own rules, because the Bureau's interpretation of Reg. B is unreasonable and creates "unfair surprise". *Kisor v. Wilkie*, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019); *Auer v. Robbins*, 519 U.S. 452 (1997). Similarly, because such interpretations are unreasonable, they are also not deserving of *Skidmore* deference. *See Skidmore v. Swift Co*, 323 U.S. 134 (1944).

is nothing ambiguous about 'applicant' and no way to confuse an applicant with a guarantor." *Id.* at 441. The Court also noted the parade of horribles that would occur if the term "applicant" where stretched to include guarantors, and explained that "the Congress that enacted the Act would have been unlikely to accept" the "vistas of liability" that would accompany such an interpretation. *Id.*

Other circuits that have addressed this issue similarly declined to expand the statutory definition of "applicant". *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 942 (8th Cir. 2014) ("because the text of the ECOA is unambiguous regarding whether a guarantor constitutes an applicant, we will not defer to the Federal Reserve's interpretation of applicant, and we conclude that a guarantor is not protected from marital-status discrimination by the ECOA."), *aff'd*, 136 S. Ct. 1072, 194 L. Ed. 2d 163 (2016); *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1193(11th Cir. 2019) ("we agree with the Seventh and Eighth Circuits that the ordinary meaning of 'applicant' does not encompass a guarantor, we hold that no deference is due section 202.2(e).").

Even the Sixth Circuit, which held that "applicant" included a guarantor, did so only because a guarantor actually appears on a credit application. *RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 385 (6th Cir. 2014) (noting that the definition of "applicant" could "encompass all those who offer promises *in support of an application*—including guarantors, who make formal requests for aid in the form of credit for a third party.") (emphasis added). Thus, even under the Sixth Circuit's logic, "applicant" cannot be stretched to include "prospective applicants" where there is no actual application. *Id.*

Courts in this district routinely require an actual application as a prerequisite to stating an ECOA claim. In *Bartucci v. Wells Fargo Bank N.A.,* No. 14 CV 5302, 2015 WL 6955482, at

*2 (N.D. Ill. Nov. 10, 2015), the court stated that, "[t]o survive a 12(b)(6) motion to dismiss an ECOA claim, Plaintiff must allege that he was an applicant, as defined by the ECOA, and that Defendant treated him less favorably because of his national origin or age*." See also, New Louisiana Holdings, LLC v. Arrowsmith,* No. 11 C 5031, 2012 WL 6061710, at *5 (N.D. Ill. Dec. 4, 2012) ("[t]o state a prima facie claim of discrimination under the ECOA, plaintiffs must allege that they were applicants, as defined by the ECOA".)

The Complaint only makes allegations about Townstone's interactions with prospective applicants who are not governed by ECOA. This attempted expansion of "applicant" is inconsistent with ECOA and case law interpreting the same. Because the term "applicant" is unambiguous and does not include "prospective applicants", this Court should dismiss the Complaint.

(3) <u>ECOA Does Not Mandate Advertising Practices, Demographic Hiring Quotas, or Business Success, so the Complaint Should be Dismissed.</u>

The Complaint should also be dismissed because it attempts to improperly expand ECOA to impose: (1) affirmative requirements to target advertising to specific racial or ethnic groups; (2) a demographic hiring quota; and (3) a requirement to have business success with specific racial or ethnic groups. The Complaint – through Reg. B's "discouragement" definition – seeks to hold Townstone accountable for not affirmatively targeting advertising to African-Americans, (s*ee* Doc. 1, ¶¶41 & 43) and/or for not hiring African-American loan officers. (*Id.*). The Complaint also seeks to interpret ECOA and Reg. B in a manner that would create an affirmative requirement to have a certain amount of business success with certain racial or ethnic demographic groups to avoid a claim of an ECOA violation. (*See* Doc. 1, ¶¶45 - 50).  Nothing in ECOA or Reg. B. creates or supports any such cause of action.

ECOA's scope is limited to regulating behavior between creditors and applicants. To

7

create such new regulatory requirements, the Bureau would be required to engage in a "notice and comment" rulemaking under the APA, 5 U.S.C. § 553; it cannot engage in rulemaking by lawsuit. The Bureau's interpretation is outside of the authority of ECOA, in violation of the APA, and is unlawful and void under the APA.

Here, the Bureau seeks to redefine ECOA obligations on a case by case litigation basis. The result is predictably unpredictable. As it is, no mortgage lender has any certainty regarding how to comply with the Bureau and Reg. B's alleged affirmative obligations. Further, any "business success" test is tantamount to a "disparate impact" theory of discrimination, which is unavailable under ECOA.[5] Congress never intended such a result.

Townstone asks this Court not to allow the Bureau to use ECOA to create such affirmative regulatory requirements that exist nowhere in the statute or Reg. B, and that were not intended by Congress. Such an interpretation of ECOA is not deserving of *Chevron* deference. Townstone asks this Court to dismiss the Bureau's Complaint.

### C.  The Bureau Alleged No Other Violations of Federal Consumer Financial Law, and Thus, Count II Fails.

Count II of the Bureau's Complaint must be dismissed because it is wholly derivative of its ECOA claim, which, as described, is fatally flawed. The Complaint contains no other allegations of violations of "Federal consumer financial law" other than ECOA. Accordingly,

---

[5] The Supreme Court determined that disparate impact theory is available under the Fair Housing Act because it contains results-oriented statutory language. *Texas Dep't of Hous. and Comty. Affairs v. Inclusive Communities Project, Inc.*, 135 S.Ct. 2507, 2518 (2015) ("results-oriented language counsels in favor of recognizing disparate-impact liability"). ECOA's general prohibition against discrimination does not include any such results-oriented language, and thus, the Bureau cannot base its claim on such a comparative analysis of the results of Townstone's lending, which amounts to a "disparate impact" theory. *See also Unsafe at Any Bureaucracy, Part III: The Bureau's Vitiated Legal Case Against Auto-Lenders*, Report Prepared by the Republican Staff of the Committee on Financial Services, U.S. House Of Representatives, Hon. Jeb Hensarling, Chairman, 115th Congress, First Session (Jan. 18, 2017), available at https://republicans-financialservices.house.gov/UploadedFiles/1-18-17_Bureau_Indirect_Auto_Staff_Report_III.pdf. 17_Bureau_Indirect_Auto_Staff_Report_III.pdf.

the Bureau's derivative second count also fails and should be dismissed.

**D.     Even if a Claim of Potential Discouragement of "Prospective Applicants" Existed under ECOA, It Runs Afoul of the First Amendment.**

The First Amendment states that "Congress shall make no law...abridging the freedom of speech". "[S]peech on 'matters of public concern'…is 'at the heart of the First Amendment's protection.'" *Snyder v. Phelps,* 562 U.S. 443, 451 (2011). "Speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Id.*

The statements upon which the Bureau seeks to punish Townstone directly reflect on the public issue of crime in Chicago and the benefits of policing, two very real issues as recognized by commentators and citizens from across the political spectrum. Townstone – a Chicago-based business – is well versed in these issues and has every right to comment upon them. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (recognizing that corporations have free speech rights). Because Townstone's speech is tantamount to political speech, it cannot be suppressed by the government. *Id.* at 319 ("[t]he Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech").

Despite these realities, the Bureau seeks to punish Townstone's exercise of its First Amendment rights by citing violations of ECOA and Reg. B. These efforts must fail because Townstone's political speech cannot be suppressed, and for at least two reasons:  (1) Reg. B and the Bureau's enforcement of it violate the First Amendment because they are content and viewpoint-based prohibitions on speech; and (2) Reg. B and the Bureau's enforcement of it violate the First Amendment because they are constitutionally overbroad and vague as applied and on their face.

(1) <u>Reg. B and the Bureau's Enforcement Violate the First Amendment Because They Are Content and Viewpoint-Based Bans of Free Speech that Are Not Narrowly Tailored to Serve Compelling State Interests.</u>

Reg. B and the Bureau's enforcement of Regulations B impose impermissible content and viewpoint-based restrictions on Townstone's speech. These realities are apparent on the face of Reg. B's prohibition on "discouragement" – "A creditor shall not make any oral or written statement. . . that would discourage". 12 C.F.R. § 1002.4.

Reg. B plainly "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 155 (2015). Content-based laws, like Reg. B "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163. Viewpoint discriminatory laws, like Reg. B, are "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)). The Supreme Court has been particularly emphatic about striking down viewpoint discrimination as Justice Alito explained in his concurring opinion in *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302, 204 L. Ed. 2d 714 (2019) where he stated:

> Viewpoint discrimination is poison to a free society. * * * At a time when free speech is under attack, it is especially important for this Court to remain firm on the principle that the First Amendment does not tolerate viewpoint discrimination. We reaffirm that principle today.

*Id.*

Reg. B is content-based because a violation turns on the content of a statement. Moreover, because Reg. B prevents only "discouragement", the regulation is viewpoint based. Accordingly,

the burden is on the Bureau to demonstrate that Reg. B and its efforts further a compelling interest and are narrowly tailored to achieve that interest. *Reed*, 576 U.S. at 171.

The Complaint makes reference to ECOA's purpose, which is "to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age." 12 C.F.R. § 202.1. In *R.A.V.*, the Supreme Court found that helping "to ensure the basic human rights of members of groups that have historically been subjected to discrimination was a compelling interest, but nevertheless struck St. Paul's cross-burning ordinance. *R.A.V.*, 505 U.S. at 395. While ECOA and Reg. B are well intended, like City of St. Paul in *R.A.V.*, the Bureau cannot demonstrate that this content and viewpoint-based Regulation and the Bureau's further interpretation of the same is narrowly tailored to meet this purpose. In *R.A.V.*, the Court explained, "Let there be no mistake about our belief that burning a cross in someone's front yard is reprehensible. But St. Paul has sufficient means to prevent such behavior without adding the First Amendment to the fire." 505 U.S. at 396.

Even if banning Townstone's speech could be considered furthering ECOA's stated goals, there are more effective, constitutionally permissible ways to achieve that goal. For example, the federal government can and does create programs that assist applicants and prospective applicants in protected classes in obtaining credit.[6]

The Bureau claims Townstone violated ECOA by engaging in political speech and social commentary and by not engaging in targeted advertising to African-Americans in Chicago. There can be no such prohibition on political speech or affirmative obligation to speak under ECOA and Reg. B, because either would flagrantly violate the First Amendment. The Bureau is unable to meet its burden to show that such a requirement that it seeks to enforce in the Complaint would be

---

[6] Reg. B already permits "special purpose credit programs." 12 C.F.R. § 1002.8.

narrowly tailored to its compelling interest. Rather than preventing Townstone from speaking on public issues or requiring Townstone to speak, the Government could embark on an educational program which "promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age." *See, e.g., Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376, 201 L. Ed. 2d 835 (2018) (noting that rather than requiring certain crisis pregnancy centers to place certain notices, California itself "could inform low-income women about its services 'without burdening a speaker with unwanted speech.'") (internal citations omitted). Because the Bureau cannot meet its burden, the Complaint should be dismissed.

> (2) Reg. B and the Bureau's Enforcement Violate the First Amendment Because It Is Unconstitutionally Vague and Overbroad as Applied to Townstone and Facially.

