IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) ) ) | Case No. 1:20-cv-04176 |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) ) | |
| Townstone Financial, Inc. and Barry Sturner, | ) ) ) ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT**

The Bureau of Consumer Financial Protection ("Bureau") files this Amended Complaint against Townstone Financial, Inc. ("Townstone") and Barry Sturner ("Sturner") and alleges as follows.

**INTRODUCTION**

1. The Bureau brings this action under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f; the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5536(a)(1)(A); and Federal Debt Collection Procedure, 28 U.S.C. §§ 3301–3308.

2. ECOA and its implementing regulation, Regulation B, 12 C.F.R. pt. 1002, make it illegal for a creditor to discriminate against an applicant in any aspect of

1

a credit transaction on the basis of, among other characteristics, race, color, or national origin. 15 U.S.C. § 1691(a); 12 C.F.R. § 1002.4(a). ECOA and Regulation B prohibit any acts or practices that would discourage on a prohibited basis an applicant or prospective applicant from applying for credit. 15 U.S.C. § 1691(a); 12 C.F.R. § 1002.4(b); 12 C.F.R. pt. 1002, Supp. I, 1002.4(b)(1) ("In keeping with the purpose of the Act—to promote the availability of credit on a nondiscriminatory basis—§ 1002.4(b) covers acts or practices directed at prospective applicants that could discourage a reasonable person, on a prohibited basis, from applying for credit.").

3. Regulation B also provides that "prohibited basis" in ECOA includes "the characteristics of individuals with whom an applicant is affiliated or with whom the applicant associates," such as "the race of other residents in the neighborhood where the property offered as collateral is located." 12 C.F.R. pt. 202, Supp. I, 202.2(2)(z).

4. Since January 1, 2014, Townstone has been a non-depository mortgage lender or mortgage broker exclusively engaged in mortgage lending.[1] Townstone has acted as a correspondent lender for the majority of its business and also has brokered Federal Housing Administration and Veterans Administration home loans. From at least 2014 through 2017, Townstone ranked in the top 10% of lenders that drew

---

[1] For purposes of this Complaint, "mortgage loans" refers to all loans that Townstone and other creditors were required to report under the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801–2810, and "mortgage lending" refers to providing those loans.

2

applications from the Chicago-Naperville-Elgin Metropolitan Statistical Area ("Chicago MSA").

5. Since at least 2014, Townstone has engaged in unlawful discrimination, including redlining and acts or practices that would discourage prospective applicants, on the basis of race, from applying for credit in the Chicago MSA.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1); presents a federal question, 28 U.S.C. § 1331; and is brought by an agency of the United States, 28 U.S.C. § 1345.

7. Venue is proper in this district because both Townstone and Sturner are located, reside, and do business in this district. 12 U.S.C. § 5564(f).

8. The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, including the authority to enforce the CFPA and ECOA. 12 U.S.C. §§ 5564(a)–(b), 5481(12)(D), (14).

9. Townstone is incorporated in the State of Illinois and headquartered in Chicago. Townstone operates in five states—Illinois, Indiana, Michigan, Wisconsin, and Florida—with most of its mortgage lending and brokering in the Chicago MSA.

10. Townstone is subject to the federal laws governing fair lending, including ECOA and its implementing regulation, Regulation B.

11. Townstone is a "creditor" under ECOA. 15 U.S.C. § 1691a(e).

12. Townstone is a "covered person" under the CFPA. 12 U.S.C. § 5481(6)(A) & (15)(A)(i).

13. Sturner is an Illinois resident and Townstone's cofounder, sole owner, and sole director. Sturner serves as Townstone's President and Chief Executive Officer, and he is also a loan officer. Sturner is a first transferee of all or almost all of Townstone's liquid assets.

## FACTUAL ALLEGATIONS

14. Townstone has acted to meet the credit needs of majority-white neighborhoods in the Chicago MSA while avoiding the credit needs of majority- and high-African-American neighborhoods.

15. A majority-African-American neighborhood or area is a census tract in which more than 50% of the residents are identified in the U.S. Census as either Black or African American. A high-African-American neighborhood or area is a census tract in which more than 80% of the residents are identified in the U.S. Census as either Black or African American.

