**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) ) ) | Case No. 1:20-cv-04176 |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| Townstone Financial, Inc. and Barry Sturner | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' COMBINED MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Date: February 8, 2021

Respectfully submitted,

*/s/ Sean P. Burke*
Sean P. Burke #6277203
E. Brenda Kpotufe # 34084-49
Mattingly Burke Cohen & Biederman LLP
155 E. Market St., Suite 400
Indianapolis, IN 46204
Sean.Burke@mbcblaw.com
Brenda.Kpotufe@mbcblaw.com

Marx Sterbcow
Sterbcow Law Group
824 Elmwood Park Blvd #205
New Orleans, LA 70123
marx@sterbcowlaw.com

*Attorneys for Defendant Townstone*
*Financial, Inc. and Barry Sturner*

i

# TABLE OF CONTENTS

I.    Introduction ..................................................................................................... 1

II.   Facts Plead and Not Plead in the Complaint. .................................................. 2

III.   Argument. ......................................................................................................... 3

     A.   **Rule 12(b)(6) Standard.** ......................................................................... 3

     B.   **Reg. B and the Bureau Improperly Attempt to Expand ECOA's Reach.** ............. 4

         (1) The Complaint Seeks to Punish Behavior that Is Not Regulated by ECOA. ......... 4

         (2) Precedent Holds that ECOA Cannot Be Extended to Reach Persons Who Are Not "Applicants," And Thus, the Bureau's Complaint Must Fail ................................. 6

         (3) ECOA Does Not Mandate Advertising Practices, Demographic Hiring Quotas, or Disparate Impact Claims, so the Complaint Should be Dismissed. ....................... 8

         (4) The Bureau Improperly Seeks to Use a Disparate Impact Theory of Discrimination under ECOA ................................................................................ 9

         (5) Other Courts Have Recognized that They Must Stop the Bureau From Exceeding Its Statutory Authority. ........................................................................... 10

     C.   **Even if a Claim of Potential Discouragement of "Prospective Applicants" Existed under ECOA, It Would Run Afoul of the First Amendment.** ................. 12

         (1) Reg. B and the Bureau's Enforcement Violate the First Amendment Because They Are Content and Viewpoint-Based Bans of Free Speech that Are Not Narrowly Tailored to Serve Compelling State Interests. ............................................. 13

         (2) Reg. B and the Bureau's Enforcement Violate the First Amendment Because They Are Unconstitutionally Vague and Overbroad as Applied to Townstone and on Their Face. ............................................................................................. 16

           i.   Reg. B Violates the First Amendment as Applied to Townstone. .................... 18

           ii. Reg. B Violates the First Amendment Because It Is Facially Invalid. .............. 20

     D.   **The Bureau's Use of Reg. B Violates the Fifth Amendment.** ................................. 22

     E.   **The Bureau Alleged No Other Violations of Federal Consumer Financial Law, and Thus, Count II Fails.** ........................................................................... 23

IV.   The Complaint Should be Dismissed With Prejudice. ...................................... 23

V.    Conclusion ...................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Auer v. Robbins*, 519 U.S. 452 (1997) .................................................................................. 6

*Bartucci v. Wells Fargo Bank N.A.*, No. 14 CV 5302, 2015 WL 6955482 (N.D. Ill. Nov. 10, 2015) ........................................................................................................................................... 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................... 3

*Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013) ........................................... 5, 8, 9

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................................................................. 16, 21

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ......... 5, 9

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ......................................... 13

*Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) ........................... 16

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) .............................................. 16

*FEC v. Wisconsin Right to Life*, 551 U.S. 449, 567 (2007) ................................................. 16

*Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937 (8th Cir. 2014) ...................................... 7

*Iancu v. Brunetti*, 139 S. Ct. 2294, 204 L. Ed. 2d 714 (2019) ........................................... 14

*Kisor v. Wilkie*, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019) ................................................... 6

*Lake v. Neal*, 585 F.3d 1059 (7th Cir. 2009) ......................................................................... 4

*Moran Foods v. Mid-Atlantic Market Development*, 476 F.3d 436 (7th Cir. 2007).................... 6

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018) .. 15

*New Louisiana Holdings, LLC v. Arrowsmith, No. 11 C 5031, 2012 WL 6061710 (N.D. Ill. Dec. 4, 2012)*.................................................................................................................................. 8

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ............................................................................... 14

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ...................................................... 13, 14

*Regions Bank v. Legal Outsource PA*, 936 F.3d 1184 (11th Cir. 2019).................................... 7

*RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380 (6th Cir. 2014). 7

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995)............................ 14

*Skidmore v. Swift Co*, 323 U.S. 134 (1944) ............................................................................ 6

*Snyder v. Phelps,* 562 U.S. 443 (2011)................................................................................... 12

*Texas Dep't of Hous. and Comty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) ................................................................................................................................ 9, 10

*United States v. Williams*, 553 U.S. 285 (2008) ............................................................... 16, 22

## STATUTES

15 U.S.C. § 1691(a)(1)............................................................................................................. 4

15 U.S.C. § 1691(a)(b)............................................................................................................. 4

15 U.S.C. §§ 1691–1691f ........................................................................................................ 1

## REGULATIONS

12 C.F.R. § 1002.4................................................................................................... 5, 13, 17

12 C.F.R. Part 1002................................................................................................................. 4

## I.    __Introduction.__

The Bureau of Consumer Financial Protection ("Bureau") amended its complaint (the "Complaint") is an unsuccessful attempt to plead around the constitutional and statutory infirmities. Its new Complaint remains flawed and must be dismissed for the following reasons: (1) contrary to the express language used in the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, *et. seq*., the Bureau improperly seeks to expand ECOA's reach to include "prospective applicants", to regulate behavior before a "credit transaction" ever takes place, to create affirmative advertising and hiring requirements based on demographics, and to bring a discrimination case based on an inapplicable "disparate impact" theory; (2) contrary to the First Amendment, the Bureau unconstitutionally seeks to regulate the content and viewpoint of protected speech and does so in a way that is unconstitutionally overbroad and vague both as applied to Townstone and on its face; and (3) the regulation the Bureau seeks to enforce is unconstitutionally vague in violation of the Fifth Amendment's due process clause both as applied and facially.

The Bureau's attempt to assert an individual, derivative claim against Townstone Financial, Inc.'s ("Townstone") owner, Barry Sturner ("Sturner"), should also be dismissed because even if that claim were well taken, which is expressly denied, it only becomes relevant if the Bureau succeeds on its claims against Townstone, which for reasons articulated herein, it cannot.

Townstone and Sturner ask this Court to dismiss the Bureau's Complaint with prejudice because any further attempt to amend is futile.

## II.    Facts Plead and Not Plead in the Complaint.

Even after the Bureau amended its Complaint, it remains devoid of any factual allegation that Townstone behaved improperly towards any actual applicant or with respect to any bona fide credit transaction that falls within the purview of ECOA. Instead, the Complaint alleges that Townstone acted or failed to act only with regard to ***prospective applicants***, which activity is not regulated under ECOA. For example, Doc. 27, ¶22 alleges: "Townstone has engaged in acts or practices directed at ***prospective applicants*** that, together and separately, would discourage ***prospective applicants***, on the basis of race, from seeking or obtaining credit for properties within the Chicago MSA." (*See also*, Doc. 27, ¶¶5, 32, 39, 41, 52, 54, and 56, each of which only complain about actions or inactions relating to "prospective applicants") (emphasis added).[1]

Part of Townstone's advertising efforts include producing the Townstone Financial Show, a community-based talk radio show available throughout the Chicago MSA and widely available on the internet. (Doc. 27, ¶29). On the show, Townstone's team educates listeners on financial and real estate issues involving home purchasing and mortgage loans, answers mortgage questions from the public, but also frequently discusses topics of public and political interest such as food, sports, politics, including crime and policing in Chicago.

Despite no statutory basis to regulate Townstone's speech, the Bureau excerpts a few comments out of context from hundreds of broadcasting hours and alleges that those statements

---

[1] Townstone – as it must – treats the Bureau's factual allegations as true for purposes of this motion only. Townstone disputes the Bureau's allegations that Townstone engaged in any discriminatory behavior and provided the Bureau with independent, objective evidence demonstrating Townstone's marketing efforts encourage, rather than discourage African-American applicants to apply to Townstone and that Townstone was not an outlier in terms of generating applications from majority African-American neighborhoods in Chicago. In addition, as admitted by the Bureau, Townstone's marketing efforts targeted the widest possible geographic area, including all of Chicago, which is the polar opposite of redlining.

"discourage African-American prospective applicants from applying for mortgage loans, or making or pursuing an application, including from Townstone". (Doc. 27, ¶¶32, 33-39[2]). In one example, there was a discussion about the crime rates on the southside of Chicago in which a speaker equated the rush one gets from skydiving to walking through the southside at 3 a.m. in the morning. (Doc. 27, ¶37). The Bureau alleges that discussion somehow discouraged prospective African-Americans from applying for credit. The Bureau also argues that, because Townstone allegedly did not affirmatively target advertising specifically to African-Americans, and because Townstone allegedly had no African-American loan officers, Townstone discouraged prospective African-American applicants. (Doc. 27, ¶¶40, 51).

Count III, which alleges that Sturner engaged in a fraudulent transfer, badly misrepresents the circumstances surrounding Sturner's monetary transfer, the effect of the transfer on Townstone, and Townstone's post-transfer behavior.[3] Nonetheless, even if the facts alleged were true, Count III fails because it is wholly derivative of Count I, which is improper.

## III. **Argument.**

### A. **Rule 12(b)(6) Standard.**

A complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). While the Court must accept all

---

[2] In Paragraphs 33 and 34, the Bureau recounts statements of Townstone's former president that were made in January 2014 – well beyond the five-year statute of limitations period under ECOA. The Bureau appears to include these dated, and wholly out of context, statements of social commentary made by a former employee as a means to inflame the Court, not because they can be legally actionable.

[3] While Sturner must accept the facts as true at this stage, the evidence will show that instead of trying to "hinder, delay, or defraud the Bureau" Sturner actually voluntarily disclosed the transfer to the Bureau and never made any attempt to hide it. (Doc. 27, ¶72). As the Bureau knows, prior to the transfer being made, Townstone downsized its business from mortgage lender to a non-depository mortgage broker, as it is much less expensive to operate a mortgage brokerage business and there are lower net worth requirements mortgage brokers. Accordingly, it was perfectly appropriate for Sturner to lower his capital investment in his business. Townstone remains a going concern, was never insolvent, and Sturner does not pay Townstone's bills personally. Finally, as reflected in its second Motion to Dismiss, Townstone and Sturner do not believe that Townstone will incur financial obligations to the Bureau based on the Bureau's Complaint.

well-pled factual allegations in the Complaint as true, the factual allegations in the Bureau's Complaint do not raise a right to relief above the speculative level and should be dismissed. *Lake v. Neal,* 585 F.3d 1059, 1060 (7th Cir. 2009).

      **B.**      <u>**Reg. B and the Complaint Improperly Attempt to Expand ECOA's Reach**</u>.

         (1) <u>The Complaint Seeks to Punish Behavior that Is Not Regulated by ECOA</u>.

      ECOA never mentions and explicitly does not regulate behavior relating to ***prospective*** applicants. Rather, ECOA makes it "unlawful for any creditor to discriminate against any ***applicant*** with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age…" 15 U.S.C. § 1691(a)(1) (emphasis added). ECOA defines the term "applicant" to mean "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691(a)(b). There is no ambiguity in ECOA's reach. Under the heading "Scope of prohibition", ECOA unambiguously prohibits discrimination against an "applicant", or a "person who applies" for credit. 15 U.S.C. § 1691(a). There is no language in this section of ECOA that regulates any behavior relating to relating to ***prospective*** "applicants" who have not yet applied for credit. While ECOA Section 1691 uses the word "applicant" twenty-six (26) times, it never once uses the phrase prospective applicant or proscribes any conduct prior to the filing of an application.

      ECOA's implementing regulation – Regulation B at 12 C.F.R. Part 1002 ("Reg. B") – improperly expands ECOA's reach to include not just "applicants" but "prospective applicants", *i.e.*, individuals who have not applied and may never apply for credit. Reg. B goes even further by prohibiting "Discouragement" of "prospective applicants":

4

(b) Discouragement. A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

12 C.F.R. § 1002.4.

The Complaint seeks to further expand ECOA by claiming that ECOA affirmatively mandates specific targeted advertising to certain racial and ethnic groups, requires affirmative action-like hiring practices, and dictates that certain amounts of African-American applications are received. (Doc. 27, ¶¶40, 51). By attempting to extend ECOA's reach beyond the express and unambiguous language of the statute, Reg. B and the Bureau's Complaint overreach.

When a statue is unambiguous, agency regulations, or statutory interpretations are not entitled to deference. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *Brumfield v. City of Chicago*, 735 F.3d 619, 626 (7th Cir. 2013) ("if the statute is unambiguous on the question, we give effect to the unambiguous statutory language and the inquiry goes no further."). If the statute is ambiguous, "the second step is to determine whether the agency has promulgated a reasonable interpretation of the statute; if so, we defer to that interpretation." *Brumfield*, 735 F.3d at 626.

To the extent Reg. B and/or the Bureau attempt to regulate behavior relating to "prospective applicants", no deference should be given to Reg. B or the Bureau's interpretation thereof. Even if there were some ambiguity regarding the term "applicant," there is no reasonable, or even plausible interpretation of "applicant" that could expand it to include all "prospective applicants" or non-applicants who have not yet started to engage in any "credit transaction". Similarly, the Bureau's interpretation in Reg. B is not deserving of deference,

because "Discouragement" – a term that is not defined or even mentioned in ECOA – is not reasonably included within the unambiguous term "discrimination".

From a policy perspective, the scope of liability created by an expansion of ECOA to include the vague term "prospective applicants", which theoretically includes the entire world is unreasonable and unworkable. Such an absurd result could not have been intended by Congress.[4] It also makes no sense that Congress, by banning discrimination to applicants, would have intended the Bureau to regulate all industry statements to unilaterally determine if there were ever any "Discouragement" to any potential homeowner. The Complaint exceeds the Bureau's statutory jurisdiction, limitations, and authority, is contrary to Townstone's constitutional rights and privileges, and thus, is unlawful and void under the Administrative Procedures Act, 5 U.S.C. § 706 ("APA").

(2) Precedent Holds that ECOA Cannot Be Extended to Reach Persons Who Are Not "Applicants," And Thus, the Bureau's Complaint Must Fail.

Multiple circuits, including the Seventh Circuit, have rejected attempts to expand ECOA's reach beyond "applicants," based on the express, unambiguous language used in the statute. The Seventh Circuit refused an attempt to expand the definition of "applicant" in *Moran Foods v. Mid-Atlantic Market Development*, 476 F.3d 436 (7th Cir. 2007). There, the Court did not allow an expansion of "applicant" to include guarantors of credit applications, who were included within the version of Reg. B in effect at the time. The Seventh Circuit had no trouble finding this regulatory expansion had no basis in the statute. *Id.* at 441. The Court succinctly stated, "there is nothing ambiguous about 'applicant' and no way to confuse an

---

[4] In addition, where Reg. B or the Bureau's interpretation of ECOA fails the test for *Chevron* deference, it also fails the test enunciated by the Supreme Court for *Auer* deference to an agency's interpretation of its own rules, because the Bureau's interpretation of Reg. B is unreasonable and creates "unfair surprise". *Kisor v. Wilkie*, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019); *Auer v. Robbins*, 519 U.S. 452 (1997). Similarly, because such interpretations are unreasonable, they are also not deserving of *Skidmore* deference. *See Skidmore v. Swift Co*, 323 U.S. 134 (1944).

applicant with a guarantor." *Id.* at 441. The Court also noted the parade of horribles that would occur if the term "applicant" were stretched to include guarantors, and explained that "the Congress that enacted the Act would have been unlikely to accept" the "vistas of liability" that would accompany such an interpretation. *Id.*

Other circuits that have addressed this issue similarly declined to expand the statutory definition of "applicant". *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 942 (8th Cir. 2014) ("because the text of the ECOA is unambiguous regarding whether a guarantor constitutes an applicant, we will not defer to the Federal Reserve's interpretation of applicant, and we conclude that a guarantor is not protected from marital-status discrimination by the ECOA."), *aff'd*, 136 S. Ct. 1072, 194 L. Ed. 2d 163 (2016); *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1193 (11th Cir. 2019) ("we agree with the Seventh and Eighth Circuits that the ordinary meaning of 'applicant' does not encompass a guarantor, we hold that no deference is due").

Even the Sixth Circuit, which held that "applicant" could be read to include a guarantor, did so only because a guarantor actually appears on a credit application. *RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 385 (6th Cir. 2014) (noting that the definition of "applicant" could "encompass all those who offer promises *in support of an application*—including guarantors, who make formal requests for aid in the form of credit for a third party.") (emphasis added). Thus, even under the Sixth Circuit's logic, "applicant" cannot be stretched to include "prospective applicants" because there is no actual application. *Id.*

Courts in this district routinely require an actual application as a prerequisite to stating an ECOA claim. In *Bartucci v. Wells Fargo Bank N.A.,* No. 14 CV 5302, 2015 WL 6955482, at *2 (N.D. Ill. Nov. 10, 2015), the court stated that, "[t]o survive a 12(b)(6) motion to dismiss

an ECOA claim, Plaintiff must allege that he was an applicant, as defined by the ECOA, and that Defendant treated him less favorably because of his national origin or age." *See also New Louisiana Holdings, LLC v. Arrowsmith,* No. 11 C 5031, 2012 WL 6061710, at *5 (N.D. Ill. Dec. 4, 2012) ("[t]o state a prima facie claim of discrimination under the ECOA, plaintiffs must allege that they were applicants, as defined by the ECOA".)

The Complaint only makes allegations about Townstone's interactions with prospective applicants who are not governed by ECOA. This attempted expansion of "applicant" is inconsistent with ECOA and case law interpreting the same. Because the term "applicant" is unambiguous and does not include "prospective applicants", this Court should dismiss the Complaint.

(3) <u>ECOA Does Not Mandate Advertising Practices, Demographic Hiring Quotas, or Disparate Impact Claims, so the Complaint Should be Dismissed.</u>

The Complaint should also be dismissed because it attempts to improperly expand ECOA to impose: (1) affirmative requirements to target advertising to specific racial or ethnic groups; (2) a hiring quota for certain racial or ethnic groups; and (3) a disparate impact theory that would require business to have success with specific racial or ethnic groups. Because none of these affirmative requirements can be found in ECOA, or even Reg. B, the Bureau's attempt to impose such requirements through litigation should fail. *Brumfield*, 735 F.3d at 626 ("if the statute is unambiguous on the question, we give effect to the unambiguous statutory language and the inquiry goes no further.").

The Complaint – apparently through Reg. B's "Discouragement" definition – seeks to expand ECOA and hold Townstone accountable for not affirmatively targeting advertising to African-Americans, (Doc. 27, ¶40), and/or for not hiring African-American loan officers. (Doc. 27, ¶51). The Complaint also seeks to interpret ECOA and Reg. B in a manner that

8

would create an affirmative requirement to have a certain amount of business success with certain racial or ethnic demographic groups to avoid a claim of an ECOA violation. (Doc. 27, ¶¶45-50). Nothing in ECOA or Reg. B. creates these requirements or supports a cause of action for violating any such non-existent requirements.

ECOA's scope is unambiguously limited to regulating behavior between creditors and applicants. *Chevron*, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency"); *Brumfield*, 735 F.3d at 626. The Bureau's interpretation is outside of the authority of ECOA and violates the APA, making it unlawful and void. Rather than seeking amendments to ECOA, or even engaging in a "notice and comment" process to amend Reg. B, the Bureau attempts to expand ECOA's obligations on a case-by-case basis through litigation. Not only is this tactic prohibited by the clear, unambiguous language used in ECOA, but it would create a predictably unpredictable situation in which mortgage lenders would have no idea if they were ever running afoul of the Bureau's newly-created affirmative obligations under ECOA.[5]

(4) <u>The Bureau Improperly Seeks to Use a Disparate Impact Theory of Discrimination under ECOA.</u>

The Complaint repeatedly alleges that Townstone did not have enough success with African-American applicants when compared to its alleged peers. These disputed allegations are irrelevant because there is no "disparate impact" theory of discrimination ECOA.[6] Instead of basing their allegations on direct discrimination against applicants or even prospective

---

[5] For example, the Complaint does not address how much targeted advertising to African-Americans is enough, how many African-American loan officers must be hired, or how much "business success" is necessary to be compliant with ECOA.

[6] In contrast to a "disparate treatment" claim in which the plaintiff must prove a discriminatory intent, a "disparate impact" claim can be proven without evidence intent based on a neutral practice's disproportionately adverse effect on minorities that are otherwise unjustified by a legitimate rationale. See *Texas Dep't of Hous. and Comty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015).

applicants, the Bureau bases its ECOA claim on the alleged disproportionate effects or disparate impact of Townstone's marketing practices.

