IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) | Case No. 1:20-cv-04176 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Franklin U. Valderrama |
| | ) | Magistrate Judge Gabriel A. Fuentes |
| | ) | |
| Townstone Financial, Inc. and Barry Sturner, | ) | |
| | ) | |
| Defendants. | ) | |

**OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................................................... 1

**STANDARD OF REVIEW** ........................................................................................................ 1

**BACKGROUND** ......................................................................................................................... 2

**ARGUMENT** ............................................................................................................................... 5

    **I.**    **The Amended Complaint states claims under ECOA and Regulation B.** ..................... 5

        **A.**    Regulation B's longstanding discouragement prohibition is authorized by and necessary to ECOA. .......................................................................................................... 6

        **B.**    Courts have consistently recognized Regulation B's discouragement prohibition, including its application to prospective applicants. ................................................. 8

        **C.**    The Amended Complaint alleges sufficient facts to state a claim under ECOA and Regulation B. .......................................................................................................... 11

    **II.**    **Neither Regulation B nor this action violates the First Amendment.** ..................... 15

        **A.**    This action does not implicate speech protected by the First Amendment. ........... 16

        **B.**    Even if the challenged communications are protected speech, they are commercial speech appropriately subject to regulation here. ............................................................... 19

            **1.**    Commercial speech mixed with discussion of public issues remains commercial speech. ............................................................................................................ 19

            **2.**    The Bureau's regulation of Townstone's commercial speech directly advances the Bureau's substantial interest in prohibiting discriminatory lending. ..................... 21

        **C.**    Neither this action nor Regulation B is unconstitutionally vague. ............................ 23

    **III.**    **ECOA and Regulation B provide fair notice of the prohibited conduct and comport with the Fifth Amendment.** ......................................................................................... 25

    **IV.**    **The fraudulent-transfer claim should not be dismissed.** ........................................... 27

**CONCLUSION** ........................................................................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alexander v. AmeriPro Funding, Inc.,*
  848 F.3d 698 (5th Cir. 2017)...............................................................................9

*Page v. Midland Fed. Sav. & Loan,*
  2013 WL 5211747 (N.D. Ill. Sept. 13, 2013).......................................... 10

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).......................................................................................2

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).......................................................................................2

*Bolger v. Youngs Drug Prod. Corp.,*
  463 U.S. 60 (1983).......................................................................16, 19, 20

*Burns v. McGregor Elec. Indus., Inc.,*
  989 F.2d 959 (8th Cir. 1993)..................................................................... 26

*Campbell v. Robb,*
  162 F. Appx. 460 (6th Cir. 2006)............................................................. 20

*Cartwright v. Am. Sav. & Loan Ass'n,*
  880 F.2d 912 (7th Cir. 1989)..................................................................... 12

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
  447 U.S. 557 (1980).......................................................19, 21, 23, 24

*CFTC v. Schor,*
  478 U.S. 833 (1986).......................................................................................4

*Cherry v. Amoco Oil Co.,*
  481 F. Supp. 727 (N.D. Ga. 1979)........................................................... 13

*Chevron v. NRDC,*
  467 U.S. 837 (1984)...................................................................................6, 8

*City of Sacramento v. Wells Fargo & Co.,*
  2019 WL 3975590 (E.D. Cal. 2019)........................................................ 16

*Davis v. Strata Corp.,*
  242 F. Supp. 2d 643 (D.N.D. 2003).......................................................... 13

*Dhade v. Huntington Learning Ctrs., Inc.,*
  414 F. Supp. 3d 703 (D. Del. 2019).......................................................9, 10

*EEOC v. O & G Spring & Wire Forms Specialty Co.,*
  38 F.3d 872 (7th Cir. 1994)..................................................................... 15

*Estate of Davis v. Wells Fargo Bank,*
  633 F.3d 529 (7th Cir. 2011)..................................................................... 12

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012).................................................................................... 28

*First Merit Bank, N.A. v. Ferrari,*
  71 F.Supp.3d 751 (N.D. Ill. 2014).......................................................... 12

*Ford Motor Credit Co. v. Milhollin,*
  444 U.S. 555 (1980).......................................................................................3

*Freedom v. Madigan,*
  697 F.3d 464 (7th Cir. 2012)...............................................................25, 27

*FTC v. Trudeau,*
   662 F.3d 947 (7th Cir. 2011)............................................................22, 23

*Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7,*
   570 F.3d 811 (7th Cir. 2009)....................................................................1

*Harbaugh v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.,*
   615 F.2d 1169 (7th Cir. 1980)..................................................................9

*Hazelwood Sch. Dist. v. United States,*
   433 U.S. 299 (1977)...............................................................................15

*Hill v. Colorado,*
   530 U.S. 703 (2000)...............................................................................27

*Hood v. Midwest Sav. Bank,*
   95 F. App'x 768 (6th Cir. 2004)..............................................................13

*Household Credit Servs., Inc. v. Pfennig,*
   541 U.S. 232 (2004).................................................................................3

*Int'l Bd. of Teamsters v. United States,*
   431 U.S. 324 (1977)...................................................................7, 12, 15

*Jancik v. HUD,*
   44 F.3d 553 (7th Cir. 1995)....................................................................26

*Jordan v. Jewel Food Stores, Inc.,*
   743 F.3d 509 (2014)...................................................................17, 21, 22

*Lewis v. ACB Bus. Servs., Inc.,*
   135 F.3d 389 (6th Cir. 1998)..................................................................12

*Mourning v. Fam. Publ'ns Serv., Inc.,*
   411 U.S. 356 (1973).................................................................................7

*Muro v. Target Corp.,*
   580 F.3d 485 (7th Cir. 2009)....................................................................7

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
   138 S. Ct. 2361 (2018)...........................................................................18

*NLRB v. Bell Aerospace Co.,*
   416 U.S. 267 (1974).................................................................................4

*Oncale v. Sundowner Offshore Servs., Inc.,*
   523 U.S. 75 (1998).................................................................................26

*Ortiz v. Werner Enters., Inc.,*
   834 F.3d 760 (7th Cir. 2016)..................................................................12

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,*
   413 U.S. 376 (1973)...........................................................................19, 20

*Ragin v. NY Times,*
   923 F.2d 995 (2d Cir. 1991)..................................................20, 25, 26, 28

*RAV v. City of St. Paul,*
   505 U.S. 377 (1992)...............................................................................18

*RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC,*
   754 F.3d 380 (6th Cir. 2014)....................................................................8

*Rosa v. Park W. Bank & Trust Co.,*
   214 F.3d 213 (1st Cir. 2000)..................................................................12

*Rumsfeld v. F.A.I.R.,*
   547 U.S. 47 (2006).......................................................................17, 18, 20

*Schor v. Daley,*
   563 F. Supp. 2d 893 (N.D. Ill. 2008).....................................................27

*Sims v. New Penn Fin. LLC,*
  2018 WL 1523212 (N.D. Ind. 2018) ............................................................... 11
*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ........................................................................... 18, 20
*Sullivan-Knoff v. City of Chicago,*
  348 F. Supp. 3d 787 (N.D. Ill. 2018) ............................................................ 27
*Swierkiewicz v. Sorema,*
  534 U.S. 506 (2002) ............................................................................. 12
*Thomas v. First Fed. Sav. Bank of Ind.,*
  653 F. Supp. 1330 (N.D. Ind. 1987) ............................................................ 12
*Treadway v. Gateway Chevrolet Oldsmobile,*
  362 F.3d 971 (7th Cir. 2004) .................................................................... 9
*United States. v. BancorpSouth Bank,*
  No. 1:16-cv-00118 (N.D. Miss. June 29, 2016) .................................................. 15
*United States. v. Bell,*
  414 F.3d 474 (3d Cir. 2005) .................................................................... 22
*United States. v. Blackpipe State Bank,*
  No. 93-5115 (D.S.D. 1993) ...................................................................... 15
*United States. v. Chevy Chase Fed. Sav. Bank,*
  No. 1:94-cv-01829, (D.D.C. Aug. 22, 1994) ...................................................... 15
*United States. v. Decatur Fed. Sav. & Loan Assoc.,*
  No. 1:92-cv-02198 (N.D. Ga. Mar. 17, 1992) .................................................... 15
*United States ex rel. Jackson v. Racey,*
  112 F.3d 512 (4th Cir. May 7, 1997) ............................................................ 20
*United States v. First Am. Bank,*
  No. 04C-4585 (N.D. Ill. July 13, 2004) ......................................................... 8
*United States v. First Merchants Bank,*
  No. 1:19-cv-02365 (S.D. Ind. June 13, 2019) ................................................... 8
*United States v. First Secs. Bank,*
  No. 09-0644 (S.D. Ala. Sept. 30, 2009) ......................................................... 14
*United States v. Hudson City Savs. Bank, F.S.B.,*
  No. 2:15-cv-07056 (D. N.J. Sept. 24, 2015) .................................................. 8, 15
*United States v. Hunter,*
  459 F.2d 205 (4th Cir. 1972) ................................................................... 20
*United States v. KleinBank,*
  No. 0:17-cv-00136 (D. Minn. Jan. 30, 2018) .................................................... 8
*United States v. Mead Corp.,*
  533 U.S. 218 (2001) ........................................................................... 6, 8
*United States v. Space Hunters, Inc.,*
  429 F.3d 416 (2d Cir. 2005) ................................................................... 18
*United States v. Union Auto Sales, Inc.,*
  490 F. App'x 847 (9th Cir. 2012) ............................................................... 12
*United States v. Williams,*
  553 U.S. 285 (2008) ........................................................................... 20
*Vill. of Arlington Heights v. Metro. Haus. Dev. Corp.,*
  429 U.S. 252 (1977) ........................................................................... 12
*Volling v. Kurtz Paramedic Servs., Inc.,*
  840 F.3d 378 (7th Cir. 2016) .................................................................... 7