If the federal government intends on regulating speech, including political speech, the Supreme Court mandates precision to assure the appropriate "breathing room" and to prevent "chill" through the doctrines of vagueness and overbreadth. For example, in *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court explained that the First Amendment regulation requires specificity and objectivity, "'[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'" *Id.* at 41 n.48 (internal citations omitted)). This is because "'vague laws may not only 'trap the innocent by not providing fair warning' or foster 'arbitrary and discriminatory application' but also operate to inhibit protected expression by inducing 'citizens to '"steer far wider of the unlawful zone.'" *Id.* (citations omitted).

In the context of First Amendment challenges, "vagueness and overbreadth are two sides of the same coin, and the two sorts of challenges are often conceived of as 'alternative and often

overlapping' theories for relief on the same claim." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012) (internal citations omitted). The void-for-vagueness doctrine protects against any law that "fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (internal citations omitted). The overbreadth doctrine prohibits laws that restrict "a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

In *FEC v. Wisconsin Right to Life*, 551 U.S. 449, 567 (2007) ("*WRTL-II*"), the Supreme Court outlined how courts should safeguard political speech in as-applied challenges. Courts must (i) reject intent-and-effect tests, (ii) focus on the actual words at issue, (iii) restrict burdensome discovery and litigation to prevent "chilling speech through the threat of burdensome litigation," (iv) "eschew 'the open-ended rough-and-tumble of factors, which "invit[es] complex argument in a trial court and a virtually inevitable appeal,'" and (v) "give the benefit of any doubt to protecting rather than stifling speech." 551 U.S. at 469 (internal citations omitted). *WRTL-II* also mandates that if the challenged communication can be interpreted as doing something other than violating the First Amendment it must be so interpreted: "[A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of *no reasonable interpretation other than* as an appeal to vote for or against a specific candidate." *Id.* at 469-70 (emphasis added). Put differently, where the First Amendment is implicated, the tie goes to the speaker, not the censor. *Id.* at 474.

A "statute is facially overbroad only when 'it prohibits a substantial amount of protected speech,' *Id.* and unconstitutionally vague only when its 'deterrent effect on legitimate expression

is ... both real and substantial.' *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60, 96 S. Ct. 2440, 49 L.Ed.2d 310 (1976)." *Ctr. for Individual Freedom,* 697 F.3d at 470.

         i.   <u>Reg. B Violates the First Amendment as Applied to Townstone</u>.

The Bureau's allegations in the Complaint demonstrate Reg. B's vagueness and overbreadth as applied to Townstone. Initially, the Bureau alleges discouragement, in large part, based upon statements made on the Townstone Financial Show. The Bureau reads Townstone's statements and encourages this Court to read those statements in the most hostile way possible to portray them as being about race instead of crime. But the Supreme Court holds that tests restricting political speech must be speech-protective with the benefit of any doubt always going to free speech. Accordingly, if there is another possible reading of the statements, *e.g.*, that they are about crime, they cannot be deemed to be about race or discouraging towards a member of that race. And each statement in the Complaint can be read as about something besides race (let alone "discouraging" activity based on race).

The Complaint specifically criticizes Townstone for comparing the rush received from skydiving to wandering the streets of the southside of Chicago in the middle of the night. This comment is comparing the adrenalin rush many seek out from certain sports or activities, such as skydiving, and the adrenalin rush that would come from the common fear of walking in the dark in an area with a high crime rate. The statement is clearly about crime and not race. And if it can be read as being about something other than race, as it can be, it must be so read.

Similarly, the discussion of weekends being called "Hoodlum Weekend" is clearly about crime and the need for police to keep order. "Hoodlum" typically refers to a "a violent person" or a "member of a group of criminals." *See* https://dictionary.cambridge.org/dictionary/english/hoodlum. The statement's words (which must

be the focus under First Amendment tests) have nothing to do with race, but the real problem of crime in Chicago.

The Complaint then mentions a comment made by Townstone's former employee about preparations that should be made prior to putting a home on the market. Doc. 1, ¶37. Those preparations included changing the light fixtures, painting the house, and a reference to taking down the Confederate flag. Townstone is puzzled how advice to take down the Confederate flag – a symbol that may make African-Americans uncomfortable – is discouraging African-American credit applications.

The Bureau's attempt to read Townstone's statements to be about race when they can and should be, read as being about something else (e.g., crime, potential offensiveness of certain symbols) must be rejected as an overreaching attempt to regulate speech about political issues. Townstone was exercising its right to speak on issues of public concern its show. As the Bureau states in its Complaint, the Townstone Financial Show did not discriminate geographically and was heard across the entire Chicago MSA, including the Southside. As alleged by the Bureau, the Townstone Financial Show was designed to create interest in Townstone and to solicit potential credit applications. It is counterintuitive and contrary to the case law interpreting the First Amendment to interpret Townstone's statements as intending to discourage the same prospective applicants it was attempting to solicit.

A final example of how Reg. B is unconstitutional as applied to Townstone is that Townstone is alleged to have violated ECOA and Reg. B not only for statements it made, but for statements it is alleged not to have made. The Bureau dedicates a heading in its Complaint to **"Targeted Marketing"** and seeks to punish Townstone for "not specifically target[ing] any marketing toward African-Americans in the Chicago MSA." (Doc. 1, ¶¶41-42). Even if ECOA

and Reg. B can be read to require such an affirmative requirement, ECOA and Reg. B provide no answer to the questions of how much or the types of targeted advertising that would be necessary to comply.[7]

Each of these examples demonstrates the vagueness and overbreadth of the Bureau's interpretation of ECOA and Reg. B as applied to Townstone. Because Townstone is wholly unaware of what speech is prohibited or required to comply with its mandates, ECOA and Reg. B are unconstitutional as applied to it and the Bureau's Complaint should be dismissed.

ii.    *Reg. B Violates the First Amendment Because It Is Facially Invalid.*

The "discouragement" provision of Reg. B impacts so much protected speech that it should not be applied to anyone, a facial challenge. Each of the examples above demonstrate the difficulty of applying this definition, not only to Townstone, but to any real world situation.

Similarly, Reg. B's use of the vague terms "or otherwise", "prospective applicants", and "discourage" create additional, significant uncertainty for the regulated person. "[O]r otherwise" is just vague as the terms "relative to" and "advocating the election or defeat" of a candidate in *Buckley. Buckley*, 424 U.S. 1 at 50-55 & n.52. While "advertising" may be clear, adding the descriptor "or otherwise" makes it wholly unclear as to what else is being regulated by Reg. B.

Further, the phrase "prospective applicant" can be interpreted to mean anyone in the world who has access to the "advertising" (even over the internet) "or otherwise" that is the subject of discussion. The enormous and unknown reach of these terms will have a substantial chilling effect on protected speech.

---

[7] In addition, because of limited advertising budgets, such a requirement limits commercial speech meant for general distribution not based on racial or ethnic groups, which is an impermissible limitation on speech as well.

Lastly, the term "discourage" is vague and sweeps in protected content. There are some "prospective applicants" that should be discouraged from applying for a loan because that person does not currently have sufficient credit history. If the "prospective applicant" is a member of a protected class, potential lenders would be disincentivized to give proper advice to or discuss underwriting standards with that person for fear of running afoul of ECOA and Reg. B. And finally, mortgage lenders would be afraid to engage in political discussions either directly to applicants or in public media for fear of "discouraging."

Reg. B is thus both unconstitutionally vague and overbroad because it creates a "deterrent effect on legitimate expression [that] is…both real and substantial," *Young v. American Mini Theatres, Inc*., 427 U.S. at 60, and "prohibits a substantial amount of protected speech, *Williams*, 553 U.S. at 292. For both of these reasons, Reg. B should not be applied to Townstone or similarly situated companies.

### E.     The Bureau's Use of Reg. B Violates the Fifth Amendment.

The due process clause of the Fifth Amendment states that no person shall be "deprived of life, liberty, or property, without due process of law." Indeed, "a fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C.*, 567 U.S. at 253. "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

Reg. B's definition of "discouragement" is unconstitutionally vague and fails to give fair notice of the specific conduct that the Bureau interprets to be forbidden or required in this

Complaint. There is simply no way for any creditor to know what is proscribed by the Bureau under Reg. B. The Bureau seeks to punish Townstone for (1) expressing political speech on a radio show and podcast; (2) not purchasing advertising targeting specific minority groups; (3) not hiring loan officers that include every specific racial or ethnic demographic in their market area; and (4) failing a "business success" test for which the Bureau uses secret metrics (e.g., creditors have no prior notice of the "peer lenders" to which the Bureau will compare them, or the threshold for compliance). These prohibitions are nowhere in ECOA or Reg. B, nor does the Bureau provide any guidance about how to comply with them to avoid enforcement. This is the epitome of vague and a failure of due process. In its attempt to use ECOA and Reg. B to punish Townstone's actions and inactions, the Complaint violates the due process clause as applied to Townstone and Reg. B's "discouragement" provision is unconstitutionally vague on its face.

## IV.     <u>Conclusion</u>

For the foregoing reasons, Townstone asks the Court to dismiss the Complaint with prejudice.

18

Respectfully submitted,

*/s/ Sean P. Burke* _____
Sean P. Burke #6277203
E. Brenda Kpotufe #34084-49
Mattingly Burke Cohen & Biederman LLP
155 E. Market St., Suite 400
Indianapolis, IN 46204
Sean.Burke@mbcblaw.com
Brenda.Kpotufe@mbcblaw.com

*Attorneys for Defendant Townstone
Financial, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2020 a copy of the foregoing was filed electronically. Service of this filing was also made by operation of the Court's CM/ECF system:

Barry Reiferson
Vincent Herman
Michael G. Salemi
Mary E. Olson
Bureau of Consumer Financial Protection
230 S. Dearborn St., Suite 1590
Chicago, IL 60604

And

1700 G Street, NW
Washington, DC 20552

*/s/ Sean P. Burke* _____
Sean P. Burke

1

2015 WL 6955482
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Louis G. Bartucci, Plaintiff,
v.
Wells Fargo Bank N.A., Defendant.

Case No. 14 CV 5302
|
Signed 11/10/2015

**Attorneys and Law Firms**

James Matthew Pfeiffer, Pfeiffer Law Offices, P.C., Wheaton,
IL, for Plaintiff.

Lucia Nale, Charles Michael Woodworth, Michelle V. Dohra,
Mayer Brown LLP, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

Marvin E. Aspen, District Judge

 **\*1** Presently before us is Defendant Wells Fargo Bank N.A.'s
motion to dismiss a seven-count complaint filed by Plaintiff
Louis G. Bartucci. Plaintiff's complaint alleges: (1) violation
of the Fair Housing Act ("FHA"), 42 U.S.C. § 3605; (2)
violation of the Equal Credit Opportunity Act ("ECOA"),
15 U.S.C. § 1691; (3) a claim for declaratory judgment;
(4) violation of 42 U.S.C. § 1983; (5) violation of the
Illinois Consumer Fraud and Deceptive Business Practices
Act ("ICFA"), 815 ILCS 505/2; (6) breach of the Illinois
implied covenant of good faith and fair dealing; and (7) a
claim for promissory estoppel.