16. The Chicago MSA comprises 14 counties in three states: Cook County, DuPage County, Grundy County, Kendall County, McHenry County, Will County, DeKalb County, Kane County, and Lake County, Illinois; Jasper County, Lake County, Newton County, and Porter County, Indiana; and Kenosha County, Wisconsin.

17. As of 2010, the Chicago MSA included about 1.6 million African-American residents.

18. As of 2010, the Chicago MSA's population was 9,461,105, of which 17% were African Americans. According to the U.S. Census Bureau, 30.1% of the residents of the City of Chicago were African Americans.

19. As of 2010, 18.7% of the Chicago MSA's 2,215 census tracts were majority-African-American, and 13.8% were high-African-American.

20. From 2014 through 2017, Townstone drew about 2,700 mortgage-loan applications from and originated about 1,800 mortgage loans in the Chicago MSA.

21. From 2014 through 2017, Townstone drew over 90% of its mortgage-loan applications for properties within the Chicago MSA.

**Townstone's Marketing**

22. Since at least 2014, Townstone has engaged in acts or practices directed at prospective applicants that, together and separately, would discourage prospective applicants, on the basis of race, from seeking or obtaining credit for properties within the Chicago MSA.

23. Townstone's business model has been to market and draw mortgage-loan applications primarily through radio advertising.

24. Starting at least as early as 2014, Townstone has marketed through "The Townstone Financial Show," its own radio show and podcast.

5

25. Townstone has generated up to 90% of its mortgage-loan applications from radio advertising, including through the Townstone Financial Show.

26. The Townstone Financial Show is a long-form commercial advertisement, which Townstone refers to as an infomercial, that also includes shorter advertisements for Townstone during commercial breaks. Since 2014, the Townstone Financial Show hosts have discussed mortgage-related issues on the show and have taken questions from prospective applicants. The hosts have regularly referred to their work at Townstone and promoted the benefits that prospective applicants might expect from applying for mortgage loans from Townstone.

27. Since about January 2015, the Townstone Financial Show has been co-hosted by Sturner and another senior loan officer.

28. Townstone's website and the Townstone Financial Show have described the hosts of the Townstone Financial Show as "Chicago real-estate experts."

29. Starting at least as early as 2014, the Townstone Financial Show was conducted weekly on AM radio and reached the entire Chicago MSA. A weekly podcast of the radio show has been available exclusively online. Townstone Financial Show radio broadcasts and podcasts have been available on the Townstone website. Both the radio show and podcast have been streamed on Facebook Live and then advertised on Facebook, Twitter, and LinkedIn.

30. The hosts have typically started the Townstone Financial Show podcasts by stating Townstone's licensing information, including that Townstone is a licensed

mortgage broker/banker, NMLS number 136639, Illinois residential-mortgage licensee number 6629.

32. The Townstone Financial Show radio broadcasts have typically included an introductory statement such as: "This show is brought to you by Townstone Financial, the home-loan expert since 2002. Townstone Financial is an Indiana, Michigan, Wisconsin, Florida, Illinois mortgage licensee 6629, NMLS 136639. Remember no one values your mortgage business more than Townstone Financial."

32. The Townstone Financial Show has regularly included statements that would discourage African-American prospective applicants from applying for mortgage loans, or making or pursuing an application, including from Townstone; would discourage prospective applicants living in majority- or high-African-American neighborhoods from applying for mortgage loans, or making or pursuing an application, including from Townstone; and would discourage prospective applicants from applying for mortgage loans, or making or pursuing an application, for properties in majority- or high-African-American neighborhoods, including from Townstone.

33. For example, during a January 2014 broadcast in which Townstone marketed its services, a caller from Markham, Illinois, asked how he and his wife could improve their credit scores. Markham is a city in Cook County, Illinois, and its population is 80.3% African American, according to the U.S. Census Bureau. Referring to the women of this predominately African-American area, the Townstone

7

Financial Show's host responded that "[you've] got to keep those women in line over there in Markham." The host went so far as to presume that the caller should "stop spending freaking money [on his wife] and tell her to get a better job." While discussing the couple's credit concerns, the host turned his comments toward Markham generally, claiming that "it's crazy in Markham on weekends" and stating, "I know, I've been to Markham." "You drive very fast through Markham," he continued, "and you don't look at anybody or lock on anybody's eyes in Markham . . . . You look at your dashboard, you don't lock on anybody."