The Bureau's pursuit of a "disparate impact" claim under ECOA must fail because ECOA does not contain any of the required results-oriented statutory language. Disparate impact claims are only authorized if the enabling statute allows them. For instance, the Fair Housing Act ("FHA") includes results-oriented language (which makes it illegal, in pertinent part, to "otherwise make unavailable…a dwelling") and therefore supports the disparate impact theory of liability. 42 U.S.C. § 3604(a); *Texas Dep't of Hous. and Comty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2518 (2015) ("results-oriented language counsels in favor of recognizing disparate-impact liability"). Unlike the FHA, ECOA does not include any such results-oriented language, and thus, disparate impact theory is unavailable. *See also Unsafe at Any Bureaucracy, Part III: The Bureau's Vitiated Legal Case Against Auto-Lenders*, Report Prepared by the Republican Staff of the Committee on Financial Services, U.S. House Of Representatives, Hon. Jeb Hensarling, Chairman, 115th Congress, First Session (Jan. 18, 2017), available at https://republicans-financialservices.house.gov/uploadedfiles/1-18-17_cfpb_indirect_auto_staff_report_iii.pdf.

This Court should reject the Bureau's attempt to expand ECOA to allow for a disparate impact theory of liability.

(5) <u>Other Courts Have Recognized that They Must Stop the Bureau From Exceeding Its Statutory Authority.</u>

In multiple other cases, courts found it necessary to prevent the Bureau from exceeding its statutory or regulatory authority. For example, a recent federal court in the District of Columbia held that the Bureau's positions in support of expanding their authority lacked merit. *PayPal v. the Consumer Financial Protection Bureau, et. al,* Civil Case No.19-3700 (Dist.

Col. Dec. 30, 2020). There, PayPal challenged the Bureau's interpretation of certain portions of the Dodd-Frank Act, namely the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §1693(b), and the Truth in Lending Act ("TILA"), 15 U.S.C. §1601. EFTA gives the Bureau the authority to "issue *model* clauses for *optional* use by financial institutions." *Id.* (Emphasis added). Under the auspices of ETFA, the Bureau created a *mandatory* form that *required* certain language be used and required a thirty-day restricted period for certain credit transactions. Pursuant to TILA, which regulates the type of disclosures that must be made to consumers, the Bureau created restrictions on the type of credit offered.

In siding with PayPal on both issues, the court repeatedly looked no further than the language of the enabling statute. Because EFTA only allows for optional forms and because TILA only allows the Bureau to regulate disclosures, the court found that the Bureau's actions – in creating a mandatory form and making a substantive guideline rather than a disclosure requirement – well exceeded their authority. *Id.* at 9. In finding that the Bureau's actions were inconsistent with the statutory language, the court emphatically held "the plain language of the statute forbids it!" *Id.* When the Bureau argued that it was simply effectuating TILA's purpose, the judge was unimpressed: "The Bureau cannot simply rely on the overarching purpose of the statute without giving credence to *how* Congress intended the agency to fulfill the statute's purpose." *Id.* at 19.

Similarly, in *PHH Corp. v. CFPB*, 839 F.3d 1, 44 (D.C. Cir. 2016), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 75 (D.C. Cir. 2018), the D.C. Circuit rejected a Bureau interpretation of the Real Estate Settlement Procedures Act in a case in which the agency sought over $100 million in damages. In *PHH,* the D.C. Circuit held that the Bureau's interpretation of the statute was not entitled to any *Chevron* deference. *Id.* at 43. In the D.C.

11

Circuit's three-judge panel opinion, which was later affirmed *en banc*, the court rejected the Bureau's interpretation and noted that it was "not a close call," because the statute uses "nothing" and "[n]othing means nothing." *Id.* at 41. The court stated that "the CFPB's interpretation flouts not only the text of the statute but also decades of carefully and repeatedly considered official government interpretations." *PHH Corp.*, 839 F.3d at 42.

Here, as in *PayPal* and *PHH*, the Bureau's actions exceed the statutory language and its express direction from Congress. ECOA gives the Bureau the power to prevent discrimination against "applicants" engaged in a "credit transaction." The Complaint, which attempts to prohibit "Discouragement" of "prospective applicants," create of affirmative minority hiring quotas, target demographic-based advertising requirements, and add a "business success" test, far exceeds the Bureau's statutory authority under ECOA. Because the Bureau's Complaint exceeds its statutory authority in multiple ways, Townstone asks this Court to dismiss the Bureau's ECOA count (Count I) and its companion Count II.

### C.      Even if a Claim of Potential Discouragement of "Prospective Applicants" Existed under ECOA, It Would Run Afoul of the First Amendment.

The First Amendment states that "Congress shall make no law...abridging the freedom of speech". "[S]peech on 'matters of public concern'…is 'at the heart of the First Amendment's protection.'" *Snyder v. Phelps,* 562 U.S. 443, 451 (2011). "Speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Id.*

The statements upon which the Bureau seeks to punish Townstone directly reflect on the public issue of crime in Chicago and the benefits of policing, two very real issues as recognized by commentators and citizens from across the political spectrum. Townstone – a Chicago-based business – is well versed in these issues and has every right to comment upon them. *Citizens*

*United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (recognizing that corporations have free speech rights). Because Townstone's speech is tantamount to political speech, it cannot be suppressed by the government. *Id.* at 319 ("[t]he Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech").

Despite these realities, the Bureau seeks to punish Townstone's exercise of its First Amendment rights by citing violations of ECOA and Reg. B. These efforts must fail because Townstone's political speech cannot be suppressed, and for at least two reasons: (1) Reg. B and the Bureau's enforcement of it violate the First Amendment because they are content and viewpoint-based prohibitions on speech; and (2) Reg. B and the Bureau's enforcement of it violate the First Amendment because they are constitutionally overbroad and vague as applied to Townstone and on their face.

(1) <u>Reg. B and the Bureau's Enforcement Violate the First Amendment Because They Are Content and Viewpoint-Based Bans of Free Speech that Are Not Narrowly Tailored to Serve Compelling State Interests.</u>

Reg. B and the Bureau's enforcement of Regulations B impose impermissible content and viewpoint-based restrictions on Townstone's speech. These realities are apparent on the face of Reg. B's prohibition on "Discouragement" – "A creditor shall not make any oral or written statement. . .  that would discourage". 12 C.F.R. § 1002.4.

Reg. B plainly "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 155 (2015). Content-based laws, like Reg. B "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163. Viewpoint discriminatory laws, like Reg. B, are "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "When the

13

government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)). The Supreme Court has been particularly emphatic about striking down viewpoint discrimination as Justice Alito explained in his concurring opinion in *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302, 204 L. Ed. 2d 714 (2019) where he stated:

> Viewpoint discrimination is poison to a free society. * * * At a time when free speech is under attack, it is especially important for this Court to remain firm on the principle that the First Amendment does not tolerate viewpoint discrimination. We reaffirm that principle today.

*Id.*

Reg. B is content-based because a violation turns on the content of a statement – one only has to look at the Complaint, which literally complains about the content of several of Townstone's statements. (Doc. 27, ¶¶33-40). Moreover, because Reg. B prevents only "discouragement", the regulation is viewpoint based. Accordingly, the burden is on the Bureau to demonstrate that Reg. B and its efforts further a compelling interest and are narrowly tailored to achieve that interest. *Reed*, 576 U.S. at 171.

In a possible attempt to support the Bureau's position, the Complaint references ECOA's purpose: "to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age." 12 C.F.R. § 202.1. In *R.A.V.*, the Supreme Court found that helping "to ensure the basic human rights of members of groups that have historically been subjected to discrimination" was a compelling interest, but nevertheless struck St. Paul's cross-burning ordinance. *R.A.V.*, 505 U.S. at 395. As in *R.A.V.,* while the Bureau's interpretation of ECOA and Reg. B may be well intended, like St. Paul in *R.A.V.*, the Bureau cannot demonstrate that this content and viewpoint-based Regulation and the Bureau's further interpretation of the same is narrowly tailored to meet ECOA's purpose. In *R.A.V.*, the

Court explained, "Let there be no mistake about our belief that burning a cross in someone's front yard is reprehensible. But St. Paul has sufficient means to prevent such behavior without adding the First Amendment to the fire." *Id.* at 396.

Even if banning Townstone's speech could be considered furthering ECOA's stated goals, there are more effective, constitutionally permissible ways to achieve that goal. For example, the federal government can and does create programs that assist applicants and prospective applicants from protected classes in obtaining credit.[7]

The Bureau claims Townstone violated ECOA by engaging in political speech and social commentary and by not engaging in targeted advertising to African-Americans in Chicago. There can be no such prohibition on political speech or affirmative obligation to speak under ECOA because either would flagrantly violate the First Amendment. In its original and now its amended Complaint, the Bureau is unable to meet its burden to show that punishing Townstone's speech is narrowly tailored to achieve its compelling interest. Rather than preventing Townstone from speaking on public issues or requiring Townstone to speak, the Government could embark on educational programs that "promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age." *See, e.g., Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376, 201 L. Ed. 2d 835 (2018) (noting that rather than requiring certain crisis pregnancy centers to place certain notices, California itself "could inform low-income women about its services 'without burdening a speaker with unwanted speech.'") (internal citations omitted). Because the Bureau cannot meet its burden, the Complaint should be dismissed.

---

[7] *E.g.*, Reg. B already permits "special purpose credit programs." 12 C.F.R. § 1002.8.

(2) <u>Reg. B and the Bureau's Enforcement Violate the First Amendment Because They Are Unconstitutionally Vague and Overbroad as Applied to Townstone and on Their Face.</u>

If the federal government intends on regulating speech, including political speech, the Supreme Court mandates precision to assure the appropriate "breathing room" to prevent "chill" through the doctrines of vagueness and overbreadth. In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court explained that the First Amendment regulation requires specificity and objectivity, "'[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'" *Id.* at 41 n.48 (internal citations omitted)). This is because "'vague laws may not only 'trap the innocent by not providing fair warning' or foster 'arbitrary and discriminatory application' but also operate to inhibit protected expression by inducing 'citizens to ''steer far wider of the unlawful zone.'" *Id.* (citations omitted).

In the context of First Amendment challenges, "vagueness and overbreadth are two sides of the same coin, and the two sorts of challenges are often conceived of as 'alternative and often overlapping' theories for relief on the same claim." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012) (internal citations omitted). The void-for-vagueness doctrine protects against any law that "fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (internal citations omitted). The overbreadth doctrine prohibits laws that restrict "a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

In *FEC v. Wisconsin Right to Life*, 551 U.S. 449, 567 (2007) ("*WRTL-II*"), the Supreme Court outlined how courts should safeguard political speech in as-applied challenges. Courts

must (i) reject intent-and-effect tests, (ii) focus on the actual words at issue, (iii) restrict burdensome discovery and litigation to prevent "chilling speech through the threat of burdensome litigation," (iv) "eschew 'the open-ended rough-and-tumble of factors, which "invit[es] complex argument in a trial court and a virtually inevitable appeal,'" and (v) "give the benefit of any doubt to protecting rather than stifling speech." 551 U.S. at 469 (internal citations omitted). *WRTL-II* also mandates that if the challenged communication can be interpreted as doing something other than violating the First Amendment it must be so interpreted: "[A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of *no reasonable interpretation other than* as an appeal to vote for or against a specific candidate." *Id.* at 469-70 (emphasis added). Put differently, where the First Amendment is implicated, the tie goes to the speaker, not the censor. *Id.* at 474.

A "statute is facially overbroad only when 'it prohibits a substantial amount of protected speech,' *Id.* and unconstitutionally vague only when its 'deterrent effect on legitimate expression is ... both real and substantial.' *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60, 96 S. Ct. 2440, 49 L.Ed.2d 310 (1976)." *Ctr. for Individual Freedom,* 697 F.3d at 470.

Reg. B's "Discouragement" provision, in its use of vague terms such as "or otherwise", "prospective applicants", "discourage," and "pursue," is both vague and overbroad such that it should not be applied to Townstone or any creditor:

(b) **Discouragement.** A creditor shall not make any oral or written statement, in **advertising or otherwise**, to applicants or **prospective applicants** that would **discourage** on a prohibited basis a reasonable person from making or **pursuing** an application.

12 C.F.R. § 1002.4 (emphasis added).

i. *Reg. B Violates the First Amendment as Applied to Townstone.*

The Bureau's allegations in the Complaint demonstrate Reg. B's vagueness and overbreadth as applied to Townstone. Initially, the Bureau alleges discouragement, in large part, based upon statements made on the Townstone Financial Show. The Bureau reads Townstone's statements and encourages this Court to read those statements in the most hostile way possible to portray them as being about race instead of crime or other societal issues. But the Supreme Court holds that tests restricting political speech must be speech-protective with the benefit of any doubt always going to free speech. Accordingly, if there is another possible reading of the statements, *e.g.*, that they are about crime, they cannot be deemed to be about race or discouraging towards a member of that race. And each statement in the Complaint can be read as about something besides race (let alone "discouraging" activity based on race).

The Complaint specifically criticizes Townstone for comparing the rush received from skydiving to wandering the streets of the southside of Chicago in the middle of the night. (Doc. 27, ¶37). This comment is comparing the adrenalin rush many seek out from certain sports or activities, such as skydiving, and the adrenalin rush that would come from the common fear of walking in the dark in an area with a high crime rate. The statement is clearly about crime and does not mention race. And, if it can be read as being about something other than race, as it can be, it must be so read.

Similarly, the discussion of weekends being called "Hoodlum Weekend" is clearly about crime and the need for police to keep order. (Doc. 27, ¶35). "Hoodlum" typically refers to a "violent person" or a "member of a group of criminals." *See* https://dictionary.cambridge.org/dictionary/english/hoodlum. The statement's words (which must be the focus under First Amendment tests) do not address race, but the real problem of crime.

The Complaint even complains about comments made a Townstone former employee that are encouraging the selling and buying of homes ("it's a great time to buy. . . it's a great time to sell") and discussing preparations that should be made prior to putting a home on the market. (Doc. 27, ¶34). Those preparations included changing the light fixtures, painting the house, and a joking reference to taking down the Confederate flag. (*Id.*).[8] While the Bureau apparently feels that this discussion discourages African-American applications, Townstone is puzzled how statements encouraging consumers to buy and sell now and to take down the Confederate flag – a symbol that may make African-Americans uncomfortable – to make a home more desirable to African-Americans can somehow be heard to discourage African-American credit applications. This example convincingly demonstrates how speech can be construed differently by different people and evidences the vagaries of policing Townstone's alleged "discouragement".

The Bureau's attempt to read Townstone's statements to be about race, when they can, and should be read as being about something else, (e.g., crime, support of police, and potential offensiveness of certain symbols, the historical nickname used by local residents for a grocery store) must be rejected as an overreaching attempt to regulate speech about political issues. Townstone was exercising its right to speak on issues of public concern on its show. As the Bureau states in its Complaint, the Townstone Financial Show did not discriminate geographically and was heard across the entire Chicago MSA, including the Southside, and was widely available on the internet. (Doc. 27, ¶29). As alleged by the Bureau, the Townstone Financial Show was designed to create interest in Townstone and to solicit potential credit

---

[8] The instructions to "change the light fixtures" and "paint from top to bottom" were included in the Bureau's original complaint. (Doc. 1, ¶37). To the extent the Bureau attempts to save its complaint by removing context in the hopes that a stand-alone comment about a Confederate flag would inflame the Court, one hopes that such efforts would not be rewarded.

applications from the largest geographical area as possible, in light of Townstone's small-business marketing budget, by providing free information to the public and showing that "no one values your mortgage business more than Townstone Financial." (Doc. 27, ¶¶23-31). It is counterintuitive and contrary to the case law interpreting the First Amendment to interpret Townstone's efforts – that were admittedly designed to encourage mortgage applications – as simultaneously discouraging the same prospective applicants it was attempting to solicit.

A final example of how Reg. B is unconstitutional as applied to Townstone is that Townstone is alleged to have violated ECOA and Reg. B not only for statements it made, but also for statements it is alleged not to have made. The Bureau seeks to punish Townstone, which directed ads to the entire Chicago MSA, for "not specifically target[ing] any marketing toward African-Americans in the Chicago MSA." (Doc. 27, ¶41). Even if ECOA and Reg. B can be read to require such an affirmative requirement, ECOA and Reg. B provide no answer to the questions of how much or the types of targeted advertising that would be necessary to comply. This vagueness chills speech because it provides Townstone with no notice regarding what behavior is appropriate.

Each of these examples demonstrates the vagueness and overbreadth of the Bureau's interpretation of ECOA and Reg. B as applied to Townstone. Because Townstone is wholly unaware of what speech is prohibited or required to comply with its mandates, ECOA and Reg. B are unconstitutional as applied to it and the Bureau's Complaint should be dismissed.

> ii. _Reg. B Violates the First Amendment Because It Is Facially Invalid._

Reg. B's "Discouragement" provision negatively impacts so much protected speech that it should not be applied to anyone, a facial challenge. Each of the examples above demonstrate the difficulty of applying this definition, not only to Townstone, but to any real-world situation.

Reg. B's use of the vague terms and phrases "or otherwise", "prospective applicants", "discourage", and "pursuing an application" create significant uncertainty for the regulated person. The phrase "or otherwise" is as vague as the terms "relative to" and "advocating the election or defeat" of a candidate that were found to be problematic in *Buckley*. *Buckley*, 424 U.S. 1 at 50-55 & n.52. While "advertising" may be reasonably clear, adding the descriptor "or otherwise" makes it wholly ambiguous as to what else is being regulated by Reg. B. For example, under the "or otherwise" phrase, a creditor could be sanctioned based on a remark made by one of its employees at a party attended by a "prospective applicant." That is not what Congress or the First Amendment intends.

Further, the phrase "prospective applicant" can be interpreted to mean literally anyone in the world who has access to the "advertising or otherwise" (even over the internet) that is the subject of discussion. In addition, the phrasing "pursuing an application" can be interpreted to mean any action that could lead to the potential submission of an application, including driving to a creditor's office, such that discouraging driving could fall under this provision. The enormous and unknown reach of these terms will have a substantial chilling effect on speech.

Lastly, the term "discourage" is vague and sweeps in protected content. As demonstrated above, one person's encouragement may be another's "Discouragement". In addition, there are some "prospective applicants" that perhaps should be discouraged from applying for a loan for a myriad of reasons. If the "prospective applicant" is a member of a protected class, potential lenders would be disincentivized to give proper advice to or discuss underwriting standards with that person for fear of running afoul of ECOA. And finally, and significantly under the First Amendment, mortgage lenders would be afraid to engage in *political discussions* in public media for fear of the Bureau believing such statements are "discouraging."

21

Reg. B's "Discouragement" provision is both unconstitutionally vague and overbroad because it creates a "deterrent effect on legitimate expression [that] is…both real and substantial," *Young v. American Mini Theatres, Inc*., 427 U.S. at 60, and "prohibits a substantial amount of protected speech, *Williams*, 553 U.S. at 292. For these reasons, Reg. B should not be applied to Townstone or similarly situated companies.

### D. The Bureau's Use of Reg. B Violates the Fifth Amendment.

The due process clause of the Fifth Amendment states that no person shall be "deprived of life, liberty, or property, without due process of law." Indeed, "a fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C.*, 567 U.S. at 253. "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

Reg. B's definition of "Discouragement" is unconstitutionally vague and fails to give fair notice of the specific conduct that the Bureau arbitrarily interprets to be forbidden or required in this Complaint. There is simply no way for any creditor to know what is proscribed by the Bureau under Reg. B. The Bureau seeks to punish Townstone for (1) expressing political speech on a radio show and podcast; (2) not purchasing advertising targeting specific minority groups; (3) not hiring loan officers that include every specific racial or ethnic demographic in their market area; and (4) failing a "business success" test for which the Bureau uses secret metrics (e.g., creditors have no prior notice of the "peer lenders" to which the Bureau will compare them, or the threshold for compliance). These prohibitions are nowhere in ECOA or Reg. B, nor does

the Bureau provide any guidance about how to comply with them to avoid enforcement. This is the epitome of vagueness and a failure of due process. In its attempt to use ECOA and Reg. B to punish Townstone's actions and inactions, the Complaint violates the due process clause as applied to Townstone and Reg. B's "Discouragement" provision is unconstitutionally vague on its face.

### E. The Bureau Alleged No Other Violations of Federal Consumer Financial Law, and Thus, Count II Fails.

Counts II and III of the Bureau's Complaint against Townstone and Sturner, respectively, must be dismissed because they are wholly derivative of its ECOA claim, which, as described, is fatally flawed. Count II seeks to impose liability under Consumer Financial Protection Act of 2010 (the "CFPA"), 12 U.S.C. § 5536(a)(1)(A). The CFPA punishes "covered persons" like Townstone if they violate any "Federal consumer financial law", like ECOA. Paragraph 61 of the Complaint expressly only mentions violations of ECOA as the predicate acts that would also create liability under the CFPA. (Doc. 27, ¶61). Accordingly, if Count I, which alleges violations of ECOA, is dismissed, the Bureau's tag-along CFPA claim should also be dismissed.