*Wis. Right to Life, Inc. v. Barland,*
  751 F.3d 804 (7th Cir. 2014) ........................................................................... 25

Statutes

5 U.S.C. § 706(2)(A)-(C) ....................................................................................6
12 U.S.C. § 5519 ..................................................................................................4
15 U.S.C. § 1604(a) ..............................................................................................6
15 U.S.C. § 1691 .............................................................................................1, 2
15 U.S.C. § 1691a ............................................................................................3, 8
15 U.S.C. § 1691b ...................................................................................3, 4, 6, 7
15 U.S.C. § 1691e ............................................................................................4, 9
28 U.S.C. §§ 3301–3308 ...................................................................................29
42 U.S.C. § 3604(c) ...........................................................................................20
Pub. L. No. 90-321 ...............................................................................................6
Pub. L. No. 93-495 ...............................................................................2, 6, 7, 18
Pub. L. No. 94-239 ..........................................................................................2, 4
Pub. L. No. 102-242 ............................................................................................4
Pub. L. No. 111-203 .........................................................................................3, 4

Rules

Fed. R. Civ. P. 8(a)(2) ........................................................................................2

Regulations

12 C.F.R. pt. 202 ............................................................................................3, 8
12 C.F.R. pt. 1002 & Supp. I ...........................................................4, 18, 19, 20
12 C.F.R. § 1002.4(b) .................................................................................1, 4, 15
40 Fed. Reg. 49,298 (Oct. 22, 1975) ...............................................................3, 8
42 Fed. Reg. 1254 (Jan. 6, 1977) ........................................................................3
50 Fed. Reg. 48,050 (Nov. 12, 1985) ............................................................3, 20
76 Fed. Reg. 79,442 (Dec. 21, 2011) ..................................................................4

Other Authorities

Federal Financial Institutions Examination Council, "Interagency Fair Lending Examination
Procedures," (September 2009) at ii, iv, available at https://www.ffiec.gov/PDF/fairlend.pdf..........8
H.R. Rep. No. 102-330 ........................................................................................5
S. Rep. No. 102-167 ............................................................................................5
S. Rep. No. 93-278 ..................................................................................2, 17, 22
S. Rep. No. 94-589 ......................................................................................2, 22

## INTRODUCTION

The Equal Credit Opportunity Act (ECOA or the Act), enacted in 1974, prohibits discrimination in any aspect of a credit transaction.[1] ECOA's implementing regulation, Regulation B, prohibits creditors from making "any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application."[2] ECOA and Regulation B have been protecting consumers from credit discrimination for more than 45 years. The Bureau's claims present a straightforward application of these laws.

Townstone Financial, Inc. (Townstone), a mortgage-loan creditor, has for years engaged in unlawful discrimination by engaging in acts or practices that would discourage prospective applicants, on the basis of race, from applying for credit in the Chicago Metropolitan Statistical Area (MSA), in violation of ECOA and Regulation B. After litigation became likely, Townstone transferred more than $2.4 million to Barry Sturner, which, if allowed to stand, would thwart the Bureau's collection on any judgment.

The law provides no respite for Townstone's discrimination, and Townstone and Barry Sturner cannot prevent the Bureau's collection on any favorable judgment in this case by fraudulently transferring Townstone's assets. The Amended Complaint adequately alleges claims for relief, and Defendants' motion to dismiss should be denied.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) challenges the complaint's sufficiency.[3] Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the

---

[1] 15 U.S.C. § 1691(a).
[2] 12 C.F.R. § 1002.4(b).
[3] *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).

pleader is entitled to relief."[4] To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "'state a claim to relief that is plausible on its face.'"[5] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[6] The allegations "must be enough to raise a right to relief above the speculative level."[7] Factual allegations are entitled to the assumption of truth.[8]

## BACKGROUND

ECOA is a landmark civil-rights law that protects individuals and businesses against discrimination in accessing and using credit—"a virtual necessity of life" for most Americans.[9] Congress enacted ECOA in 1974, initially to address "widespread discrimination . . . in the granting of credit to women."[10] Two years later, Congress added race, color, religion, and national origin, among others, to the list of prohibited bases.[11] From the beginning, the Act has made it unlawful for "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction," on a prohibited basis.[12]

Congress directed the Board of Governors of the Federal Reserve System (Board) to prescribe regulations to implement ECOA and gave the Board broad authority in doing so:

> The Board *shall prescribe regulations* to carry out the purposes of this title. These regulations may contain but are not limited to such classifications, differentiation, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are *necessary or proper to effectuate the*

[4] Fed. R. Civ. P. 8(a)(2).

[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[6] *Id.* (citing *Twombly*, 550 U.S. at 556).

[7] *Twombly*, 550 U.S. at 555.

[8] *Iqbal*, 556 U.S. at 678–79.

[9] S. Rep. No. 94-589, at 3–4 (1976).

[10] S. Rep. No. 93-278, at 16 (1973), Equal Credit Opportunity Act of 1974, Pub. L. No. 93-495, 88 Stat. 1500, 1521 (1974).

[11] Equal Credit Opportunity Amendments Act of 1976, Pub. L. No. 94-239, 90 Stat. 251 (1976).

[12] 15 U.S.C. § 1691.

*purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith.*[13]

Congress made clear that the requirements of these regulations would bind creditors to the same extent as the statute itself.[14]

Using notice-and-comment rulemaking, the Board issued these rules, known as Regulation B, in 1975, the year after ECOA was enacted and several days before the statute took effect.[15] These rules provided that "[a] creditor shall not make any statements to applicants or prospective applicants which would, [on a prohibited basis], discourage a reasonable person from applying for credit or pursuing an application for credit."[16] The Board described the provision as "necessary to protect applicants against discriminatory acts occurring before an application is initiated."[17] The Board updated this provision to encompass the broader prohibited bases mandated by the 1976 ECOA amendments,[18] including race, color, and national origin, and to add specificity and commentary.[19]

The Dodd-Frank Wall Street Reform and Consumer Protection Act, enacted in 2010, established the Bureau and transferred to it primary rulemaking responsibility under ECOA.[20]

---

[13] 15 U.S.C. § 1691b(a) (emphasis added). This broad statutory charge is identical to language in the Truth in Lending Act (TILA), which the Supreme Court has characterized as providing "expansive authority to the [Board] to enact appropriate regulations," *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 235 (2004), and as indicating that Congress "specifically designated the [Board] as the primary source for interpretation and application of [the] law," *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980).

[14] *See* 15 USC 1691a(g).

[15] *See* 40 Fed. Reg. 49,298 (Oct. 22, 1975) (promulgating 12 C.F.R. pt. 202).

[16] *Id.* at 49,307.

[17] 40 Fed. Reg. 49,298, 49,307 (Oct. 22, 1975).

[18] 42 Fed. Reg. 1254 (Jan. 6, 1977).