Defendant moves to dismiss all counts. For the following
reasons, Defendant's motion to dismiss is granted in part, and
denied in part.

## BACKGROUND

In 2007, Plaintiff obtained a loan from Defendant for the
purchase of a residential property. (Am. Compl. ¶ 6.) From
2008 to 2009, Plaintiff faced financial difficulties meeting his
mortgage payments. (*Id.* ¶ 8.) Plaintiff submitted paperwork
to Defendant to modify his loan under the Home Affordable
Mortgage Program ("HAMP"), a federal program that assists
eligible homeowners who face financial hardships with loan
modifications. (*Id.* ¶ 11.) In 2010, while Plaintiff's application
for a home loan modification was still pending, Defendant
served Plaintiff with a mortgage foreclosure complaint and
summons. (*Id.* ¶ 14.)

From 2010–2013, Plaintiff continued to contact Defendant in
regards to his loan modification request. (*Id.* ¶ 15.) Plaintiff
alleges that during the loan modification process, he disclosed
his national origin on mandatory loan paperwork. (*Id.* ¶ 16.)
In June 2013, Defendant denied Plaintiff's loan modification
request citing his negative net present value. (*Id.* ¶ 18.) Soon
thereafter, Plaintiff appealed Defendant's denial of his HAMP
modification. (*Id.* ¶ 19.)

Plaintiff alleges that he made several telephone calls in
2013 to Defendant's representatives concerning his loan
modification denial, but that Defendant's representatives told
Plaintiff that they could not understand him because of
his accent, that he needed to call back, and then hung up
on him without any warning. (*Id.* ¶ 24.) Further, Plaintiff
alleges that while attending a seminar hosted by Defendant,
a representative told Plaintiff "that he would probably have
had an easier time obtaining a loan modification if he were in
fact much younger." (*Id.* ¶ 25.) On another occasion, Plaintiff
alleges that one of Defendant's representatives expressed that
Plaintiff's age factored into the denial of his loan modification
request. (*Id.* ¶ 47.)

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure
12(b)(6) is meant to test the sufficiency of the complaint,
not to decide the merits of the case. *Gibson v. City of
Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a
motion to dismiss, the complaint must contain a "short and
plain statement of the claim showing that the pleader is
entitled to relief." Fed. R. Civ. P. 8(a)(2). Specifically, "a
complaint must contain sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its face.'"
*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949
(2009) (citing *Bell Atl. Corp. v. Twombly*, 540 U.S. 544,
555, 127 S. Ct. 1955, 1964– 65 (2007)). The plausibility
standard "is not akin to a 'probability requirement,' but it
asks for more than a sheer possibility that a defendant has
acted unlawfully." *Id.* Thus, while a complaint need not

give "detailed factual allegations," it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 540 U.S. at 545, 127 S. Ct. at 1964–65; *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618–19 (7th Cir. 2007). The statement must be sufficient to provide the defendant with "fair notice" of the claim and its basis. *Twombly*, 540 U.S. at 545, 127 S. Ct. at 1964 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99, 102 (1957)); *Tamayo v. Blagojevich,* 526 F.3d 1074, 1083 (7th Cir. 2008). In evaluating a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Thompson v. Ill. Dep't of Prof'l Reg.,* 300 F.3d 750, 753 (7th Cir. 2002).

## ANALYSIS

**\*2** Plaintiff brings both federal and state law claims. We will begin with an analysis of his federal claims.

### I. Plaintiff's Federal Claims

#### A. Count I – Violation of Fair Housing Act 42 U.S.C. § 3605

Plaintiff contends that Defendant violated § 3605 of the FHA, which makes it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms of conditions of such a transaction, because of...national origin...." 42 U.S.C. § 3605(a). A plaintiff may prove a violation of the FHA under two theories: (1) disparate treatment or (2) disparate impact. *Daveri Development Group, LLC v. Village of Wheeling,* 934 F. Supp. 2d 987, 996 (N.D. Ill. March 21, 2013). Here, Plaintiff alleges that Defendant engaged in disparate treatment when it denied him a loan modification based on his national origin. To survive a motion to dismiss, a FHA claim must allege discrimination related to the terms, conditions, privileges, or provisions of services of a dwelling. *Swanson v. Citibank, N.A.,* 614 F.3d 400, 405 (7th Cir. 2010). Specifically, Plaintiff must plead: (1) the type of discrimination he believes occurred; (2) by whom; (3) and when. *Id.* (finding that plaintiff's FHA claim survived a motion to dismiss when she alleged that she was discriminated against based on her race, by a named manager at Citibank, in connection with her efforts in early 2009 to obtain a home-equity loan). Finally, to support his disparate treatment allegation, Plaintiff must allege that he was treated differently than other applicants based on his national origin.

*Wigginton v. Bank of America Corp.,* 770 F.3d 521, 522 (7th Cir. 2014) (granting defendant's motion to dismiss FHA claim because plaintiff failed to allege that someone else had been treated differently).

Plaintiff alleges that Defendant violated § 3605 of the FHA when it denied him a loan modification request because of his national origin. (Am. Compl. ¶ 33.) Plaintiff alleges that Defendant was aware of his national origin based on required disclosures on various loan applications. (Am. Compl. ¶¶ 28–30). Additionally, Plaintiff asserts that in 2013, in connection with his HAMP loan modification request, Defendant's representatives frequently hung up the phone on him claiming that his accent was too difficult to understand. (*Id.* ¶¶ 31–33). We find that Plaintiff's allegations are insufficient to survive a motion to dismiss. Plaintiff fails to identify specific individuals who hung up on him and fails to allege that he was treated differently than other loan applicants.

Accordingly, we grant Defendant's motion to dismiss Count I.

#### B. Count II – Violation of Equal Credit Opportunity Act 15 U.S.C. § 1691

Plaintiff alleges that Defendant violated § 1691 of the ECOA that prohibits creditors from discriminating against any credit applicant "with respect to any aspect of a credit transaction [ +] on the basis of...national origin...or age." 15 U.S.C. § 1691(a). To survive a 12(b)(6) motion to dismiss an ECOA claim, Plaintiff must allege that he was an applicant, as defined by the ECOA [1], and that Defendant treated him less favorably because of his national origin or age. *FirstMerit Bank, N.A. v. Ferrari,* 71 F. Supp. 3d 751, 755 (N.D. Ill. Oct. 16, 2014); *New Louisiana Holdings, LLC v. Arrowsmith,* No. 11 C 5031, 2012 WL 6061710, at *6 (N.D. Ill. Dec. 4, 2012).

**\*3** Similar to a FHA claim, to survive a motion to dismiss on an ECOA claim, Plaintiff must simply present a "plausible scenario,...even though it may not accurately describe what actually occurred." *FirstMerit Bank, N.A.,* 71 F. Supp. 3d at 755 (holding that ECOA complaint survived a motion to dismiss when complaint alleged that Bank refused to finalize settlement because individual was Hispanic and that Bank's loan officer made biased comments about doing business with Hispanics).

Plaintiff alleges that Defendant discriminated against him based on his national origin when Defendant hung up the phone on him and refused to provide him information

concerning his loan because of his accent. Plaintiff alleges that Defendant discriminated against him based on age when Defendant's representatives told him he would have "an easier time obtaining a loan modification if he were in fact much younger." (Am. Compl. ¶ 43, 47.) These allegations present a plausible scenario in which Plaintiff was unlawfully discriminated against based on his national origin or age.

For the reasons stated above, we deny Defendant's motion to dismiss Count II.

### C. Count III – Declaratory Judgment 28 U.S.C. § 2201

Plaintiff seeks a declaratory judgment affirming various rights under HAMP pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, which enables a party "to 'clarif[ +] and settl[e] the legal relations at issue' and to 'terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding." *Amari v. Radio Spirits, Inc.*, 219 F. Supp. 2d 942, 944 (N.D. Ill. Sept. 12, 2002) (citing *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 89 F.2d 746, 747 (7th Cir. 1995)). The purpose of the Act is "to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication, without waiting until his adversary should see fit to begin suit." *Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 577 (7th Cir. 1994) (citing *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1167 (7th Cir. 1969)).

Federal courts may issue declaratory judgments only in cases of "actual controversy." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). A justiciable "actual controversy" exists only when a private right of action is available. *Schilling v. Rogers*, 363 U.S. 666, 677, 80 S. Ct. 1288, 1296 (1960) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S. Ct. 876, 879 (1950)); *see also Villasenor v. American Signature, Inc.*, No. 06 C 5493, 2007 WL 2025739, at *6 (N.D. Ill. July 9, 2007) (finding that where there is no private right of action available for an alleged statutory violation, a declaratory judgment claim cannot proceed).

Plaintiff asks us to enter a declaratory judgment that clarifies the parties' rights and obligations under HAMP; declares that Plaintiff qualifies for a loan modification under HAMP; and declares that Defendant did not properly consider Plaintiff for a loan modification under HAMP. (Am. Compl. ¶ 58.) The Seventh Circuit, however, has held that HAMP contains no private right of action. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012); *Baginski v. JP Morgan*

*Chase Bank N.A.*, No. 11 C 6999, 2012 WL 5989295, at *3 (N.D. Ill. Nov. 29, 2012). Because the Declaratory Judgment Act provides no relief unless there is a justiciable controversy between the parties, and because no private right of action exists under HAMP, we grant Defendant's motion to dismiss Count III [2].

### D. Count IV – Violation of 42 U.S.C. § 1983

**\*4** Plaintiff brings a fourth claim alleging that Defendant violated 42 U.S.C. § 1983. We grant Defendant's motion to dismiss Count IV because Plaintiff has not demonstrated that Defendant was acting under the color of law.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives a person of his federal constitutional or statutory rights shall be liable in an action at law. 42 U.S.C. § 1983. To survive a motion to dismiss a § 1983 claim, a plaintiff must allege facts which show that the defendant deprived him of a right secured by the Constitution or any law of the United States and that the deprivation of that right resulted from the defendant acting *under color of law*. *Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir. 2005) (citing *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1009 (7th Cir. 2000) (emphasis added)). Non-state actors may be found to act under color of state law when they have conspired or acted in concert with state actors to deprive a person of his civil rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S. Ct. 1598, 1605 (1970). In other words, for a private individual to act under color of law, there must be evidence of a concerted effort between a state actor and that private individual. *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998).

Plaintiff alleges that Defendant violated 42 U.S.C. § 1983 when Defendant, acting under the color of law, denied his requests for a loan modification because of his national origin and age. (Am. Compl. ¶ 61.)

Plaintiff boldly alleges that the Defendant "was acting under color of state and federal law when it denied his several requests for loan modification" yet states no facts to support such a claim. (Am. Compl. ¶ 61.) Plaintiff does not assert that Defendant is a state actor or conspired or acted in concert with state actors and therefore does not allege enough facts to support a § 1983 claim. Accordingly, we grant Defendant's motion to dismiss Count IV.

### II. Plaintiff's State Law Claims

### A. Count V – Illinois Consumer Fraud and Deceptive Business Practices Act

Plaintiff alleges that Defendant violated the ICFA, which prohibits: "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception [or] fraud...." ILCS.