34. In another January 2014 broadcast of the Townstone Financial Show, during which Townstone marketed its services, Townstone's then-president encouraged listeners that "it's a great time to buy, it's a great time to rent, it's a great time to sell." The show's hosts, including a local realtor and a bankruptcy attorney, then recommended that listeners preparing a home for sale should "take down the Confederate flag."

35. In a June 2016 episode of the Townstone Financial Show, during which Townstone marketed its services, before discussing the mortgage-lending services that Townstone could provide to police officers and others, Sturner volunteered his view of the South Side of Chicago. The South Side refers to the southern neighborhoods in the City of Chicago and is majority-African-American, with about 489,000 African American or Black residents. According to Sturner, that part of the city between Friday and Monday is "hoodlum weekend," and the police are "the only ones between

8

that [area] turning into a real war zone and keeping it where it's kind of at."

36. In a January 2017 episode of the Townstone Financial Show, during which Townstone marketed its services, the hosts discussed a now-replaced grocery store in downtown Chicago that was part of the Jewel-Osco grocery-store chain. Sturner described "[having] to go to the Jewel on Division," which he referred to as "Jungle Jewel." Sturner described the "Jungle Jewel" as "a scary place," attributing his fear and the store's nickname to the "Jungle Jewel's" patrons who "packed" the store and "were people from all over the world."

37. In a November 2017 episode of the Townstone Financial Show, during which Townstone marketed its services, Townstone's senior loan officer discussed a recent skydiving experience and the ensuing "rush" from the jump; another Townstone host responded that he thought skydiving was crazy and suggested that someone "walking through the South Side at 3AM [would] get the same rush."

38. Through the Townstone Financial Show, Townstone has characterized areas and people in a manner that would discourage those who identify or associate with those areas or people from applying for credit. For example, the Townstone Financial Show's hosts have disparaged majority-African-American areas as "hoodlum weekend" and approaching "a real war zone" or as "crazy" and places "to be driven through quickly" while avoiding eye contact; they have referred to a place with "people from all over the world" as a "jungle" and "scary"; they have disparaged the

9

women of a predominantly African-American area; and their home-selling advice has included recommendations regarding displays of the Confederate flag.

39. A prospective applicant is reasonable to consider statements made by loan officers, realtors, and others marketing themselves as real-estate experts when making decisions about a property or seeking credit. And a reasonable prospective applicant would consider the characteristics of prospective neighborhoods, including the neighborhoods' safety or dangerousness, when making decisions about a property or seeking credit.

40. Even though African Americans made up 30% of the population of the City of Chicago, Townstone has not targeted any marketing toward African Americans in the Chicago MSA.

41. Townstone has engaged in unlawful conduct by engaging in acts or practices that would discourage African-American prospective applicants from applying for mortgage loans, or making or pursuing an application, including from Townstone; would discourage prospective applicants living in majority- or high-African-American neighborhoods from applying for mortgage loans, or making or pursuing an application, including from Townstone; and would discourage prospective applicants from applying for mortgage loans, or making or pursuing an application, for properties in majority- or high-African-American neighborhoods, including from Townstone.

### Applications from African-American Neighborhoods

42. Based on HMDA data from 2014 through 2017, Townstone received an average of 740 mortgage-loan applications each year. Townstone brokered an average of 60 total Federal Housing Administration and Veterans Administration home loans each year.

43. Townstone has drawn few applications from African-American applicants throughout the Chicago MSA. From 2014 through 2017, Townstone drew about 2,700 applications, of which only 37 (1.4%) came from African Americans in the Chicago MSA. During the same period, other mortgage lenders in the Chicago MSA drew 1,217,223 applications, of which 119,370 (9.8%) came from African-American applicants.

44. Similarly, from 2014 through 2017, Townstone drew almost no applications from applicants applying for mortgage loans for properties in majority-African-American neighborhoods. During the same period, Townstone drew an average of five or six applications each year (0.8%, 0.8%, 0.7%, and 0.9% of all Townstone applications) for properties in high-African-American neighborhoods, even though such neighborhoods made up 13.8% of the Chicago MSA's census tracts. Of Townstone's five or six applications each year for properties in high-African-American neighborhoods (more than 80% African American), more than half each year were from non-Hispanic white applicants.

11

45. Similarly, only 2.3%, 1.4%, 1.4%, and 2.2% of Townstone's applications for the years 2014 through 2017, respectively, came from applicants applying for mortgage loans for properties in majority-African-American areas, even though 18.7% of the Chicago MSA's census tracts were majority-African-American.