Count III alleges that Sturner improperly transferred money to himself that allegedly should have been available to the Bureau if the Bureau prevails on its ECOA violations, Count I. For the reasons stated herein, Count I should be dismissed. With no underlying liability, there is no reason to look beyond or unwind the transfer making Count III moot and subject to dismissal. Accordingly, the Bureau's derivative second and third counts fail and should be dismissed.

## IV. The Complaint Should be Dismissed With Prejudice.

The Complaint should be dismissed with prejudice because the Bureau already amended

its complaint once and any future amendments would be futile. Rule 15 allows a party to amend its pleading as a matter of right under certain circumstances and "freely . . . when justice so requires." F.R. Civ. P. 15(a)(1)-(2).

Courts may deny a motion for leave to amend for numerous reasons, including delay, futility, and undue prejudice to the opposing party. *Park v. City of Chicago*, 297 F.3d 606, 612 (7th Cir.2002) (citations and quotations omitted). As the Seventh Circuit recognized, courts "generally dismiss the plaintiff's complaint without prejudice and give the plaintiff at least one opportunity to amend her complaint." *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008). However, "[A] motion [to amend] is always made to the sound discretion of the district court and the court may deny a leave to amend where the proposed amendment fails to allege facts which would support a valid theory of liability, ..., or where the party to amend has not shown that the proposed amendment has substantial merit...." *Goulding v. Feinglass*, 811 F.2d 1099, 1103–04 (7th Cir. 1987).

Recognizing this authority, Townstone consented to the Bureau filing the amended Complaint that is now subject to this motion. A comparison of the two complaints shows that other than some slight reorganizing and rephrasing, and adding Count III against Mr. Sturner, the substance of the allegations is only minimally changed. This makes sense, of course, because the Bureau is complaining about events that occurred three to seven years ago. Townstone has been dealing with this investigation, including providing significant documents and sitting for multiple investigational hearings, since 2017. Townstone was forced to pass on potentially fruitful transactions as a result of the Bureau's investigation and spent hundreds of thousands of dollars in legal fees.

Townstone and Sturner ask this Court to say enough is enough and put an end to this

saga. *E.g., Verhein v. S. Bend Lathe, Inc*., 598 F.2d 1061, 1063 (7th Cir. 1979) (ruling that the district court properly denied a plaintiff's motion to amend its complaint since the motion for leave to amend failed to allege facts supporting a valid theory of the defendant's liability and thus failed to cure the defect in the original complaint.) If the Court agrees with Townstone and Sturner that the Complaint should be dismissed for some or all of the reasons stated herein, Townstone and Sturner respectfully ask that that dismissal be made with prejudice.[9]

## V.    **Conclusion**

For the foregoing reasons, Townstone asks the Court to dismiss the Complaint with prejudice.

Respectfully submitted,

/s/ Sean P. Burke
Sean P. Burke #6277203
E. Brenda Kpotufe #34084-49
Mattingly Burke Cohen & Biederman LLP
155 E. Market St., Suite 400
Indianapolis, IN 46204
Sean.Burke@mbcblaw.com
Brenda.Kpotufe@mbcblaw.com

Marx Sterbcow
Sterbcow Law Group
824 Elmwood Park Blvd #205
New Orleans, LA 70123
marx@sterbcowlaw.com

*Attorneys for Defendant Townstone*
*Financial, Inc. and Barry Sturner*

---

[9] Townstone and Sturner ask this Court to award them their legal and expert fees they incurred under the Equal Access to Justice Act, ("EAJA"), 28 U.S.C.§ 2412, which makes the federal government liable for fees where the demand by the agency is found substantially in excess of the decision and is unreasonable when compared with the decision. To the extent the Court would entertain this request Townstone and Sturner would be willing to submit evidence of these expenditures.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2021, a copy of the foregoing was filed electronically. Service of this filing was also made by operation of the Court's CM/ECF system:

Barry Reiferson
Vincent Herman
Michael G. Salemi
Mary E. Olson
Bureau of Consumer Financial Protection
230 S. Dearborn St., Suite 1590
Chicago, IL 60604

And

1700 G Street, NW
Washington, DC 20552


*/s/ Sean P. Burke*_____
Sean P. Burke



Unsafe at Any Bureaucracy, Part III:

The CFPB's Vitiated Legal Case Against Auto-Lenders

REPORT PREPARED BY THE REPUBLICAN STAFF OF THE
COMMITTEE ON FINANCIAL SERVICES, U.S. HOUSE OF REPRESENTATIVES

HON. JEB HENSARLING, CHAIRMAN

115TH CONGRESS, FIRST SESSION
JANUARY 18, 2017

*This report has not been officially adopted by the Committee on Financial Services and may not necessarily reflect the views of its Members.*

# TABLE OF CONTENTS

**Executive Summary**

**Background**

**Disparate Impact**

- Under Current Case Law, The CFPB Cannot Make A *Prima Facie* Case Of Disparate Impact Against Auto-Financers
  - The Text of the Equal Credit Opportunity Act Does Not Give Rise to Disparate Impact Liability
  - New Case Law Shows That The CFPB Could Not Make a *Prima Facie* Case Against Indirect Auto Financers Under *Inclusive Communities*
    - *Discretion is not a "policy" and therefore cannot be used to make out a prima facie case of disparate impact liability*
    - *The CFPB could not meet the robust causality standard of* Inclusive Communities
- The CFPB's Test For Harm In Indirect Auto Lending Makes The Same Errors The Court Rejected In *Inclusive Communities*

**Rulemaking**

- The CFPB Likely Violated The Administrative Procedure Act, Against Its Attorneys' Advice, When Issuing Its Recent Rule Governing Auto Financers

## Executive Summary

This is the third installment in a series of staff reports examining the Bureau of Consumer Financial Protection's (CFPB's) Equal Credit Opportunity Act (ECOA) enforcement actions against indirect auto financers. Part I showed, using internal CFPB documents, that the CFPB's ECOA actions against auto financers were knowingly premised on a suspect legal theory and a fundamentally flawed statistical methodology for estimating the race of borrowers. Part II showed, again using internal CFPB documents, that the CFPB's theory of liability for auto financers cannot meet the legal test for disparate impact.

Part III in this continuing series makes additional CFPB documents available to the public. These documents discuss the CFPB's disparate-impact methodology in more detail. They also reveal potential legal deficiencies in the issuance of the CFPB's major rule authorizing it to supervise the larger participants of the auto lending market.

Part III also demonstrates that under recent Supreme Court precedent, if the CFPB were to rely upon the legal theory it deployed in previous enforcement actions against auto financers, its claims would not survive judicial scrutiny.

# Background

The original Staff Report entitled *Unsafe at Any Bureaucracy I* analyzed the questionable legal basis of the CFPB's disparate-impact enforcement of ECOA against indirect auto financers. Since the release of that report, judicial decisions, including by the U.S. Supreme Court, have further demonstrated the legal insufficiency of the CFPB's position. It is now apparent that the CFPB's auto-lending enforcement actions have been grounded in a fundamental misapplication of the law.

As set forth in detail in previous Committee Staff Reports, most auto dealers offer vehicle financing as a convenience to customers, some through indirect auto financers, sometimes called "indirect auto lenders,"[1] which are assignee creditors that may be banks, captive finance companies,[2] independent finance companies, or credit unions. Prospective car buyers can finance their car through the dealer if they wish. After negotiating the terms of the financing, they execute a contract known as a "Retail Installment Sale Contract" (RISC) that memorializes these terms.

Either before or after entering into a RISC with a car buyer, dealers solicit competitive bids from indirect auto financers to purchase the RISC.[3] Dealers are able to obtain a "wholesale" interest rate for the purchase of a RISC from indirect creditors because of the large volume of credit applications they originate and the origination costs they save for the creditors. Dealers try to maintain a retail margin to cover the costs of their origination operation and provide a return. The difference between the retail rate accepted by the buyer and the wholesale rate quoted by creditors to the dealer is known as "dealer participation" or "dealer reserve," and constitutes the dealer's retail margin.

---

[1] CFPB documents describe these finance companies as "indirect auto *lenders*," although they are more appropriately described as creditors rather than lenders pursuant to state laws.
[2] Captive finance companies are subsidiaries whose purpose is to provide financing to customers buying the parent company's product.
[3] Purchasing the RISC means extending financing in exchange for the future income stream of finance payments made by the car buyer. The assignee becomes the owner of the RISC.

2

The CFPB brought a series of disparate-impact actions against auto finance companies, none of which have yet been challenged in a federal court, and several of which ended in negotiated agreements or public settlements. Disparate impact is a controversial legal theory of liability. Unlike a disparate treatment case, where a "plaintiff must establish that the defendant had a discriminatory intent or motive, a plaintiff bringing a disparate impact claim challenges practices that have a disproportionately adverse effect on minorities and are not otherwise justified by a legitimate rationale."[4] In other words, disparate impact theory states that a law or regulation may prohibit a practice that is discriminatory in effect because it has a disproportionately negative impact on a protected class, even if the defendant has no intent to discriminate and the practice appears neutral on its face. The CFPB has collected some $200 million in penalties that the public knows of from companies in disparate impact enforcement actions related to ECOA, without ever having to set foot in federal court.[5]

The CFPB has claimed that various indirect auto financers are legally liable for disparities in the dealer-participation on RISCs for minority borrowers relative to non-Hispanic white borrowers, despite the fact that auto-dealers (not financers) set their own dealer participation for each RISC they retail.[6] As examined in detail in the Staff Report entitled *Unsafe at Any Bureaucracy I*, the CFPB refused to consider these auto financers' showings that the purported disparities were in fact correlated to and caused by relevant

---

[4] *Texas Dep't of Hous. and Comty. Affairs v. Inclusive Communities Project, Inc.*, 135 S.Ct. 2507, 2513 (2015) (quoting Ricci v. DeStefano, 557 U.S. 557, 577 (2009) (internal quotation marks omitted) (hereinafter "*Inclusive Communities*, Supreme Court"); *see also Unsafe at Any Bureaucracy*, at 8.

[5] *See* Consent Order, *In the Matter of Toyota Motor Credit Corporation*, No. 2016-CFPB-0002 (CFPB Feb. 2, 2016) *available at* http://files.consumerfinance.gov/f/201602_cfpb_consent-order-toyota-motor-credit-corporation.pdf ($21.9 million); *In the Matter of Fifth-Third*, No. 2015-CFPB-0024 (CFPB Sept. 28, 2015), *available at* http://files.consumerfinance.gov/f/201509_cfpb_consent-order-fifth-third-bank.pdf ($18 million); Consent Order, *In the Matter of American Honda Finance Corp.*, No. 2015-CFPB-0014 (CFPB Jul. 14, 2015), *available at* http://files.consumerfinance.gov/f/201507_cfpb_consent-order_honda.pdf ($24 million); Consent Order, *In the Matter of Ally Financial Inc.*, No. 2013-CFPB-0010 (CFPB 19 Dec., 2013), *available at* http://files.consumerfinance.gov/f/201312_cfpb_consent-order_ally.pdf ($80 million); CFPB, Supervisory Highlights, 4 (Summer 2014), http://files.consumerfinance.gov/f/201409_cfpb_supervisory-highlights_auto-lending_summer-2014.pdf ("[T]ogether with the DOJ, the Bureau took public enforcement action against Ally Financial Inc. and Ally Bank (collectively, Ally) in December 2013, requiring Ally to pay $80 million to address harm to about 235,000 borrowers. Supervisory resolutions with several other auto lenders will account for the remaining approximately $56 million. . . . ").

[6] Dealer participation is capped at a maximum of 175-250 basis points industry-wide.

characteristics of the RISCs' terms and circumstances and relevant borrower credit characteristics, not the race of the borrower.

Now, case law applying recent Supreme Court precedent has demonstrated again how weak the CFPB's legal case is. In *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*,[7] a case involving disparate impact claims under the Fair Housing Act, the Supreme Court set forth rigorous legal tests for disparate-impact liability, including an exacting burden of proof to establish a *prima facie* case of disparate impact.[8] Application of those standards to the enforcement actions brought by the CFPB against auto financing companies would result in almost certain dismissal of those claims.

## Disparate Impact

### Under Current Case Law, The CFPB Cannot Make A *Prima Facie* Case Of Disparate Impact Against Auto Financers

**The Text of the Equal Credit Opportunity Act Does Not Give Rise to Disparate Impact Liability**

The CFPB employs a "disparate impact" theory of discrimination when enforcing ECOA despite the lack of a valid legal or statutory basis for doing so.[9] One searches the text of ECOA in vain for any language giving rise to a disparate impact theory of liability. The Staff Report entitled *Unsafe at Any Bureaucracy I* highlighted the absence of any case law supporting the CFPB's attempt to import disparate impact theory into ECOA, and showed that the operative language in other statutes that courts have construed to imply disparate-

---

[7] This case considered whether the Fair Housing Act gave rise to disparate-impact liability.

[8] *See Inclusive Communities*, Supreme Court.

[9] *See* Consumer Financial Protection Bureau, Bureau Bulletin 2012-04 (Fair Lending) (Apr. 18, 2012), *available at* http://files.consumerfinance.gov/f/201404_cfpb_bulletin_lending_discrimination.pdf ("[T]he CFPB reaffirms that the legal doctrine of disparate impact remains applicable as the Bureau exercises its supervision and enforcement authority to enforce compliance with the ECOA and Regulation B.").

impact liability is nowhere to be found in ECOA. Yet that has not stopped the CFPB from charging ahead with multiple cases against auto financers under a baseless legal theory.

In the absence of a Supreme Court case on ECOA, the CFPB has analogized to cases interpreting laws with different statutory text and context from ECOA, most notably, the Fair Housing Act (FHA). At a March 2016 hearing before the House Financial Services Committee, Representative Randy Hultgren explained that the *Inclusive Communities* holding that disparate impact was cognizable under the FHA "rested primarily on the unique congressional history of FHA — history that is plainly inapplicable to ECOA." CFPB Director Richard Cordray responded by claiming that the FHA and ECOA "have been applied hand in glove for decades."[10] A review of the relevant legal landscape contradicts Director Cordray on this point.

In *Griggs v. Duke Power* and *Smith v. City of Jackson*, the Supreme Court inferred disparate impact liability from the text of the Civil Rights Act and the Age Discrimination in Employment Act, respectively, with the *Griggs* Court holding that Congress had "directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation."[11] The Court applied the rule *Griggs* and *Smith* established to reach the same conclusion about the FHA in the *Inclusive Communities* case, after examining the language of the FHA and holding that its "results-oriented language counsels in favor of recognizing disparate-impact liability."[12]

By contrast, ECOA contains no such consequences-based language, but focuses solely on the intent of the actor. A textual comparison of ECOA and the Fair Housing Act illustrates this critical distinction.[13] The FHA expressly prohibits an actor from acting in any way that results in any person being denied housing on the basis of race: "It shall be

---

[10] *The Semi-Annual Report of the Bureau of Consumer Financial Protection: Hearing Before the H. Comm. On Fin. Servs.*, 114th Cong. (2016) (statements of Rep. Hultgren and Director Cordray).

[11] *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971) (emphasis added); *see Smith v. City of Jackson*, 544 U.S. 228 (2005). For further analysis, see *Unsafe at Any Bureaucracy*.

[12] *Inclusive Communities*, Supreme Court, at 2518.

[13] *See Unsafe at any Bureaucracy*, at 14.

unlawful . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."[14]  This is the results-oriented statutory language the Court relied on in *Inclusive Communities* to hold that disparate impact claims were cognizable under the FHA.  ECOA's text, on the other hand, contains no such results-oriented provision.  Instead, it prohibits an actor from *discriminating* on the basis of race:  "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age. . . ."[15]  Due to the absence of results-oriented statutory language, under *Inclusive Communities*, disparate impact is not cognizable under ECOA.

The FHA's legislative history provides additional grounds for differentiating it from ECOA on the issue of disparate impact.  In the case of the FHA, prior to the Supreme Court's holding in *Inclusive Communities,* the lower courts issued a series of opinions holding that the FHA authorized disparate-impact liability.[16]  Subsequently, Congress amended the FHA to exempt certain activities that could only have violated the law if the FHA authorized disparate-impact.[17]  The Court in *Inclusive Communities* interpreted Congress' amendment as a ratification of those prior holdings finding disparate impact liability.[18]  However, Congress has made no such amendments to ECOA.

**New Case Law Shows the CFPB Could Not Make a *Prima Facie* Case Against Indirect Auto Financers Under *Inclusive Communities***

Even if ECOA authorized disparate impact enforcement actions, which it does not, the CFPB still could not make a legally valid case for its enforcement actions against auto financers.  As outlined in greater detail below, in *Inclusive Communities*, the Supreme Court set an exacting burden of proof to establish a *prima facie* case of disparate impact.  On

---

[14] 42 U.S.C. § 3604(a).
[15] 15 U.S.C. § 1691(a).
[16] *Id.* at 2520-21.
[17] *Id.* at 2520-21.
[18] *Id.* at 2520-21.

remand, the district court applied that standard and ruled that discretion does not constitute a policy pursuant to a disparate-impact theory. The CFPB's entire theory of liability against indirect auto financers is premised on the claim that individual auto dealers' ability to set discretionary dealer participation constitutes a policy on the part of the auto financer — a theory that *Inclusive Communities* conclusively refutes.

The facts underlying *Inclusive Communities* pertain to a housing authority in Dallas that granted tax credits to builders of low-income housing on a discretionary basis. The federal government provided tax credits to the states to distribute to developers, which Texas did in this case through the defendant housing authority.[19] Developers could then apply for the tax credits which could be "sold to finance construction of a housing project," which the housing authority granted on a discretionary basis.[20] Any developers who received these housing tax credits were required by law to accept recipients of Section 8 housing vouchers.[21] The plaintiff in the case alleged that the housing authority's allocation of tax credits in Dallas had "a disparate impact on the location of low-income housing in the area."[22] Specifically, the plaintiffs alleged that the housing authority's "use of discretion in the aggregate resulted in an approval rate for units located in Caucasian areas of nearly half the approval rate for units located in minority areas," and that the housing authority's "decisions to deny or approve applications for specific applications for . . . tax credits" was "evidence of disparate impact."[23]

The Supreme Court opinion in *Inclusive Communities* focused primarily on the parameters of a disparate impact claim. First, the Court noted the three-step burden-shifting test that the Department of Housing and Urban Development had adopted by regulation and the Fifth Circuit Court of Appeals applied below, as follows: (1) the plaintiff must "make a prima facie showing of disparate impact," which requires meeting the "burden of proving that a challenged practice caused or predictably will cause a

---

[19] *Id.* at 11-12.
[20] *Id.* at 11-12.
[21] *Id.* at 11-12.
[22] *Id.* at 11-12.
[23] *Id.* at 11-12.

discriminatory effect";[24] (2) if the plaintiff makes out a *prima facie* case, "the burden shifts to the defendant to prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests";[25] (3) if the defendant proves the practice served a legitimate interest the burden shifts back to the plaintiff to "prov[e] that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."[26]

Turning to the heart of the case, the Court found that disparate-impact liability "has always been properly limited in key respects."[27] A key limitation on disparate-impact liability is that plaintiffs must establish a defendant's "policy or policies caus[ed] this disparity."[28] This requires a twofold showing: both that the defendant had a policy in place, and that the policy caused the disparity at issue. The holding stressed the "robust causality requirement" needed to show that a policy of the defendants caused the disparity.[29] The Court emphasized two purposes of such a robust requirement. The first is to avoid incentivizing the use of racial quotas and causing entities to create policies that "in fact, tend to perpetuate race-based considerations rather than move beyond them."[30] The second is to "protect[] defendants from being held liable for racial disparities they did not create," and "protect potential defendants against abusive disparate impact claims."[31]

In addition to establishing plaintiffs' *prima facie* burdens, the opinion held that courts must give both government and private defendants "leeway to state and explain the valid interest served by their policies . . . analogous to the business necessity standard

---

[24] *Id.* at 4-5; *see also Inclusive Communities Project, Inc., v. Texas Dep't of Hous. and Comty. Affairs*, Nos. 12–11211, 13–10306., slip op. (5th Cir., Mar. 24, 2014) (hereinafter "*Inclusive Communities*, 5th Circuit").
[25] *Inclusive* Communities, Supreme Court at 2514-15; *see also Inclusive Communities*, 5th Circuit.
[26] *Inclusive* Communities, Supreme Court at 2514-15 (internal quotation marks and citations omitted); *see also Inclusive Communities*, 5th Circuit.
[27] *Inclusive Communities*, Supreme Court, at 2522.
[28] *Id.* at 2523.
[29] *Id.* at 2523. The Court highlighted in particular that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.*
[30] *Id.* at 2524.
[31] *Id.* at 2523-24.

under Title VII."[32]  This leeway is because defendants must "be allowed to maintain a policy if they can prove it is necessary to achieve a valid interest."[33]

The Supreme Court decided *Inclusive Communities* in 2015 and remanded the case to the appellate court, which in turn remanded it to the district court for disposition consistent with the Supreme Court's holding.  In August 2016, the District Court for the Northern District of Texas stated that its prior conclusion that the plaintiff had made a *prima facie* case was "reached without the benefit of the Supreme Court's decision in this case," and changed its decision in light of the Supreme Court's holding.[34]  It found that the plaintiff could not state a *prima facie* case of disparate impact under the Supreme Court's opinion.