[19] 50 Fed. Reg. 48,050 (Nov. 12, 1985) (adding official commentary to the discouragement prohibition and stating, "Generally, the regulation's protections apply only to persons who have requested or received an extension of credit. In keeping with the purpose of the act—to promote the availability of credit on a nondiscriminatory basis—§ 202.5(a) covers acts or practices directed at potential applicants.").

[20] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2083–84 (2010).

Shortly thereafter, the Bureau republished the Board's ECOA regulations without material change.[21] Accordingly, through Congress's express delegation of rulemaking authority, Regulation B's discouragement provision has been effectuating "the purposes of" ECOA and preventing "circumvention or evasion thereof" since 1975. At all times relevant here, it has prohibited creditors from making "any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application."[22] This provision is the basis for the Bureau's claims against Townstone.

It is true today—as it was in 1975—that a prohibition on discouragement is necessary to implement ECOA and prevent evasion. In the 45 years since the Board issued Regulation B, Congress has revisited ECOA on several occasions, yet Congress has never displaced or altered the regulation's discouragement provision.[23] "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'"[24] Here, not only has Congress acted without altering Regulation B's discouragement provision, but Congress also specifically recognized the provision in its 1991 amendment of ECOA, requiring that agencies enforcing the Act refer to the Attorney General any matter involving a suspected "pattern or practice of *discouraging* or denying applications for credit in violation of [ECOA]."[25] Thus, Congress recognized that discriminatory

---

[21] *See* 76 Fed. Reg. 79,442 (Dec. 21, 2011) (promulgating 12 C.F.R. pt. 1002 & Supp. I). The Board retains the authority to prescribe rules under ECOA with respect to auto dealers excluded from the Bureau's authority by 12 U.S.C. § 5519. *See* 15 U.S.C. § 1691b(f).

[22] 12 C.F.R. § 1002.4(b).

[23] *E.g.*, Equal Credit Opportunity Amendments Act of 1976, Pub. L. No. 94-239, 90 Stat. 251 (1976); FDIC Improvement Act of 1991, Pub. L. No. 102-242, 105 Stat 2236 (1991); Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, 1980, 2083 (2010).

[24] *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75 (1974)).

[25] FDIC Improvement Act of 1991, Pub. L. 102-242, 105 Stat 2236 (1991), codified at 15 U.S.C. § 1691e(g) (emphasis added).

4

discouragement of applications for credit is a violation of ECOA and directed that it must be addressed to effectively enforce the Act.[26]

## ARGUMENT

Townstone asserts that the Bureau's claims improperly expand ECOA's reach contrary to its express language. Townstone further argues that the Bureau's claims must be dismissed because they seek to regulate the content and viewpoint of speech protected by the First Amendment and because Regulation B's reasonable-person standard is unconstitutionally vague under the Fifth Amendment's Due Process Clause. Townstone's arguments are unavailing. Regulation B's prohibition on discouragement of prospective applicants is entirely consistent with, not contrary to, ECOA's express language, which refers to "discouraging . . . applications for credit";[27] Townstone's commercial speech in violation of ECOA is not protected by the First Amendment; and Regulation B provides fair notice of the conduct that it proscribes.

## I. The Amended Complaint states claims under ECOA and Regulation B.

Townstone argues that Regulation B's discouragement provision exceeds ECOA's scope. Townstone asserts that ECOA's prohibition is limited to "applicants," such that inclusion of "prospective applicants" in Regulation B improperly expands ECOA. Similarly, Townstone asserts that "discouragement" is not reasonably within the unambiguous "discrimination" prohibited by ECOA. Asserting that there is no ambiguity in ECOA's language, Townstone argues that Regulation B should receive no deference and further argues that Regulation B is not a reasonable interpretation

---

[26] *See* H.R. Rep. 102-330, 131, 1991 U.S.C.C.A.N. 1901, 1944 ("Regulators will be required by this section to promptly refer loan discrimination violations of the Equal Credit Opportunity Act to the Justice Department."); S. Rep. 102-167, at *86, 93 (Oct. 1, 1991) (citing ECOA regulations "[d]iscouraging applications on a prohibited basis and advertising which implies a discriminatory preference are also prohibited").

[27] 15 U.S.C. § 1691e(g).

of ECOA because "prospective applicants" is vague and arguably includes "the entire world." But contrary to Townstone's assertions, Regulation B's discouragement provision is a valid regulation, entirely consistent with ECOA's express language, and necessary to achieve ECOA's stated purpose of prohibiting discrimination in any aspect of a credit transaction.

### A. Regulation B's longstanding discouragement prohibition is authorized by and necessary to ECOA.

Under the Administrative Procedure Act (APA), a court may set aside a rule only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations."[28] Where Congress provides "'an express delegation of authority to [an] agency to elucidate a specific provision of [a] statute by regulation,'" as it did in ECOA, the agency's implementing regulations are "binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute."[29]

Regulation B's discouragement prohibition is not manifestly contrary to ECOA, but rather fulfills the Act's express mandate to the Bureau, and to the Board before it, "to prevent circumvention or evasion thereof, or to facilitate . . . compliance therewith."[30] Congress understood that additional rules may be necessary to prevent evasion of ECOA's prohibitions and expressly instructed the Board, then the Bureau, to enact any such rules. The language delegating this authority is unambiguous. In examining an identical anti-evasion provision in the Truth in Lending Act (TILA),[31] the Supreme Court held that

> [t]he language employed evinces the awareness of Congress that some creditors
> would attempt to characterize their transactions so as to fall one step outside

---

[28] 5 U.S.C. § 706(2)(A)-(C).
[29] *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (quoting *Chevron v. NRDC*, 467 U.S. 837, 843–44 (1984)).
[30] 15 U.S.C. § 1691b(a); Pub. L. No. 93-495, 88 Stat. 1522.
[31] Consumer Credit Protection Act, Pub. L. No. 90-321, 82 Stat. 146 (1968), *codified at* 15 U.S.C. § 1604(a).

> whatever boundary Congress attempted to establish. It indicates as well the clear desire of Congress to insure that the Board had adequate power to deal with such attempted evasion. In addition to granting to the Board the authority normally given to administrative agencies to promulgate regulations designed to 'carry out the purposes' of the Act, Congress specifically provided, as noted earlier, that the regulations may define classifications and exceptions to insure compliance with the Act.[32]

And the Seventh Circuit has likewise held that rules necessary to render TILA effective must be sustained so long as they are reasonably related to the legislation's purposes.[33]

The same analysis leads to the same conclusion here. ECOA's delegation of rulemaking authority plainly permits the Bureau to deal with attempted evasion and authorizes the Bureau to promulgate a rule like the discouragement prohibition of Regulation B.[34] Regulation B carries out ECOA's purpose by making clear that creditors cannot evade the statute's prohibition on discrimination in lending by discouraging applications—in effect, telling prospective applicants that, because of some protected characteristic, they need not apply.[35] As a lawful rulemaking, Regulation B is not "in excess of statutory jurisdiction" or in violation of the APA.

ECOA has never operated without the discouragement provision, nor would it be effective without it. When the Board first issued Regulation B in 1975, it recognized that the statute cannot prevent discrimination in any aspect of a credit transaction without prohibiting discrimination against prospective applicants.[36] As such, the discouragement prohibition is based on the straightforward premise that turning away a prospective applicant may be just as pernicious a vehicle

---

[32] *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356, 365–66 (1973) (upholding the Board's authority to require disclosures in circumstances beyond those specified in the TILA based on delegated authority to prevent evasion).

[33] *Muro v. Target Corp.*, 580 F.3d 485 n.9 (7th Cir. 2009).

[34] 15 U.S.C. § 1691b(a); Pub. L. No. 93-495, 88 Stat. 1522.

[35] *Cf. Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383–84 (7th Cir. 2016) (recognizing that "a prospective employee" who was deterred or prevented from applying for a position "suffers an adverse employment action despite not applying" and that to hold otherwise would "effectively bar 'victims of the most entrenched forms of discrimination' from Title VII relief") (quoting *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 367 (1977)).

[36] 40 Fed. Reg. 49,298, 49,299 (Oct. 22, 1975) (promulgating 12 C.F.R. pt. 202).

for credit discrimination as denying an application later on. Indeed, this premise was recognized by Congress in its 1991 amendment to ECOA, which made clear that discouraging applications is a violation distinct from denying applications.[37] If ECOA were construed to allow disparagement of people of a certain race or gender in marketing, suggesting to certain prospective applicants (on a prohibited basis) that they should not apply for credit, the law would be powerless to prevent and remedy credit discrimination—its core functions. Regulation B's prohibition against discouragement for both applicants and prospective applicants was promulgated to prevent this circumvention or evasion, and it has been reasonably and practically applied for decades in regulatory enforcement,[38] as well as supervision and examination of financial institutions.[39] Regulation B's discouragement prohibition is both consistent with and necessary to fulfilling ECOA's anti-discrimination aims.