The ICFA is "a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 2011 Ill. 2d 403, 416–17, 775 N.E.2d 951, 960 (2002).

The statute provides redress not only for deceptive business practices, but also for business practices that, while not deceptive, are unfair. *Boyd v. U.S. Bank, N.A. ex rel.*, 787 F.Supp. 2d 747, 751 (N.D. Ill. April 12, 2011); *Robinson*, 2011 Ill. 2d at 417, 775 N.E.2d at 960. Plaintiff alleges that Defendant engaged in both deceptive and unfair conduct. (Am. Compl. ¶¶ 70–71).

The correct legal standard for a motion to dismiss under an ICFA claim differs for claims alleging deceptive conduct and claims alleging unfair conduct. *Windy City Metal Fabricators & Supply, Inc., v. CIT Tech. Fin. Servs. Inc.*, 536 F.3d 663, 659 (7th Cir. 2008). Because Plaintiff alleges both deceptive and unfair conduct, we will analysis each component of the claim under the appropriate standard of review.

**\*5** Where Plaintiff alleges deceptive conduct, the heightened 9(b) rule applies. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441(7th Cir. 2011) (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005)); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). To meet this heightened pleading standard, plaintiff must allege the "who, what, when, where and how" of the alleged deceptive conduct. *Pirelli Armstrong Tire*, 631 F.3d at 441. More specifically, the pleader must detail "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *McGann v. PNC Bank, Nat. Ass'n*, No. 11 C 06894, 2013 WL 1337204, at \*5 (N.D. Ill. 2013 March 29, 2013) (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997); *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994)).

To state an ICFA deceptive conduct claim, a plaintiff must allege: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 180, 835 N.E.2d 801, 850 (Ill. 2005). District courts have held that a loan servicer's alleged failure to consider plaintiff's eligibility for a HAMP modification is a sufficient predicate for an ICFA claim. *Boyd*, 787 F. Supp. 2d at 752. Additionally, an ICFA claim does not require "proof of intent to deceive;" rather, a plaintiff only needs to allege "that the defendant committed a deceptive or unfair act and intended that the plaintiff rely on that act." *Wigod*, 673 F.3d at 575. As to damages, courts have held that the inability to fairly negotiate a plan to stay in the home constitutes economic damages under the ICFA. *Boyd*, 787 F. Supp at 754.

Plaintiff alleges that Defendant engaged in deceptive conduct when various representatives assured him that he would qualify for a HAMP loan modification, provided him differing information as to the status of his loan modification, gave him explanations that led to dead-ends and excuses as to why his loan modification was not being processed or granted, and created "nonsensical tasks" for Plaintiff to complete in order to be eligible for a loan modification. (Am. Compl. ¶¶ 68–71.) Plaintiff alleges Defendant had "motive [to make]...and stands to profit," (Am. Compl. ¶ 72), from the deceptive communications and that as a result of his reliance on Defendant's unfair and deceptive conduct, he incurred actual damage in the form of monetary losses and the imminent loss of his property to foreclosure. (*Id.* ¶¶ 83–84). We find that Plaintiff's allegation as to deceptive conduct under the ICFA survive even a heightened 9(b) analysis.

Next we consider Plaintiff's allegations of unfair conduct. Claims alleging unfair conduct under the ICFA are subject to a Rule 8(a) notice pleading standard. *Windy City Metal*, 536 F.3d at 670 ("Because neither fraud nor mistake is an element of unfair conduct under [the ICFA], a cause of action for unfair practices under the [ICFA] need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b).").

For conduct to be considered unfair, we consider three factors: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. *Robinson*,

201 Ill. 2d at 417–18, 775 N.E.2d at 961. The Seventh Circuit has held that a Plaintiff need not use the exact language in his complaint to describe the three factors listed above. *See Windy City Metal Fabricators*, 536 F.3d at 672 (holding that plaintiff adequately stated a claim for relief when complaint alleged conduct that could support the statutory definition of unfairness even if the complaint did not specifically use the words "immoral, unethical, oppressive, or unscrupulous"). Plaintiff does not use the word "unethical," but does allege that Defendant's representatives promised over the telephone that he would receive a loan modification, yet ultimately denied him the request, (Am. Compl. ¶ 71), allegations that, if taken as true, could be considered immoral and unethical.

**\*6** For the reasons stated above, we deny Defendant's motion to dismiss Count V.

### B. Count VI – Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing by "requiring [the Plaintiff] to extend to meet unreasonable expectations, go through obstacles, and falsely promise that he would get a modification after fulfilling all tasks it demanded of him." (Am. Compl. ¶ 78.)

Under Illinois law, the covenant of good faith and fair dealing is not an independent cause of action. *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 687 (7th Cir. 2013); *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 381 (7th Cir. 2000). Instead, the covenant only guides the construction of explicit terms in an agreement. *Id.* Plaintiff has not alleged that he entered into an explicit agreement with Defendant or that a contract between the parties exists. Therefore, Count VII is dismissed.

### C. Count VII – Promissory Estoppel

Plaintiff also brings a state law promissory estoppel claim. Promissory estoppel is an alternative means of obtaining contractual relief under Illinois law. *Wigod*, 673 F.3d at 566. To establish the elements of a promissory estoppel claim, the plaintiff must prove that: (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment. *Id.* Under Illinois law, promissory estoppel is considered an equitable device wherein a contract may be implied where none is found to exist for a lack of consideration. *Dumas v. Infinity Broadcasting Corp.*, 416 F.3d 671, 766 (7th Cir. 2005). A claim for promissory estoppel will succeed only where all the other elements of a contract exist. *Id.* Thus, in order to succeed on his claim of promissory estoppel, Plaintiff must present written evidence of an "unambiguous promise" which, but for the existence of consideration, would constitute an enforceable contractual agreement under Illinois law. *Id.*

Plaintiff does not present written evidence that Defendant unambiguously promised him a loan modification. Instead, to support his claim, Plaintiff simply alleges that Defendant "communicated to [Plaintiff] during several telephone conversations that [he] would be able to qualify for a loan modification under his existing contract." (*Id.* ¶ 81.) This assertion is not specific enough to sufficiently plead that Defendant made an unambiguous promise to Plaintiff.

Therefore, we grant Defendant's motion to dismiss Count VII.

### CONCLUSION

For the aforementioned reasons, we deny Defendant's motion to dismiss Counts II and V and grant Defendant's motion to dismiss Counts I, III, IV, VI and VII. It is so ordered.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 6955482

### Footnotes

1    Defendant does not argue that Plaintiff was not an applicant under the ECOA, so we focus on the second prong of the analysis; whether Plaintiff has sufficiently alleged that he was treated less favorable based on his national origin or age.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2    Plaintiff broadly contends that his claim is not seeking to enforce HAMP but instead is based on civil rights violations, specifically, Defendant's failure to provide an accounting as to how Defendant determined ineligibility under HAMP. (*See* Reply-Mot. to Dismiss at 5–6.) Despite Plaintiff's blanket assertion that he seeks a declaratory judgment based on civil rights violations, Plaintiff cites only to HAMP for both enforcement and relief. (Am. Compl. ¶¶ 56–57.)

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6061710
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

NEW LOUISIANA HOLDINGS, LLC; Fountain
View 215 Tenant LLC; Jackson Manor 1691 Tenant
LLC; Panola 501 GP LLC; Retirement Center
14686 Tenant LLC; Acadian 4005 Tenant LLC;
Lakewood Quarters Rehab 8225 Tenant LLC;
Regency 14333 Tenant LLC; Sherwood 2828
Tenant LLC; Lakewood Quarters Assisted 8585
Tenant LLC; Panola 501 Partners LP; Citiscape
Out Parcel Tenat LLC; Citiscape 5010 Tenant
LLC; St. Charles 1539 Tenant LLC; Woodland
Village 5301 Tenant LLC; Atrium 6555 Tenant
LLC; and Harris Schwartzberg, Plaintiffs,
v.
Richard ARROWSMITH, Defendant.

No. 11 C 5031.
|
Dec. 4, 2012.

***MEMORANDUM OPINION AND ORDER***

RUBEN CASTILLO, District Judge.

**\*1** New Louisiana Holdings, et al,[1] ("Plaintiffs") initiated
this discrimination suit against GE Business Financial
Services, Inc. ("GE Financial"); GE Healthcare Financial
Services, Inc.; General Electric Capital Corporation; CIT
Healthcare LLC ("CIT"); Marathon Structured Finance Fund,
L.P. ("Marathon") (collectively, the "Entity Defendants");
and Richard Arrowsmith ("Arrowsmith") (collectively, with
the Entity Defendants, "Defendants"). The Plaintiffs bring
claims pursuant to 42 U.S.C. § 1981 ("Section 1981") and
the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §
1691 *et seq.* (R. 1, Compl.) Presently before the Court is
Arrowsmith's motion to dismiss pursuant to Federal Rule of
Civil Procedure 12(b)(6),[2] (R. 25, Arrowsmith's Mot.),
and Arrowsmith's amended petition for fees, (R. 58, Arrowsmith's
Am. Pet.)[3] For the reasons discussed herein, the Court grants
Arrowsmith's motion to dismiss and his petition for fees.

**RELEVANT FACTS**

Corporate Plaintiffs consist of a network of nursing facilities
that provide long-term care to seniors. (R. 1, Compl. ¶¶
30, 32 .) Plaintiff Harris Schwartzberg ("Schwartzberg")
and his father, Albert Schwartzberg, who is not a party to
this suit (collectively, the "Schwartzbergs"), are Jewish. (R.
1, Compl. at 2.) According to Plaintiffs, on January 18,
2006, "the Schwartzbergs, through Plaintiff New Louisiana
Holdings, LLC and its affiliates, acquired the right to operate
twelve nursing and assisted living facilities in and around
Louisiana." (*Id.* at 3; *id.* ¶ 39.) The acquisition was effected
through a number of agreements. (*Id.* ¶ 40.) The purchase
of the twelve nursing facilities was financed through a term
loan that was secured by the real estate and physical assets
of the facilities. (*Id.* ¶¶ 40–41.) The borrowers on the term
loan (the "Term Borrowers") are the title holders of the real
estate and physical assets of the twelve nursing facilities and
are not parties to this action. (*Id.* ¶ 41.) The Term Borrowers
lease the twelve nursing facilities to Corporate Plaintiffs.
(*Id* ) In addition to leasing the twelve nursing and assisted
living facilities, the Corporate Plaintiffs also operate the
facilities. (*Id.* ¶ 42.) Merrill Lynch Capital ("Merrill"), CIT,
and Marathon were the original lenders on the Term Loan.
(*Id.* ¶ 40.)