46. Statistical analyses of Townstone's mortgage-loan applications in the Chicago MSA, as compared to its peer lenders during the same period, show disparities between Townstone and its peers in drawing mortgage-loan applications for properties in African-American neighborhoods.

47. These disparities are statistically significant and demonstrate that there were applicants seeking mortgage loans for properties in African-American neighborhoods in the Chicago MSA from Townstone's peers in much higher proportions than from Townstone.

48. Townstone had no legitimate, non-discriminatory reason to draw relatively few applications for mortgage loans for properties in these majority-African-American areas.

49. Townstone drew a significantly smaller proportion of mortgage-loan applications for properties in majority-African-American neighborhoods than did its peer lenders operating in the Chicago MSA. While Townstone drew 2.3%, 1.4%, 1.4%, and 1.3% of its applications for properties in majority-African-American neighborhoods from 2014 through 2017, respectively, Townstone's peers drew many times more—8.2%, 7.6%, 7.7%, and 8.1%.

50. Similarly, Townstone drew a significantly smaller proportion of mortgage-loan applications for properties in high-African-American neighborhoods than its peers operating in the Chicago MSA. While Townstone drew only 0.8%, 0.8%, 0.7%, and 0.9% of its applications for mortgage loans for properties in high-African-American census tracts from 2014 through 2017, respectively, other similar lenders drew 5.3%, 4.9%, 5.1%, and 5.5% of their applications from such census tracts—6.3, 6.2, 7.7 and 6.1 times that of Townstone.

51. Townstone employed 17 loan officers from 2014 through 2017. Townstone did not employ an African-American loan officer during that period, even though it was aware that hiring a loan officer from a particular racial or ethnic group could increase the number of applications from members of that racial or ethnic group.

52. Townstone's hiring practices, consumer outreach, consumer interactions, and other business acts or practices exclude or treat differently African-American prospective applicants for credit, as well as prospective applicants for credit in African-American census tracts.

## COUNT 1: ECOA VIOLATIONS—TOWNSTONE

53. The Bureau incorporates the allegations in Paragraphs 1–52 here by reference.

54. Townstone's acts or practices would discourage from seeking credit, on the basis of race or the racial composition of neighborhoods, African-American

13

prospective applicants, as well as those who identify or associate with, and those seeking credit in, majority- and high-African-American neighborhoods in the Chicago MSA.

55. Townstone's discouragement on the basis of race constitutes unlawful discrimination in violation of Regulation B and ECOA. 15 U.S.C. § 1691 et seq.; 12 C.F.R. § 1002.4(b).

56. Townstone's acts or practices discriminate against African-American prospective applicants, as well as those seeking credit in majority- and high-African-American neighborhoods in the Chicago MSA.

57. Townstone's discrimination with respect to credit transactions on the basis of race or the racial character of neighborhoods within the Chicago MSA violates ECOA. 15 U.S.C. § 1691 et seq.

58. Townstone's conduct constitutes a pattern or practice of discrimination and discouragement, in violation of ECOA. 15 U.S.C. § 1691 et seq.

### COUNT 2: CFPA VIOLATIONS—TOWNSTONE

59. The Bureau incorporates the allegations of Paragraphs 1–52 here by reference.

60. Section 1036(a)(1)(A) of the CFPA prohibits a covered person from offering or providing to a consumer any financial product or service not in conformity with "Federal consumer financial law" or otherwise committing any act or

omission in violation of a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

61. Townstone's ECOA violations, described above in Count 1, constitute violations of § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A); 15 U.S.C. § 1691c(b).

### COUNT 3: FRAUDULENT TRANSFER—STURNER

62. The Bureau incorporates the allegations of Paragraphs 1–52 here by reference.

63. Townstone transferred more than $2.4 million to Sturner in December 2018 and January 2019 ("the Transfer").

64. After the Transfer, Townstone was insolvent or soon became insolvent.

65. After the Transfer, Townstone had no cash.

66. After the Transfer, Townstone had less than $100,000 worth of liquid assets.

67. After the Transfer, Townstone retained possession or control of the transferred money.

68. Townstone and the Bureau had discussed the Bureau's potential suit in the months preceding the Transfer.

69. Townstone did not receive reasonably equivalent value from Sturner for Townstone's $2.4 million.

15

70. Townstone did not receive anything of value from Sturner for Townstone's $2.4 million.

71. Sturner made the decision on Townstone's behalf for Townstone to transfer $2.4 million to Sturner.

72. Townstone and Sturner engaged in the Transfer with actual intent to hinder, delay, or defraud the Bureau.

73. When Townstone and Sturner engaged in the Transfer, Townstone believed, or reasonably should have believed, that it would incur a debt to the Bureau beyond Townstone's ability to pay.