## *Discretion is not a "policy" and therefore cannot be used to make out a prima facie case of disparate impact liability*

The District Court held that the plaintiff had failed to meet the burden of proof the Supreme Court requires to show disparate impact because discretion is not a cognizable policy under disparate-impact analysis.  The District Court held that as a matter of law a generalized policy of discretion is not a specific policy or practice that can be said to cause the alleged disparity, but rather a series of "cumulative effects."[35]  Indeed, it held that if "the plaintiff establishes a subjective policy, such as the use of discretion, has been used to achieve racial disparity, the plaintiff has shown disparate treatment," *not* disparate impact.[36]  Disparate impact, by contrast, requires the plaintiff to "establish[] that the existence of the policy itself, rather than how the policy is applied, resulted in a racial disparity."[37]  The court went on to find that because the plaintiff was merely complaining

---

[32] *Id.* at 2522.
[33] *Id.* at 2523.
[34] *Inclusive Communities Project, Inc.*, v. *Texas Dep't of Hous. and Comty. Affairs*, No. 3:08-CV-0546, slip op. at 3, 32 (N.D. TX, Aug. 26, 2016) (hereinafter "*Inclusive Communities*, District Court").
[35] *Id.* at 15.
[36] *Id.* at 18.
[37] *Id.* at 17.

about the "results of [the defendant]'s discretion, not the exercise of discretion," it had failed to demonstrate a *prima facie* case of discrimination.[38]

Because the CFPB's case against indirect auto financers is premised on the claim that discretion is a policy,[39] it would also fail under an application of the Supreme Court's rigorous *Inclusive Communities* standard. The CFPB has pointed to auto financers' "policy" of discretion whereby the dealers, not the financers, have the discretion to determine whether and how much dealer participation to charge.[40] However, because discretion is not a specific policy, it cannot give rise to disparate impact liability.

The CFPB would likely point to an ancillary point made by the District Court opinion in an attempt to salvage its argument. The court noted that the plaintiff was properly understood as bringing a disparate treatment claim rather than a disparate impact claim, because the relief the plaintiff sought was not an order eliminating the housing authority's ability to exercise discretion but rather an order forcing the housing authority to exercise that discretion to reduce racial segregation in low-income housing.[41] The CFPB would likely argue that because it seeks to cap the level of discretion that car dealers may exercise, not force auto dealers to exercise their discretion in a particular way, discretion constitutes a "policy" in its cases against the auto financers.

There are several flaws in this line of reasoning. First, the court merely pointed to the relief sought as an illustration of the point it had already arrived at through the application of precedent and logic. Namely, that discretion is not in itself a policy capable

---

[38] *Id.* at 18.

[39] *See e.g.* November 19, 2014, Decision Memorandum, 'Authorization to Seek a Settlement or Commence Litigation', at 11, ("As described above, Honda, Toyota, and Nissan each maintain a specific policy and practice that provides dealers discretion to mark up borrowers' interest rates above each institution's established buy rates, and compensates dealers for those markups.").

[40] *See e.g.*, Consent Order, *In the Matter of Toyota Motor Credit Corporation*, No. 2016-CFPB-0002, ¶11 (CFPB Feb. 2, 2016) *available at* http://files.consumerfinance.gov/f/201602_cfpb_consent-order-toyota-motor-credit-corporation.pdf ("With respect to non-subvented retail installment contracts, Respondent maintains a specific policy and practice that provides dealers discretion to mark up a consumer's interest rate above Respondent's established risk-based buy rate.").

[41] *Inclusive Communities*, District Court, at 18.

of creating a disparate impact, but rather an absence of a policy, and instead the ad hoc discretionary decisions either are motivated by an intention to treat minorities differently (and therefore illegal because they are disparate treatment, not disparate impact), or are not (and therefore are not illegal). Second, the fact that the plaintiff in *Inclusive Communities* sought to address its complaints about the "results of [the defendant]'s discretion" by seeking to make the defendant exercise that discretion to secure different results does not change the baseline conclusion that the results of discretion simply cannot be defined as the results of a policy. Third, none of the consent orders resolving the CFPB's actions against auto financers had the effect of eliminating the discretion of a dealer to charge a dealer participation, but rather imposed lower ceilings on how much reserve dealers can charge. Fourth, if anything, the fact pattern in indirect auto lending is still further removed from a "specific policy." In *Inclusive Communities* the discretion was actually exercised by the defendant in the case. By contrast, indirect auto financers are not the parties that exercise the discretion to set dealer participation; that discretion is exercised by auto dealers. Thus financers' relationship to the results of discretion is even more attenuated than that of the housing authority in *Inclusive Communities*.

Further support for the holding that discretion is not a policy comes from another case decided by a federal district court in the aftermath of the *Inclusive Communities* Supreme Court case. In *City of Los Angeles v. Wells Fargo & Co*, plaintiffs alleged that Wells Fargo had violated the Fair Housing Act's disparate impact prohibition by issuing mortgages that imposed different terms or costs on minority borrowers.[42] In that case the plaintiff did not claim that the defendant had a policy of discretion per se, but it claimed that the defendant's "inadequate monitoring policies resulted in the disparate issuance of [h]igh-[c]ost loans to minority borrowers."[43] The court summarized this position as an argument that "a *lack* of a policy produced the disparate impact."[44] In other words: discretion. The court ruled that the plaintiff failed to make a valid disparate impact claim

---

[42] *City of Los Angeles v. Wells Fargo & Co*., No. 13-09007, at 2 (C.D. Calif. Jul. 17, 2015).
[43] *Id*. at 16.
[44] *Id.* at 16 (emphasis in original).

because the plaintiff could not meet *Inclusive Communities*' requirement to identify an "actual policy" of the defendants as part of the causation showing.[45]

*The CFPB could not meet the robust causality standard of* Inclusive Communities

The District Court in the *Inclusive Communities* remand case next turned to the question of causation. The District Court found that even if, *arguendo*, discretion were a policy, the plaintiff would still have no actionable claim against the housing authority because it had "not proved that it was [the defendant]'s exercise of discretion — and not something else — that caused" the disparity.[46] So even if disparate-impact actions were cognizable under ECOA, and even if discretion were a policy for the purposes of making out a *prima facie* case, the CFPB still could not prove that dealer discretion to set dealer participation caused the alleged disparity because it cannot prove that the exercise of discretion caused the disparities it observed.

In the *Inclusive Communities* opinion, the Supreme Court articulated a "robust causality requirement" designed to "ensure[] that [r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact and thus protect[] defendants from being held liable for racial disparities they did not create."[47] The Court incorporated this protection because if it did not, "disparate-impact liability might displace valid governmental and private priorities," which would in turn "set our Nation back in its quest to reduce the salience of race in our social and economic system," whereas disparate-impact liability must properly be applied to "remov[e] . . . artificial, arbitrary, and unnecessary barriers."[48] The Court further held that if the plaintiff could not meet its burden to show a causal connection between a defendant's policy and a disparate impact, it "should result in dismissal of this case."[49]

---

[45] *Id.* at 16.

[46] *Inclusive Communities*, District Court, at 19. The court also held that providing the requested relief of forcing the plaintiff to "monitor relevant data" and "correct the disproportionate issuance" of high-cost loans to minorities "is a roundabout way of arguing for a racial quota," which is explicitly prohibited by the *Inclusive Communities* decision due to the Constitutional issues it would raise. *Id.* at 16-17.

[47] *Inclusive Communities*, Supreme Court, at 2523 (internal quotation marks and citation omitted).

[48] *Id.* at 2524 (internal quotation marks and citation omitted).

[49] *Id.* at 2524; *see also Inclusive Communities*, District Court, at 20-21.

Applying the Supreme Court's "robust" causation standard, the District Court found that the plaintiff failed to make a *prima facie* case of disparate impact.[50]  It first noted that there is no evidence the statistical disparity would have been eliminated had the housing authority been forced to use a particular points-system for awarding tax credits rather than exercising discretion.[51]  The court then found that that the plaintiff did not show causation because it failed to account for "other potential causes of the statistical disparity."[52]  The Supreme Court had recognized that in this case it "may be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units."[53]  The District Court pointed out that there were multiple potential causes of the disparity alleged in the case, such as developers' considerations, local governments' preferences, and federal laws mandating preferences for low-income communities in awarding tax credits.[54]  Therefore the plaintiff failed to meet its burden to prove that the housing authority's "exercise of discretion — and not other factors — caused the statistical disparity."[55]  Because the plaintiff failed to meet its burden to show that it was the housing authority's exercise of discretion that caused the disparity, it could not have made out a disparate impact case even if discretion were a policy as a matter of law.

Nor could the CFPB make a sufficient showing of causation if its auto-lending enforcement strategy were ever exposed to scrutiny by a federal court.  As the previous Staff Reports have demonstrated, the CFPB was informed time and again of factors other than race that completely or almost completely accounted for the disparities in dealer participation the CFPB alleged it found in various indirect auto financers' portfolios.[56]  These factors included the credit score, the new or used status of the vehicle, the term of

---

[50] *Inclusive Communities,* District Court, at 6, 10, 19, 25, 30.

[51] *Id.* at 19.

[52] *Id.* at 20.

[53] *Inclusive Communities,* Supreme Court, at 2523-24; *see also Inclusive Communities,* District Court, at 20-21.

[54] *Inclusive Communities,* District Court, at 19-23.

[55] *Id.* at 21.  The plaintiff attempted to prove that some of the potential factors were not causes of the disparity but its analysis suffered from methodological problems, such as comparing the cumulative results of annual tax credit awards over many years rather than comparing tax credit awards within each year against one another as the housing authority did when reaching its decisions.  *Id.* at 22.

[56] *Unsafe at any Bureaucracy*, at 38-39.

repayment, the dealer, and the geographical area.[57]  The Supreme Court viewed a robust *prima facie* causality showing as a necessary step in safeguarding valid business and other priorities.  Each of the above factors represents a potential valid business priority.  For example, a borrower with a lower credit score may be less appealing to financers, and the dealer may have to expend significantly more time and effort to find him or her financing.  Under the robust standard of causation set forth in *Inclusive Communities*, the CFPB must consider each of these factors and any other relevant factors and prove that each one did not cause the disparity in order to meet its burden to show that a policy of the financers did cause the disparity.  However, based on its internal documents, it appears the CFPB does not even consider these factors when making a showing of correlation, much less causation.

In order to make a valid comparison between the dealer participation charged to consumers of different races one should compare consumers only with other similarly-situated consumers.  For example, RISCs of borrowers seeking a 5-year car repayment term should be compared only against RISCs of other borrowers seeking the same repayment term, not the RISCs of consumers with a 7-year repayment term, in order to tell if there is really a difference in dealer participation between people of different races or only between people who select different terms.  But, as extensive internal CFPB documentation has revealed,[58] when determining whether differences in dealer participation are correlated to race the CFPB does not regress out other variables to assess whether the differences in dealer participation are truly correlated to race or whether they are in fact correlated to some other relevant borrower characteristic (like geographical area, credit score, or term).

Court documents demonstrate one theory the CFPB likely relied on to try to justify its decision to ignore these variables.  The Department of Justice (DOJ) filed a complaint

---

[57] *Id.* at 38-39.
[58] *See generally Unsafe at any Bureaucracy; Unsafe at any Bureaucracy II.*

(later settled) against Toyota on the basis of the CFPB's decision to "refer[] Toyota to the United States Department of Justice pursuant to ECOA."[59]  The complaint alleged:

> The United States's and the CFPB's markup analyses focused on the interest rate difference between each borrower's contract rate and each borrower's buy rate set by Toyota.  Toyota considers individual borrowers' creditworthiness and other objective criteria related to borrower risk in setting the buy rate . . . . The dealer markups charged by Toyota to consumers are based on dealer discretion and are separate from, and not controlled by, the adjustments for creditworthiness and other objective criteria related to borrower risk that are already reflected in the buy rate.  Toyota's markup policy provided for dealer discretion and did not include consideration of these factors.  Because the analysis focused on only the difference between each borrower's contract rate and buy rate, it did not make additional adjustments for creditworthiness or other objective criteria related to borrower risk.[60]

In other words, the DOJ and CFPB's analysis treated factors such as credit score, geography, new/used status, term of the loan, etc. as if they were irrelevant to setting dealer participation.  The apparent rationale is that the agencies believed the factors were relevant only to risk-based pricing of the buy rate and were therefore already "baked in" to the buy rate, rendering it unnecessary or even double-counting to consider them in analyzing dealer participation.

The CFPB's internal documentation shows that this theory was applied internally as well.  In one memorandum to Director Cordray, CFPB staff justified its decision not to control for relevant potentially explanatory variables by claiming:

---

[59] Complaint, *U.S. v. Toyota Motor Credit Corp.*, No. cv-16-725, ¶16 (Feb. 2, 2016, C.D. Cal.).
[60] *Id*. at ¶20.

> Given the fact that Honda, Toyota, and [Institution C]'s buy rate on any given transaction already accounted for characteristics associated with the borrower's creditworthiness, the characteristics of the vehicle, and the timing, location, and structure of the deal, such factors were not included as controls in the analysis, which focused on dealer markups.[61]

This reasoning closely tracks an approach promoted by Professor Ian Ayres, suggesting that the CFPB may be relying on or incorporating his theory in its own position. This theory is known as "included variable bias" theory, which is the opposite of the standard and accepted statistical "omitted variable bias" analysis. Ayres has written several articles on the subject, and served as an expert witness for the plaintiffs in a 2004 class-action lawsuit against Honda's financing arm, a case that was ultimately settled (prior to a ruling on class certification) on terms including an agreement to cap dealer participation at 250 basis points (2.5 percentage points).[62] For that case, Ayres wrote a report supporting class certification, arguing that "[i]ncluding controls for non-race factors that do not represent legitimate business justifications can bias the estimate of whether a decisionmaker's policies produced an unjustified disparate impact."[63] Whereas "omitted variable bias" refers to the idea that failing to control for factors other than the one being tested for — here, race or ethnicity — creates a statistical bias, "included variable bias" theory holds that "[i]t is inappropriate to control for these non-race factors in the regression under a disparate impact theory, because the statistician wants to see whether these non-race factors produce racially disparate outcomes."[64] However, this misunderstands the legal analysis required, which is to determine whether the defendant's policy produces racially disparate outcomes, not whether other non-race factors produce racially disparate outcomes.

---

[61] November 19, 2014, Decision Memorandum, 'Authorization to Seek a Settlement or Commence Litigation', at 13.

[62] *See* Settlement Agreement at ¶9.1, Jan. 21, 2005, *Willis et al. v. American Honda Finance Corp.*, class action, No. 3-02-0490 (M.D. Tenn.); *see also* Docket, *Willis et al. v. American Honda Finance Corp.*, class action, No. 3-02-0490 (M.D. Tenn.).

[63] Expert Report Of Ian Ayres at 7, Jun. 30, 2004, *Willis et al. v. American Honda Finance Corp.*, class action, No. 3-02-0490 (M.D. Tenn.).

[64] *Id*. at 6.

Ayres further argued that in that particular case Honda's "centralized credit scoring process . . . base[s] credit determinations on arms-length, non-subjective criteria" and that because Honda "exclusively bears the risk of non-repayment of its principal and . . . it bases its lending and buy-rate decisions exclusively on information that is embedded in its available databases, it is disingenuous to argue that dealerships (who are not bearing any risk of non-repayment of principal) are nonetheless making risk-based decisions."[65]

Ayres' argument ignores the fact that these factors do not only predict risk of non-repayment of principal, but also directly reflect the origination costs dealers face when working to find financing for their customers. Dealers have to make a significant investment to obtain financing for borrowers and that investment varies depending on the borrower. For example, a dealer must expend significantly more time and effort to find financing for buyers with poor credit or buyers who wish to enter into RISCs with terms that are more complicated or companies are less eager to finance, such as longer repayment periods. The dealer has to factor in the real costs, time-cost, overhead cost, opportunity cost, etc. to the retail pricing decision. None of this pricing is contingent on the risk of non-repayment of principal, but rather on the cost of originating or retailing the RISC. In addition, the dealer must also price in risk in some circumstances. Where the dealer issues a RISC to a borrower before securing financing and then sells the RISC after the fact (called a "spot delivery"), the dealer must in fact price in risk of non-repayment of capital. And, on all RISCs the dealer must price in the risk of losing his compensation if the borrower defaults within the first 90 days of the loan period.

Ayres also argued that "[u]nder a disparate impact theory, it is necessary to intentionally exclude (that is, "omit") non-race variables from a regression to test whether those variables produced a disparate racial impact."[66] This argument is convincing to a point, as it would seem to make little sense to control for variables that bear no reasonable relation to the cost or price of assigning or originating a RISC, especially if they are

---

[65] *Id*. at 26.
[66] *Id*. at 5.

correlated with race or ethnicity. To use a simplistic example, a person's eye color has no reasonable bearing on the ease or difficulty a dealer may have in obtaining financing for that person or any other cost or credit-risk factors, but it may be correlated with race or ethnicity, so it would be self-defeating to control for eye color in a disparate impact case and inappropriate to include it in the *prima facie* analysis. Similarly, whether the person is a dog or a cat owner, while having nothing to do with race, is an inapposite control because it has no plausible connection with the cost (including time-cost, overhead cost, risk pricing, etc.) of assigning a RISC.

However, Ayres took this argument past its logical extreme by arguing that in a disparate impact case regarding dealer reserve, the "qualified pool is simply the class of Honda Finance borrowers" without regressing out any non-racial characteristics. Under this approach, a fact-finder should "simply compare the average finance markup charged" to minority versus non-Hispanic white borrowers.[67] His reasoning was that "Honda Finance's own willingness to lend to this class is direct evidence that these borrowers were deemed by Honda Finance to be qualified borrowers."[68]

This argument has several flaws. First, it ignores the fact that there is not simply a binary choice between qualified and unqualified borrowers but a spectrum of financing rates and terms that various applicants will be qualified for depending on multiple pertinent factors, which in turn will make each applicant more or less difficult and costly for the dealer to obtain financing for. This in turn will affect the retail price of the RISC. Second, the fact that some characteristics are plainly irrelevant does not refute the point that many factors like those discussed above *are* relevant and must be controlled for to reach an accurate picture of whether disparate impact has in fact occurred. Third, this argument fails to account for the heightened burden the courts have placed on plaintiffs to make a *prima facie* case, as in *Inclusive Communities*. A *prima facie* case must prove that the

---

[67] *Id.* at 9.
[68] *Id*. at 9.

plaintiff's policy and not some other factor (such as creditworthiness, geography, etc.) caused disparate impact.

Moreover, even Ayres conceded that some variables should be considered in disparate impact analysis, even if he advocated against using such variables to analyze dealer participation. He argued that "a variable should be presumptively excluded from the statistical analysis unless the defendant can demonstrate separate from the regression that the variable was required and affected performance."[69] In other words, he appears to believe that the inclusion of variables should be the defendant's burden, presumably falling under the business necessity prong of the three-step burden-shifting analysis. But this is inconsistent with the standard articulated by the Supreme Court in *Inclusive Communities*.

Internal documentation of the CFPB's process shows that not only did the CFPB fail to conduct appropriate regression analysis to make out its *prima facie* case under the first stage of the burden-shifting test, it also refused to accept the reasonable regression analysis proposed by auto financers under the second stage of the burden-shifting test. In a memorandum for the Director, the CFPB nominally considered and summarily dismissed potentially explanatory non-racial factors only under the first prong of the test (ultimately deciding not to control for such factors for the reasons discussed above) and did not even raise these factors under the "Legitimate Business Need" (or, stage two) section of the memorandum.[70]

Indeed, the CFPB had ample actual and constructive knowledge of such factors and their explanatory value. It was presented on multiple occasions with potentially explanatory factors along with explanations for their relevance.[71] Yet the CFPB refused to

---

[69] *Id*. at 7 (internal quotations marks and brackets omitted).

[70] November 19, 2014, Decision Memorandum, 'Authorization to Seek a Settlement or Commence Litigation', at 13, 19.

[71] *See e.g.* November 19, 2014, Decision Memorandum, 'Authorization to Seek a Settlement or Commence Litigation', at 13, 19; January 17, 2013, Institution A PARR/NORA Submission, 3 (included in February 14, 2014 CFPB Referral of Institution A Matter to DOJ); April_2013 Draft Memorandum, "Choice of Estimation Methods for Indirect Auto Lending Markup Disparities," Draft 1, 1-2; April_2013 Draft Memorandum, "Choice of Estimation Methods for Indirect Auto Lending Markup Disparities," Draft 2, 1-2.

control for those factors.[72]  And, at least as early as 2007 the DOJ entered into well-publicized consent orders settling disparate impact cases,[73] which recognized seven variables as valid "competitive reason[s] that are consistent with ECOA" under a disparate impact theory and that would cause dealers to set different dealer participation.[74]  Yet nowhere did the CFPB control for those factors either.