Because Regulation B's discouragement provision is not "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to"[40] ECOA, the provision is valid and binding.[41]

### B. Courts have consistently recognized Regulation B's discouragement prohibition, including its application to prospective applicants.

To support its assertion that Regulation B's use of "prospective applicants" exceeds the scope of ECOA, Townstone relies on several cases analyzing whether a "guarantor" is within the

---

[37] FDIC Improvement Act of 1991, Pub. L. 102-242, § 223, 105 Stat 2236 (1991), codified at 15 U.S.C. § 1691e(g) (requiring that agencies enforcing the Act refer to the Attorney General any matter involving a suspected "pattern or practice of discouraging *or* denying applications for credit in violation of [ECOA]" (emphasis added)).

[38] *See, e.g.,* Compl., *United States v. First Merchs. Bank*, No. 1:19-cv-02365 (S.D. Ind. June 13, 2019); *United States v. KleinBank*, No. 0:17-cv-00136, ECF No. 93, at 10–11 (D. Minn. Jan. 30, 2018); Compl., *CFPB v. Hudson City Sav. Bank, F.S.B.*, No. 2:15-cv-07056 (D. N.J. Sept. 24, 2015); Compl., *United States v. First Am. Bank*, No. 1:04-cv-04585 (N.D. Ill. July 13, 2004).

[39] Federal Financial Institutions Examination Council, "Interagency Fair Lending Examination Procedures," (September 2009) at ii, iv, available at https://www.ffiec.gov/PDF/fairlend.pdf (noting that bank examiners use procedures that "are intended to be a basic and flexible framework to be used in the majority of fair lending examinations conducted by the FFIEC agencies," including the prohibitions on discouragement of and discrimination against prospective applicants).

[40] *United States v. Mead Corp.*, 533 U.S. at 227 (quoting *Chevron v. NRDC*, 467 U.S. at 843–44 (1984)).

[41] *See RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp.*, LLC, 754 F.3d 380, 386–87 (6th Cir. 2014) ("A creditor who violates Regulation B necessarily violates ECOA itself.") (citing 15 U.S.C. 1691a(g)).

definition of "applicant" for purposes of bringing a private action under ECOA. Townstone argues that these cases demonstrate that ECOA's reach is limited to conduct involving those who meet the definition of "applicant." But the cases that Townstone cites do not support that argument. And the Bureau's authority to prohibit Townstone's discouragement of "prospective applicants" does not require interpreting the statutory definition of "applicant" to encompass "prospective applicants." The definition of "applicant" is not at issue here, nor is the question of whether a private right of action exists, and the cases on which Townstone relies are therefore irrelevant.

Regulation B's prohibition on discouragement, including its application to "prospective applicants," is consistent with and necessary to prevent evasion of ECOA, and it is plainly within the scope of the Bureau's rulemaking mandate under the Act. Courts have recognized this, acknowledging the discouragement provision and treating it as presumptively valid.[42] In *Alexander v. AmeriPro Funding, Inc.*, the Fifth Circuit observed that "[d]iscouragement of a 'prospective applicant' may be regulatorily prohibited" even if the discouragement provision "does not alter the definition of 'applicant'" to allow a private action under ECOA.[43] Similarly, in *Dhade v. Huntington Learning Centers, Inc.*, the court declined to extend ECOA's private right of action to a prospective applicant, concluding that Regulation B's discouragement provision "does not change the definition of 'applicant,' let alone expand the definition to include 'prospective applicant.'"[44] The court noted that "the CFPB draws a distinction between 'applicants' and 'prospective applicants'" in Regulation B's discouragement provision, stating that "ECOA vested the CFPB with enforcement powers that are

---

[42] *See, e.g., Treadway v. Gateway Chevrolet Oldsmobile*, 362 F.3d 971, 979–80 (7th Cir. 2004) (acknowledging that where a person meets the definition of a creditor as someone who "regularly refers applicants to lenders," that person must comply with Regulation B's discouragement provision); *Harbaugh v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 615 F.2d 1169, 1174 (7th Cir. 1980) (noting that if the defendant had made an inquiry implicating gender, it would have risked a claim brought under Regulation B's discouragement provision).
[43] *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 708 (5th Cir. 2017) (holding that prospective applicants do not have a private right of action under 15 U.S.C. § 1691e(a)).
[44] *Dhade v. Huntington Learning Ctrs., Inc.*, 414 F. Supp. 3d 703, 707 (D. Del. 2019).

9

more expansive than the private right of action authorized by [ECOA]," and "[t]hus, it makes sense that the CFPB would promulgate regulations that extend to parties not covered by the ECOA's private right of action,"[45] specifically, prospective applicants. And in *Page v. Midland Federal Savings and Loan*, Judge Gettleman cited Regulation B's discouragement provision and expressly noted that "ECOA applies to all stages of a credit transaction, including the pre-application stage."[46]

Townstone argues that conduct affecting prospective applicants is not regulated by ECOA. But courts recognize the authority of regulators like the Bureau to enforce Regulation B's discouragement provision, including as to prospective applicants. And courts recognizing the discouragement provision's validity have been direct in stating that its coverage of prospective applicants is independent of the statute's definition of "applicants," which governs who can bring private causes of action. Townstone's statement that "courts in this district routinely require an actual application as a prerequisite to stating an ECOA claim"[47] refers only to courts analyzing claims by private plaintiffs. But a private plaintiff's ability to satisfy the definition of "applicant" has no bearing on the Bureau's authority to enforce ECOA and Regulation B's prohibitions. Nor do these cases even purport to address the Bureau's rulemaking authority to prohibit discriminatory conduct that would discourage prospective applicants from seeking credit. Here, the Amended Complaint need only allege enough facts from which the Court may reasonably infer that Townstone engaged in acts or practices that would discourage, on the basis of race, prospective applicants for credit. Having done so, the Bureau has adequately stated a claim for illegal discouragement in violation of Regulation B and ECOA.

---

[45] *Id.*
[46] No. 12 C 8261, *Page v. Midland Fed. Savs. & Loan*, 2013 WL 5211747, at *5 (N.D. Ill. Sept. 13, 2013).
[47] Townstone Mem. Supp. Mot. to Dismiss 7, ECF No. 32 (Townstone Mem.).

### C.     The Amended Complaint alleges sufficient facts to state a claim under ECOA and Regulation B.

The Amended Complaint follows a consistent and longstanding approach to pleading and proving illegal discrimination, including redlining,[48] and does not create new rules or expand ECOA.[49] Courts evaluating ECOA disparate-treatment claims often look to analogous Title VII employment discrimination and Fair Housing Act (FHA) case law.[50] Under each of these statutes, direct and circumstantial evidence of discrimination and of an intent to discriminate have long been recognized as supporting claims of illegal discriminatory treatment.[51] And that evidence of discrimination—both direct and circumstantial—must not be evaluated in isolation: "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence."[52] Considered as a whole, the Amended Complaint's allegations support a plausible claim that Townstone discouraged prospective applicants, on the basis of race, from seeking credit in the Chicago MSA, in violation of ECOA and Regulation B.[53]

---

[48] "'Redlining' means 'mortgage credit discrimination based on the characteristics of the neighborhood surrounding the would-be borrower's dwelling.'" *Cartwright v. Am. Sav. & Loan Ass'n*, 880 F.2d 912, 923 (7th Cir. 1989) (citing *Thomas v. First Fed. Sav. Bank of Ind.*, 653 F. Supp. 1330, 1337 (N.D. Ind. 1987)).

[49] Townstone Mem. at 9.

[50] *See, e.g.*, *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir. 1998) (recognizing the relevance of "judicial constructions of anti-discrimination legislation in the employment field" to determining an ECOA violation); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215 (1st Cir. 2000) ("In interpreting ECOA, this court looks to Title VII case law."); *First Merit Bank, N.A. v. Ferrari*, 71 F.Supp.3d 751 (N.D. Ill. 2014) (treating discrimination claims under the FHA, ECOA, or other civil-rights statutes similarly for pleading purposes).