In a separate agreement, the original lenders entered into
a Credit and Security Agreement (the "Operating Loan")
with Corporate Plaintiffs. (*Id.* ¶ 42.) The Operating Loan
contains two credit facilities: (1) a term loan in the original
principal amount of $14 million, and (2) a revolving credit
loan of up to $8 million.[4] (*Id.*) The Operating Loan appointed
an "Administrative Agent" and granted the Administrative
Agent discretion to make decisions regarding the revolving
loan. (*Id.* ¶ 45.) Originally, Merrill acted as the Administrative
Agent. (*Id.* ¶ 49.) In connection with Corporate Plaintiffs'
execution of the Operating Loan, Schwartzberg executed
Guaranty Agreements, (*id.* ¶¶ 17, 143), pursuant to which he
personally guaranteed the payment of the Operating Loan. (R.
29–3, Ex. B, Guaranty Agreement; R. 29–4, Ex. C, Amended
Guaranty Agreement.) In December 2007, GE Financial
acquired Merrill's healthcare financing business and, as a
result, assumed Merrill's position as the Administrative Agent
for the Operating Loan.[5] (*Id.* ¶ 50.) GE Financial designated
Arrowsmith as the individual responsible for administering
the Operating Loan. (*Id.* ¶ 51.)

**\*2** The gravamen of Plaintiffs' complaint is that Arrowsmith's anti-Semitism affected the administration of the Operating Loan, making it difficult for Corporate Plaintiffs to operate effectively. (*Id* at 24.) According to Plaintiffs, "Arrowsmith embarked upon a campaign to harm the Schwartzberg family and to hurt their business after he took over as the loan administrator for the Lenders." (*Id* at 3.) Specifically, Plaintiffs allege that Arrowsmith declared a series of defaults under both the Operating and Term Loans, (*id.* ¶¶ 56–57), dramatically decreased the amount of funds available to be borrowed through the Operating Loan, (*id.* ¶ 59), caused GE Financial to assess financial penalties on Corporate Plaintiffs, (*id.*), and increased the amount of required reserves thereby further reducing the amount of funds available to be borrowed, (*id.* ¶¶ 62, 72–73). Plaintiffs allege that Arrowsmith referred to the Schwartzbergs as "those people," (*id* at 4, ¶ 63), and that he was motivated to take these actions by his anti-Semitism, (*id.* ¶ 66).

## PROCEDURAL HISTORY

On June 2, 2011, Plaintiffs filed a six-count complaint against Defendants in the United States District Court for the Southern District of New York ("the New York Action"), asserting that Arrowsmith had discriminated against them in violation of Section 1981 and the ECOA. (R. 9–1, Ex. 1, S.D.N.Y.Compl.) Plaintiffs also asserted claims for breach of contract, and breach of the covenant of good faith and fair dealing, and they sought an accounting and a declaratory judgment. [6] (*Id* ) Plaintiffs filed their action in the Southern District of New York, even though Corporate Plaintiffs agreed in the Operating Loan to submit to the jurisdiction of state or federal courts in Chicago, Illinois. (R. 29–2, Ex. A, Credit and Security Agreement (Revolving Credit and Term Loan) dated as of January 18, 2006, at 27.) On July 13, 2011, Defendants filed a letter with Judge Naomi Reice Buchwald, the judge in the Southern District of New York to whom Plaintiffs' action was assigned. (R. 9–2, Ex. 2, July 13, 2011 Letter.) In their letter, Defendants requested a pre-motion conference in advance of filing a motion to dismiss and setting forth the anticipated basis of that motion. (*Id.;* R. 9, Defs.' Mot. for Costs Mem. at 3.) On July 21, 2011, Judge Buchwald informed the parties via letter that the court "wish[ed] to afford plaintiffs an opportunity to amend their complaint within twenty (20) days[.]" (R. 9–4, Ex. 4, July 21, 2011 Letter at 2.) Judge Buchwald further stated that "having been afforded the opportunity to amend the complaint in response to the defendants' letter submission, plaintiffs should

not anticipate being granted a further opportunity to amend, should [the court] find that there is merit in some or all of the defendants' arguments ." (*Id.*) On July 25, 2011, Plaintiffs voluntarily dismissed the New York Action pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and did not amend their complaint. Min. Entry, *New Louisiana Holdings, LLC v. GE Business,* No. 11–3773 (July 25, 2011) ECF No. 4. That same day, in compliance with the terms of the Operating Loan, Plaintiffs re-filed their action against Defendants in the Northern District of Illinois. (R.1, Compl.) The case was randomly assigned to this Court.

**\*3** On July 29, 2011, Defendants moved the Court for an order directing Plaintiffs to pay the costs and fees they incurred in defending the suit that Plaintiffs filed in the Southern District of New York, and for an order staying the current action until Plaintiffs did so, pursuant to Rule 41(d) (the "Costs Motion"). (R. 8, Defs.' Mot. at 1–2.) On August 10, 2011, the Court granted Defendants' Costs Motion. (R. 20, Min.Entry.) The Court awarded Defendants those costs incurred in litigating the New York Action that were not necessary or useful to the instant action, and ordered Defendants to file a petition for costs by August 24, 2011. (*Id.;* R. 59–1, Ex. 1, Aug. 10, 2011 Tr. at 8:9–13.) On August 24, 2011, Defendants filed the court-ordered petition. (R 21, Defs.' Pet.)

On November 16, 2011, the Entity Defendants and Plaintiffs filed an agreed motion to dismiss the Entity Defendants, which the Court granted on November 21, 2011. (R. 38, Joint Mot.) The Entity Defendants were thereby dismissed from this action with prejudice and without cost to Plaintiffs or Entity Defendants. (R. 44, Min. Entry; R. 45, Order of Dismissal.) On June 4, 2012, the Court dismissed as moot Defendants' petition for costs on the grounds that the Entity Defendants were no longer parties to the action subject to the agreed order of dismissal. (R. 46, Min.Entry.) On June 19, 2012, Arrowsmith moved for reconsideration of the Court's June 4 minute entry because Defendants' petition for fees was filed on behalf of all Defendants, including Arrowsmith, and therefore the petition for fees was not moot as to him. (R. 47, Arrowsmith's Mot. Recons.; R. 48, Arrowsmith's Mem.) On June 28, 2012, the Court heard the motion to reconsider and ordered Arrowsmith to submit a separate fee petition by July 12, 2012. (R 55, Min. Entry.) On July 12, 2012, Arrowsmith filed an amended fee petition seeking $16,269.00 in attorneys' fees incurred in litigating the New York Action and $13,710.00 incurred in researching, drafting, and filing the Costs Motion, for a total of $29,979.00 in attorneys' fees.

(R 58, Arrowsmith's Am. Pet. at 1–2.) On July 23, 2012, Plaintiffs filed a response brief in opposition to Arrowsmith's amended fee petition. (R. 61, Pl.'s Resp.)

In the instant action, Plaintiffs assert six counts against Defendants. The relevant counts that remain after the dismissal of the Entity Defendants are Counts I, II, and V. [7] In Count I, Corporate Plaintiffs [8] allege that "Defendants intentionally discriminated against [them] on the basis of their racial identity," in violation of Section 1981. (R. 1, Compl. ¶ 16.) In Count II, Corporate Plaintiffs allege that "Defendants discriminated against [them] on the basis of their Jewish identity with respect to the Loan Agreements[,]" through their administration of the Operating Loan, in violation of the ECOA. (Id. ¶ 123.) In Count V, Corporate Plaintiffs allege that "Defendants have acted in bad faith by tailing to disclose their calculations, methodologies, and other bases for" reducing available funds, withholding funds in reserve accounts, and demanding that Corporate Plaintiffs pay excessive loan-related fees, penalties, and expenses, and Corporate Plaintiffs accordingly request an accounting. (Id. ¶ 137.)

**\*4** On September 7, 2011, Arrowsmith filed a motion to dismiss. (R. 25, Arrowsmith's Mot) Arrowsmith argues that Plaintiffs' discrimination claims should be dismissed because Plaintiffs have Med to sufficiently allege that they have a racial or religious identity. (R. 24–1, Defs.' Mem. at 12–16.) On October 11, 2011, Plaintiffs filed a response to Arrowsmith's motion to dismiss, (R. 33, Pls.' Resp.), and on November 1, 2011, Arrowsmith filed a reply in support of his motion, (R. 37, Arrowsmith's Reply).

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). When reviewing a motion to dismiss, the Court accepte as true all of the factual allegations pled in the complaint and draws all reasonable inferences in favor of the nonmoving party. *Id.* Pursuant to Rule 8(a)(2), a complaint must contain "a 'short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir.2008) (quoting Fed.R.Civ.P. 8(a)(2); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). To survive amotion to dismiss, a complaint need not contain

detailed factual allegations, but must contain sufficient factual matter that when accepted as true, states a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp,* 550 U.S. at 570). If the factual allegations are well-pleaded, the Court assumes their veracity and then proceeds to determine whether they plausibly give rise to an entitlement to relief. *Id.* at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for me misconduct alleged." *Id* at 678. "Plausibility" in this context does not imply that the Court "should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.,* 514 F.3d 400, 404 (7th Cir.2010). Rather, to survive a motion to dismiss under Rule 12(b)(6), the "plaintiff must give enough details about the subject matter of the case to present a story that holds together." *Id.* In other words, "the court will ask itself *could* these things have happened, not *did* they happen." *Id.*

## ANALYSIS

### I. Motion to dismiss

In Counts I and II, Corporate Plaintiffs allege that Arrowsmith discriminated against them on the basis of their racial and religious identities—Jewish—in violation of Section 1981 and the ECOA. (R. 1, Compl.¶¶ 116, 123.) Specifically, in Count I, Corporate Plaintiffs allege that they are each "a legal identity that has acquired a racial identity," (*id.* ¶ 115), and that "Defendants intentionally discriminated against [them] on the basis of their racial identity," (*id.* ¶ 116). In Count n, Corporate Plaintiffs allege that they are each "a legal identity that has acquired a racial and religious identity with a minority group," (*id.* ¶ 120), and that "Defendants discriminated against [them] on the basis of their Jewish identity," (*id.* ¶ 123).

**\*5** Arrowsmith argues that Corporate Plaintiffs' Section 1981 and ECOA claims should be dismissed "for failure to allege adequately that Corporate Plaintiffs, the entities asserting the claims, have a racial or religious identity." (R. 29, Arrowsmith's Mem. at 9–10.) According to Arrowsmith, Counts I and II are devoid of any factual support for Corporate Plaintiffs' fundamental allegation that they have a racial or religious identity. (*Id.* at 13.) Arrowsmith argues that Corporate Plaintiffs' "sole allegation mat the entities are members of a protected class is that [they] have acquired a racial and religious identity with a minority group, namely Jews." (*Id.*)

New Louisiana Holdings, LLC v. Arrowsmith, Not Reported in F.Supp.2d (2012)

Furthermore, Arrowsmith argues that "the Complaint contains *no* allegations that Arrowsmith, the only direct actor described in the Complaint, discriminated against Corporate Plaintiffs." (*Id.* at 10.) According to Arrowsmith, the Complaint only alleges that he referred to the Schwartzbergs as "those people," but "there is no support in law or in fact that simply using the plural pronoun 'those' is anti-Semitic." (*Id.*) Additionally, Arrowsmith asserts that "while the discrimination claims are asserted by Corporate Plaintiffs, the conduct alleged to be discriminatory relates only to the Schwartzbergs." (*Id.*) Therefore, Arrowsmith concludes, "without *any* allegation of direct discrimination against Corporate Plaintiffs—the parties asserting the claims—the claims must be dismissed." (*Id.*)

### A. Discrimination claims under Section 1981 and the ECOA

Section 1981 prohibits discrimination in the "mak[ing] and enforc[ment of] contracts." 42 U.S.C. § 1981. Although Section 1981 does not use the term "race," the Supreme Court has construed Section 1981 to "forbid all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis Coll. v. Al–Khazraji,* 481 U.S. 604, 609 (1987) (citing *Runyon v. McCrary,* 427 U.S. 160 (1976).) To state a *prima facie* claim of discrimination under Section 1981, a plaintiff must allege "that (1) he is a member of a racial minority; (2) the defendants had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract." *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 756 (7th Cir.2006) (citing *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996)).