74. When Townstone and Sturner engaged in the Transfer, Townstone and Sturner believed or reasonably should have believed that Townstone would incur a debt to the Bureau greater than the value of Townstone's remaining liquid assets.

75. When Townstone and Sturner engaged in the Transfer, Townstone and Sturner believed or reasonably should have believed that Townstone would incur other financial obligations beyond Townstone's ability to pay, including payroll, taxes, property rental, utility costs, marketing costs, and legal costs.

76. After Townstone and Sturner engaged in the Transfer, Sturner paid Townstone's bills.

77. After Townstone and Sturner engaged in the Transfer, Sturner paid Townstone's bills using, at least in part, the money Sturner received in the Transfer.

78. Under 28 U.S.C. §§ 3301-3308, the Transfer was fraudulent as to the Bureau and as to any Townstone debt to the Bureau.

## DEMAND FOR RELIEF

The Bureau requests that the Court enter an order that:

(1) declares that Townstone's acts and practices constitute violations of ECOA, 15 U.S.C. §§ 1691–1691f;

(2) requires Townstone, under 15 U.S.C. § 1691c(a)(9) and 12 U.S.C. § 5565(a), as well as Townstone's agents, employees, successors, and all others in active concert or participation with Townstone, to:

    a. not discriminate in any aspect of its mortgage-lending business on the basis of race or any other basis prohibited by ECOA, 15 U.S.C. § 1691(a);

    b. take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Townstone's unlawful conduct to the position they would have been in but for the discriminatory conduct; and

    c. take such affirmative steps as may be necessary to prevent the recurrence of any such discriminatory conduct; to eliminate, to the extent practicable, the effect of Townstone's unlawful practices; and to implement policies and procedures to ensure that all prospective applicants have an equal opportunity to seek and obtain loans on a non-discriminatory basis and with non-discriminatory terms and conditions;

(3) awards damages, restitution, equitable, and other monetary relief, under 15 U.S.C. § 1691c(a)(9) and 12 U.S.C. § 5565;

(4) assesses a civil money penalty against Townstone in an amount authorized by 12 U.S.C. § 5565(c);

(5) declares that Townstone's transfer of money to Sturner in December 2018 and January 2019 was fraudulent under 28 U.S.C. §§ 3301-3308;

(6) allows the Bureau to avoid the Transfer to the extent necessary to satisfy any monetary judgment entered in this case against Townstone;

(7) compels Sturner to transfer to the Bureau, in a manner to be prescribed by the Bureau, all money transferred by Townstone to Sturner up to the amount necessary to satisfy any monetary judgment entered in this case against Townstone;

(8) awards any other relief to the Bureau that is available under the law and necessary to restore the Bureau to the position it would have been upon entry of judgment in this case if Townstone and Sturner had not engaged in a fraudulent transfer;

(9) awards to the Bureau the costs of bringing this action; and

(10) awards to the Bureau such additional relief as the interests of justice may require.

Respectfully submitted,

THOMAS G. WARD
Enforcement Director
CARA PETERSEN
Principal Deputy Enforcement Director
JEFFREY PAUL EHRLICH
Deputy Enforcement Director
KARA K. MILLER
Assistant Litigation Deputy

/s/ Barry Reiferson
BARRY REIFERSON NY Reg. #4343893
Email: barry.reiferson@cfpb.gov
VINCENT HERMAN DC Bar #974596
Email: vincent.herman@cfpb.gov
MARY E. OLSON, IL ARDC 6297334
Email: mary.olson@cfpb.gov
MICHAEL G. SALEMI, IL ARDC 6279741
Email: michael.salemi@cfpb.gov

230 S. Dearborn Street
Suite 1590
Chicago, IL 60604

    and

1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9599

Attorneys for the Bureau of Consumer Financial Protection