If, as appears to be the case, the CFPB were relying on Ayres' theory, *Inclusive Communities* would eliminate any doubt that such analysis is insufficient to show disparate impact.  As discussed above, both the Supreme Court and the District Court made it clear that in a disparate-impact suit the CFPB would have a robust initial burden, both to show that a disparity actually exists (here, by comparing similarly-situated borrowers) and to show that any disparity is caused by the policy itself and not by various market or other forces.  Moreover, even under the burden-shifting test an auto financer would be easily able to show that its policy was needed to meet legitimate, non-discriminatory, interests, as discussed above and in previous Staff Reports.[75]  While the CFPB could not meet its heightened burden to show that the auto financers' "policy" caused the disparate impact, the auto financers could show that their policy met several legitimate business interests.

If the CFPB brought such an action in federal court (setting aside the dispositive fact that discretion is not a policy) using the models and factors it currently considers in applying disparate impact, it could not set forth a case that would satisfy the standard established by Supreme Court precedent.  Nothing less than considering all relevant

---

[72] *See e.g.* id; *see also*  January 17, 2013, Institution A PARR/NORA Submission, 3 (included in February 14, 2014 CFPB Referral of Institution A Matter to DOJ); April_2013 Draft Memorandum, "Choice of Estimation Methods for Indirect Auto Lending Markup Disparities," Draft 1, 1-2; April_2013 Draft Memorandum, "Choice of Estimation Methods for Indirect Auto Lending Markup Disparities," Draft 2, 1-2.

[73] *See* Consent Order, *United States v. Pacifico Ford, Inc.*, No. 2:07-cv-03470-PBT (E.D. Pa. Aug. 28, 2007); Consent Order, *United States v. Springfield Ford*, No. 2:07-cv-03469-PBT (E.D. Pa. Aug. 28, 2007).

[74] Those seven reasons are: (1) "a lower cap imposed by the lender for the particular transaction;" (2) "a constraint on the customer's ability to satisfy monthly payment requirements;" (3) "a statement by the customer that he or she has access to an equal or more favorable offer from another dealer or lender;" (4) "a special promotional offer extended to all customers on the same terms;" (5) "the fact that a particular transaction is eligible for . . . [a manufacturer] Credit or other subvened interest rates;" (6) "the fact that the transaction is eligible for . . . [the dealer's] employee incentive program"; or (7) "documented inventory reduction considerations related to specific vehicles."  *Pacifico Ford.* at ¶7(b); *Springfield Ford* at ¶7(b).

[75] *See Inclusive Communities*, Supreme Court, at 2514-15.

explanatory factors will do, i.e., the traditional "omitted variable bias" analysis advocated by the targets of the CFPB's actions. The CFPB could not meet its burden of proving that the defendant's "exercise of discretion — and not other factors — caused the statistical disparity,"[76] and, even if it could, it would have to overcome the auto financers' showings of a legitimate business need.

This sheds light on yet another significant problem with the CFPB's case that is related to causation, namely that causation is so attenuated here that it may not be sufficient to confer standing on the CFPB to sue the auto financer in the first place because the *dealer* exercises the discretion over what dealer participation to charge, not the auto financer.[77] The "irreducible constitutional minimum" required to show standing includes "a causal connection between the injury and the conduct complained of" whereby the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."[78]

When the District Court in the *Inclusive Communities* case addressed causation, although it was not considering standing, it is nonetheless highly telling that the entire focus of its inquiry was whether the housing authority's *exercise* of discretion caused the disparity. Car dealers exercise the discretion to set dealer participation in the auto-lending context, not financers. Even if there were legal grounds for the CFPB to sue, the appropriate defendants would be the car dealers, not the auto financers. However the CFPB cannot sue car dealers because the Dodd-Frank Act expressly forbids it from doing so.[79] To circumvent this statutory prohibition, the CFPB concocted an elaborate and

---

[76] *Inclusive Communities,* District Court, at 21.

[77] The dealer has discretion to set his own dealer participation within the parameters of the common industry caps of 175-200 basis points maximum.

[78] *See e.g. Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561-61 (Jun. 12, 1992) (internal citations and quotation marks omitted).

[79] Dodd–Frank Wall Street Reform and Consumer Protection Act § 1029(a), 12 U.S.C. § 5519(a) (2012). It is also important to note that the CFPB's case against car dealers would be plagued by all the same legal and evidentiary deficiencies as its case against auto financers, such as the lack of statutory authorization to pursue disparate impact claims, inability to make a prima facie showing of causation, and inability to rebut the legitimate business needs defense.

unfounded legal theory of liability so it could go through auto financers in an attempt to attack the car dealers indirectly.

### The CFPB's Test For Harm In Indirect Auto Lending Makes The Same Errors The Court Rejected In Inclusive Communities

The CFPB has not only pursued disparate impact actions against auto financers, it has forced several to settle their claims using an invalid calculus of consumer harm.  As noted in *Unsafe at Any Bureaucracy II*, the CPFB's definition of harm, which it uses to determine eligibility for remuneration,[80] is incorrect.  When distributing the funds from the disparate-impact settlement it reached with Ally, the CPFB considered borrowers who entered into RISCs financed by Ally during the relevant time period to be eligible for monetary relief if:  (1) "at least one borrower on the contract . . . [is believed by the CFPB to be] African American, Black, Latino, Hispanic, of Spanish origin, Asian, Native Hawaiian, and/or other Pacific Islander";[81] and (2) the borrower was "identified by the . . . [CFPB and DOJ] as having been overcharged."[82]  The CFPB defined "overcharged" as "paying more than the non-Hispanic white average" dealer participation.[83]  The CFPB appears to have used this definition of "overcharged" widely in its auto-lending settlements; internal documents show it used this approach to quantify the costs of the alleged disparities for the purposes of discussing proposed settlements with at least three other auto financers.[84]

The same deficiency that was revealed at several points in the CFPB's assessment of liability also undermines the legitimacy of its assessment of harm and recovery, namely, the failure to be specific.  By asking only whether a minority borrower paid more than the

---

[80] CFPB Staff has informed Committee staff that the CFPB did not attempt to determine whether potential claimants to the Ally settlement were "harmed" but merely whether they met the criteria to receive a check from the settlement.  In light of the CFPB's insistence that it did not assess whether the consumers it directed be mailed checks were actually harmed by Ally, this report notes that fact here to avoid misstating any facts.

[81] Letter from Director Cordray to Chairman Hensarling (Aug. 31, 2015).

[82] *Id.*

[83] *Id.*; *see also* CFPB PowerPoint #1 at 10; CFPB PowerPoint #2 at 7; Ally Distribution Draft – Draft 1, at 1; *see generally* Ally Distribution Draft – Draft 2; Ally Distribution Draft – Draft 3; Ally Distribution Draft – Draft 4.

[84] November 19, 2014, Decision Memorandum, 'Authorization to Seek a Settlement or Commence Litigation', at 3; June 16, 2015, Decision Memo, at 3.

non-Hispanic white average, the CFPB does not accurately assess whether he or she was actually harmed by disparate impact. An accurate assessment of harm would determine whether the minority borrower paid more than a similarly-situated non-Hispanic white borrower for the entire purchase of the car, including not only the price of financing but also the vehicle price, trade-in value, dealer-installed options, and "add-on" products that the dealer and buyer negotiate at the same time as part of the total cost of the car.[85] At a bare minimum, an accurate inquiry would compare the dealer participation included in the RISC for a minority borrower against the average dealer participation for similarly-situated non-Hispanic white borrowers, not all non-Hispanic white borrowers.

For example, as described above, a dealer may set a higher dealer participation for customers with low credit scores, because it is more difficult, time-consuming, and costly for the dealer to find an auto-financer who is willing to accept a RISC from a less creditworthy borrower. If an African-American borrower had a credit score of 780, he or she should be compared against non-Hispanic white borrowers with similar credit scores to determine whether and how much he or she was overcharged. If his or her dealer participation is compared with the dealer participation of all non-Hispanic white borrowers, and their average credit scores are closer to 550, they may have been charged significantly higher dealer participation. That African-American borrower therefore would fall at or below the non-Hispanic white average, and would be unable to recover settlement remuneration. Whereas, if he or she were compared with non-Hispanic white borrowers with equally high credit scores, it might be revealed that he or she was charged more than they, and was therefore entitled to receive remuneration. Conversely, if that borrower had a credit score of 500 and he or she was charged a higher dealer participation than the non-Hispanic white average, that borrower might not be entitled to remuneration if it turned out that his or her dealer participation was the same or lower than the average for non-Hispanic white borrowers with a similar credit score. Comparing similarly-situated consumers is the only way to draw meaningful conclusions, and it is the only way to satisfy the legal requirement to show causation.

---

[85] *Unsafe at Any Bureaucracy*, at 20.

It is certainly true that a borrower could be entitled to damages in excess of the difference between his or her dealer participation and the average for similarly-situated non-Hispanic white borrowers if *arguendo* disparate impact were cognizable under ECOA; the statute authorizes not only actual damages but also punitive damages.[86]   Nonetheless, only a minority borrower who was actually harmed could recover damages.   And, only a minority borrower who was charged more than the average for similarly-situated non-Hispanic white borrowers could make a showing of harm.

Fuzzy logic and false comparisons are unfortunately prevalent in the CFPB's auto-lending actions.   In every aspect of the CFPB's auto-lending actions, the CFPB's lack of rigor leads to unsupported and unreliable conclusions.

## Rulemaking

### The CFPB Likely Violated The Administrative Procedure Act, Against Its Attorneys' Advice, When Issuing Its Recent Rule Governing Auto Financers

ECOA is not the only legal standard the CFPB has likely sidestepped.   It also failed to take steps that its attorneys advised the Director to undertake to comply with the Administrative Procedure Act (APA) when issuing a major rulemaking governing the larger participants in the auto-lending market.

The APA governs the procedures for rulemaking by federal agencies.   As CFPB lawyers acknowledged in internal memoranda, section 553 of the APA "requires agencies to publish 'notice' of 'either the terms or substance of the proposed rule or a description of the subjects and issues involved' to 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.'   Courts have held that to satisfy the requirements of section 553 agencies must provide an opportunity

---

[86] Equal Credit Opportunity Act, §1691e(a), (b).

for the public to comment on data and technical studies used to support a rule."[87]  An agency must provide data supporting its conclusions, and if it fails to do so it must publish the data and re-open its comment period.[88]

The Dodd-Frank Act authorizes the CFPB to enact a rule classifying certain auto financers as "larger participants" in the consumer auto-lending market and subjecting them to supervision.[89]  In October 2014, the CFPB published a proposed rule that defined "larger participants" in the market for automobile financing, and thereby "extend[ed] the Bureau's supervisory authority over larger participants of the defined automobile financing market . . . to supervise for compliance with the Equal Credit Opportunity Act" and other consumer laws,[90] and "include[d] certain automobile leases in the Dodd-Frank Act definition of 'financial product or service' [which] would subject those leases to the prohibition on unfair, deceptive, or abusive acts or practices."[91]

The CFPB's definition of "larger participants" is based upon "quantitative information on the number of market participants and their number and dollar volume of originations" taken from Experian's AutoCount database.[92]  During the comment period the CFPB received multiple requests for a list of the institutions that it believed the rule would cover and "a number of comments pertaining directly or indirectly to the Experian list."[93] The CFPB did not respond with the requested information because it "understood that Experian regarded the AutoCount data and information derived from that data, including

---

[87] February 10, 2015, Briefing Memorandum for the Director, "Meeting on Auto LP Rule," at 5 (quoting 5 U.S.C. §§ 553(b), (c)) (citing *Connecticut Light and Power Co. v. NRC*, 673 F.2d 525, 530-31 (D.C. Cir. 1982) (finding that integral to the notice requirement is the agency's duty "to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules .... An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary."); *Am. Radio Relay League v. FCC*, 524 F.3d 227, 236, 237 (D.C. Cir. 2008)).
[88] *See id.*
[89] *See* 12 CFR 1090.100 (2014).
[90] Defining Larger Participants of the Automobile Financing Market and Defining Certain Automobile Leasing Activity as a Financial Product or Service, 79 Fed. Reg. 60,762, 60,773 (proposed Oct. 8, 2014).
[91] *Id.* at 60,774.
[92] *Id.* at 60,774.
[93] February 10, 2015, Briefing Memorandum for the Director, "Meeting on Auto LP Rule," at 2-4.

25

the names of the entities the Bureau estimates would be newly subject to supervision, as proprietary."[94]

The public comment period on the proposed rule closed on December 8, 2014. Internal documents reveal that after the comment period ended, Experian informed the CFPB that "it had no objection to releasing the list of entity names that the Bureau estimated would be covered under the Bureau's proposed threshold as well as the relative market share for each listed entity."[95]

On February 10, 2015, CFPB attorneys wrote a memorandum to Director Cordray "recommend[ing] publication of the Experian non-proprietary data and reopening of the comment period for the Auto LP proposed rule . . . to comment on the released data," and warning that "there is a cognizable risk that a court would conclude" that the APA required the CFPB to do so.[96] After explaining the legal analysis supporting their conclusion that the CFPB should re-open the comment period, the attorneys outlined the possible negative outcomes of doing so, including the risk of "Congressional scrutiny,"[97] the prospect that it would "raise questions about whether the four prior Larger Participant rules were procedurally defective since the Bureau did not solicit public comment on the identities of the entities that would qualify for supervision[,]"[98] and the likelihood that "[t]he Bureau might feel the need to manage . . . expectation[s] by providing a detailed explanation in future rulemakings of exactly why the identities of potential larger participants are not being released, which might draw attention to potential limitations of the dataset utilized to support the rule.[99]

---

[94] *Id.* at 2.

[95] *See id.* at 2, 5. The internal CFPB memo also implies that Experian never regarded this information as proprietary in the first instance, as the memo refers to it throughout as "non-proprietary data." *See id.* at 2 ("Following the close of the comment period, Experian authorized the Bureau to release the requested names in order of number of originations and each entity's percent market share ('Experian non-proprietary data')."); *id.* at 5,7-14.

[96] *Id.* at 2; *see id.* at 7-11.

[97] *Id.* at 13.

[98] *Id.* at 13.

[99] *Id.* at 12-13.

Despite the risk that the CFPB's data would be exposed as inadequate if made transparent, the attorneys advised that: "Although it would be difficult to avoid these collateral consequences entirely, *they, of course, do not provide a defense against § 553's notice and comment requirements.* Moreover, it bears note that failure to release the Experian non-proprietary data would create oversight risk. . . ."[100]

Later memoranda Committee Staff reviewed on the subject omit any mention of the lawyers' conclusion that the Administrative Procedure Act required the CFPB to release the underlying data and reopen the comment period or the risk that greater transparency would expose flaws in the dataset used. A June 3, 2015 memorandum signed by Director Cordray and prepared by David Silberman, the Assistant Director for Research, Markets, and Regulations, and one of his senior counsels recommended that the Director issue and publish the final rule.[101] Nowhere does that memorandum (or any of the other prior legal memoranda on the rule attached to that memorandum) mention Experian's clarification that much information was non-proprietary or raise the possibility of re-opening the comment period.

Although none of the documents the Committee has reviewed reflect whether Director Cordray responded to this legal concern, it is known that Director Cordray did express policy misgivings about the rule. An internal memorandum to Director Cordray from his staff states: "We understand from our meeting on February 11, 2015, that you are concerned that the proposed threshold . . . may be too low, given our limited supervisory resources and the fact that it would include participants that are responsible for a small percentage of market activity and that could be small businesses."[102]

Rather than provide a substantive or policy justification for the low threshold established by the proposed rule, CFPB staff admitted that CFPB had acted similarly before

---

[100] *Id.* at 13 (emphasis added).
[101] June 3, 2015, Decision Memorandum for the Director, "Issuance and Publication of Final Rule."
[102] March 23, 2015, Briefing Memorandum for the Director, "Meeting on the Auto Finance Larger Participant Rule," at 3 (attached to June 3, 2015, Decision Memorandum for the Director, "Issuance and Publication of Final Rule").

and informed the Director that the CFPB had used thresholds low enough to define small businesses paradoxically as "larger participants" in previous rulemakings: "[W]e have acknowledged the fact that other larger participant rules could capture small businesses, and in fact, estimated in the international money transfer rulemaking that 10 of 25 larger participants would be small businesses."[103] And, they added, the rulemaking would bolster the CFPB's data-collection efforts: "the Bureau may be able to gather some information through supervisory activities . . . [that are] less resource-intensive . . . [so that] it may be able to gather information from a larger number of entities in this market each year."[104]

Despite the legal implications of failing to re-open the comment period flagged by his lawyers — and the policy risk of failing to alter the rule to avoid burdening small businesses by regulating them as "larger participants" — Director Cordray approved issuing the Final Rule on June 3, 2015, and signed the final rule on June 5.[105] The Final Rule was published on June 30, 2015[106] — without disclosure and public comment on the data underlying the rulemaking.

---

[103] *Id.* at 4. At no point in the memorandum did the lawyers revisit whether the size of the businesses affected would impact the Regulatory Flexibility Act analysis, which requires additional analysis of rules affecting small businesses. *Id.*; *see generally* September 15, 2014, Decision Memorandum for the Director, "Proposed Rule . . . and the Regulatory Flexibility Act" (attached to June 3, 2015, Decision Memorandum for the Director, "Issuance and Publication of Final Rule").

[104] *Id.* at 5.

[105] June 3, 2015, Decision Memorandum for the Director, "Issuance and Publication of Final Rule"; Signed Final Rule (attached to June 3, 2015, Decision Memorandum for the Director, "Issuance and Publication of Final Rule").

[106] *See* Defining Larger Participants of the Automobile Financing Market and Defining Certain Automobile Leasing Activity as a Financial Product or Service, 80 Fed. Reg. 37496 (Jun. 30, 2015).

2015 WL 6955482
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Louis G. Bartucci, Plaintiff,

v.

Wells Fargo Bank N.A., Defendant.

Case No. 14 CV 5302
|
Signed 11/10/2015

**Attorneys and Law Firms**

James Matthew Pfeiffer, Pfeiffer Law Offices, P.C., Wheaton, IL, for Plaintiff.

Lucia Nale, Charles Michael Woodworth, Michelle V. Dohra, Mayer Brown LLP, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

Marvin E. Aspen, District Judge

**\*1** Presently before us is Defendant Wells Fargo Bank N.A.'s motion to dismiss a seven-count complaint filed by Plaintiff Louis G. Bartucci. Plaintiff's complaint alleges: (1) violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3605; (2) violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691; (3) a claim for declaratory judgment; (4) violation of 42 U.S.C. § 1983; (5) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2; (6) breach of the Illinois implied covenant of good faith and fair dealing; and (7) a claim for promissory estoppel.

Defendant moves to dismiss all counts. For the following reasons, Defendant's motion to dismiss is granted in part, and denied in part.

## BACKGROUND

In 2007, Plaintiff obtained a loan from Defendant for the purchase of a residential property. (Am. Compl. ¶ 6.) From 2008 to 2009, Plaintiff faced financial difficulties meeting his mortgage payments. (Id. ¶ 8.) Plaintiff submitted paperwork to Defendant to modify his loan under the Home Affordable Mortgage Program ("HAMP"), a federal program that assists eligible homeowners who face financial hardships with loan modifications. (Id. ¶ 11.) In 2010, while Plaintiff's application for a home loan modification was still pending, Defendant served Plaintiff with a mortgage foreclosure complaint and summons. (Id. ¶ 14.)

From 2010–2013, Plaintiff continued to contact Defendant in regards to his loan modification request. (Id. ¶ 15.) Plaintiff alleges that during the loan modification process, he disclosed his national origin on mandatory loan paperwork. (Id. ¶ 16.) In June 2013, Defendant denied Plaintiff's loan modification request citing his negative net present value. (Id. ¶ 18.) Soon thereafter, Plaintiff appealed Defendant's denial of his HAMP modification. (Id. ¶ 19.)

Plaintiff alleges that he made several telephone calls in 2013 to Defendant's representatives concerning his loan modification denial, but that Defendant's representatives told Plaintiff that they could not understand him because of his accent, that he needed to call back, and then hung up on him without any warning. (Id. ¶ 24.) Further, Plaintiff alleges that while attending a seminar hosted by Defendant, a representative told Plaintiff "that he would probably have had an easier time obtaining a loan modification if he were in fact much younger." (Id. ¶ 25.) On another occasion, Plaintiff alleges that one of Defendant's representatives expressed that Plaintiff's age factored into the denial of his loan modification request. (Id. ¶ 47.)