[51] *See Intl. Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) ("Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.") (Title VII); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.") (FHA); *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 539 (7th Cir. 2011) (requiring "direct and/or circumstantial evidence sufficient to demonstrate defendants' discriminatory intent") (ECOA/FHA).

[52] *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (evaluating a claim under Title VII); *Sims v. New Penn Fin. LLC*, 2018 WL 1523212, *10 (N.D. Ind. 2018) (applying holding in *Ortiz* to ECOA matter).

[53] *See Swierkiewicz v. Sorema*, 534 U.S. 506, 508 (2002) (holding that plaintiff at the pleading stage in a discrimination case must allege only a short and plain statement of the claim so as to give the defendant fair

11

Discouragement of prospective applicants on the basis of race is a form of illegal discrimination. Unlawful discrimination may be based on the race of a particular applicant or prospective applicant or on the racial characteristics of a neighborhood generally.[54] The Amended Complaint provides several examples of Townstone's statements that would have discouraged reasonable prospective applicants on the basis of race, including that Townstone disparaged majority-African-American neighborhoods as "hoodlum weekend" and approaching "a real war zone" or as "crazy" and places "to be driven through quickly" while avoiding eye contact; referred to a place with "people from all over the world" as a "jungle" and "scary"; and disparaged the women of a predominantly African-American area in Chicago.[55] Townstone recorded and posted these statements as part of its marketing on its website and elsewhere online.[56] The alleged facts also include statistical evidence that Townstone did not draw applications from African Americans or from African-American neighborhoods in the Chicago MSA, as well as descriptions of Townstone's hiring and marketing practices, all of which also support the Bureau's claims of discouragement and discrimination in violation of ECOA and Regulation B.[57] Townstone challenges these specific factual pleadings as improper under the APA, but a pleading is not a rulemaking or final agency action, so the Amended Complaint does not implicate the APA.

---

notice of the claim and the grounds upon which it rests) (Title VII); *United States v. Union Auto Sales, Inc.,* 490 F. App'x 847, 848 (9th Cir. 2012) (reversing dismissal of a discrimination claim under ECOA because, "[a]t the pleading stage, the United States is not required to demonstrate discrimination, but merely to allege facts sufficient to make a discrimination claim plausible").

[54] *See Hood v. Midwest Sav. Bank,* 95 F. App'x 768, 778 (6th Cir. 2004) (finding that the plaintiff is in a protected class for the purposes of ECOA and FHA claims in part because the property is located in a predominantly African-American community); *Davis v. Strata Corp.,* 242 F. Supp. 2d 643, 650 (D.N.D. 2003) (finding that a plaintiff who was denied credit in part because he lived on an Indian reservation stated a valid ECOA claim); *Cherry v. Amoco Oil Co.,* 481 F. Supp. 727, 730 (N.D. Ga. 1979) (holding that a complaint stated a claim under ECOA where a white plaintiff alleged a denial of consumer credit based, in part, on the fact that she lived in a predominantly Black neighborhood).

[55] Am. Compl. ¶ 38.

[56] Am. Compl. ¶ 29.

[57] Am. Compl. ¶¶ 40–52.

Statistical disparities have long been regarded as a reliable indicator of disparate-treatment discrimination.[58] The statistical evidence cited in the Amended Complaint[59] supports the Bureau's claims because it alleges that (1) Townstone failed to draw applications from African Americans or from African-American neighborhoods in the Chicago MSA; (2) similar mortgage lenders in the Chicago MSA did draw applications from African Americans or African-American neighborhoods in the Chicago MSA; (3) the most likely explanation for these disparities is Townstone's discouraging conduct; and (4) Townstone's conduct *did* discourage prospective applicants on a prohibited basis. Accordingly, this statistical evidence and the inferences that can be drawn from this evidence support the Bureau's claims that Townstone made statements that "would discourage on a prohibited basis a reasonable person from making or pursuing an application."[60] Townstone characterizes these allegations as creating new affirmative obligations under ECOA.[61] But the use of statistical evidence, such as application shortfalls and disparities, is plainly relevant to the determination of discouragement and discriminatory intent in this matter. It is similar to evidence used to support plausible claims of illegal discriminatory treatment in other litigated matters,[62] and it is consistent with the data analyses used as evidence of discouraging and discriminatory conduct regularly pleaded over decades of ECOA enforcement.[63]

---

[58] *See Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308, 313 (1977) (comparing the percentage of African-American teachers hired by the defendant to the percentage of African-American teachers hired by other school districts in the area) (Title VII); *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 339 (1977) ("Statistics showing racial or ethnic imbalance are probable . . . because such imbalance is often a telltale sign of purposeful discrimination.") (Title VII); *EEOC v. O & G Spring & Wire Forms Specialty Co.,* 38 F.3d 872, 876 (7th Cir. 1994) (recognizing that statistical evidence can be used to show an intent to discriminate) (Title VII).

[59] Am. Compl. ¶¶ 42–50.

[60] 12 C.F.R. § 1002.4(b).

[61] Townstone Mem. 9.

[62] *Supra* at note 58.

[63] *See, e.g.,* Compl., *United States v. Decatur Fed. Sav. & Loan Ass'n,* Civil Action No. 1:92-cv-02198 (N.D. Ga. Mar. 17, 1992) (only 6% of applications came from Black applicants); Compl., *United States v. First United Sec. Bank,* Civil Action No. 09-0644 (S.D. Ala. Sept. 30, 2009) (defendant received only 14% percent of applications from majority-black areas, whereas comparable lenders in the area received about 31%); Compl.,

Similarly, the Amended Complaint alleges that Townstone did not market to African Americans, despite marketing specifically to other demographic communities in the Chicago MSA, and that Townstone lacked African-American loan officers, despite its acknowledgement that its loan officers from other demographic groups aided in outreach to those groups.[64] These facts, when considered alongside Townstone's discouraging statements—made on its marketing infomercial called the Townstone Financial Show—and the lack of applications from African Americans and African-American neighborhoods, are highly relevant to the determination of Townstone's discriminatory intent and avoidance of the credit needs of African-Americans and African-American neighborhoods,[65] all of which support the Bureau's claims of discouragement and intentional discrimination in violation of ECOA and Regulation B.[66] Courts have recognized the relevance of such evidence in redlining matters.[67] And prior ECOA enforcement matters relating to

---

*United States v. KleinBank*, No. 0:17-cv-00136 (D. Minn. Jan. 13, 2017) ("comparable lenders generated applications in majority-minority tracts at over five times the rate of KleinBank, and originated loans in majority-minority tracts at over four times the rate of KleinBank."); Compl., *United States v. First Merchs. Bank*, Civil Action No. 1:19-cv-02365 (S.D. Ind. June 13, 2019) ("between 2011 and 2017, First Merchants Bank severely underperformed comparable lenders in generating residential mortgage loan applications from majority-Black areas within the Indianapolis-Carmel-Anderson MSA").

[64] Am. Compl. ¶¶ 39–40, 51.

[65] Am. Compl. ¶ 14.

[66] Am. Compl. ¶¶ 54–55.

[67] *See, e.g.*, *U.S. v. KleinBank*, No. 0:17-cv-00136, ECF No. 93 at 10-11 (D. Minn. Jan. 30, 2018) (finding that defendant's marketing efforts that potentially avoided minority borrowers contributed to plausible ECOA and FHA claims); *City of Sacramento v. Wells Fargo & Co.*, 2019 WL 3975590, at *1, 7 (E.D. Cal. 2019) (denying motion to dismiss FHA claims based, in part, on loan officer comments consistent with racial profiling and non-Spanish speaking loan officers "more often than not" serving Spanish-speaking borrowers).

discrimination in mortgage lending, especially redlining, have relied on similar marketing[68] and hiring[69] allegations.

## II.   Neither Regulation B nor this action violates the First Amendment.

The First Amendment provides no basis for dismissing any claim or count. Townstone argues that Regulation B should be reviewed under the strict-scrutiny standard appropriate for content-based and viewpoint-based speech restrictions.[70] But this action does not implicate speech protected by the First Amendment. The challenged statements, made during a marketing infomercial, are commercial speech and relate to illegal discrimination. This commercial speech by Townstone falls outside the First Amendment's protections. Even if covered by the First Amendment, only the lesser constitutional protection available to commercial speech would apply, and Regulation B survives the intermediate scrutiny applied to regulations implicating such speech.