Similarly, the ECOA provides, in relevant part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1); *see also* 12 C.F.R. § 202.4(a). The ECOA creates a private right of action for actual and punitive damages, equitable and declaratory relief, and recovery of costs and attorneys' fees. 15 U.S.C. § 1691e(a)-(d). To state a *prima facie* claim of discrimination under the ECOA, plaintiffs must allege that they were applicants, as defined by the ECOA, and that defendants treated them less favorably because of their race or religion. 16 U.S.C. § 1691(a)(1); 12 C.F.R. § 202.2(n) ("Discriminate against an applicant means to treat an applicant less favorably

than other applicants."); *see also Estate of Davis v. Wells Fargo Bank,* 633 F.3d 529, 538 (7th Cir.2011).

**\*6** Therefore, under both Section 1981 and the ECOA, a plaintiff must allege that he is a member of a protected class who was discriminated against because of his minority identity. The Section 1981 and ECOA counts at issue here are brought solely by Corporate Plaintiffs. (R. 1, Compl.¶¶ 114–124.) Specifically, Corporate Plaintiffs allege that they are members of a protected minority because they have acquired a racial and religious identity with a minority group, namely Jews, and that Arrowsmith discriminated against them because of their Jewish identity. (R. 1, Compl.¶¶ 115–116, 120, 123.)

The threshold question with respect to the Section 1981 and ECOA claims is whether Corporate Plaintiffs have acquired a racial or religious identity. In *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 264 (1977), the Supreme Court stated in dicta that a corporation has no racial identity and therefore cannot be the direct target of discrimination. Since *Village of Arlington Heights,* however, various federal appellate courts have found that under some circumstances "a corporation may have standing to allege racial discrimination." *Triad Assocs., Inc. v. Chi. Hous. Auth.,* 892 F .2d 583, 591 (7th Cir.1989) (remanding where the district court did not properly consider the implications of post-*Village of Arlington Heights* precedent), *overruled on other grounds by Bd. of Cnty. Comm'rs v. Umbehr,* 518 U.S. 668, 673 (1996); *see also Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.,* 368 F.3d 1053, 1058–59 (9th Cir.2004). The Supreme Court itself has recognized that the Courts of Appeals which have considered the issue have concluded that corporations may indeed assert Section 1981 claims. [9] *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 473 n. 1 (2006). Although the Seventh Circuit has not explicitly addressed the question, other federal appellate courts have held that corporate entities may assert Section 1981 claims in limited circumstances. *See Hudson Valley Freedom Theater, Inc. v. Heimbach,* 671 F.2d 702, 705–07 (2d Cir.1982). Circumstances in which a corporate entity may bring suit under Section 1981 include cases in which a corporation is owned entirely by shareholders of a single race, *Amber Pyramid, Inc. v. Buffington Harbor Riverboats, LLC,* 129 Fed. App'x. 292, 294 (7th Cir.2005) (allowing corporation owned by two African–American sisters to maintain a suit under Section 1981), cases in which a corporation has acquired a protected identity pursuant to a government designation, *Thinket Ink Info. Res., Inc.,* 368 F.3d

at 1060 (holding that a corporate plaintiff, which was entirely owned by African–Americans, and certified by the Unites States Small Business Administration as a "minority-owned business," had standing to bring a Section 1981 action), or cases in which a corporation is "established for the very purpose of advancing minority interests," *Hudson Valley,* 671 F.2d at 705. Other circumstances in which corporations have been found to have an imputed racial identity are "when *the owner, majority of shareholders and/or president are members of the specific class that is alleged to have been discriminated against." Contemporary Pers., Inc. v. Godiva Chocolatier, Inc.,* No. 09–00187, 2009 WL 2431461, at *2 (E.D.Pa. Aug. 6, 2009) (collecting cases).

 **\*7** Here, Corporate Plaintiffs summarily allege that they are each legal entities that have "acquired a racial and religious identity with a minority group protected by the safeguards of [Section 1981 and the ECOAL]." (R. 1, Compl.¶¶ 115, 120.) The specific facts that Corporate Plaintiffs rely upon to establish that they have acquired a minority identity are that Harris Schwartzberg is a Jewish–American businessman, (R. 1, Compl. at 2), and that "the Schwartzbergs, through their affiliates, purchased nursing and assisted living facilities with the intent of improving the experience of the residents. Each of the facilities affiliated with the Schwartzbergs are operated through companies, led by qualified, licensed professionals who hire, train, and maintain, the best available nurses, managers, and administrators." (*Id.* ¶¶ 31–32.) Corporate Plaintiffs further allege that Arrowsmith discriminated against them on the basis of their Jewish identity. (*Id.* ¶¶ 116–117, 123.)

These allegations fail to provide the Court with a factual basis for finding that Corporate Plaintiffs have acquired a racial or religious identity. Plaintiffs do not allege any facts regarding the ownership structures of Corporate Plaintiffs, whether Corporate Plaintiffs have been certified as having minority identities by a government institution, or whether Corporate Plaintiffs' purposes are to serve or advance Jewish interests. For instance, the complaint does not identify whether the Schwartzbergs are the sole shareholders or majority shareholders of Corporate Plaintiffs. *See, e.g., Amber Pyramid, Inc.,* 129 Fed. App'x, at 294. Nor does the complaint allege any facts to demonstrate that Corporate Plaintiffs are closely held companies owned and operated by the Schwartzbergs. Instead, the complaint's allegations suggest that Corporate Plaintiffs are not directly owned by members of a protected minority group. For example, the complaint alleges that the Schwartzbergs' affiliates, and

not the Schwartzbergs themselves, purchased nursing and assisted living facilities, (R. 1, Compl.¶ 31.) The complaint also alleges that Corporate Plaintiffs, who operate the nursing and assisted living facilities, are "led by qualified, licensed professionals," (*id.* ¶ 32), and not the Schwartzbergs themselves or anyone else that would qualify as being a member of a protected minority. Indeed, the complaint also suggests that the Schwartzbergs' affiliates purchased the nursing and assisted living facilities with the intent of improving the experience of the facilities' residents, and not with the intent of advancing Jewish interests. (*Id.* ¶ 31.) The allegations set forth by Corporate Plaintiffs are inadequate to establish that they have acquired a racial or religious identity. *See Cholla Ready Mix, Inc. v. Civish,* 382 F.3d 969, 977–78 (9th Cir.2004) (dismissing a Section 1981 claim because the corporate plaintiff failed to allege facts from which the court could infer that the plaintiff had an imputed racial identity); *Prestige Rests. & Entm't Inc. v. Bayside Seafood Rest., Inc.,* No. 09–23128–CIV, 2010 WL 680905, at *1, *7 n. 9 (S.D.Fla. Feb. 23, 2010) (requiring dismissal of Section 1981 claim where the corporate plaintiff simply alleged that it was discriminated against because of its patrons' race because the allegations were not adequate to establish that the plaintiff had assumed a racial identity); *Contemporary Pers., Inc.,* 2009 WL 2431461, at *1–2 (dismissing a Section 1981 action where the complaint failed to allege the race of the corporate plaintiff's owner, president, or shareholders, or the racial make-up of its workforce).

 **\*8** Plaintiffs fail to inform the Court whether Schwartzberg is the direct owner of Corporate Plaintiffs, the sole owner, sole shareholder, or even majority shareholder of Corporate Plaintiffs, and for this reason the cases relied upon by Plaintiffs to support their argument that they have established a racial or religious identity, are distinguishable. *See, e.g., Bains LLC v. Arco Prods. Co.,* 405 F.3d 764, 770 (9th Cir.2005) (corporation acquired an imputed racial identity where corporation was owned entirely by Sikh shareholders); *T & S Serv. Assocs., Inc. v. Crenson,* 505 F.Supp. 938, 943 (D.R.I.1981) (corporate plaintiff properly alleged Section 1981 claim where sole owner of corporate plaintiff was African–American), *vacated and remanded on other grounds,* 666 F.2d 722 (1st Cir.1981); *Shah v. Am. Bottling Co., Inc.,* No. 07–1042, 2008 WL 718435, at *4 (C.D.Ill. Mar. 14, 2008) (corporate plaintiff acquired an "imputed racial social identity" from sole shareholder and operator, who was born in India); *Calderon v. SW Bell Mobile Sys., LLC,* 390 F.Supp.2d 714, 717 (N.D.Ill.2005) (closely held corporation of which a Mexican national was the majority stockholder, as well

as the president, owner and operator, acquired an imputed racial identity and therefore had standing to pursue a Section 1981 action); *Florence Urgent Care v. Healthspan, Inc.,* 445 F.Supp.2d 871, 877 (S.D.Ohio 2006) (corporate plaintiff owned entirely by doctors of Arab descent had a racial identity); *Howard Sec. Servs., Inc. v. Johns Hopkins Hosp.,* 516 F.Supp. 508, 513 (D.Md.1981) (corporation that was wholly owned and operated by African–American plaintiff had a cause of action under Section 1981).

Seeking to avoid this result, Plaintiffs argue that their complaint "alleges that the Schwartzbergs are the ultimate beneficial owners of the [Corporate Plaintiffs], and that [Corporate Plaintiffs] acquired a racial identity from their Jewish owners and managers." (R. 33, Pls.' Mem. at 16.) Plaintiffs assert that "Arrowsmith saw the [Corporate Plaintiffs] as extensions of the Schwartzbergs in all respects, including their Jewish identity, and 'assault [ed]' them because of it" (*Id.*) Furthermore, they contend that "GE Financial's correspondence regarding the Operating Loan repeatedly referred to the 'Schwartzbergs'... thereby demonstrating that Lenders consider the Schwartzbergs and [Corporate Plaintiffs] as one and the same." (*Id.* at 16–17.) According to Plaintiffs, "[t]hese allegations are more than sufficient to establish that [Corporate Plaintiffs] acquired a Jewish identity and have standing to assert claims under Section 1981." (*Id.* at 17 .) As discussed above, however, Plaintiffs' arguments find no support in their complaint. The Court further notes that Plaintiffs never sought leave to amend their complaint throughout the pendency of Defendants' motion to dismiss. The Court reminds Plaintiffs mat they cannot amend their complaint through their opposition briefs. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 448 (7th Cir.2011) (noting the "axiomatic rule that a plaintiff may not amend his complaint in his response brief"); *see also Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984) (a "complaint may not be amended by the briefs in opposition to a motion to dismiss"). Because Corporate Plaintiffs have failed to sufficiently allege in their complaint that they acquired a racial identity, the Court dismisses Counts I and II of their complaint.