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is meant to test the sufficiency of the complaint, not to decide the merits of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a motion to dismiss, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Specifically, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 540 U.S. 544, 555, 127 S. Ct. 1955, 1964– 65 (2007)). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, while a complaint need not

give "detailed factual allegations," it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 540 U.S. at 545, 127 S. Ct. at 1964–65; *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618–19 (7th Cir. 2007). The statement must be sufficient to provide the defendant with "fair notice" of the claim and its basis. *Twombly*, 540 U.S. at 545, 127 S. Ct. at 1964 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 102 (1957)); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008). In evaluating a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Thompson v. Ill. Dep't of Prof'l Reg.*, 300 F.3d 750, 753 (7th Cir. 2002).

## ANALYSIS

**\*2** Plaintiff brings both federal and state law claims. We will begin with an analysis of his federal claims.

### I. Plaintiff's Federal Claims

#### A. Count I – Violation of Fair Housing Act 42 U.S.C. § 3605

Plaintiff contends that Defendant violated § 3605 of the FHA, which makes it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms of conditions of such a transaction, because of...national origin...." 42 U.S.C. § 3605(a). A plaintiff may prove a violation of the FHA under two theories: (1) disparate treatment or (2) disparate impact. *Daveri Development Group, LLC v. Village of Wheeling*, 934 F. Supp. 2d 987, 996 (N.D. Ill. March 21, 2013). Here, Plaintiff alleges that Defendant engaged in disparate treatment when it denied him a loan modification based on his national origin. To survive a motion to dismiss, a FHA claim must allege discrimination related to the terms, conditions, privileges, or provisions of services of a dwelling. *Swanson v. Citibank, N.A.,* 614 F.3d 400, 405 (7th Cir. 2010). Specifically, Plaintiff must plead: (1) the type of discrimination he believes occurred; (2) by whom; (3) and when. *Id.* (finding that plaintiff's FHA claim survived a motion to dismiss when she alleged that she was discriminated against based on her race, by a named manager at Citibank, in connection with her efforts in early 2009 to obtain a home-equity loan). Finally, to support his disparate treatment allegation, Plaintiff must allege that he was treated differently than other applicants based on his national origin.

*Wigginton v. Bank of America Corp.*, 770 F.3d 521, 522 (7th Cir. 2014) (granting defendant's motion to dismiss FHA claim because plaintiff failed to allege that someone else had been treated differently).

Plaintiff alleges that Defendant violated § 3605 of the FHA when it denied him a loan modification request because of his national origin. (Am. Compl. ¶ 33.) Plaintiff alleges that Defendant was aware of his national origin based on required disclosures on various loan applications. (Am. Compl. ¶¶ 28–30). Additionally, Plaintiff asserts that in 2013, in connection with his HAMP loan modification request, Defendant's representatives frequently hung up the phone on him claiming that his accent was too difficult to understand. (*Id.* ¶¶ 31–33). We find that Plaintiff's allegations are insufficient to survive a motion to dismiss. Plaintiff fails to identify specific individuals who hung up on him and fails to allege that he was treated differently than other loan applicants.

Accordingly, we grant Defendant's motion to dismiss Count I.

#### B. Count II – Violation of Equal Credit Opportunity Act 15 U.S.C. § 1691

Plaintiff alleges that Defendant violated § 1691 of the ECOA that prohibits creditors from discriminating against any credit applicant "with respect to any aspect of a credit transaction [ +] on the basis of...national origin...or age." 15 U.S.C. § 1691(a). To survive a 12(b)(6) motion to dismiss an ECOA claim, Plaintiff must allege that he was an applicant, as defined by the ECOA [1], and that Defendant treated him less favorably because of his national origin or age. *FirstMerit Bank, N.A. v. Ferrari*, 71 F. Supp. 3d 751, 755 (N.D. Ill. Oct. 16, 2014); *New Louisiana Holdings, LLC v. Arrowsmith*, No. 11 C 5031, 2012 WL 6061710, at *6 (N.D. Ill. Dec. 4, 2012).

**\*3** Similar to a FHA claim, to survive a motion to dismiss on an ECOA claim, Plaintiff must simply present a "plausible scenario,...even though it may not accurately describe what actually occurred." *FirstMerit Bank, N.A.,* 71 F. Supp. 3d at 755 (holding that ECOA complaint survived a motion to dismiss when complaint alleged that Bank refused to finalize settlement because individual was Hispanic and that Bank's loan officer made biased comments about doing business with Hispanics).

Plaintiff alleges that Defendant discriminated against him based on his national origin when Defendant hung up the phone on him and refused to provide him information

concerning his loan because of his accent. Plaintiff alleges that Defendant discriminated against him based on age when Defendant's representatives told him he would have "an easier time obtaining a loan modification if he were in fact much younger." (Am. Compl. ¶ 43, 47.) These allegations present a plausible scenario in which Plaintiff was unlawfully discriminated against based on his national origin or age.

For the reasons stated above, we deny Defendant's motion to dismiss Count II.

**C. Count III – Declaratory Judgment 28 U.S.C. § 2201**
Plaintiff seeks a declaratory judgment affirming various rights under HAMP pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, which enables a party to 'clarify[ +] and settl[e] the legal relations at issue' and to 'terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding." *Amari v. Radio Spirits, Inc.*, 219 F. Supp. 2d 942, 944 (N.D. Ill. Sept. 12, 2002) (citing *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 89 F.2d 746, 747 (7th Cir. 1995)). The purpose of the Act is "to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication, without waiting until his adversary should see fit to begin suit." *Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 577 (7th Cir. 1994) (citing *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1167 (7th Cir. 1969)).

Federal courts may issue declaratory judgments only in cases of "actual controversy." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). A justiciable "actual controversy" exists only when a private right of action is available. *Schilling v. Rogers*, 363 U.S. 666, 677, 80 S. Ct. 1288, 1296 (1960) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S. Ct. 876, 879 (1950)); *see also Villasenor v. American Signature, Inc.*, No. 06 C 5493, 2007 WL 2025739, at *6 (N.D. Ill. July 9, 2007) (finding that where there is no private right of action available for an alleged statutory violation, a declaratory judgment claim cannot proceed).

Plaintiff asks us to enter a declaratory judgment that clarifies the parties' rights and obligations under HAMP; declares that Plaintiff qualifies for a loan modification under HAMP; and declares that Defendant did not properly consider Plaintiff for a loan modification under HAMP. (Am. Compl. ¶ 58.) The Seventh Circuit, however, has held that HAMP contains no private right of action. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012); *Baginski v. JP Morgan*

*Chase Bank N.A.*, No. 11 C 6999, 2012 WL 5989295, at *3 (N.D. Ill. Nov. 29, 2012). Because the Declaratory Judgment Act provides no relief unless there is a justiciable controversy between the parties, and because no private right of action exists under HAMP, we grant Defendant's motion to dismiss Count III [2] .

**D. Count IV – Violation of 42 U.S.C. § 1983**
*4 Plaintiff brings a fourth claim alleging that Defendant violated 42 U.S.C. § 1983. We grant Defendant's motion to dismiss Count IV because Plaintiff has not demonstrated that Defendant was acting under the color of law.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives a person of his federal constitutional or statutory rights shall be liable in an action at law. 42 U.S.C. § 1983. To survive a motion to dismiss a § 1983 claim, a plaintiff must allege facts which show that the defendant deprived him of a right secured by the Constitution or any law of the United States and that the deprivation of that right resulted from the defendant acting *under color of law*. *Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir. 2005) (citing *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1009 (7th Cir. 2000) (emphasis added)). Non-state actors may be found to act under color of state law when they have conspired or acted in concert with state actors to deprive a person of his civil rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S. Ct. 1598, 1605 (1970). In other words, for a private individual to act under color of law, there must be evidence of a concerted effort between a state actor and that private individual. *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998).

Plaintiff alleges that Defendant violated 42 U.S.C. § 1983 when Defendant, acting under the color of law, denied his requests for a loan modification because of his national origin and age. (Am. Compl. ¶ 61.)

Plaintiff boldly alleges that the Defendant "was acting under color of state and federal law when it denied his several requests for loan modification" yet states no facts to support such a claim. (Am. Compl. ¶ 61.) Plaintiff does not assert that Defendant is a state actor or conspired or acted in concert with state actors and therefore does not allege enough facts to support a § 1983 claim. Accordingly, we grant Defendant's motion to dismiss Count IV.

**II. Plaintiff's State Law Claims**

### A. Count V – Illinois Consumer Fraud and Deceptive Business Practices Act

Plaintiff alleges that Defendant violated the ICFA, which prohibits: "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception [or] fraud...." ILCS.

The ICFA is "a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.,* 2011 Ill. 2d 403, 416–17, 775 N.E.2d 951, 960 (2002).

The statute provides redress not only for deceptive business practices, but also for business practices that, while not deceptive, are unfair. *Boyd v. U.S. Bank, N.A. ex rel.,* 787 F.Supp. 2d 747, 751 (N.D. Ill. April 12, 2011); *Robinson,* 2011 Ill. 2d at 417, 775 N.E.2d at 960. Plaintiff alleges that Defendant engaged in both deceptive and unfair conduct. (Am. Compl. ¶¶ 70–71).

The correct legal standard for a motion to dismiss under an ICFA claim differs for claims alleging deceptive conduct and claims alleging unfair conduct. *Windy City Metal Fabricators & Supply, Inc., v. CIT Tech. Fin. Servs. Inc.,* 536 F.3d 663, 659 (7th Cir. 2008). Because Plaintiff alleges both deceptive and unfair conduct, we will analysis each component of the claim under the appropriate standard of review.

**\*5** Where Plaintiff alleges deceptive conduct, the heightened 9(b) rule applies. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 441(7th Cir. 2011) (citing *Davis v. G.N. Mortg. Corp.,* 396 F.3d 869, 883 (7th Cir. 2005)); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990). To meet this heightened pleading standard, plaintiff must allege the "who, what, when, where and how" of the alleged deceptive conduct. *Pirelli Armstrong Tire,* 631 F.3d at 441. More specifically, the pleader must detail "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *McGann v. PNC Bank, Nat. Ass'n,* No. 11 C 06894, 2013 WL 1337204, at \*5 (N.D. Ill. 2013 March 29, 2013) (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir. 1997); *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 777 (7th Cir. 1994)).

To state an ICFA deceptive conduct claim, a plaintiff must allege: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill. 2d 100, 180, 835 N.E.2d 801, 850 (Ill. 2005). District courts have held that a loan servicer's alleged failure to consider plaintiff's eligibility for a HAMP modification is a sufficient predicate for an ICFA claim. *Boyd,* 787 F. Supp. 2d at 752. Additionally, an ICFA claim does not require "proof of intent to deceive;" rather, a plaintiff only needs to allege "that the defendant committed a deceptive or unfair act and intended that the plaintiff rely on that act." *Wigod,* 673 F.3d at 575. As to damages, courts have held that the inability to fairly negotiate a plan to stay in the home constitutes economic damages under the ICFA. *Boyd,* 787 F. Supp at 754.

Plaintiff alleges that Defendant engaged in deceptive conduct when various representatives assured him that he would qualify for a HAMP loan modification, provided him differing information as to the status of his loan modification, gave him explanations that led to dead-ends and excuses as to why his loan modification was not being processed or granted, and created "nonsensical tasks" for Plaintiff to complete in order to be eligible for a loan modification. (Am. Compl. ¶¶ 68–71.) Plaintiff alleges Defendant had "motive [to make]...and stands to profit," (Am. Compl. ¶ 72), from the deceptive communications and that as a result of his reliance on Defendant's unfair and deceptive conduct, he incurred actual damage in the form of monetary losses and the imminent loss of his property to foreclosure. (*Id.* ¶¶ 83–84). We find that Plaintiff's allegation as to deceptive conduct under the ICFA survive even a heightened 9(b) analysis.

Next we consider Plaintiff's allegations of unfair conduct. Claims alleging unfair conduct under the ICFA are subject to a Rule 8(a) notice pleading standard. *Windy City Metal,* 536 F.3d at 670 ("Because neither fraud nor mistake is an element of unfair conduct under [the ICFA], a cause of action for unfair practices under the [ICFA] need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b).").

For conduct to be considered unfair, we consider three factors: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. *Robinson,*

201 Ill. 2d at 417–18, 775 N.E.2d at 961. The Seventh Circuit has held that a Plaintiff need not use the exact language in his complaint to describe the three factors listed above. *See Windy City Metal Fabricators*, 536 F.3d at 672 (holding that plaintiff adequately stated a claim for relief when complaint alleged conduct that could support the statutory definition of unfairness even if the complaint did not specifically use the words "immoral, unethical, oppressive, or unscrupulous"). Plaintiff does not use the word "unethical," but does allege that Defendant's representatives promised over the telephone that he would receive a loan modification, yet ultimately denied him the request, (Am. Compl. ¶ 71), allegations that, if taken as true, could be considered immoral and unethical.

**\*6** For the reasons stated above, we deny Defendant's motion to dismiss Count V.

### B. Count VI – Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing by "requiring [the Plaintiff] to extend to meet unreasonable expectations, go through obstacles, and falsely promise that he would get a modification after fulfilling all tasks it demanded of him." (Am. Compl. ¶ 78.)

Under Illinois law, the covenant of good faith and fair dealing is not an independent cause of action. *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 687 (7th Cir. 2013); *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 381 (7th Cir. 2000). Instead, the covenant only guides the construction of explicit terms in an agreement. *Id.* Plaintiff has not alleged that he entered into an explicit agreement with Defendant or that a contract between the parties exists. Therefore, Count VII is dismissed.

### C. Count VII – Promissory Estoppel

Plaintiff also brings a state law promissory estoppel claim. Promissory estoppel is an alternative means of obtaining

contractual relief under Illinois law. *Wigod*, 673 F.3d at 566. To establish the elements of a promissory estoppel claim, the plaintiff must prove that: (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment. *Id.* Under Illinois law, promissory estoppel is considered an equitable device wherein a contract may be implied where none is found to exist for a lack of consideration. *Dumas v. Infinity Broadcasting Corp.*, 416 F.3d 671, 766 (7th Cir. 2005). A claim for promissory estoppel will succeed only where all the other elements of a contract exist. *Id.* Thus, in order to succeed on his claim of promissory estoppel, Plaintiff must present written evidence of an "unambiguous promise" which, but for the existence of consideration, would constitute an enforceable contractual agreement under Illinois law. *Id.*

Plaintiff does not present written evidence that Defendant unambiguously promised him a loan modification. Instead, to support his claim, Plaintiff simply alleges that Defendant "communicated to [Plaintiff] during several telephone conversations that [he] would be able to qualify for a loan modification under his existing contract." (*Id.* ¶ 81.) This assertion is not specific enough to sufficiently plead that Defendant made an unambiguous promise to Plaintiff.

Therefore, we grant Defendant's motion to dismiss Count VII.

### CONCLUSION

For the aforementioned reasons, we deny Defendant's motion to dismiss Counts II and V and grant Defendant's motion to dismiss Counts I, III, IV, VI and VII. It is so ordered.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 6955482

### Footnotes

1    Defendant does not argue that Plaintiff was not an applicant under the ECOA, so we focus on the second prong of the analysis; whether Plaintiff has sufficiently alleged that he was treated less favorable based on his national origin or age.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2    Plaintiff broadly contends that his claim is not seeking to enforce HAMP but instead is based on civil rights violations, specifically, Defendant's failure to provide an accounting as to how Defendant determined ineligibility under HAMP. (*See* Reply-Mot. to Dismiss at 5–6.) Despite Plaintiff's blanket assertion that he seeks a declaratory judgment based on civil rights violations, Plaintiff cites only to HAMP for both enforcement and relief. (Am. Compl. ¶¶ 56–57.)

---

**End of Document**                                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6061710
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

NEW LOUISIANA HOLDINGS, LLC; Fountain
View 215 Tenant LLC; Jackson Manor 1691 Tenant
LLC; Panola 501 GP LLC; Retirement Center
14686 Tenant LLC; Acadian 4005 Tenant LLC;
Lakewood Quarters Rehab 8225 Tenant LLC;
Regency 14333 Tenant LLC; Sherwood 2828
Tenant LLC; Lakewood Quarters Assisted 8585
Tenant LLC; Panola 501 Partners LP; Citiscape
Out Parcel Tenat LLC; Citiscape 5010 Tenant
LLC; St. Charles 1539 Tenant LLC; Woodland
Village 5301 Tenant LLC; Atrium 6555 Tenant
LLC; and Harris Schwartzberg, Plaintiffs,
v.
Richard ARROWSMITH, Defendant.

No. 11 C 5031.
|
Dec. 4, 2012.

## MEMORANDUM OPINION AND ORDER

RUBEN CASTILLO, District Judge.

*1 New Louisiana Holdings, et al,[1] ("Plaintiffs") initiated this discrimination suit against GE Business Financial Services, Inc. ("GE Financial"); GE Healthcare Financial Services, Inc.; General Electric Capital Corporation; CIT Healthcare LLC ("CIT"); Marathon Structured Finance Fund, L.P. ("Marathon") (collectively, the "Entity Defendants"); and Richard Arrowsmith ("Arrowsmith") (collectively, with the Entity Defendants, "Defendants"). The Plaintiffs bring claims pursuant to 42 U.S.C. § 1981 ("Section 1981") and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 et seq. (R. 1, Compl.) Presently before the Court are Arrowsmith's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),[2] (R. 25, Arrowsmith's Mot.), and Arrowsmith's amended petition for fees, (R. 58, Arrowsmith's Am. Pet.)[3] For the reasons discussed herein, the Court grants Arrowsmith's motion to dismiss and his petition for fees.

## RELEVANT FACTS

Corporate Plaintiffs consist of a network of nursing facilities that provide long-term care to seniors. (R. 1, Compl. ¶¶ 30, 32 .) Plaintiff Harris Schwartzberg ("Schwartzberg") and his father, Albert Schwartzberg, who is not a party to this suit (collectively, the "Schwartzbergs"), are Jewish. (R. 1, Compl. at 2.) According to Plaintiffs, on January 18, 2006, "the Schwartzbergs, through Plaintiff New Louisiana Holdings, LLC and its affiliates, acquired the right to operate twelve nursing and assisted living facilities in and around Louisiana." (Id. at 3; id. ¶ 39.) The acquisition was effected through a number of agreements. (Id. ¶ 40.) The purchase of the twelve nursing facilities was financed through a term loan that was secured by the real estate and physical assets of the facilities. (Id. ¶¶ 40–41.) The borrowers on the term loan (the "Term Borrowers") are the title holders of the real estate and physical assets of the twelve nursing facilities and are not parties to this action. (Id. ¶ 41.) The Term Borrowers lease the twelve nursing facilities to Corporate Plaintiffs. (Id .) In addition to leasing the twelve nursing and assisted living facilities, the Corporate Plaintiffs also operate the facilities. (Id. ¶ 42.) Merrill Lynch Capital ("Merrill"), CIT, and Marathon were the original lenders on the Term Loan. (Id. ¶ 40.)

In a separate agreement, the original lenders entered into a Credit and Security Agreement (the "Operating Loan") with Corporate Plaintiffs. (Id. ¶ 42.) The Operating Loan contains two credit facilities: (1) a term loan in the original principal amount of $14 million, and (2) a revolving credit loan of up to $8 million.[4] (Id.) The Operating Loan appointed an "Administrative Agent" and granted the Administrative Agent discretion to make decisions regarding the revolving loan. (Id. ¶ 45.) Originally, Merrill acted as the Administrative Agent. (Id. ¶ 49.) In connection with Corporate Plaintiffs' execution of the Operating Loan, Schwartzberg executed Guaranty Agreements, (id. ¶¶ 17, 143), pursuant to which he personally guaranteed the payment of the Operating Loan. (R. 29–3, Ex. B, Guaranty Agreement; R. 29–4, Ex. C, Amended Guaranty Agreement.) In December 2007, GE Financial acquired Merrill's healthcare financing business and, as a result, assumed Merrill's position as the Administrative Agent for the Operating Loan.[5] (Id. ¶ 50.) GE Financial designated Arrowsmith as the individual responsible for administering the Operating Loan. (Id. ¶ 51.)

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 1

**\*2** The gravamen of Plaintiffs' complaint is that Arrowsmith's anti-Semitism affected the administration of the Operating Loan, making it difficult for Corporate Plaintiffs to operate effectively. (*Id* at 24.) According to Plaintiffs, "Arrowsmith embarked upon a campaign to harm the Schwartzberg family and to hurt their business after he took over as the loan administrator for the Lenders." (*Id* at 3.) Specifically, Plaintiffs allege that Arrowsmith declared a series of defaults under both the Operating and Term Loans, (*id.* ¶¶ 56–57), dramatically decreased the amount of funds available to be borrowed through the Operating Loan, (*id.* ¶ 59), caused GE Financial to assess financial penalties on Corporate Plaintiffs, (*id.*), and increased the amount of required reserves thereby further reducing the amount of funds available to be borrowed, (*id.* ¶¶ 62, 72–73). Plaintiffs allege that Arrowsmith referred to the Schwartzbergs as "those people," (*id* at 4, ¶ 63), and that he was motivated to take these actions by his anti-Semitism, (*id.* ¶ 66).