---

[68] *See, e.g.*, Compl., *United States v. Decatur Fed. Sav. & Loan Ass'n*, No. 1:92-cv-02198 (N.D. Ga. Mar. 17, 1992) ("In advertising its mortgage products through the media, Defendant has rarely or never utilized newspapers, radio stations, or other media that are oriented to the black community of Atlanta."); Compl., *United States v. Chevy Chase Fed. Sav. Bank*, No. 1:94-cv-01829, (D.D.C. Aug. 22, 1994) ("defendants have rarely or never utilized newspapers, radio stations, or other media that are oriented to the African American community"); Compl., *United States v. First Am. Bank*, No. 04C 4585 (N.D. Ill. July 13, 2004) ("The Bank has directed its radio advertising to stations that target 'general audiences', although many minority format stations exist in the Chicago MSA market. In advertising its products and services through the media, First American never utilized radio stations oriented to minority communities in the Chicago MSA until after the Board's criticism of those advertising practices."); Compl., *CFPB v. Hudson City Savs. Bank, F.S.B.*, No. 2:15-cv-07056 (D. N.J. Sept. 24, 2015) ("Hudson City engaged in limited marketing outside of its branch network, and therefore failed to advertise meaningfully in majority-Black-and-Hispanic neighborhoods.").

[69] *See, e.g.*, Compl., *United States v. Decatur Fed. Sav. & Loan Assoc.*, No. 1:92-cv-02198 (N.D. Ga. Mar. 17, 1992) (defendant employed only white real-estate appraisers); Compl., *United States v. Blackpipe State Bank*, No. 93-5115 (D.S.D. 1993) (defendant did not employ any Native Americans); Compl., *United States v. BancorpSouth Bank*, No. 1:16-cv-00118 (N.D. Miss. June 29, 2016) (more than 95% percent of loan officers hired by defendant were white).

[70] *See* Townstone Mem. 12–14.

15

### A. This action does not implicate speech protected by the First Amendment.

In evaluating First Amendment claims, a court must first determine whether speech is being regulated at all, and, if it is, the court must determine the "proper classification" of the statements and conduct at issue.[71] Where a government action restricts or compels some speech only incidentally to the government's regulation of conduct, the First Amendment is not implicated: "it has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed."[72] Where government action clearly affects expressive conduct, the court should assess the nature of that expressive conduct because certain speech, like "commercial speech," is accorded lesser constitutional protection.[73]

Under this framework, this case does not implicate speech protected by the First Amendment. The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.[74] Congress "can prohibit employers from discriminating in hiring on the basis of race."[75] And a "ban on race-based hiring may require employers to remove 'White Applicants Only' signs."[76] ECOA's prohibition of discrimination in credit transactions and Regulation B's prohibition of discouragement of prospective applicants (which covers "acts or practices" that could "discourage a reasonable person, on a prohibited basis, from applying for credit,"[77] and is designed to prevent the core antidiscrimination provision of ECOA from being a dead letter) fall squarely within this category of permissible regulation of

---

[71] *See Bolger v. Youngs Drug. Prod. Corp.*, 463 U.S. 60, 65 (1983).

[72] *Rumsfeld v. F.A.I.R.*, 547 U.S. 47, 62 (2006).

[73] *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 514 (2014).

[74] *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

[75] *Rumsfeld*, 547 U.S. at 62.

[76] *Sorrell*, 564 U.S. at 567 (referencing *RAV v. City of St. Paul*, 505 U.S. 377, 389 (1992).

[77] 12 C.F.R. part 1002, Supp. I, Comment 4(b).

commercial conduct that may impose incidental burdens on expression. Congress enacted ECOA to counteract a "clear pattern" of discrimination[78] and to make credit "equally available to all creditworthy customers."[79] Protecting equal access to credit is a permissible, commercial objective, and any attendant, incidental impact on expression occasioned by enforcement of ECOA, via Regulation B, is no more protected than the "White Applicants Only" sign that the Supreme Court acknowledged can be permissibly prohibited under a lawful ban on race-based hiring.[80] Neither represents any more than "a particular content-based subcategory of a proscribable class of speech" being "swept up incidentally within the reach of a statute directed at conduct rather than speech."[81]

Even if Regulation B's prohibition on creditor advertising that expresses, implies, or suggests a discriminatory preference[82] is viewed as a non-incidental restriction of speech, it does not run afoul of the First Amendment because the First Amendment does not protect speech that proposes unlawful transactions, particularly in the commercial context.[83] Simply put: "[t]he government may ban . . . commercial speech related to illegal activity."[84]

In *Pittsburgh Press v. Pittsburgh Commission on Human Relations,* the Supreme Court described a prohibition of commercial speech related to an ordinance that barred employers from discriminating against any person with respect to hiring because of sex and prohibited any other person to aid employers in publishing advertisements "which indicate[] any discrimination because of . . . sex."[85] A newspaper that had allowed employers to advertise jobs in sex-specific columns (e.g., "Jobs—Male Interest," "Jobs—Female Interest," and "Male-Female") challenged under the First Amendment an

---

[78] S. Rep. No. 93-278, 93d Cong., 1st Sess. 16, 16–17 (1973).
[79] Equal Credit Opportunity Act of 1974, Pub. L. No. 93-495, 88 Stat. 1521.
[80] *See RAV*, 505 U.S. at 389.
[81] *Id.*
[82] 12 C.F.R. pt. 1002, Supp. I, 1002.4(b)(1)(ii).
[83] *See Infra*, Section II.B for further discussion of the parameters of "commercial" speech.
[84] *Cent. Hudson*, 447 U.S. at 563–64 (citations omitted).
[85] *Pittsburgh Press v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 378 (1973).

order enforcing the ordinance.[86] The Supreme Court rejected the challenge and explained that "[t]he advertisements, as embroidered by their placement, signaled that the advertisers were likely to show an illegal sex preference in their hiring decisions."[87] As a result, "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity."[88] The Supreme Court has repeatedly reaffirmed this basic principle, both generally[89] and with respect to discrimination.[90]

Applying *Pittsburgh Press*, a series of appellate decisions have rejected First Amendment challenges to a provision of the FHA[91] that prohibits conduct similar to that addressed in Regulation B. Section 3604(c) of the FHA prohibits making statements "with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."[92] As the Second Circuit has explained, "[c]ourts have consistently found that commercial speech that violates [§ 3604(c)] is not protected by the First Amendment."[93]

According to the Official Interpretation, practices prohibited by Regulation B include "[t]he use of words, symbols, models or other forms of communication in advertising that express, imply,

---

[86] *Id.* at 380.

[87] *Id.* at 389.

[88] *Id.* at 389.

[89] *United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection.")

[90] *Sorrell*, 564 U.S. at 567 (2011) (noting that a "ban on race-based hiring may require employers to remove 'White Applicants Only' signs") (quoting *Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.,* 547 U.S. 47, 62 (2006)).

[91] 42 U.S.C. § 3604(c).

[92] 42 U.S.C. § 3604(c).

[93] *United States v. Space Hunters, Inc.*, F.3d 416, 425 (2d Cir. 2005); *see also Campbell v. Robb*, 162 F. Appx. 460, 468-72 (6th Cir. 2006); *United States ex rel. Jackson v. Racey*, 112 F.3d 512, at *1 (4th Cir. May 7, 1997); *Ragin v. NY Times*, 923 F.2d 995, 1002–05 (2d Cir. 1991); *United States v. Hunter*, 459 F.2d 205, 211–13 (4th Cir. 1972).

or suggest a discriminatory preference or a policy of exclusion in violation of the Act."[94] The similarities between Regulation B and § 3604(c) (prohibiting communications "indicat[ing] any preference, limitation, or discrimination based on race. . .") justify the same conclusion that courts have reached on § 3604(c)—that commercial speech that violates Regulation B is not protected by the First Amendment.