### B. Action for an accounting
**\*9** In Count V, asserted against all Defendants, Plaintiffs seek an accounting "regarding the management, administration, and handling of the loans." (R. 1, Compl.¶ 137.) Defendants argue that Plaintiffs released this claim under the terms of the Operating Loan, and that Count V

should therefore be barred. (R. 29, Arrowsmith's Mem. at 21–24; R. 37, Arrowsmith's Reply at 13–14.) An action for an accounting is an action based in contract. 1 Am.Jur.2d Accounts and Accounting § 8 (2012). Therefore, an action on an account must be founded on a contract, either express or implied. *Id.* Because Arrowsmith is not a party to the loans at issue, there is no contractual basis for the requested accounting. Accordingly, the Court dismisses Count V.

## II. Petition for fees
Arrowsmith also petitions the Court for an order directing Plaintiffs to pay him $29,979.00 in fees. (R. 58, Arrowsmith's Am. Pet.) This amount represents the attorneys' fees incurred by Arrowsmith in (1) litigating the New York Action, and (2) researching, drafting, and filing the Costs Motion, which this Court granted on August 10, 2011. (*Id.* at 1.) According to Arrowsmith, his counsel incurred fees of $16,269.00 in researching case law concerning Plaintiffs' two statutory discrimination claims in the Second Circuit and the Southern District of New York, and in drafting a motion to dismiss that relied on that case law in the New York Action. (*Id.* at 2.) Arrowsmith asserts that his counsel would not have incurred these expenses if Plaintiffs had filed the action in the Northern District of Illinois in the first instance. (*Id.*) With respect to the Costs Motion, Arrowsmith asserts that his counsel incurred fees of $13,710.00 for researching, drafting, and filing the Costs Motion that would not have been necessary had Plaintiffs not filed their action in New York, voluntarily dismissed that action, and then re-filed their action in the Northern District of Illinois. (*Id.* at 2.) According to Arrowsmith, the fees his counsel seek "relate to him individually or alternatively, to all Defendants collectively (including him), and thus, would have been incurred had Mr. Arrowsmith been the only defendant in the action." (*Id.* at 3.)

Plaintiffs present several arguments to support their position that Arrowsmith is not entitled to attorneys' fees. (R. 61, Pls.' Resp. at 4–13.) First, Plaintiffs argue that Arrowsmith has not shown, as a matter of law, that he is entitled to attorneys' fees under *Esposito v. Piatrowski,* 223 F.3d 497, 501 (7th Cir.2000). (*Id.* at 4, 6–9.) Second, Plaintiffs argue that Arrowsmith has not established that he has incurred any attorneys' fees. (*Id.* at 4, 9–10.) Plaintiffs also argue that Arrowsmith has not established that the attorneys' fees he seeks to recover are reasonable, (*id.* at 4, 11), nor has he demonstrated that all of the work performed by the Fulbright and Jenner attorneys was unnecessary or inapplicable to litigating the instant suit in the Northern District of Illinois, (*id.* at 4, 12–13). Alternatively, Plaintiffs request that the

Court grant them leave to take limited discovery to determine whether Arrowsmith incurred any of the attorneys' fees sought and, if so, the amount of such fees. (*Id.* at 4.) For the reasons discussed below, the Court awards Arrowsmith $28,518.05 in fees.

**A. Legal basis for awarding attorneys' fees**

**\*10** Federal courts generally may not provide an award of attorneys' fees absent a statute or contractual provision authorizing such an award. *Esposito v. Piatrowski,* 223 F.3d 497, 500 (7th Cir.2000); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257 (1975). Here, Arrowsmith seeks the recovery of legal fees pursuant to Rule 41(d). Plaintiffs attempt to block Arrowsmith from recovering attorneys' fees and argue that, as a matter of law, Arrowsmith is not entitled to recovery any attorneys' fees as part of the "costs" that Rule 41(d) contemplates. (R. 61, Pls.' Resp. at 6–10.)

Rule 41(d) states, in relevant part: "If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court ... may order the plaintiff to pay all or part of the costs of that previous action[.]" Fed.R.Civ.P. 41(d). Rule 41(d) refers to "costs," but it fails to specify whether that term includes attorneys' fees. The Advisory Committee Notes also fail to address the question. *See Esposito,* 223 F.3d at 501 (noting that the Advisory Committee Notes do not indicate whether such costs include attorneys' fees). Recognizing this ambiguity, the Seventh Circuit reasoned in *Esposito* that "[b]ecause Rule 41(d) does not refer to costs any differently than does 18 U.S.C. § 1920, which provides the statutory specification of allowable costs, fees may be included as costs only where the underlying statute so provides." *Id.* Therefore, the Seventh Circuit held "that a party may recover reasonable attorneys' fees as part of its 'costs' under Rule 41(d) only where the underlying statute defines costs to include attorneys' fees." *Id.* Thus, Plaintiffs argue, that under *Esposito,* "courts may only award attorneys as 'costs' under Rule 41(d) when the underlying statute would have allowed for the recovery of attorneys' fees." (R. 61, Pls.' Resp. at 6) (citing *Esposito,* 223 F.3d at 501).

Plaintiffs' argument on this point is without merit. Plaintiffs fail to recognize that district courts have the inherent authority to order an award of attorneys' fees under certain circumstances, such as where a party has acted in bad faith or inflicted unnecessary costs on the court or the defendants. *See Esposito,* 223 F.3d at 500 n. 5 ("Attorneys' fees may

be awarded by order of the court under certain factual circumstances ... One such example is the courts' inherent authority to order a party acting in bad faith to pay for the attorneys' fees of its adversary.") (citing *F.D. Rich Co., Inc. v. United States ex rel. Indus. Lumber Co., Inc.,* 417 U.S. 116 (1974)); *Chambers v. Nasco, Inc.,* 501 U.S. 32, 45–46 (1991) ("a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons") (citations and internal quotation marks omitted); *Mañez v. Bridgestone Firestone N. Am. Tire, LLC,* 533 F.3d 578, 591 (7th Cir.2008) (noting that "courts retain inherent power to punish the full range of litigation abuses," which includes punishing a party "for an act that inflict[s] needless costs on the court and the defendants"). *Esposito* did not change the long-standing rule establishing the inherent power of district courts to award attorneys' fees. Indeed, after reaching its holding in *Esposito,* the Seventh Circuit clarified that "attorneys' fees are not a recoverable cost of litigation under Rule 41(d) unless the substantive statute which formed the basis of the original suit allows for the recovery of such fees *(or unless such fees are specifically ordered by the court)."* 223 F.3d at 501 (emphasis added). Accordingly, contrary to Plaintiffs' argument, the Court possesses the inherent authority to specifically order attorneys' fees under Rule 41(d). Here, the Court previously ordered the imposition of such fees on Plaintiffs when it granted Defendants' Costs Motion and requested that Defendants submit a petition for costs. (R. 59–1, Ex. 1, Aug. 10, 2011 Tr. at 8:9–15; R. 20, Min. Entry.) In so doing, it recognized that Plaintiffs had unnecessarily filed their complaint in the Southern District of New York. (R. 59–1, Ex. 1, Aug. 10, 2011 Tr. at 10:15–17.) The Court's order is consistent with *Esposito,* 223 F.3d at 501, which recognized that "awarding [attorneys'] fees as part of costs advances the purpose of Rule 41(d), which is to deter forum shopping and vexatious litigation."

**B. Amount of attorneys' fees**

**\*11** Having found that Rule 41(d) is applicable, and that the Court may impose attorneys' fees on Plaintiffs, the Court next determines the appropriate amount of the award of attorneys' fees. Failing to cite any case law, Plaintiffs argue that Arrowsmith has failed to establish that he incurred any attorneys' fees in connection with the voluntary dismissal of the New York Action. (R. 61, Pls.' Resp. at 4, 9–10.) According to Plaintiffs, "it appears that the Entity Defendants incurred and paid all of the legal fees that Arrowsmith now seeks to recover." (*Id* at 9.) Plaintiffs' argument is based on nothing more than mere speculation. As Arrowsmith points out, the fees his counsel seek "relate to him individually or

alternatively, to all Defendants collectively (including him), and thus, would have been incurred had Mr. Arrowsmith been the only defendant in the action." (R. 58, Arrowsmith's Am. Pet. at 3.) District courts have inherent power "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers,* 501 U.S. at 4445. Such sanctions are appropriate where a litigant has "abused the judicial process or otherwise conducted litigation in bad faith." *Salmeron v. Enter. Recovery Sys., Inc.,* 579 F.3d 787, 793 (7th Cir.2009) (citing *Maynard v. Nygren,* 332 F.3d 462, 470–71 (7th Cir.2003)). Here, the Court has already determined that Plaintiffs abused the judicial process, and pursuant to its inherent authority, the Court will fashion an appropriate sanction.

Where a case is voluntarily dismissed and re-filed by the plaintiff, attorneys' fees are awarded to the defendant to compensate for the unnecessary expenses incurred by the litigation. *Cauley v. Wilson,* 754 F.2d 769, 772 (7th Cir.1985). Generally, courts "should not impose any costs associated with work that will still be useful to the defendants in the instant litigation." *Oteng v. Golden Star Res., Ltd.,* 615 F.Supp.2d 1228, 1240 (D.Colo.2009) (citing *Esquivel v. Arau,* 913 F.Supp. 1382, 1386 (C.D.Cal.1996)); *see also Westlands Water Dist. v. United States,* 100 F.3d 94, 97 (9th Cir.1996) (remanding to the district court to consider, *inter alia,* whether to condition a voluntary dismissal under Rule 41(a)(2) on the payment of costs and attorney fees, and instructing the district court that "if [it] decides it should condition dismissal on the payment of costs and attorney fees, the defendants should only be awarded attorney fees for work which cannot be used in any future litigation on these claims.") (citing *Koch v. Hankins,* 8 F.3d 650, 652 (9th Cir.1993)); *Copeland v. Hussmann Corp.,* 462 F.Supp.2d 1012, 1024 (E.D.Mo.2006) (allowing award of "attorneys' fees for any work done in the previously dismissed case that is useless in the present case").

### 1. Unnecessary work related to the New York Action

Prior to the dismissal of the New York Action, Arrowsmith asserts that his counsel, from the law firm of Fulbright & Jaworski L.L.P. ("Fulbright"), incurred $16,093.00 in attorneys' fees for defending the New York Action. (R. 59, Arrowsmith's Mem. at 3.) Arrowsmith seeks attorneys' fees for 57 billable hours spent by his attorneys researching the two anti-discrimination statutes at issue and drafting a motion to dismiss the New York Action. (*Id* at 5.) Arrowsmith asserts that Sarah O'Connell, a senior associate at Fulbright, who graduated law school in 2002 and bills her clients at an hourly rate of $382.00, expended 6.5 hours on the New York

Action. (*Id.* at 4–5.) Additionally, Arrowsmith claims that Jami Vibbert, a Fulbright associate who graduated law school in 2007 and bills her clients at an hourly rate of $273.00, expended 50.5 hours on the New York Action. (*Id.*) To support his fee petition, Arrowsmith submitted Fulbright's invoices for the work its associates completed while representing Arrowsmith in the New York Action. (R. 59–2, Ex. 2, Invoice No. 11196925.)