### PROCEDURAL HISTORY

On June 2, 2011, Plaintiffs filed a six-count complaint against Defendants in the United States District Court for the Southern District of New York ("the New York Action"), asserting that Arrowsmith had discriminated against them in violation of Section 1981 and the ECOA. (R. 9–1, Ex. 1, S.D.N.Y.Compl.) Plaintiffs also asserted claims for breach of contract, and breach of the covenant of good faith and fair dealing, and they sought an accounting and a declaratory judgment. [6] (*Id* ) Plaintiffs filed their action in the Southern District of New York, even though Corporate Plaintiffs agreed in the Operating Loan to submit to the jurisdiction of state or federal courts in Chicago, Illinois. (R. 29–2, Ex. A, Credit and Security Agreement (Revolving Credit and Term Loan) dated as of January 18, 2006, at 27.) On July 13, 2011, Defendants filed a letter with Judge Naomi Reice Buchwald, the judge in the Southern District of New York to whom Plaintiffs' action was assigned. (R. 9–2, Ex. 2, July 13, 2011 Letter.) In their letter, Defendants requested a pre-motion conference in advance of filing a motion to dismiss and setting forth the anticipated basis of that motion. (*Id.;* R. 9, Defs.' Mot. for Costs Mem. at 3.) On July 21, 2011, Judge Buchwald informed the parties via letter that the court "wish[ed] to afford plaintiffs an opportunity to amend their complaint within twenty (20) days[.]" (R. 9–4, Ex. 4, July 21, 2011 Letter at 2.) Judge Buchwald further stated that "having been afforded the opportunity to amend the complaint in response to the defendants' letter submission, plaintiffs should

not anticipate being granted a further opportunity to amend, should [the court] find that there is merit in some or all of the defendants' arguments ." (*Id.*) On July 25, 2011, Plaintiffs voluntarily dismissed the New York Action pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and did not amend their complaint. Min. Entry, *New Louisiana Holdings, LLC v. GE Business,* No. 11–3773 (July 25, 2011) ECF No. 4. That same day, in compliance with the terms of the Operating Loan, Plaintiffs re-filed their action against Defendants in the Northern District of Illinois. (R.1, Compl.) The case was randomly assigned to this Court.

**\*3** On July 29, 2011, Defendants moved the Court for an order directing Plaintiffs to pay the costs and fees they incurred in defending the suit that Plaintiffs filed in the Southern District of New York, and for an order staying the current action until Plaintiffs did so, pursuant to Rule 41(d) (the "Costs Motion"). (R. 8, Defs.' Mot. at 1–2.) On August 10, 2011, the Court granted Defendants' Costs Motion. (R. 20, Min.Entry.) The Court awarded Defendants those costs incurred in litigating the New York Action that were not necessary or useful to the instant action, and ordered Defendants to file a petition for costs by August 24, 2011. (*Id.;* R. 59–1, Ex. 1, Aug. 10, 2011 Tr. at 8:9–13.) On August 24, 2011, Defendants filed the court-ordered petition. (R 21, Defs.' Pet.)

On November 16, 2011, the Entity Defendants and Plaintiffs filed an agreed motion to dismiss the Entity Defendants, which the Court granted on November 21, 2011. (R. 38, Joint Mot.) The Entity Defendants were thereby dismissed from this action with prejudice and without cost to Plaintiffs or Entity Defendants. (R. 44, Min. Entry; R. 45, Order of Dismissal.) On June 4, 2012, the Court dismissed as moot Defendants' petition for costs on the grounds that the Entity Defendants were no longer parties to the action subject to the agreed order of dismissal. (R. 46, Min.Entry.) On June 19, 2012, Arrowsmith moved for reconsideration of the Court's June 4 minute entry because Defendants' petition for fees was filed on behalf of all Defendants, including Arrowsmith, and therefore the petition for fees was not moot as to him. (R. 47, Arrowsmith's Mot. Recons.; R. 48, Arrowsmith's Mem.) On June 28, 2012, the Court heard the motion to reconsider and ordered Arrowsmith to submit a separate fee petition by July 12, 2012. (R 55, Min. Entry.) On July 12, 2012, Arrowsmith filed an amended fee petition seeking $16,269.00 in attorneys' fees incurred in litigating the New York Action and $13,710.00 incurred in researching, drafting, and filing the Costs Motion, for a total of $29,979.00 in attorneys' fees.

(R 58, Arrowsmith's Am. Pet. at 1–2.) On July 23, 2012, Plaintiffs filed a response brief in opposition to Arrowsmith's amended fee petition. (R. 61, Pl.'s Resp.)

In the instant action, Plaintiffs assert six counts against Defendants. The relevant counts that remain after the dismissal of the Entity Defendants are Counts I, II, and V. [7] In Count I, Corporate Plaintiffs [8] allege that "Defendants intentionally discriminated against [them] on the basis of their racial identity," in violation of Section 1981. (R. 1, Compl.¶ 16.) In Count II, Corporate Plaintiffs allege that "Defendants discriminated against [them] on the basis of their Jewish identity with respect to the Loan Agreements[,]" through their administration of the Operating Loan, in violation of the ECOA. (Id. ¶ 123.) In Count V, Corporate Plaintiffs allege that "Defendants have acted in bad faith by failing to disclose their calculations, methodologies, and other bases for" reducing available funds, withholding funds in reserve accounts, and demanding that Corporate Plaintiffs pay excessive loan-related fees, penalties, and expenses, and Corporate Plaintiffs accordingly request an accounting. (Id. ¶ 137.)

**\*4** On September 7, 2011, Arrowsmith filed a motion to dismiss. (R. 25, Arrowsmith's Mot) Arrowsmith argues that Plaintiffs' discrimination claims should be dismissed because Plaintiffs have Med to sufficiently allege that they have a racial or religious identity. (R. 24–1, Defs.' Mem. at 12–16.) On October 11, 2011, Plaintiffs filed a response to Arrowsmith's motion to dismiss, (R. 33, Pls.' Resp.), and on November 1, 2011, Arrowsmith filed a reply in support of his motion, (R. 37, Arrowsmith's Reply).

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7, 570 F.3d 811, 820 (7th Cir.2009).* When reviewing a motion to dismiss, the Court accepte as true all of the factual allegations pled in the complaint and draws all reasonable inferences in favor of the nonmoving party. *Id.* Pursuant to Rule 8(a)(2), a complaint must contain "a 'short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir.2008)* (quoting Fed.R.Civ.P. 8(a)(2); *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)*). To survive amotion to dismiss, a complaint need not contain

detailed factual allegations, but must contain sufficient factual matter that when accepted as true, states a claim to relief that is plausible on its face. *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* (quoting *Bell Atl. Corp, 550 U.S. at 570).* If the factual allegations are well-pleaded, the Court assumes their veracity and then proceeds to determine whether they plausibly give rise to an entitlement to relief. *Id. at 679.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for me misconduct alleged." *Id at 678.* "Plausibility" in this context does not imply that the Court "should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.,* 514 F.3d 400, 404 (7th Cir.2010). Rather, to survive a motion to dismiss under Rule 12(b)(6), the "plaintiff must give enough details about the subject matter of the case to present a story that holds together." *Id.* In other words, "the court will ask itself *could* these things have happened, not *did* they happen." *Id.*

## ANALYSIS

### I. Motion to dismiss

In Counts I and II, Corporate Plaintiffs allege that Arrowsmith discriminated against them on the basis of their racial and religious identities—Jewish—in violation of Section 1981 and the ECOA. (R. 1, Compl.¶¶ 116, 123.) Specifically, in Count I, Corporate Plaintiffs allege that they are each "a legal identity that has acquired a racial identity," (*id.* ¶ 115), and that "Defendants intentionally discriminated against [them] on the basis of their racial identity," (*id.* ¶ 116). In Count n, Corporate Plaintiffs allege that they are each "a legal identity that has acquired a racial and religious identity with a minority group," (*id.* ¶ 120), and that "Defendants discriminated against [them] on the basis of their Jewish identity," (*id.* ¶ 123).

**\*5** Arrowsmith argues that Corporate Plaintiffs' Section 1981 and ECOA claims should be dismissed "for failure to allege adequately that Corporate Plaintiffs, the entities asserting the claims, have a racial or religious identity." (R. 29, Arrowsmith's Mem. at 9–10.) According to Arrowsmith, Counts I and II are devoid of any factual support for Corporate Plaintiffs' fundamental allegation that they have a racial or religious identity. (*Id.* at 13.) Arrowsmith argues that Corporate Plaintiffs' "sole allegation mat the entities are members of a protected class is that [they] have acquired a racial and religious identity with a minority group, namely Jews." (*Id.*)

Furthermore, Arrowsmith argues that "the Complaint contains *no* allegations that Arrowsmith, the only direct actor described in the Complaint, discriminated against Corporate Plaintiffs." (*Id.* at 10.) According to Arrowsmith, the Complaint only alleges that he referred to the Schwartzbergs as "those people," but "there is no support in law or in fact that simply using the plural pronoun 'those' is anti-Semitic." (*Id.*) Additionally, Arrowsmith asserts that "while the discrimination claims are asserted by Corporate Plaintiffs, the conduct alleged to be discriminatory relates only to the Schwartzbergs." (*Id.*) Therefore, Arrowsmith concludes, "without *any* allegation of direct discrimination against Corporate Plaintiffs—the parties asserting the claims—the claims must be dismissed." (*Id.*)

### A. Discrimination claims under Section 1981 and the ECOA

Section 1981 prohibits discrimination in the "mak[ing] and enforc[ment of] contracts." 42 U.S.C. § 1981. Although Section 1981 does not use the term "race," the Supreme Court has construed Section 1981 to "forbid all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis Coll. v. Al–Khazraji,* 481 U.S. 604, 609 (1987) (citing *Runyon v. McCrary,* 427 U.S. 160 (1976).) To state a *prima facie* claim of discrimination under Section 1981, a plaintiff must allege "that (1) he is a member of a racial minority; (2) the defendants had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract." *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 756 (7th Cir.2006) (citing *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996)).

Similarly, the ECOA provides, in relevant part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1); *see also* 12 C.F.R. § 202.4(a). The ECOA creates a private right of action for actual and punitive damages, equitable and declaratory relief, and recovery of costs and attorneys' fees. 15 U.S.C. § 1691e(a)-(d). To state a *prima facie* claim of discrimination under the ECOA, plaintiffs must allege that they were applicants, as defined by the ECOA, and that defendants treated them less favorably because of their race or religion. 16 U.S.C. § 1691(a)(1); 12 C.F.R. § 202.2(n) ("Discriminate against an applicant means to treat an applicant less favorably

than other applicants."); *see also Estate of Davis v. Wells Fargo Bank,* 633 F.3d 529, 538 (7th Cir.2011).

**\*6** Therefore, under both Section 1981 and the ECOA, a plaintiff must allege that he is a member of a protected class who was discriminated against because of his minority identity. The Section 1981 and ECOA counts at issue here are brought solely by Corporate Plaintiffs. (R. 1, Compl.¶¶ 114–124.) Specifically, Corporate Plaintiffs allege that they are members of a protected racial and religious minority because they have acquired a racial and religious identity with a minority group, namely Jews, and that Arrowsmith discriminated against them because of their Jewish identity. (R. 1, Compl.¶¶ 115–116, 120, 123.)

The threshold question with respect to the Section 1981 and ECOA claims is whether Corporate Plaintiffs have acquired a racial or religious identity. In *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 264 (1977), the Supreme Court stated in dicta that a corporation has no racial identity and therefore cannot be the direct target of discrimination. Since *Village of Arlington Heights,* however, various federal appellate courts have found that under some circumstances "a corporation may have standing to allege racial discrimination." *Triad Assocs., Inc. v. Chi. Hous. Auth.,* 892 F .2d 583, 591 (7th Cir.1989) (remanding where the district court did not properly consider the implications of post-*Village of Arlington Heights* precedent), *overruled on other grounds by Bd. of Cnty. Comm'rs v. Umbehr,* 518 U.S. 668, 673 (1996); *see also Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.,* 368 F.3d 1053, 1058–59 (9th Cir.2004). The Supreme Court itself has recognized that the Courts of Appeals which have considered the issue have concluded that corporations may indeed assert Section 1981 claims.[9] *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 473 n. 1 (2006). Although the Seventh Circuit has not explicitly addressed the question, other federal appellate courts have held that corporate entities may assert Section 1981 claims in limited circumstances. *See Hudson Valley Freedom Theater, Inc. v. Heimbach,* 671 F.2d 702, 705–07 (2d Cir.1982). Circumstances in which a corporate entity may bring suit under Section 1981 include cases in which a corporation is owned entirely by shareholders of a single race, *Amber Pyramid, Inc. v. Buffington Harbor Riverboats, LLC,* 129 Fed. App'x. 292, 294 (7th Cir.2005) (allowing corporation owned by two African–American sisters to maintain a suit under Section 1981), cases in which a corporation has acquired a protected identity pursuant to a government designation, *Thinket Ink Info. Res., Inc.,* 368 F.3d

at 1060 (holding that a corporate plaintiff, which was entirely owned by African–Americans, and certified by the Unites States Small Business Administration as a "minority-owned business," had standing to bring a Section 1981 action), or cases in which a corporation is "established for the very purpose of advancing minority interests," *Hudson Valley,* 671 F.2d at 705. Other circumstances in which corporations have been found to have an imputed racial identity are "when *the owner, majority of shareholders and/or president are members of the specific class that is alleged to have been discriminated against." Contemporary Pers., Inc. v. Godiva Chocolatier, Inc.,* No. 09–00187, 2009 WL 2431461, at *2 (E.D.Pa. Aug. 6, 2009) (collecting cases).

**\*7** Here, Corporate Plaintiffs summarily allege that they are each legal entities that have "acquired a racial and religious identity with a minority group protected by the safeguards of [Section 1981 and the ECOA]." (R. 1, Compl.¶¶ 115, 120.) The specific facts that Corporate Plaintiffs rely upon to establish that they have acquired a minority identity are that Harris Schwartzberg is a Jewish–American businessman, (R. 1, Compl. at 2), and that "the Schwartzbergs, through their affiliates, purchased nursing and assisted living facilities with the intent of improving the experience of the residents. Each of the facilities affiliated with the Schwartzbergs are operated through companies, led by qualified, licensed professionals who hire, train, and maintain, the best available nurses, managers, and administrators." (*Id.* ¶¶ 31–32.) Corporate Plaintiffs further allege that Arrowsmith discriminated against them on the basis of their Jewish identity. (*Id.* ¶¶ 116–117, 123.)

These allegations fail to provide the Court with a factual basis for finding that Corporate Plaintiffs have acquired a racial or religious identity. Plaintiffs do not allege any facts regarding the ownership structures of Corporate Plaintiffs, whether Corporate Plaintiffs have been certified as having minority identities by a government institution, or whether Corporate Plaintiffs' purposes are to serve or advance Jewish interests. For instance, the complaint does not identify whether the Schwartzbergs are the sole shareholders or majority shareholders of Corporate Plaintiffs. *See, e.g., Amber Pyramid, Inc.,* 129 Fed. App'x, at 294. Nor does the complaint allege any facts to demonstrate that Corporate Plaintiffs are closely held companies owned and operated by the Schwartzbergs. Instead, the complaint's allegations suggest that Corporate Plaintiffs are not directly owned by members of a protected minority group. For example, the complaint alleges that the Schwartzbergs' affiliates, and

not the Schwartzbergs themselves, purchased nursing and assisted living facilities, (R. 1, Compl.¶ 31.) The complaint also alleges that Corporate Plaintiffs, who operate the nursing and assisted living facilities, are "led by qualified, licensed professionals," (*id.* ¶ 32), and not the Schwartzbergs themselves or anyone else that would qualify as being a member of a protected minority. Indeed, the complaint also suggests that the Schwartzbergs' affiliates purchased the nursing and assisted living facilities with the intent of improving the experience of the residents, and not with the intent of advancing Jewish interests. (*Id.* ¶ 31.) The allegations set forth by Corporate Plaintiffs are inadequate to establish that they have acquired a racial or religious identity. *See Cholla Ready Mix, Inc. v. Civish,* 382 F.3d 969, 977–78 (9th Cir.2004) (dismissing a Section 1981 claim because the corporate plaintiff failed to allege facts from which the court could infer that the plaintiff had an imputed racial identity); *Prestige Rests. & Entm't Inc. v. Bayside Seafood Rest., Inc.,* No. 09–23128–CIV, 2010 WL 680905, at *1, *7 n. 9 (S.D.Fla. Feb. 23, 2010) (requiring dismissal of Section 1981 claim where the corporate plaintiff simply alleged that it was discriminated against because of its patrons' race because the allegations were not adequate to establish that the plaintiff had assumed a racial identity); *Contemporary Pers., Inc.,* 2009 WL 2431461, at *1–2 (dismissing a Section 1981 action where the complaint failed to allege the race of the corporate plaintiff's owner, president, or shareholders, or the racial make-up of its workforce).

**\*8** Plaintiffs fail to inform the Court whether Schwartzberg is the direct owner of Corporate Plaintiffs, the sole owner, sole shareholder, or even majority shareholder of Corporate Plaintiffs, and for this reason the cases relied upon by Plaintiffs to support their argument that they have established a racial or religious identity, are distinguishable. *See, e.g., Bains LLC v. Arco Prods. Co.,* 405 F.3d 764, 770 (9th Cir.2005) (corporation acquired an imputed racial identity where corporation was owned entirely by Sikh shareholders); *T & S Serv. Assocs., Inc. v. Crenson,* 505 F.Supp. 938, 943 (D.R.I.1981) (corporate plaintiff properly alleged Section 1981 claim where sole owner of corporate plaintiff was African–American), *vacated and remanded on other grounds,* 666 F.2d 722 (1st Cir.1981); *Shah v. Am. Bottling Co., Inc.,* No. 07–1042, 2008 WL 718435, at *4 (C.D.Ill. Mar. 14, 2008) (corporate plaintiff acquired an "imputed racial social identity" from sole shareholder and operator, who was born in India); *Calderon v. SW Bell Mobile Sys., LLC,* 390 F.Supp.2d 714, 717 (N.D.Ill.2005) (closely held corporation of which a Mexican national was the majority stockholder, as well

as the president, owner and operator, acquired an imputed racial identity and therefore had standing to pursue a Section 1981 action); *Florence Urgent Care v. Healthspan, Inc.,* 445 F.Supp.2d 871, 877 (S.D.Ohio 2006) (corporate plaintiff owned entirely by doctors of Arab descent had a racial identity); *Howard Sec. Servs., Inc. v. Johns Hopkins Hosp.,* 516 F.Supp. 508, 513 (D.Md.1981) (corporation that was wholly owned and operated by African–American plaintiff had a cause of action under Section 1981).

Seeking to avoid this result, Plaintiffs argue that their complaint "alleges that the Schwartzbergs are the ultimate beneficial owners of the [Corporate Plaintiffs], and that [Corporate Plaintiffs] acquired a racial identity from their Jewish owners and managers." (R. 33, Pls.' Mem. at 16.) Plaintiffs assert that "Arrowsmith saw the [Corporate Plaintiffs] as extensions of the Schwartzbergs in all respects, including their Jewish identity, and 'assault [ed]' them because of it" (*Id.*) Furthermore, they contend that "GE Financial's correspondence regarding the Operating Loan repeatedly referred to the 'Schwartzbergs'... thereby demonstrating that Lenders consider the Schwartzbergs and [Corporate Plaintiffs] as one and the same." (*Id.* at 16–17.) According to Plaintiffs, "[t]hese allegations are more than sufficient to establish that [Corporate Plaintiffs] acquired a Jewish identity and have standing to assert claims under Section 1981." (*Id.* at 17 .) As discussed above, however, Plaintiffs' arguments find no support in their complaint. The Court further notes that Plaintiffs never sought leave to amend their complaint throughout the pendency of Defendants' motion to dismiss. The Court reminds Plaintiffs mat they cannot amend their complaint through their opposition briefs. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 448 (7th Cir.2011) (noting the "axiomatic rule that a plaintiff may not amend his complaint in his response brief"); *see also Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984) (a "complaint may not be amended by the briefs in opposition to a motion to dismiss"). Because Corporate Plaintiffs have failed to sufficiently allege in their complaint that they acquired a racial identity, the Court dismisses Counts I and II of their complaint.

### B. Action for an accounting
**\*9** In Count V, asserted against all Defendants, Plaintiffs seek an accounting "regarding the management, administration, and handling of the loans." (R. 1, Compl.¶ 137.) Defendants argue that Plaintiffs released this claim under the terms of the Operating Loan, and that Count V

should therefore be barred. (R. 29, Arrowsmith's Mem. at 21–24; R. 37, Arrowsmith's Reply at 13–14.) An action for an accounting is an action based in contract. 1 Am.Jur.2d Accounts and Accounting § 8 (2012). Therefore, an action on an account must be founded on a contract, either express or implied. *Id.* Because Arrowsmith is not a party to the loans at issue, there is no contractual basis for the requested accounting. Accordingly, the Court dismisses Count V.