> **B.      Even if the challenged communications are protected speech, they are commercial speech appropriately subject to regulation here.**

Even if the challenged communications were protected speech, they would be commercial speech properly subject to regulation here because Regulation B directly advances the Bureau's substantial interest in prohibiting discriminatory lending.[95]

> **1.      Commercial speech mixed with discussion of public issues remains commercial speech.**

While the "core notion" of "commercial speech" is speech that does "no more than propose a commercial transaction," the Supreme Court has made clear that for purposes of the First Amendment, "commercial speech" is not so narrowly defined.[96] Instead, "commercial speech" can include materials that contain both advertising elements and "discussions of important public issues."[97] Townstone argues that its statements should be treated as fully protected "political speech" because they "reflect on the public issue of crime."[98] But the Court has made clear that advertising

[94] 12 C.F.R. part 1002, Supp. I, Comment 4(b). This addition to the Official Interpretations was finalized in 1985 after notice of proposed rulemaking and review of public comments. 50 Fed. Reg. 48,050 (Nov. 12, 1985).
[95] *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).
[96] *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67–68 (1983).
[97] *Id.*
[98] Townstone Mem. 12.

that "links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech."[99]

In *Bolger v. Youngs Drug Products*, for example, the Supreme Court evaluated whether the Postal Service could apply a statute to restrict the mailing of a contraceptives manufacturer's informational pamphlet that discussed the desirability and availability of prophylactics in general and contained limited information about the manufacturer's specific products. The Court found that "the mailings constitute commercial speech notwithstanding the fact that they contain discussions of important public issues such as venereal disease and family planning."[100] In analyzing the informational pamphlets in *Bolger*, the Court relied on the fact that the informational pamphlets "were a form of advertising, [that] they referred to specific commercial products, and [that] they were distributed … for economic purposes."[101] The Court noted that none of these factors alone was determinative but the "combination of *all* these characteristics . . . provide[d] strong support for the . . . conclusion that the informational pamphlets are properly characterized as commercial speech."[102]

Similarly, in *Jordan v. Jewel Food Stores*, the Seventh Circuit found that a grocery store's advertisement congratulating Michael Jordan for his induction into the Basketball Hall of Fame was commercial speech because communications may "constitute commercial speech notwithstanding the fact that they contain discussions of important public issues," and advertisements that are meant to burnish a company's brand through commentary on a matter of public interest should be treated

---

[99] *Cent. Hudson*, 447 U.S. at 562 n5; *see also Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014) (citing *Bolger*, 463 U.S. at 67–68).
[100] *Bolger*, 463 U.S. at 67–68.
[101] 743 F.3d at 517 (discussing *Bolger*, 463 U.S. at 62).
[102] *Bolger*, 463 U.S. at 67.

as commercial speech.[103] This is consistent with other cases treating infomercials—which combine advertising and commentary on public issues—as commercial speech.[104]

Even if Townstone's discouraging statements and other commercial speech broadcast on the Townstone Financial Show contained discussions of public issues, they would remain commercial speech properly subject to Regulation B. The repeated promotion of Townstone's services and the promise of the benefits that prospective applicants might expect from applying for mortgage loans from Townstone highlight the commercial nature of the Townstone Financial Show radio broadcasts and podcasts.[105]

      **2.    The Bureau's regulation of Townstone's commercial speech directly advances the Bureau's substantial interest in prohibiting discriminatory lending.**

The validity of a restriction on commercial speech is analyzed under a four-part test that considers (1) whether the speech is constitutionally protected; (2) whether the governmental interest is substantial; (3) whether the regulation directly advances the government interest asserted; and (4) whether the restriction is narrowly drawn,[106] i.e., "reasonably well tailored to its stated objective."[107] "[C]ommensurate with [the] subordinate position of [commercial speech] in the scale of First Amendment values," "the fit needn't be perfect, but only 'reasonable' . . . not necessarily the single best disposition but one whose scope is in proportion to the interest served."[108]

---

[103] 743 F.3d at 516.

[104] *See, e.g.*, *FTC v. Trudeau*, 662 F.3d 947 (7th Cir. 2011) (holding that an infomercial about weight-loss books was commercial speech); *see also U.S. v. Bell*, 414 F.3d 474 (3d Cir. 2005) (holding that "[p]ackaging a commercial message with token political commentary does not insulate commercial speech from appropriate restrictions").

[105] Am. Compl. ¶ 26–29; Townstone Mem. 2 ("Part of Townstone's *advertising efforts* include producing the Townstone Financial Show") (emphasis added); Townstone Mem. 19 ("the Townstone Financial Show was designed to create interest in Townstone").

[106] *Cent. Hudson*, 447 U.S. at 566.

[107] *Trudeau*, 662 F.3d at 953 (applying test set out in *Cent. Hudson*, 447 U.S. at 564–65).

[108] *Id.*

Regulation B and the Bureau's claims do not run afoul of this four-part test. First, the speech at issue here is not constitutionally protected. For commercial speech to come within the First Amendment, it at least must concern lawful activity and not be misleading.[109] Townstone's speech at issue here concerns unlawful activity, and thus, the Court's inquiry should end. Even if the analysis does not end here, however, the Bureau's action survives the remaining prongs of the intermediate-scrutiny analysis. The Bureau's interest in prohibiting unlawful discrimination in lending and promoting the availability of credit to all creditworthy applicants without regard to race is substantial. Townstone concedes this point and offers no argument that Regulation B's discouragement provision does not advance a substantial interest.[110] But that point could hardly be disputed. Congress concluded that credit is "a virtual necessity of life" for most Americans and enacted ECOA to address "widespread discrimination."[111] With the purpose of eradicating that discrimination, the statute required the Board, now the Bureau, to promulgate regulations "to prevent circumvention or evasion" of the statute's purposes, resulting in Regulation B's discouragement provision, which directly advances this substantial interest. In prohibiting statements that discourage prospective applicants, Regulation B is no more extensive than necessary to prevent creditors from circumventing and evading the statute's goal of stopping unlawful discrimination.

The Bureau is not required, as Townstone argues, to demonstrate that "there are more effective, constitutionally permissible ways to achieve the government's goal."[112] Nevertheless, Townstone's suggestion that the government could achieve its goal through programs to assist applicants in obtaining credit is erroneous because such programs do not necessarily advance the

---

[109] *Cent. Hudson*, 447 U.S. at 563–64.

[110] Townstone Mem. 14–15.

[111] S. Rep. No. 94-589, at 3–4 (1976); S. Rep. No. 93-278, at 16 (1973).

[112] Townstone Mem. 15.

government's interest in ensuring that credit is made available without regard to race or other prohibited characteristics.[113] Likewise, Townstone's suggestion that the government "embark on an educational program [to] promote the availability of credit . . . without regard to race"[114] is insufficient because such a program educates credit applicants and prospective applicants without advancing the government's interest in making sure that credit is not being offered on discriminatory bases.

### C.     Neither this action nor Regulation B is unconstitutionally vague.

Townstone's facial and as-applied First Amendment challenges to Regulation B are misplaced because the First Amendment does not apply to the commercial speech implicated here.[115] Even if it did, facial challenges are disfavored because they are speculative, raise the risk of premature interpretation, and run contrary to the principal of judicial restraint.[116] In order to invalidate a statute for unconstitutional vagueness in a facial challenge, the statute must have a "potential chilling effect on protected expression" that is both "real and substantial."[117] But Townstone does not explain why this hypothetical chilling is either "real" or "substantial," especially in light of decisions rejecting vagueness challenges to the FHA provision that is analogous to

---

[113] Townstone is wrong to suggest that the Bureau separately challenges Townstone's "not engaging in targeted advertising to African-Americans in Chicago." Townstone Mem. 22. The Amended Complaint includes this allegation because the "totality" of Townstone's conduct evidences that its statements are unlawfully discouraging.

[114] Townstone Mem. 15.

[115] *See supra* at 16–19.

[116] *Ctr for Indiv. Freedom v. Madigan*, 697 F.3d 464, 476, 479 (7th Cir. 2012).

[117] *Id.* (Where the First Amendment is implicated, "vagueness [implicating due process concerns] and overbreadth [in violation of the First Amendment] are two sides of the same coin, and the two sorts of challenges are often conceived of as 'alternative and overlapping' theories for relief on the same claim"); *see also Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014) ("All laws must be clear and precise enough to give a person of ordinary intelligence fair notice about what is required of him and also to guard against the arbitrary and discriminatory exercise of enforcement discretion." In the First Amendment context, where vague speech regulations could cause speakers to self-censor, courts evaluating laws facially challenged on vagueness and overbreadth grounds determine whether the relevant law reaches a substantial amount of constitutionally protected speech).