**\*12** After reviewing Fulbright's invoices, the Court first notes that Arrowsmith has failed to precisely indicate the billing entries for which he is seeking attorneys' fees. Additionally, none of the billing entries indicate that the research conducted by O'Connell and Vibbert on the two anti-discrimination statutes focused solely on the Second Circuit or the federal district courts in New York, and the Southern District of New York in particular. Indeed, Arrowsmith relied on at least one case from the Second Circuit in drafting their motion to dismiss in this case, in addition to case law from other Circuit Courts of Appeals, which suggests that Arrowsmiths' research of the Second Circuit precedent was not entirely useless. The Court therefore has difficulty finding that all of the defense's initial research for the New York action was unnecessary and not useful in defending the instant action. That said, O'ConneU and Vibbert spent time meeting to discuss the research and to strategize on the motion to dismiss in the New York Action. The strategy employed by the defense in the New York Action is likely to have been materially different than the strategy employed by the defense in the instant action as the motion to dismiss had to be filed in a different judicial venue. Therefore, the Court will allow for the recovery of those billing entries indicating that O'ConneU and Vibbert met and conferred regarding the statutory discrimination arguments to be made in the motion to dismiss in the New York Action. Specifically, the Court allows Arrowsmith to recover attorneys' fees for two meetings that O'Connell and Vibbert held on June 13 and June 14, for .20 hours and 1.4 hours respectively, for a total of $1,048.00.

Vibbert also spent time researching pleading standards and motions to dismiss pursuant to Rule 12(b)(6). Based on the Court's experience with such matters, this research is likely to have been focused almost exclusively on Second Circuit precedent. Therefore, although the Court will not aUow Arrowsmith to recover fees for time spent generaUy researching the two anti-discrimination statutes that Plaintiffs allege Arrowsmith violated, the Court will allow Arrowsmith to recover one-half of the time for those billing entries

constituting Vibber's research of pleading standards and Rule 12(b)(6) cases. Specifically, the Court allows Arrowsmith to recover for 1.3 hours of research conducted on June 14, 1.2 hours of research conducted on June 16, 1.55 hours of research conducted on June 20, and 2.6 hours of research conducted on June 21, for a total of $1,815.45.

In addition, both O'Connell and Vibbert spent time drafting a motion to dismiss intended to be filed in the Southern District of New York, and although it is plausible that they could have made substantially similar arguments before this Court as those contained in their motion to dismiss for the Southern District of New York, it is unlikely that they could have replicated that work verbatim into a new document to be filed before this Court. The Court will therefore allow Arrowsmith to recover one-half of the billing entries representing the time that O'Connell and Vibbert spent drafting or revising the motion to dismiss. Specifically, the Court allows Arrowsmith to recover 3.9 hours for July 14, 2.7 hours for July 15, 3.9 hours for July 18, and 4.8 hours for July 19 for Vibbert's work. Additionally, the Court allows Arrowsmith to recover 1.7 hours for July 18, 1.85 hours for July 19, and 1.15 hours for July 20 for O'Connell's work. Therefore, Arrowsmith is entitled to recover $11,944.60 for the time that either O'Connell or Vibbert spent drafting and revising a motion to dismiss that was intended to be filed in the Southern District of New York, but due to the change in venue had to be filed in the Northern District of Illinois.

*13 In the exercise of its discretion, the Court finds that Arrowsmith may recover $14,808.05 in attorneys' fees for work that the Court determines was unnecessary and not useful to the instant action.

### 2. Unnecessary work related to the Costs Motion

In addition, Arrowsmith argues that he should also be compensated for expenses incurred in researching, drafting, and filing the Costs Motion. (R. 58, Arrowsmith's Mot. at 2.) Following the Plaintiffs' voluntary dismissal of the New York Action, Arrowsmith incurred $13,710.00 in attorneys' fees for work performed by Fulbright attorneys and attorneys from the law firm of Jenner & Block L.L.P. ("Jenner") on the Costs Motion. (R. 59, Arrowsmith's Mem. at 3.) Specifically, Arrowsmith asserts that Fulbright and Jenner attorneys spent a total of 38.4 billable hours on the Costs Motion. (Id at 6.) According to Arrowsmith, Linda Addison, a partner at Fulbright who bills her clients at an hourly rate of $634.00, spent 4.2 billable hours on the Costs Motion. (Id. at 4, 6.) Arrowsmith asserts that O'Connell spent 11.8 billable hours

working on the Costs Motion and that Vibbert billed 16.8 hours for her work on the Costs Motion. (Id. at 6.) Arrowsmith also states that Barbara Steiner, another partner at Jenner who bills her clients at an hourly rate of $630.00, spent .6 billable hours on the Costs Motion. (Id at 4, 6.) David Saunders, an associate at Jenner who graduated from law school in 2007 and bills his clients at an hourly rate of $315.00, billed 5 hours on the Costs Motion. (Id. at 5–6.)

"The Seventh Circuit teaches that attorney's fees incurred in litigating and establishing an attorney's entitlement to fees are generally compensable." Holmstrom v. Metro. Life Ins., Co., No. 07–CV–6044, 2011 WL 2149353, at *8 (N.D.Ill. May 31, 2011) (citing Bond v. Stanton, 630 F.2d 1231, 1235 (7th Cir.1980)). In their response to Arrowsmith's amended petition for fees, Plaintiffs do not contest the amount of fees sought for the Costs Motion. (R. 61, Pls.' Resp.)

The Court finds that the fees incurred by Arrowsmith in bringing the Costs Motion are appropriate and that they help further the purpose of Rule 41(d), which is, in part, to prevent vexatious litigation. See Esposito, 223 F.3d at 501. Had Plaintiffs originally filed this action in this District, or had Plaintiffs not chosen to re-file this action, Arrowsmith would not have had to expend time drafting the Costs Motion. Because the invoices support his request, in the exercise of its discretion, the Court grants Arrowsmith the attorneys' fees for the time spent in preparing, researching, drafting, and filing the Costs Motion. Thus, the Court awards Arrowsmith the full $13,710.00 in attorneys' fees associated with bringing the Costs Motion. Therefore, in the exercise of its discretion, the Court concludes that Arrowsmith is entitled to recover from Plaintiffs a total of $28,518.05 in costs pursuant to Rule 41(d). Since the Court grants Arrowsmith's amended petition for fees, Plaintiffs' alternative request for limited discovery is denied.

### CONCLUSION

*14 For the foregoing reasons, the Court GRANTS Arrowsmith's motion to dismiss (R. 25), GRANTS Arrowsmith's motion to reconsider (R 47), and GRANTS Arrowsmith his amended petition for fees (R. 58), in the amount of $28,518.05. The Court directs the Clerk to enter a final judgment in favor of defendant Arrowsmith and against Plaintiffs.

New Louisiana Holdings, LLC v. Arrowsmith, Not Reported in F.Supp.2d (2012)

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6061710

## Footnotes

1    Plaintiffs include the following entities and individual: New Louisiana Holdings, LLC; Fountain View 215 Tenant LLC; Jackson Manor 1691 Tenant LLC; Panola 501 GP LLC; Retirement Center 14686 Tenant LLC; Acadian 4005 Tenant LLC; Lakewood Quarters Rehab 8225 Tenant LLC; Regency 14333 Tenant LLC; Sherwood 2828 Tenant LLC; Lakewood Quarters Assisted 8585 Tenant LLC; Panola 501 Partners LP; Citiscape Out Parcel Tenant LLC; Citiscape 5010 Tenant LLC; St Charles 1539 Tenant LLC; Woodland Village 5301 Tenant LLC; Atrium 6555 Tenant LLC (collectively, "Corporate Plaintiffs"); and Harris Schwartzberg.

2    As explained below, because the Entity Defendants have been dismissed, Arrowsmith is the only remaining defendant. The Court thus refers to Defendants' motion to dismiss as Arrowsmith's motion.

3    Also before the Court is Arrowsmith's Motion to Reconsider (R. 47), the Court's June 4, 2012 Minute Entry (R. 46), denying as moot Defendants' Petition for Fees on the basis of an agreed order of dismissal as to the Entity Defendante. Because the agreed order of dismissal only applied to the Entity Defendants, and not to Arrowsmith, and because the Petition for Fees was filed on behalf of all Defendants, including Arrowsmith, the Court grants Arrowsmith's Motion to Reconsider.

4    The limitations on what the Court may consider on a motion to dismiss pursuant to Rule 12(b)(6) are attenuated by Rule 10(c) insofar as "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" may all be considered by the Court without converting a motion to dismiss into amotion for summary judgment. *Geinosky v. City of Chi.,* 675 F.3d 743,745 n. 1 (7th Cir.2012) (citing Fed.R.Civ.P. 10(c)). Although Plaintiffs failed to attach a copy of the Operating Loan to their complaint, Defendants attached the agreement to their motion to dismiss. (R. 29– 1, Ex. A, Credit and Security Agreement (Revolving Credit and Term Loan) dated as of January 18, 2006.) Documents that defendants attach to a motion to dismiss will be considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. *Venture Assocs. Corp. v.. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993) ("[A] defendant may introduce certain pertinent documents if the plaintiff failed to do so. Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") (internal citations omitted) (collecting cases); *see also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1327 (3d ed.2012). Here, because the complaint repeatedly refers to the Operating Loan, and because the Operating Loan is central to Plaintiffs' claims, the Court considers the Operating Loan submitted by Defendants to be part of the pleadings.

5    The current lenders are GE Financial, CIT, and Marathon (the "Lenders"). (R. 1, Compl.¶ 50.)

6    The complaint in the New York Action contains the same causes of action and is substantially the same as the complaint filed in the instant action. (*See* R. 9–6, Ex. 6, Redline.)

7    Counts III and IV are asserted against the Lenders, which consist of GE Financial, CIT, and Marathon, and so those claims are no longer viable because they are only alleged against defendants who are no longer parties to this suit (R. 1, Compl. ¶¶ 125–135; R. 45, Order of Dismissal.) In Count VI, Schwartzberg sought a declaratory judgment "as to the rights and other legal relations of Harris Schwartzberg and Lenders." (*Id.* ¶ 142.) Because a controversy no longer exists between Schwartzberg and the Lenders, the Court finds the request contained in Count VI moot.

**WESTLAW**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    10

**New Louisiana Holdings, LLC v. Arrowsmith, Not Reported in F.Supp.2d (2012)**

8      According to the complaint, each of the Corporate Plaintiffs is also a borrower under the Operating Loan. (R. 1, Compl. ¶¶ 1–16, 42.) Accordingly, the complaint refers to Corporate Plaintiffs as Operating Borrowers. (*See, e.g., id.* ¶ 42.)

9      Both Plaintiffs and Arrowsmith agree that the analysis of whether Plaintiffs' complaint sufficiently alleges that Arrowsmith discriminated against them on the basis of race and/or religion for purposes of Section 1981 is equally applicable to the ECOA claim. (R. 33, Pls.' Mem. at 22 n. 43; R. 24–1, Defs.' Mem. at 14 n. 8.)

---

**End of Document**                             © 2020 Thomson Reuters. No claim to original U.S. Government Works.