### II. Petition for fees
Arrowsmith also petitions the Court for an order directing Plaintiffs to pay him $29,979.00 in fees. (R. 58, Arrowsmith's Am. Pet.) This amount represents the attorneys' fees incurred by Arrowsmith in (1) litigating the New York Action, and (2) researching, drafting, and filing the Costs Motion, which this Court granted on August 10, 2011. (*Id.* at 1.) According to Arrowsmith, his counsel incurred fees of $16,269.00 in researching case law concerning Plaintiffs' two statutory discrimination claims in the Second Circuit and the Southern District of New York, and in drafting a motion to dismiss that relied on that case law in the New York Action. (*Id.* at 2.) Arrowsmith asserts that his counsel would not have incurred these expenses if Plaintiffs had filed the action in the Northern District of Illinois in the first instance. (*Id.*) With respect to the Costs Motion, Arrowsmith asserts that his counsel incurred fees of $13,710.00 for researching, drafting, and filing the Costs Motion that would not have been necessary had Plaintiffs not filed their action in New York, voluntarily dismissed that action, and then re-filed their action in the Northern District of Illinois. (*Id.* at 2.) According to Arrowsmith, the fees his counsel seek "relate to him individually or alternatively, to all Defendants collectively (including him), and thus, would have been incurred had Mr. Arrowsmith been the only defendant in the action." (*Id.* at 3.)

Plaintiffs present several arguments to support their position that Arrowsmith is not entitled to attorneys' fees. (R. 61, Pls.' Resp. at 4–13.) First, Plaintiffs argue that Arrowsmith has not shown, as a matter of law, that he is entitled to attorneys' fees under *Esposito v. Piatrowski,* 223 F.3d 497, 501 (7th Cir.2000). (*Id.* at 4, 6–9.) Second, Plaintiffs argue that Arrowsmith has not established that he has incurred any attorneys' fees. (*Id.* at 4, 9–10.) Plaintiffs also argue that Arrowsmith has not established that the attorneys' fees he seeks to recover are reasonable, (*id.* at 4, 11), nor has he demonstrated that all of the work performed by the Fulbright and Jenner attorneys was unnecessary or inapplicable to litigating the instant suit in the Northern District of Illinois, (*id.* at 4, 12–13). Alternatively, Plaintiffs request that the

Court grant them leave to take limited discovery to determine whether Arrowsmith incurred any of the attorneys' fees sought and, if so, the amount of such fees. (*Id.* at 4.) For the reasons discussed below, the Court awards Arrowsmith $28,518.05 in fees.

### A. Legal basis for awarding attorneys' fees

**\*10** Federal courts generally may not provide an award of attorneys' fees absent a statute or contractual provision authorizing such an award. *Esposito v. Piatrowski,* 223 F.3d 497, 500 (7th Cir.2000); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257 (1975). Here, Arrowsmith seeks the recovery of legal fees pursuant to Rule 41(d). Plaintiffs attempt to block Arrowsmith from recovering attorneys' fees and argue that, as a matter of law, Arrowsmith is not entitled to recovery any attorneys' fees as part of the "costs" that Rule 41(d) contemplates. (R. 61, Pls.' Resp. at 6–10.)

Rule 41(d) states, in relevant part: "If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court ... may order the plaintiff to pay all or part of the costs of that previous action[.]" Fed.R.Civ.P. 41(d). Rule 41(d) refers to "costs," but it fails to specify whether that term includes attorneys' fees. The Advisory Committee Notes also fail to address the question. *See Esposito,* 223 F.3d at 501 (noting that the Advisory Committee Notes do not indicate whether such costs include attorneys' fees). Recognizing this ambiguity, the Seventh Circuit reasoned in *Esposito* that "[b]ecause Rule 41(d) does not refer to costs any differently than does 18 U.S.C. § 1920, which provides the statutory specification of allowable costs, fees may be included as costs only where the underlying statute so provides." *Id.* Therefore, the Seventh Circuit held "that a party may recover reasonable attorneys' fees as part of its 'costs' under Rule 41(d) only where the underlying statute defines costs to include attorneys' fees." *Id.* Thus, Plaintiffs argue, that under *Esposito,* "courts may only award attorneys as 'costs' under Rule 41(d) when the underlying statute would have allowed for the recovery of attorneys' fees." (R. 61, Pls.' Resp. at 6) (citing *Esposito,* 223 F.3d at 501).

Plaintiffs' argument on this point is without merit. Plaintiffs fail to recognize that district courts have the inherent authority to order an award of attorneys' fees under certain circumstances, such as where a party has acted in bad faith or inflicted unnecessary costs on the court or the defendants. *See Esposito,* 223 F.3d at 500 n. 5 ("Attorneys' fees may

be awarded by order of the court under certain factual circumstances ... One such example is the courts' inherent authority to order a party acting in bad faith to pay for the attorneys' fees of its adversary.") (citing *F.D. Rich Co., Inc. v. United States ex rel. Indus. Lumber Co., Inc.,* 417 U.S. 116 (1974)); *Chambers v. Nasco, Inc.,* 501 U.S. 32, 45–46 (1991) ("a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons") (citations and internal quotation marks omitted); *Mañez v. Bridgestone Firestone N. Am. Tire, LLC,* 533 F.3d 578, 591 (7th Cir.2008) (noting that "courts retain inherent power to punish the full range of litigation abuses," which includes punishing a party "for an act that inflict[s] needless costs on the court and the defendants"). *Esposito* did not change the long-standing rule establishing the inherent power of district courts to award attorneys' fees. Indeed, after reaching its holding in *Esposito,* the Seventh Circuit clarified that "attorneys' fees are not a recoverable cost of litigation under Rule 41(d) unless the substantive statute which formed the basis of the original suit allows for the recovery of such fees *(or unless such fees are specifically ordered by the court)."* 223 F.3d at 501 (emphasis added). Accordingly, contrary to Plaintiffs' argument, the Court possesses the inherent authority to specifically order attorneys' fees under Rule 41(d). Here, the Court previously ordered the imposition of such fees on Plaintiffs when it granted Defendants' Costs Motion and requested that Defendants submit a petition for costs. (R. 59–1, Ex. 1, Aug. 10, 2011 Tr. at 8:9–15; R. 20, Min. Entry.) In so doing, it recognized that Plaintiffs had unnecessarily filed their complaint in the Southern District of New York. (R. 59–1, Ex. 1, Aug. 10, 2011 Tr. at 10:15–17.) The Court's order is consistent with *Esposito,* 223 F.3d at 501, which recognized that "awarding [attorneys'] fees as part of costs advances the purpose of Rule 41(d), which is to deter forum shopping and vexatious litigation."

### B. Amount of attorneys' fees

**\*11** Having found that Rule 41(d) is applicable, and that the Court may impose attorneys' fees on Plaintiffs, the Court next determines the appropriate amount of the award of attorneys' fees. Failing to cite any case law, Plaintiffs argue that Arrowsmith has failed to establish that he incurred any attorneys' fees in connection with the voluntary dismissal of the New York Action. (R. 61, Pls.' Resp. at 4, 9–10.) According to Plaintiffs, "it appears that the Entity Defendants incurred and paid all of the legal fees that Arrowsmith now seeks to recover." (*Id* at 9.) Plaintiffs' argument is based on nothing more than mere speculation. As Arrowsmith points out, the fees his counsel seek "relate to him individually or

alternatively, to all Defendants collectively (including him), and thus, would have been incurred had Mr. Arrowsmith been the only defendant in the action." (R. 58, Arrowsmith's Am. Pet. at 3.) District courts have inherent power "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers,* 501 U.S. at 4445. Such sanctions are appropriate where a litigant has "abused the judicial process or otherwise conducted litigation in bad faith." *Salmeron v. Enter. Recovery Sys., Inc.,* 579 F.3d 787, 793 (7th Cir.2009) (citing *Maynard v. Nygren,* 332 F.3d 462, 470–71 (7th Cir.2003)). Here, the Court has already determined that Plaintiffs abused the judicial process, and pursuant to its inherent authority, the Court will fashion an appropriate sanction.

Where a case is voluntarily dismissed and re-filed by the plaintiff, attorneys' fees are awarded to the defendant to compensate for the unnecessary expenses incurred by the litigation. *Cauley v. Wilson,* 754 F.2d 769, 772 (7th Cir.1985). Generally, courts "should not impose any costs associated with work that will still be useful to the defendants in the instant litigation." *Oteng v. Golden Star Res., Ltd.,* 615 F.Supp.2d 1228, 1240 (D.Colo.2009) (citing *Esquivel v. Arau,* 913 F.Supp. 1382, 1386 (C.D.Cal.1996)); *see also Westlands Water Dist. v. United States,* 100 F.3d 94, 97 (9th Cir.1996) (remanding to the district court to consider, *inter alia,* whether to condition a voluntary dismissal under Rule 41(a)(2) on the payment of costs and attorney fees, and instructing the district court that "if [it] decides it should condition dismissal on the payment of costs and attorney fees, the defendants should only be awarded attorney fees for work which cannot be used in any future litigation on these claims.") (citing *Koch v. Hankins,* 8 F.3d 650, 652 (9th Cir.1993)); *Copeland v. Hussmann Corp.,* 462 F.Supp.2d 1012, 1024 (E.D.Mo.2006) (allowing award of "attorneys' fees for any work done in the previously dismissed case that is useless in the present case").

### 1. Unnecessary work related to the New York Action

Prior to the dismissal of the New York Action, Arrowsmith asserts that his counsel, from the law firm of Fulbright & Jaworski L.L.P. ("Fulbright"), incurred $16,093.00 in attorneys' fees for defending the New York Action. (R. 59, Arrowsmith's Mem. at 3.) Arrowsmith seeks attorneys' fees for 57 billable hours spent by his attorneys researching the two anti-disccrimination statutes at issue and drafting a motion to dismiss the New York Action. (*Id* at 5.) Arrowsmith asserts that Sarah O'Connell, a senior associate at Fulbright, who graduated law school in 2002 and bills her clients at an hourly rate of $382.00, expended 6.5 hours on the New York

Action. (*Id.* at 4–5.) Additionally, Arrowsmith claims that Jami Vibbert, a Fulbright associate who graduated law school in 2007 and bills her clients at an hourly rate of $273.00, expended 50.5 hours on the New York Action. (*Id.*) To support his fee petition, Arrowsmith submitted Fulbright's invoices for the work its associates completed while representing Arrowsmith in the New York Action. (R. 59–2, Ex. 2, Invoice No. 11196925.)

*\*12* After reviewing Fulbright's invoices, the Court first notes that Arrowsmith has failed to precisely indicate the billing entries for which he is seeking attorneys' fees. Additionally, none of the billing entries indicate that the research conducted by O'Connell and Vibbert on the two anti-discrimination statutes focused solely on the Second Circuit or the federal district courts in New York, and the Southern District of New York in particular. Indeed, Arrowsmith relied on at least one case from the Second Circuit in drafting their motion to dismiss in this case, in addition to case law from other Circuit Courts of Appeals, which suggests that Arrowsmiths' research of the Second Circuit precedent was not entirely useless. The Court therefore has difficulty finding that all of the defense's initial research for the New York action was unnecessary and not useful in defending the instant action. That said, O'ConneU and Vibbert spent time meeting to discuss the research and to strategize on the motion to dismiss in the New York Action. The strategy employed by the defense in the New York Action is likely to have been materially different than the strategy employed by the defense in the instant action as the motion to dismiss had to be filed in a different judicial venue. Therefore, the Court will allow for the recovery of those billing entries indicating that O'ConneU and Vibbert met and conferred regarding the statutory discrimination arguments to be made in the motion to dismiss in the New York Action. Specifically, the Court allows Arrowsmith to recover attorneys' fees for two meetings that O'Connell and Vibbert held on June 13 and June 14, for .20 hours and 1.4 hours respectively, for a total of $1,048.00.

Vibbert also spent time researching pleading standards and motions to dismiss pursuant to Rule 12(b)(6). Based on the Court's experience with such matters, this research is likely to have been focused almost exclusively on Second Circuit precedent. Therefore, although the Court will not aUow Arrowsmith to recover fees for time spent generaUy researching the two anti-discrimination statutes that Plaintiffs allege Arrowsmith violated, the Court will allow Arrowsmith to recover one-half of the time for those billing entries

constituting Vibber's research of pleading standards and Rule 12(b)(6) cases. Specifically, the Court allows Arrowsmith to recover for 1.3 hours of research conducted on June 14, 1.2 hours of research conducted on June 16, 1.55 hours of research conducted on June 20, and 2.6 hours of research conducted on June 21, for a total of $1,815.45.

In addition, both O'Connell and Vibbert spent time drafting a motion to dismiss intended to be filed in the Southern District of New York, and although it is plausible that they could have made substantially similar arguments before this Court as those contained in their motion to dismiss for the Southern District of New York, it is unlikely that they could have replicated that work verbatim into a new document to be filed before this Court. The Court will therefore allow Arrowsmith to recover one-half of the billing entries representing the time that O'Connell and Vibbert spent drafting or revising the motion to dismiss. Specifically, the Court allows Arrowsmith to recover 3.9 hours for July 14, 2.7 hours for July 15, 3.9 hours for July 18, and 4.8 hours for July 19 for Vibbert's work. Additionally, the Court allows Arrowsmith to recover 1.7 hours for July 18, 1.85 hours for July 19, and 1.15 hours for July 20 for O'Connell's work. Therefore, Arrowsmith is entitled to recover $11,944.60 for the time that either O'Connell or Vibbert spent drafting and revising a motion to dismiss that was intended to be filed in the Southern District of New York, but due to the change in venue had to be filed in the Northern District of Illinois.

*13 In the exercise of its discretion, the Court finds that Arrowsmith may recover $14,808.05 in attorneys' fees for work that the Court determines was unnecessary and not useful to the instant action.

### 2. Unnecessary work related to the Costs Motion

In addition, Arrowsmith argues that he should also be compensated for expenses incurred in researching, drafting, and filing the Costs Motion. (R. 58, Arrowsmith's Mot. at 2.) Following the Plaintiffs' voluntary dismissal of the New York Action, Arrowsmith incurred $13,710.00 in attorneys' fees for work performed by Fulbright attorneys and attorneys from the law firm of Jenner & Block L.L.P. ("Jenner") on the Costs Motion. (R. 59, Arrowsmith's Mem. at 3.) Specifically, Arrowsmith asserts that Fulbright and Jenner attorneys spent a total of 38.4 billable hours on the Costs Motion. (*Id* at 6.) According to Arrowsmith, Linda Addison, a partner at Fulbright who bills her clients at an hourly rate of $634.00, spent 4.2 billable hours on the Costs Motion. (*Id.* at 4, 6.) Arrowsmith asserts that O'Connell spent 11.8 billable hours

working on the Costs Motion and that Vibbert billed 16.8 hours for her work on the Costs Motion. (*Id.* at 6.) Arrowsmith also states that Barbara Steiner, another partner at Jenner who bills her clients at an hourly rate of $630.00, spent .6 billable hours on the Costs Motion. (*Id* at 4, 6.) David Saunders, an associate at Jenner who graduated from law school in 2007 and bills his clients at an hourly rate of $315.00, billed 5 hours on the Costs Motion. (*Id.* at 5–6.)

"The Seventh Circuit teaches that attorney's fees incurred in litigating and establishing an attorney's entitlement to fees are generally compensable." *Holmstrom v. Metro. Life Ins., Co.,* No. 07–CV–6044, 2011 WL 2149353, at *8 (N.D.Ill. May 31, 2011) (citing *Bond v. Stanton,* 630 F.2d 1231, 1235 (7th Cir.1980)). In their response to Arrowsmith's amended petition for fees, Plaintiffs do not contest the amount of fees sought for the Costs Motion. (R. 61, Pls.' Resp.)

The Court finds that the fees incurred by Arrowsmith in bringing the Costs Motion are appropriate and that they help further the purpose of Rule 41(d), which is, in part, to prevent vexatious litigation. *See Esposito,* 223 F.3d at 501. Had Plaintiffs originally filed this action in this District, or had Plaintiffs not chosen to re-file this action, Arrowsmith would not have had to expend time drafting the Costs Motion. Because the invoices support his request, in the exercise of its discretion, the Court grants Arrowsmith the attorneys' fees for the time spent in preparing, researching, drafting, and filing the Costs Motion. Thus, the Court awards Arrowsmith the full $13,710.00 in attorneys' fees associated with bringing the Costs Motion. Therefore, in the exercise of its discretion, the Court concludes that Arrowsmith is entitled to recover from Plaintiffs a total of $28,518.05 in costs pursuant to Rule 41(d). Since the Court grants Arrowsmith's amended petition for fees, Plaintiffs' alternative request for limited discovery is denied.

### CONCLUSION

*14 For the foregoing reasons, the Court GRANTS Arrowsmith's motion to dismiss (R. 25), GRANTS Arrowsmith's motion to reconsider (R 47), and GRANTS Arrowsmith his amended petition for fees (R. 58), in the amount of $28,518.05. The Court directs the Clerk to enter a final judgment in favor of defendant Arrowsmith and against Plaintiffs.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6061710

## Footnotes

1   Plaintiffs include the following entities and individual: New Louisiana Holdings, LLC; Fountain View 215 Tenant LLC; Jackson Manor 1691 Tenant LLC; Panola 501 GP LLC; Retirement Center 14686 Tenant LLC; Acadian 4005 Tenant LLC; Lakewood Quarters Rehab 8225 Tenant LLC; Regency 14333 Tenant LLC; Sherwood 2828 Tenant LLC; Lakewood Quarters Assisted 8585 Tenant LLC; Panola 501 Partners LP; Citiscape Out Parcel Tenant LLC; Citiscape 5010 Tenant LLC; St Charles 1539 Tenant LLC; Woodland Village 5301 Tenant LLC; Atrium 6555 Tenant LLC (collectively, "Corporate Plaintiffs"); and Harris Schwartzberg.

2   As explained below, because the Entity Defendants have been dismissed, Arrowsmith is the only remaining defendant. The Court thus refers to Defendants' motion to dismiss as Arrowsmith's motion.

3   Also before the Court is Arrowsmith's Motion to Reconsider (R. 47), the Court's June 4, 2012 Minute Entry (R. 46), denying as moot Defendants' Petition for Fees on the basis of an agreed order of dismissal as to the Entity Defendante. Because the agreed order of dismissal only applied to the Entity Defendants, and not to Arrowsmith, and because the Petition for Fees was filed on behalf of all Defendants, including Arrowsmith, the Court grants Arrowsmith's Motion to Reconsider.

4   The limitations on what the Court may consider on a motion to dismiss pursuant to Rule 12(b)(6) are attenuated by Rule 10(c) insofar as "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" may all be considered by the Court without converting a motion to dismiss into amotion for summary judgment. *Geinosky v. City of Chi.,* 675 F.3d 743,745 n. 1 (7th Cir.2012) (citing Fed.R.Civ.P. 10(c)). Although Plaintiffs failed to attach a copy of the Operating Loan to their complaint, Defendants attached the agreement to their motion to dismiss. (R. 29–1, Ex. A, Credit and Security Agreement (Revolving Credit and Term Loan) dated as of January 18, 2006.) Documents that defendants attach to a motion to dismiss will be considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. *Venture Assocs. Corp. v.. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993) ("[A] defendant may introduce certain pertinent documents if the plaintiff failed to do so. Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") (internal citations omitted) (collecting cases); *see also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1327 (3d ed.2012). Here, because the complaint repeatedly refers to the Operating Loan, and because the Operating Loan is central to Plaintiffs' claims, the Court considers the Operating Loan submitted by Defendants to be part of the pleadings.

5   The current lenders are GE Financial, CIT, and Marathon (the "Lenders"). (R. 1, Compl.¶ 50.)

6   The complaint in the New York Action contains the same causes of action and is substantially the same as the complaint filed in the instant action. (*See* R. 9–6, Ex. 6, Redline.)

7   Counts III and IV are asserted against the Lenders, which consist of GE Financial, CIT, and Marathon, and so those claims are no longer viable because they are only alleged against defendants who are no longer parties to this suit (R. 1, Compl. ¶¶ 125–135; R. 45, Order of Dismissal.) In Count VI, Schwartzberg sought a declaratory judgment "as to the rights and other legal relations of Harris Schwartzberg and Lenders." (*Id.* ¶ 142.) Because a controversy no longer exists between Schwartzberg and the Lenders, the Court finds the request contained in Count VI moot.

8    According to the complaint, each of the Corporate Plaintiffs is also a borrower under the Operating Loan. (R. 1, Compl.¶¶ 1–16, 42.) Accordingly, the complaint refers to Corporate Plaintiffs as Operating Borrowers. (*See, e.g., id.* ¶ 42.)

9    Both Plaintiffs and Arrowsmith agree that the analysis of whether Plaintiffs' complaint sufficiently alleges that Arrowsmith discriminated against them on the basis of race and/or religion for purposes of Section 1981 is equally applicable to the ECOA claim. (R. 33, Pls.' Mem. at 22 n. 43; R. 24–1, Defs.' Mem. at 14 n. 8.)

---

**End of Document**                                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.