Regulation B.[118] Further, because Townstone "engages in some conduct that is clearly proscribed," it "cannot complain of the vagueness of the law as applied to the conduct of others."[119] Regulation B clearly prohibits mortgage-loan advertising with statements like those described in the Amended Complaint, including references to racially inflammatory symbols or linking Black neighborhoods to "scary" places.[120]

The relevant test for discouragement in violation of Regulation B is whether the statement would discourage a "reasonable person"—here the reasonable African American or reasonable person considering a loan for property in an African-American neighborhood—from making or pursuing an application.[121] Details regarding the creditor or prospective applicant are not relevant unless they contribute to understanding whether the reasonable prospective applicant would be discouraged *on a prohibited basis* from applying for a mortgage loan. The discouragement provision in no way disincentivizes creditors from giving proper advice or discussing underwriting standards because such conversations should have nothing to do with an applicant's or prospective applicant's prohibited-basis status. The reasonable-person test for discouragement is consistent with the caselaw and practice under analogous laws. As the Eighth Circuit has noted in the context of sexual harassment, for example, "[i]t makes no difference that the language in question may be unobjectionable to some groups of men. We must view the harassment from the victim's perspective, and in this case the victim is a woman."[122]

---

[118] *Ragin*, 923 F.2d 1002 ("Of course, close questions will arise, as they do in every area of the law, but we cannot say in the context of a facial challenge to the statute that the ordinary reader test … - not a novel, untried concept – is a hopelessly vague legal standard").

[119] *Ctr for Indiv. Freedom*, 697 F.3d 464, 479.

[120] Am. Compl. ¶ 38.

[121] *See Ragin,* 923 F.2d at 999–1000 ("Ordinary readers may reasonably infer a racial message from advertisements that are more subtle than the hypothetical swastika or burning cross"); *Jancik v. HUD*, 44 F.3d 553 (7th Cir. 1995) ("the statute is violated by 'any ad that would discourage an ordinary reader of a particular [protected group] from answering it.'") (citing *Ragin,* 923 F.2d at 999–1000).

[122] *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 965 (8th Cir. 1993); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998) (noting that "the objective severity of harassment should be judged from the

24

The reasonable prospective applicants who would be discouraged by the facts alleged in the Amended Complaint are a specific racial group or community, or those interested in living in majority-Black neighborhoods in a specific metropolitan area, not "literally anyone in the world," as Townstone claims.[123] As a result, Regulation B is not overbroad as applied to Townstone. For each of the discouraging statements described in the Amended Complaint,[124] a reasonable African American prospective applicant or a prospective applicant seeking to finance the purchase of properties in African-American neighborhoods in the Chicago MSA could well (1) conclude that the statement conveys the Townstone Financial Show's hosts' intent to discourage, and (2) be discouraged, on the basis of race or the racial composition of particular neighborhoods, from submitting a mortgage-loan application. Thus, even if Townstone's infomercials were "designed to create interest in Townstone" and were "heard across the entire Chicago MSA," they contained discouraging and discriminatory content that would have a distinct effect on prospective applicants who are African-American or are living in or seeking credit in majority-Black neighborhoods in the area.

### III. ECOA and Regulation B provide fair notice of the prohibited conduct and comport with the Fifth Amendment.

Townstone's due-process challenge under the Fifth Amendment does not warrant dismissal of this action. Townstone argues that Regulation B's discouragement provision fails to give fair notice of the specific conduct it prohibits and allows for arbitrary enforcement by the Bureau. Townstone does not meet the heavy burden faced by challengers trying to establish that a regulation is facially impermissibly vague. "A party raising a facial challenge to a statute or regulation on

---

perspective of a reasonable person in the plaintiff's position, considering all the circumstances," and adding that the "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.") (internal quotations omitted)

[123] Townstone Mem. 21.

[124] *See, e.g.*, Am. Compl. ¶¶ 32, 34, 36, 38, 40, 51.

vagueness grounds must demonstrate that the law is impermissibly vague *in all of its applications*."[125] Townstone does not claim that there are no circumstances in which Regulation B could be lawfully applied.[126]

In *FCC v. Fox Television Stations*, the only case Townstone cites in its section about the Fifth Amendment, the Supreme Court found that the FCC violated a broadcast network's due-process rights because it failed to give fair notice that, *in contrast to a prior policy* (that explicitly protected fleeting expletives and brief shots of nudity), a fleeting expletive or a brief shot of nudity could be actionably indecent.[127] Unlike in *Fox*, Townstone does not claim there was a prior policy from which Reg B or the Bureau departed without notice.[128] And the hypothetical creditor confusion Townstone alleges is premised on mischaracterizations of the Bureau's enforcement action, which, as discussed above, focuses on discouragement, on the basis of race, of *reasonable* prospective applicants.

Townstone's as-applied challenge should be rejected because, as explained above, Regulation B gives fair notice of the conduct it covers, and courts have rejected arguments like the one

---

[125] *Schor v. Daley*, 563 F. Supp. 2d 893 (N.D. Ill. 2008). If the Court considers this to be a case where the challenged law "abuts upon sensitive areas of basic First Amendment freedoms," under the First Amendment standard, discussed above, the Court evaluating a facial challenge should only invalidate as void for vagueness where the potential chilling effect on protected expression is both "real and substantial." *Sullivan-Knoff v. City of Chicago*, 348 F. Supp. 3d 787, 795 (N.D. Ill. 2018) (relying on *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 478–79 (7th Cir. 2012)). As discussed in Section II.C above, Townstone does not explain why any alleged chilling here is either "real" or "substantial." While Townstone hypothesizes that allegedly vague terms in Reg B could have "unknown reach" in certain hypothetical situations, the hypotheticals are too attenuated for any chilling to be considered real or substantial, and "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack . . . when [the challenged law] is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000). Townstone does not allege that Reg. B is not valid in the vast majority of its intended applications.

[126] Townstone Mem. 21–23.

[127] *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).

[128] Contrary to Townstone's allegations that the Bureau punished Townstone for things like not hiring loan officers "that include every specific racial or ethnic demographic in their market area," (Townstone Mem. at 22–23), as explained above, the Bureau focused on conduct that would discourage, on the basis of race, a reasonable potential applicant.

Townstone makes here—that prohibitions on "discouraging" statements are "unconstitutionally vague"[129]

## IV. The fraudulent-transfer claim should not be dismissed.

Federal Debt Collection Procedure[130] § 3006(a) provides for the relief the Bureau seeks: avoidance of Townstone's fraudulent money transfer to Sturner, payments to the Bureau "to the extent necessary to satisfy any monetary judgment entered in this case against Townstone," and other relief "necessary to restore the Bureau to the position it would have been upon entry of judgment in this case if Townstone and Sturner had not engaged in a fraudulent transfer."[131] The remedies are available to satisfy the Bureau's claim, whether the claim "is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[132] Because the Bureau's substantive claims survive the motion to dismiss, the fraudulent-conveyance claim against Sturner also survives.

## CONCLUSION

Because ECOA authorizes the Bureau to promulgate regulations necessary to prevent circumvention and evasion of the statute, and because Regulation B's discouragement prohibition is consistent with ECOA's anti-discrimination purposes, Regulation B does not violate the APA. Further, Regulation B is a constitutionally compliant check on Townstone's commercial speech. Townstone's discouraging statements are illegal and not protected by the First Amendment. Even if

---

[129] *Ragin*, 923 F.2d at 999–1002 (finding § 3604(c) of the FHA, which was construed to cover "any ad [with respect to the sale or rental of a dwelling] that would discourage an ordinary reader of a particular race from answering it," not to be unconstitutionally vague).

[130] 28 U.S.C. §§ 3301–3308.

[131] Am. Compl. 18 at ¶¶ (6)–(8).

[132] 28 U.S.C. § 3301(3).

they were, Regulation B is narrowly drawn to fulfill a compelling state interest. As a result, the Court

should deny the motion.

Respectfully submitted,

CARA M. PETERSEN
Acting Enforcement Director
JEFFREY PAUL EHRLICH
Deputy Enforcement Director
KARA K. MILLER
Assistant Litigation Deputy

/s/ Barry E. Reiferson
BARRY REIFERSON, NY Reg. #4343893
Email: barry.reiferson@cfpb.gov
MICHAEL G. SALEMI, IL ARDC 6279741
Email: michael.salemi@cfpb.gov
VINCENT HERMAN, DC Bar #974596
Email: vincent.herman@cfpb.gov
MARY E. OLSON, IL ARDC 6297334
Email: mary.olson@cfpb.gov

230 S. Dearborn Street
Suite 1590
Chicago, IL 60604

and

1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9599

Attorneys for the Bureau of Consumer Financial Protection