**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) ) ) | Case No. 1:20-cv-04176 |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| Townstone Financial, Inc. and Barry Sturner | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' COMBINED MOTION
TO DISMISS PLAINTIFF'S COMPLAINT**

Date: April 12, 2021

Respectfully submitted,

*/s/ Sean P. Burke*
Sean P. Burke #6277203
E. Brenda Kpotufe # 34084-49
Mattingly Burke Cohen & Biederman LLP
155 E. Market St., Suite 400
Indianapolis, IN 46204
Sean.Burke@mbcblaw.com
Brenda.Kpotufe@mbcblaw.com

Marx Sterbcow
Sterbcow Law Group
824 Elmwood Park Blvd #205
New Orleans, LA 70123
marx@sterbcowlaw.com

*Attorneys for Defendant Townstone
Financial, Inc.*

i

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................................1

II.     THE BUREAU CANNOT REGULATE "PROSPECTIVE APPLICANTS" UNDER ECOA. 1

    A.   The general rulemaking authority of ECOA does not give the Bureau authority to regulate activity beyond the bounds of the enabling statute......................................................1

        1.   Courts Have Narrowed the *Mourning* Test. .....................................................2

        2.   Unlike *Mourning*, ECOA's legislative history provides no support for the Bureau's creation of the DPA.........................................................................3

        3.   Congress did not acquiesce to the DPA. ...........................................................5

        4.   The Bureau's Invalid Attempt to Create Affirmative Obligations under ECOA. .....................8

III.    THE DPA VIOLATES THE FIRST AND FIFTH AMENDMENTS FACIALLY AND AS APPLIED. ......................................................................................................................9

    A.   Attempts to Punish Political Content, Statements, and Viewpoints Must Pass Strict Scrutiny Under the First Amendment, and the DPA Cannot. ....................................9

    B.   Townstone Should Not be Punished for Sponsoring Political Discussion. .............................10

        1.   The Bureau Is Improperly Seeking to Punish Speech, Not Conduct.....................................10

        2.   Townstone's Public Issue and Political Speech Cannot Properly Be Labeled "Commercial" Speech. ....................................................................................11

IV.    CONCLUSION ..............................................................................................................13

# TABLE OF AUTHORITIES

**CASES**

*44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484 (1996) ...................................................... 13

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................................ 2

*Board of Governors of Federal Reserve System v. Dimension Financial Corporation*, 474 U.S. 361 (1986) ............ 2

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ............ 1

*Chisholm v. F. C. C.*, 538 F.2d 349, 176 U.S.App.D.C. 1 (D.C. Cir. 1976) .............................. 8

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ........................................................................... 2

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 ................................................................ 10

*Citizens United v. Federal Election Comm'n,* 558 U.S. 876 (2010) ........................................... 9

*City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 ....................................................... 11

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449 ...................................... 10

*First Premier Bank v. United States Consumer Fin. Prot. Bureau*, 819 F.Supp.2d 906 (D. S.D. 2011) ...................... 3

*Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582, 103 S. Ct. 3221, 77 L. Ed. 2d 866 (1983) 2

Hill v. Ross, 183 F.3d 586 (7th Cir. 1999) .................................................................................. 8

*Jordan v. Jewel Food Stores, Inc.,* 743 F.3d 509 ....................................................................... 11

*Kisor v. Wilkie*, 139 S. Ct. 2400, 204 L.Ed.2d 841 (2019) ......................................................... 2

*Merck & Co. v. U.S. Dep't of Health & Human Servs.,* 385 F.Supp.3d 81 ................................. 4

*Moran Foods v. Mid-Atlantic Market Development,* 476 F.3d 436, 441 (7th Cir. 2007) ............ 6

*Mourning v. Family Publications Service,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) ........................ 1

*R.A.V. v. City of St. Paul,* 505 U.S. 377 ................................................................................... 11

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 ........................................................................... 10

*Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1196 (11th Cir. 2019) ........................... 5

*Rudin v. Lincoln Land Community College*, 420 F.3d 712, 722 (7th Cir. 2005) .......................... 9

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 ................................................................................... 9

*Tiger Lily, LLC, et al., v. United States Department of Housing and Urban Development, et al.*, No. 21-5256 (6th Cir. March 29, 2021) ................................................................................................. 8

*United States v. Benson*, 561 F.3d 718 (7th Cir.2009) .............................................................. 12

*United States v. Chevy Chase Fed. Sav. Bank*, No. 94-1824-JG (D.D.C. Aug. 22, 1994) ............ 6

*Ward v. Rock Against Racism*, 491 U.S. 781 ..................................................................... 10, 12

**STATUTES**

12 U.S.C. § 1844(b) .................................................................................................................... 2

42 U.S.C. § 3604(c) .................................................................................................................... 5

Administrative Procedures Act ("APA"), 5 U.S.C. § 706 .......................................................... 1

The Equal Credit Opportunity Act, 15 U.S.C. §§ 1691–1691f ................................................. 1

**OTHER AUTHORITIES**

1976 U.S.C.C.A.N. 403 ............................................................................................................. 4

1991 U.S.C.C.A.N. 1901 ........................................................................................................... 7

64 Fed. Reg. 44582, 44584 (Aug. 16, 1999) ............................................................................ 6

S. REP. 102-167 ......................................................................................................................... 7

S. Rep. No. 94–589 .................................................................................................................... 4

S.3049 - Fair Lending Enforcement Act of 1990, 101st Congress (1989-1990), https://www.congress.gov/bill/101st-congress/senate-bill/3049 ........................................................................................................... 8

**REGULATIONS**

12 C.F.R. Part 1002 ................................................................................................................... 1

## I.     Introduction.

Despite the Bureau's efforts to defend the provision of Regulation B[1] that extends ECOA's[2] reach to forbid discouraging "prospective applicants" (the "DPA")[3], it must be invalidated because it contravenes the APA,[4] and runs afoul of the First and Fifth Amendments.

## II.     The Bureau Cannot Regulate "Prospective Applicants" under ECOA.

The term "prospective applicants", which is introduced in the DPA, cannot be found in ECOA, which only refers to "applicants".[5] Rather than argue that the term "applicants" can be interpreted to include "prospective applicants" (it cannot), the Bureau theorizes that it can reach activity outside of ECOA (*i.e.*, activity towards non-applicants) under its general rulemaking authority.[6] This is incorrect. The Bureau's rulemaking authority cannot stretch beyond the unambiguous bounds of the statute.

### A.     The general rulemaking authority of ECOA does not give the Bureau authority to regulate activity beyond the bounds of the enabling statute.

The Bureau's loose interpretation of its general rulemaking authority under ECOA is not deserving of deference under *Chevron.*[7] The DPA vastly exceeds the Bureau's statutory authority and thus, it is unlawful and void under the APA.[8]  The only case cited by the Bureau that analyzes a general rulemaking provision similar to that under ECOA is *Mourning,*[9] which analyzed general rulemaking authority under a different statute with a different legislative history.[10] The *Mourning* test, however, was pre-*Chevron* and it has since been significantly narrowed by the Supreme Court. In addition, the unique facts of *Mourning* are easily

---

[1] 12 C.F.R. Part 1002.
[2] The Equal Credit Opportunity Act, 15 U.S.C. §§ 1691–1691f.
[3] 12 C.F.R. § 1002.4(b).
[4] Administrative Procedures Act ("APA"), 5 U.S.C. § 706.
[5] The Equal Credit Opportunity Act, 15 U.S.C. §§ 1691–1691f.
[6] 15 U.S.C. § 1691b(a).
[7] *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).
[8] 5 U.S.C. § 706 (the "APA").
[9] *Mourning v. Family Publications Service* 411 U.S. 356, 93 S. Ct. 1652, 36 L.Ed.2d 318 (1973).
[10] Truth in Lending Act 15 U.S.C. § 1601 *et seq.* ("TILA").

1

distinguishable from this current matter.[11]

### 1. Courts Have Narrowed the *Mourning* Test.

In *Dimension* the Supreme Court specifically rejected the argument that one of the Federal Reserve Board's ("Board") rules was permissible under nearly identical general rulemaking authority (it also refers to "evasion") found in the Bank Holding Company Act,[12] stating that, "§5 only permits the Board to police within the boundaries of the Act; *it does not permit the Board to expand its jurisdiction beyond the boundaries established by Congress*."[13] By promulgating the DPA, the Bureau reached significantly "beyond the boundaries established by Congress" under ECOA. As in *Dimension*, this Court should reject the Bureau's claim of unfettered authority.

More recently, the District Court of South Dakota found that a Bureau rule issued under TILA's general rulemaking authority likely violated the APA. The court specifically explained

---

[11] In addition, the Bureau is interpreting the term "prospective applicants" under the DPA to include persons who have had no contact, and who may never have contact with a creditor. Such persons clearly fall outside of the definition of "applicant" under ECOA. *See* 15 U.S.C. § 1691a(b). Even if the DPA were deserving of deference under *Chevron*, and it is not, the Bureau's interpretation of the term "prospective applicant" to include persons who have had no contact with a creditor is unreasonable and not deserving of *Auer* deference. See *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *Auer v. Robbins*, 519 U.S. 452 (1997). When the Board promulgated Regulation B in 1975, it described its regulation only in terms of statements by creditors to "applicants," which indicates an intent that the term refer to persons who have had at least some contact with a creditor regarding an application. The Board did not express any intention that the term "prospective applicant" should be applied to general marketing to people who have had no contact with a creditor regarding the submission of an application. 40 Fed. Reg. 49298, 49299 (Oct. 22, 1975) (emphasis added). In addition, the word "prospective" in relation to a person's status plainly means that the person has, at a minimum, taken steps to achieve that status. The online Merriam Webster dictionary defines "prospective" when used in relation to a person's status as "likely to be or become." Available at https://www.merriam-webster.com/dictionary/prospective. Under the Bureau's interpretation, everyone is a prospective anything (we are all prospective astronauts and brain surgeons).
[12] 12 U.S.C. § 1844(b).
[13] *Board of Governors of Federal Reserve System v. Dimension Financial Corporation*, 474 U.S. 361, 373 at n. 6, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986) (emphasis added). This is in line with another post-*Mourning* case where the Supreme Court narrowed *Mourning* by requiring a "nexus" between the regulation and the delegated authority, and that the rulemaking authority "contemplate[] the regulations issued.". *Chrysler Corp. v. Brown*, 441 U.S. 281, 283, 308 (1979). Here, there is no nexus between ECOA's provisions concerning activity towards "applicants" and the DPA's expansion to regulate activity towards prospective applicants, nor does the rulemaking authority contemplate such an expansion. *See also Guardians Association v. Civil Service Commission of City of New York* (where Justice O'Connor expressed a limited view of general rulemaking authority in her concurring opinion: "we would expand considerably the discretion and power of agencies were we to interpret "reasonably related" to permit agencies to proscribe conduct *that Congress did not intend to prohibit*." *Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582, 615, 103 S. Ct. 3221, 3239, 77 L. Ed. 2d 866 (1983) (emphasis added).

that the *Mourning* test only makes sense "in a pre-*Chevron* setting….," and:

> the [Bureau's] complete reliance on the authority granted in § 105 and detailed in the pre-*Chevron* cases falls short without the context of *Chevron* step one's plain language interpretation and Congressional intent or legislative history.[14]

The plain language of ECOA, which is limited to "applicants," and its legislative history do not support the creation of the DPA.

## 2. Unlike *Mourning*, ECOA's legislative history provides no support for the Bureau's creation of the DPA.

In *Mourning*, even though TILA only required disclosures for credit transactions with finance charges, the Supreme Court allowed a rule requiring disclosures in credit transactions without finance charges if they were payable in more than four installments. They did so because of the well-known fear that creditors would evade TILA by incorporating the finance charge into the sale price, which was discussed extensively in the legislative history. The Supreme Court allowed this minor expansion because the legislative history strongly supported an intention to prohibit this precise technique, and the Court's holding depended on these particular facts.[15]

In contrast to *Mourning*, ECOA's legislative evidence demonstrates that Congress was squarely focused only on "applicants." ECOA's statutory purpose is express: "[i]t is the purpose…to require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all credit-worthy *customers* without regard to sex or marital

---

[14] *First Premier Bank v. United States Consumer Fin. Prot. Bureau*, 819 F.Supp.2d 906, 919 (D. S.D. 2011) ("Congress specifically enumerated what conduct it wanted to reach in § 1637(n), and the Board's regulation covering something far beyond that express direction would be like the Board creating its own gap and then filling it. Separation of powers forbids such leaps absent the express will of Congress.").

[15] The Court stated that, "Congress was well aware, from its extensive studies" of such potential evasion, and that Congressional hearings were "replete with suggestions that such manipulation would render the Act a futile gesture in the case of goods normally sold by installment contract." *Mourning*, 411 U.S. at 366-7. The Court found that, "[i]t was against this legislative background that the Federal Reserve Board promulgated regulations…." *Id.* at 368. The Court even cited a statement by the Vice Chairman of the Board who noted that to not promulgate its rule "would have been directly contrary to Congressional intent." *Id.* at 369 (citations omitted). *Id.* at 371 ("Congress was clearly aware that merchants could evade the reporting requirements of the Act by concealing credit charges.").

status."[16] The term "customers" unambiguously refers to someone who has some contact with the creditor, as you cannot be a customer of a creditor without contact.[17] Consistent with this purpose, when a subsequent amendment added the prohibited bases of race and ethnicity to ECOA, the Senate Banking Committee's Report routinely only refers to "applicants," and never indicates any intention to cover "prospective applicants."[18]

Most importantly, the language used in the ECOA statutory scheme makes clear that Congress intended the statute to reach conduct affecting "applicants," by not using any language that would extend its prohibitions to "prospective", "potential", or "possible" applicants or anyone else who has no contact whatsoever with a creditor.[19]

This case resembles a recent District of Columbia case that distinguished *Mourning* while setting aside an agency rule.[20] In *Merck*, the court explained that the rule in *Mourning* was closely related to the purpose and scope of TILA as evidenced by the legislative history. The rule in *Merck*, however, sought to "regulate[] primary conduct several steps removed from the

---

[16] 15 U.S.C. § 1691 Notes, Congressional Findings and Statement of Purpose (emphasis added).

[17] This view regarding the meaning of the term "customer" is consistent with a later consumer protection statute enacted by Congress, the Gramm-Leach-Bliley Act, and the Bureau's implementing regulation, which require a relationship with the creditor for a customer relationship. Pub. L. 106–102, title V, § 509 (1999), codified at 15 U.S.C. § 6809; 12 C.F.R. § 1016.3(i) and (j). In addition, although the Bureau may argue that the DPA furthers the statutory purpose of ECOA, Congress stated that the definitions in ECOA, including the definition of "applicant," "are applicable for the purposes of this subchapter." 15 U.S.C. § 1691a(a). This indicates that Congress intended the purpose of the statute to be interpreted within the boundaries of the definition of "applicant."

[18] The Senate Banking Committee's Report states that, "the Committee believes it must be established as clear national policy that no *credit applicant* shall be denied the credit he or she needs and wants on the basis of characteristics that have nothing to do with his or her creditworthiness." S. Rep. No. 94–589, at 3 (1976), 1976 U.S.C.C.A.N. 403 (emphasis added). The report further states that, "[t]his legislation should therefore redound to the benefit of both creditors and *applicants*, by producing a more informed and competitive marketplace, where *credit applicants* can be assured of evenhanded treatment in their quest for what has become a virtual necessity of life." S. Rep. No. 94–589, at 4 (1976), 1976 U.S.C.C.A.N. 403 (emphasis added). The report further states, "*[t]he essential prohibition* in this legislation is directed at discrimination 'against' *applicants*." S. Rep. No. 94–589, at 5 (1976), 1976 U.S.C.C.A.N. 403 (emphasis added).

[19] The only prohibition against discrimination in ECOA applies to "applicants." 15 U.S.C. §§ 1691(a), 1691a(b). In addition, ECOA only has provisions dealing with consumers who have had some contact with a creditor in the process of submitting an application. For example, ECOA requires creditors to provide "adverse action" notices if applicants are denied credit and to provide appraisal copies with mortgage applications. 15 U.S.C. § 1691(d) and (e).

[20] *Merck & Co. v. U.S. Dep't of Health & Human Servs.,* 385 F.Supp.3d 81 (D. D.C. 2019).

4

heartland of HHS's authority under the Social Security Act."[21] As in *Merck*, the Bureau's DPA improperly seeks to regulate conduct several steps before a credit transaction is even contemplated between a creditor and individual. The Bureau seeks to expand the Bureau's authority well past the bounds set for it by Congress.[22]

### 3. Congress did not acquiesce to the DPA.

The Bureau erroneously claims that Congress acquiesced to the DPA in the hopes it will not be invalidated. The evidence cited by the Bureau, however, does not support any argument that it was Congress' intent to acquiesce.

#### a. Congress could not have acquiesced to the DPA in 1991.

The Bureau erroneously claims that a 1991 amendment to ECOA indicates that Congress acquiesced to the DPA. This very acquiescence argument was recently made to and rejected by the Eleventh Circuit in *Regions Bank*.[23] The *Regions Bank* opinion found that Congress could not have acquiesced to the Bureau's rule because the validity of the regulation had never been considered by a court so the Eleventh Circuit could "hardly infer congressional acquiescence in this circumstance."[24] Here, Congress cannot be said to have acquiesced to the DPA, because no court has yet addressed the merits of this issue. Cases and commentary that address similar issues relating to the scope of the term "applicant" post-date the 1991 amendments. For example, the

---

[21] *Id.* at 93-95.

[22] Further, in 1968, years before ECOA was enacted, Congress had enacted the Fair Housing Act ("FHA") that specifically addressed discrimination in marketing to the public for residential real estate. Pub. L. 90–284, title VIII, § 804, Apr. 11, 1968, 82 Stat. 83; 42 U.S.C. § 3604(c). If Congress wanted ECOA to reach such marketing activities it would have enacted such a provision, just as it did in the FHA. In addition, the existence of this provision in the FHA precludes any argument that Congress intended the "circumvention" or "evasion" provision of ECOA to enable the Bureau to reach this type of activity for mortgage credit, because there could be no evasion of the anti-discrimination purpose of ECOA when such activity could be actionable under the FHA.

[23] *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1196 (11th Cir. 2019) ("Although the Supreme Court has recognized that congressional inaction can, in limited circumstances, support an inference that Congress has acquiesced to an agency or judicial interpretation, it has explained that legislative silence is a poor beacon to follow in construing a statute. And it has repeatedly warned that congressional silence alone is ordinarily not enough to infer acquiescence.")

[24] *Id.* at 1179.

Seventh Circuit held that the unambiguous term "applicant' could not be stretched to include a guarantor in 2007.[25] In addition, settlements by the DOJ and/or other regulatory agencies relating to advertisements to non-applicants began in 1994, which were routinely criticized, well after the 1991 amendments.[26] In addition, even as late as 1999, the Board and others publicly questioned whether ECOA and Regulation B could reach pre-application marketing.[27] With the scope of ECOA and its regulations still in doubt today, Congress cannot be said to have acquiesced to the

[25] *Moran Foods v. Mid-Atlantic Market Development,* 476 F.3d 436, 441 (7th Cir. 2007) ("We doubt that the statute can be stretched far enough to allow [the Board's] interpretation.... there is nothing ambiguous about 'applicant' and no way to confuse an applicant with a guarantor.") (internal citations omitted).

[26] *United States v. Chevy Chase Fed. Sav. Bank*, No. 94-1824-JG (D.D.C. Aug. 22, 1994). The DOJ has recently referred to the *Chevy Chase* settlement as a "landmark." See Assistant Attorney General Thomas E. Perez, Speech at Annual Community Reinvestment Act and Fair Lending Colloquium, (Nov. 7, 2011) ("the landmark redlining case against Chevy Chase Bank"), available at https://www.justice.gov/opa/speech/assistant-attorney-general-thomas-e-perez-speaks-15th-annual-community-reinvestment-act. But because the *Chevy Chase Bank* action resulted in a settlement, it did not result in any judicial opinion on the merits of the DPA. The DOJ's interpretations of ECOA and FHA in that settlement were roundly criticized by scholars, and even another regulator, at the time. *See* Thomas P. Vartanian, Robert H. Ledig and Alisa Babitza, *Chevy Chase Case Sets New Standards For Fair Lending Law Compliance*, 13 No. 17 Banking Pol'y Rep. 1, 7-10 (Sept. 19, 1994) ("Although the Chevy Chase consent decree alleges violations of the FHA and the ECOA, the claims it asserts are not directly traceable to any specific provisions of those laws when viewed in light of prior interpretations and precedents"); Michael B. Mierzewski and Richard L. Jacobs, *What Hath Justice Department Wrought Through Chevy Chase?*, 14 No. 3 Banking Pol'y Rep. 8, 10 (1995) ("no court, to our knowledge, has ever found that the alleged activities engaged in by Chevy Chase, even if true, would constitute a violation of the federal fair lending laws."). The Mierzewski and Jacobs article also describes how the then-Acting Director of the Office of Thrift Supervision stated that the DOJ's claims against Chevy Chase Bank were "much different than the more commonly understood 'redlining' allegation[s]" and "untested in the courts." *Id. See also* John J. Spina, *United States v. Albank, FSB: Is Justice Being Served in the Enforcement of Fair Lending Laws*, 2 N.C. Banking Inst. 207, 220 (1998) ("Albank and Chevy Chase seem to stretch this fair lending definition beyond the letter and spirit of the law."), available at: http://scholarship.law.unc.edu/ncbi/vol2/iss1/13. *See also* Craig E. Marcus, Beyond the Boundaries of the Community Reinvestment Act and the Fair Lending Laws: Developing a Market-Based Framework for Generating Low- and Moderate-Income Lending, Columbia Law Review Vol. 96, No. 3, pp. 748-749 (Apr., 1996) ("[n]either the statutes nor the case law provides authority to support extending the concept of fair lending under the FHA or the ECOA to include this type of situation....").

[27] In a 1999 proposed rule, the Board stated, "[t]here has been concern through the years that Regulation B generally does not apply to *preapplication marketing*. During the 1985 review of Regulation B, the staff presented to the Board the issue of whether prescreened solicitations should be made subject to the regulation, but recommended against coverage." 64 Fed. Reg. 44582, 44584 (Aug. 16, 1999) (emphasis added). Even trade associations appear to have been confused about the reach of this provision, as indicated by a public comment letter by the Credit Union National Association, which stated that, "[i]n general, [ECOA] has not been interpreted to apply to a creditor's preapplication marketing practices.... The Board's review of the applicability of Regulation B to preapplication marketing should fully consider *whether the Act requires such coverage for individuals who are not seeking credit...*" Credit Union National Association, Comment Letter to Docket No. R-1008 (May 29, 1998), available at: http://legacy.cuna.org/reg_advocacy/comment_letters/cl_052998.html. Others questioned whether ECOA reached pre-application marketing. *See e.g.*, T. Lambert, *Fair Marketing: Challenging Pre-Application Lending Practices*, Georgetown Law Journal, 87 Geo. L.J. 2181, 2200 (June 1999) ("[t]he extent to which the ECOA reaches pre-application lending practices is unresolved.... [t]he agencies responsible for enforcing the ECOA remain divided over its coverage of pre-application marketing discrimination.").

DPA in 1991.

b.    The 1991 amendments do not evidence acquiescence.

A close look at the 1991 amendment demonstrates that Congress was not even considering the DPA at the time. In 1991 Congress added a provision to ECOA requiring administrative agencies to refer certain matters to the DOJ. The amendment requires DOJ referrals if an agency believes a creditor "engaged in a pattern or practice of discouraging or denying applications for credit *in violation of [section 1691(a) of [ECOA]]*."[28] Section 1691(a) only refers to provisions of ECOA that prohibit discrimination against "applicants."[29] The 1991 amendment has nothing to do with "prospective applicants," so there cannot have been any acquiescence.

The Bureau cites to a "Background" section of a Senate Report that states, "[d]iscouraging applications on a prohibited basis and advertising which implies a discriminatory preference are also prohibited."[30] This single, non-specific reference to "advertising which implies a discriminatory preference" (and absent any similar reference in the House report) cannot constitute acquiescence by Congress to the vast expansion of ECOA through the DPA. Again, no cases had ever been decided by a court on this issue, making Congress unaware of the potential legal infirmity of the regulatory provision.[31]

---

[28] S. REP. 102-167, at *393.

[29] 15 U.S.C. § 1691(a). In addition, this provision only refers to discouraging "applications," and not "pursuing an application," as does the DPA. This further indicates that Congress was not interested in persons who have had no contact with a creditor, who may or may not pursue an application, but instead was focused on "applicants."

[30] S. Rep. 102-167, at *86 (Oct. 1, 1991). The Bureau also cited to a House Report that stated the legislation requires agencies to "promptly refer loan discrimination violations of the Equal Credit Opportunity Act." This statement only refers to violations of ECOA, which under the terms of the statute can only involve "applicants." H.R. Rep. 102-330, 131, 1991 U.S.C.C.A.N. 1901, 1944. This does not refer to "prospective applicants," and cannot be considered evidence of acquiescence.

[31] *See Regions Bank*, 936 F.3d at 1179. Further, when this particular amendment to ECOA was introduced in the 101st Congress as S.3049, it failed to pass the House of Representatives and become law. S.3049 - Fair Lending Enforcement Act of 1990, 101st Congress (1989-1990), available at https://www.congress.gov/bill/101st-congress/senate-bill/3049 (last visited April 12, 2021). For the amendments to pass Congress, it took including the

In any case, the Bureau's purported evidence of acquiescence cannot trump the language of the statute, which the 7th Circuit in *Moran Foods* described as unambiguous.[32]

### 4. The Bureau's Invalid Attempt to Create Affirmative Obligations under ECOA.

The Bureau contends in this litigation that it is not attempting to create affirmative obligations, but that is exactly what it is doing.[33] The Bureau is attempting to create obligations for creditors to: (1) hire loan officers from; (2) market to; (3) and have business success with all demographics in their markets, in spite of ECOA only prohibiting "discrimination."[34] Further, legal and business scholars questioned the validity of the government's arguments in these

---

amendment in a major piece of legislation in response to the savings and loan crisis of the early 1990s, which the Senate Report referred to as "unprecedented since the Great Depression," which covered a myriad of technical areas of financial regulation that were the main focus of the legislation. S. Rep. 102-167, at *2. Even Senator Jake Garn, the former Senate Banking Committee Chairman who voted for the legislation in the committee, stated that the title of the legislation that included the ECOA amendments were "*contrary to the needed focus of the legislation and should be deleted.*" S. Rep. 102-167, at *235 (emphasis added). And Senator Connie Mack stated that, "the bill goes on to add several new consumer related provisions that have nothing to do with the safety and soundness of our financial institutions." *Id.* at *250-251 (emphasis added). There are no statements in the FDI Act's legislative history directly in support of the Board's regulation expanding ECOA to "prospective applicants.".

[32] We are not aware of any case law finding Congressional acquiescence to excessive regulation in the face of unambiguous statutory language, but have identified opinions holding that acquiescence is impossible in this case. For example, the 6th Circuit recently explained, "nothing in [the legislation] expressly approved the agency's interpretation . . . mere congressional acquiescence that [the eviction moratorium] was supported by [the general rulemaking authority]…does not make it so, especially given that the plain text of that provision indicates otherwise." *Tiger Lily, LLC, et al., v. United States Department of Housing and Urban Development, et al.*, No. 21-5256 (6th Cir. March 29, 2021). *See also Chisholm v. F. C. C.*, 538 F.2d 349, 176 U.S. App. D.C. 1 (D.C. Cir. 1976) (where the D.C. Circuit cautioned the Congressional inaction and reenactment of a statute were not convincing evidence that Congress had acquiesced to the F.C.C.'s interpretation of the equal time rule).

[33] As stated by its former director: "[i]t would be 'compliance malpractice' for executives not to take careful bearings from the contents of these orders about how to comply with the law and treat consumers fairly." Prepared Remarks of CFPB Director Richard Cordray at the Consumer Bankers Association (Mar. 9, 2016), available at: https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-richard-cordray-at-the-consumer-bankers-association/. But the examples of similar discrimination claims cited by the Bureau in footnotes 63 through 69 of its reply were all complaints filed by the Federal government, and all of them involved settlements with plaintiffs that could also allege violations under the FHA, which as noted above, can potentially be interpreted to reach marketing activity.

[34] In addition, the Bureau's expectation that creditors hire loan officers of a specific racial or ethnic demographic to avoid an ECOA violation raises serious concerns under other anti-discrimination laws, such as Title VII of the Civil Rights Act. *See* Hill v. Ross, 183 F.3d 586 (7th Cir. 1999) "under an affirmative action plan race or sex may be a factor in a hiring decision but can not be dispositive--not, at least, unless the plan is designed to overcome the effects of past discrimination.") (citations omitted); see also *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 722 (7th Cir. 2005) ("the existence of an affirmative action plan may be relevant to a key issue in a disparate treatment discrimination case: discriminatory intent.") (citations omitted). How can the Bureau state that the act of not hiring a loan officer based solely on race, which would likely violate Title VII, leads to a violation of ECOA? Further, if a creditor's percentage of applications from a certain race is viewed as too high, should it reject applications submitted by persons of that race, which would clearly violate the plain language ECOA? The Bureau is essentially requiring creditors to violate ECOA and Title VII to comply with its new affirmative obligations.

settlements under both ECOA and FHA, as noted above.

The DPA far exceeds the bounds of ECOA and is invalid under the APA. The Bureau must once again be reined in to avoid its encroaching on our fundamental rights.[35]

## III.   **The DPA Violates the First and Fifth Amendments Facially and As Applied.**

### A.   **Attempts to Punish Political Content, Statements, and Viewpoints Must Pass Strict Scrutiny Under the First Amendment, and the DPA Cannot.**

On their face, the challenged statements include plainly political statements, *e.g.,* the speakers' distaste for high crime rate on the Southside and their support of policing efforts in combating that crime.[36] Because the DPA punishes political speech, it must be subject to strict scrutiny.[37] Similarly, the Bureau does not and cannot dispute that the DPA punishes the content and viewpoint of Townstone's employees' comments. For this additional reason, the DPA should be subject to heightened scrutiny,[38] but the Bureau made no attempt to satisfy its burden.[39]

There is no doubt that if the statements were made by a non-corporate entity, they would

---

[35] Further, under *Chevron,* the CFPB cannot reasonably interpret the word "discriminate" in ECOA to include "discourage" in the form of a disagreement with political speech (or not having a loan officer of a certain demographic). Neither can the word "discourage" in the DPA be reasonably interpreted to include such activity (or non-activity), or the discouragement from pursuing an application as *any* creditor as the Bureau alleges in its amendment complaint. *Auer* deference does not apply. *See Kisor*, 139 S. Ct. at 2415. In addition, the CFPB has never before provided any guidance regarding this interpretation, and it is an unfair surprise. *Id.* at 2417 ("a court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise'").

[36] Notably, the two statements and activity from 2014 are outside the five-year statute of limitations under ECOA. These are included simply as an effort to inflame and are not actionable. 15 U.S.C. § 1691e(f).

[37] *See, e.g., Citizens United v. Federal Election Comm'n,* 558 U.S. 876, 900, 917 (2010) (noting that "The Court has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons'", and applying heightened scrutiny to strike a law limiting corporate speech expressed through political expenditures).

[38] *See, e.g., Sorrell v. IMS Health Inc.,* 564 U.S. 552, 563, 131 S. Ct. 2653, 2663-64, 180 L. Ed. 2d 544 (2011) (applying strict scrutiny to a commercial law that was directed at certain contents, certain speakers, and certain viewpoints and explaining, "The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)); *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163–64, 135 S. Ct. 2218, 2227, 192 L. Ed. 2d 236 (2015) (explaining that "distinctions drawn based on the message a speaker conveys. . . are subject to strict scrutiny."); *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 418, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (applying strict scrutiny to "a categorical prohibition on the use of newsracks to disseminate commercial messages"); *RCP Publications Inc. v. City of Chicago,* 204 F.Supp.3d 1012, 1015 (N.D. Ill. 2016) (noting that commercial political speed may be entitled to strict scrutiny).

[39] Under strict scrutiny, the Bureau has the burden to show that the DPA is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 171.

be entitled to strict scrutiny. The Bureau contends that political speech is undeserving of strict scrutiny if it is (1) attributable to an entity, and/or (2) made during a discussion of political viewpoints on a show that was sponsored by an entity. The First Amendment demands more.

It is well settled that corporations have the right to address political issues and that such statements are deserving of the maximum First Amendment protection.[40] It is similarly clear that when the government seeks to punish viewpoints and content – even corporate viewpoints and content – strict scrutiny is appropriate.[41] The Bureau made no attempt to satisfy the strict scrutiny standard, and the DPA cannot stand. The statements at issue can and must be interpreted as something other than discriminatory. Future political speech would be chilled if it were subject to enforcement under the DPA.[42] This Court should grant Townstone's motion to dismiss

## B. Townstone Should Not be Punished for Sponsoring Political Discussion.

The Bureau attempts to lower the bar by claiming that these statements are either not worthy of First Amendment protection at all or should be judged by a lower standard. Neither of these arguments have any merit.

### 1. The Bureau Is Improperly Seeking to Punish Speech, Not Conduct

The DPA, which treats everyone as a "prospective applicant", is not a conduct regulation that incidentally burdens speech - it is direct, content and viewpoint-based burden on speech itself. As evidenced by this case, this provision subjects all sorts of protected speech to the whim and subjective determination of the government and what it believes may be "discouraging."[43]

---

[40] *See Citizens United*, 558 U.S. at 319 ("[t]he Government . . . may not suppress that speech altogether").

[41] *See footnotes 39 - 40* and Townstone's Opening Brief at 12-22.

[42] *Fed. Election Comm'n v. Wisconsin Right To Life, Inc*., 551 U.S. 449, 451, 127 S. Ct. 2652, 2655, 168 L. Ed. 2d 329 (2007) (noting that speech can be chilled by the specter of burdensome litigation and explaining that under an objective standard courts "must give the benefit of any doubt to protecting rather than stifling speech").

[43] *City of Lakewood v. Plain Dealer Pub. Co*., 486 U.S. 750, 755, 108 S. Ct. 2138, 2143, 100 L. Ed. 2d 771 (1988) (demonstrating that the First Amendment is concerned with arbitrary and subjective government impinging on free speech, "the explicit protection accorded speech and the press in the text of the First Amendment, our cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to

It seems obvious, but it must be said, that statements made on the radio are not conduct, as the Bureau argued. Similarly, statements made against crime and in support of police are not even remotely equivalent to a demonstrably racist "White Applicant Only" sign. The Bureau's attempt to rely on "conduct" cases that only incidentally impact speech is misplaced. For example, the Bureau cites *RAV*, a case in which the Supreme Court invalidated an ordinance that was being used to punish cross burning as being violative of the First Amendment.[44] As with cross burning, discrimination is deplorable, the government "has sufficient means at its disposal to prevent such behavior without adding the First Amendment to the fire." *Id.*

The DPA's content and viewpoint of restriction on speech violates the First Amendment.

2. **Townstone's Public Issue and Political Speech Cannot Properly Be Labeled "Commercial" Speech.**

Townstone's political speech is not commercial and should not be subjected to a lower level of First Amendment scrutiny. At its core, commercial speech is speech that proposes a commercial transaction.[45] While courts have recognized that commercial speech may also include brand promotion and some mixed speech, even a casual reading of the commercial speech cases demonstrate that there must be a close nexus between the regulated speech and commerce.[46] By way of example, the Seventh Circuit identified this non-exclusive list of factors to be considered when determining whether speech is sufficiently related to commerce to label it "commercial speech," which includes whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech."[47] Regulations of commercial speech still cannot "burden substantially more speech than is

---

permit or deny expressive activity, one who is subject to the law may challenge it facially. . . . ").
[44] *R.A.V. v. City of St. Paul,* 505 U.S. 377, 396, 112 S. Ct. 2538, 2550, 120 L. Ed. 2d 305 (1992).
[45] *Jordan v. Jewel Food Stores, Inc.,* 743 F.3d 509, 516 (7th Cir. 2014) (citations and quotations omitted).
[46] *Id. at 516-17.*
[47] *United States v. Benson*, 561 F.3d 718, 725 (7th Cir.2009) (citing *Bolger*, 463 U.S. at 66–67, 103 S. Ct. 2875).

necessary to further the government's legitimate interests."[48]

The discussions regarding political and societal issues between Townstone's employees are not commercial speech despite the fact that they occurred on a Townstone-sponsored program. Nothing in the challenged statements satisfies the 7th Circuit factors. There is no nexus between the statements and commerce. Indeed, as demonstrated in the Complaint's own allegations, the challenged statements reflect the individual speaker's own extemporaneously offered opinions that are unconnected to Townstone's advertising efforts.[49]

Notwithstanding the forgoing, corporate speech on political issues must be evaluated in light of the Supreme Court's precedent in *Citizens United*. There, the Supreme Court expressly held that the First Amendment protects a corporation's right to engage in political speech—*even if that speech is commercial in nature*. The speech at issue in *Citizens United* was an *advertisement* for the petitioner's film about Hillary Clinton in the runup to the 2008 presidential election.[50] After *Citizens United*, and consistent with the dozens of Supreme Court cases that are extremely protective of corporate political speech – even that which may mixed with brand building – must be subject to strict scrutiny.

Even if the commercial speech standards apply, the DPA still violates the First Amendment because there is an insufficient fit between the DPA and ECOA's purpose – equal access to credit for applicants – and the banning of entire viewpoints and categories of content. The DPA, through its expansion to include "prospective applicants", its reliance on the

---

[48] *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

[49] *See, e.g.,* "*Sturner volunteers his view* of the South Side of Chicago" including the police being "the only ones between that [area] turning into a real war zone." (Doc.1, ¶35). Put another way, the Bureau cannot suppress political speech it disagrees with when a creditor pays for time on a radio station for its staff to engage in extemporaneous political discussion, even though a corporate name is attached to the program.

[50] Even brand-building political speech – like official statements by Amalgamated Bank supporting Black Lives Matter or reparations legislation – is protected by strict scrutiny after *Citizens United*. Amalgamated should be able to make such statements even though it is possible that some members of a racial or ethnic demographic may disagree with or feel discouraged by them. *See, e.g.,* https://www.amalgamatedbank.com/blog/black-lives-matter. and https://www.amalgamatedbank.com/blog/amalgamated-banks-hr-40-statement. (last visited on April 12, 2021).

incredibly vague and subjective concepts banning "Discouragement", and its reach that includes "advertising *or otherwise*"[51] repeatedly overreaches and demonstrates the poor fit between the stated goal and the broad ban.[52] Accordingly, the DPA even fails intermediate scrutiny.

Finally, the Bureau's reference to FHA cases for support is unavailing for several reasons. *First,* section 3604(c)'s reach is narrower than Regulation B's discouragement provision because it limits its application to statements made in the context of sales or rental of a dwelling – a much closer nexus or fit to a commercial transaction. *Second*, the speech at issue in those cases was actually commercial speech as opposed to mixed commercial and public issue speech, so the analysis therein is inapplicable. *Third,* the speech at issue there was plainly discriminatory, whereas the statements here are decidedly not and rely upon misplaced governmental subjectivity and bias to create an allegedly discriminatory narrative.

## IV.   <u>Conclusion</u>

The Bureau brought this case against a small, single owner mortgage company and now seeks to bankrupt the business and its owner based on a handful of comments that amount to about five minutes over four years of programs, which the government feels discourage applications from African-Americans. The allegedly "discriminatory" statements, however, mention crime, the police, the issue of urban food deserts, but never once mention race or actually applying or not applying for a mortgage. The DPA and the Bureau's use of the same will expand the Bureau's authority beyond ECOA and undermine the First and Fifth Amendments.[53] Townstone asks the Court to dismiss the Complaint with prejudice.

---

[51] 12 C.F.R. § 1002.4
[52] Also see *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484 (1996), a case in which the Supreme Court discussed the "special care" that is required when viewing "regulations that entirely suppress commercial speech in order to pursue nonspeech-related policy."
[53] Due to space constraints and the obvious vagueness, which is not cured by the Bureau's Response, this Reply does not discuss the void for vagueness doctrines under the First and Fifth Amendments, which arguments provide additional grounds for dismissal. For example, the Bureau has still not offered any possible way a creditor can know which entities the Bureau will consider its "peer lenders" in order to comply with the Bureau's business success test.

Respectfully submitted,

*/s/ Sean P. Burke*
Sean P. Burke #6277203
E. Brenda Kpotufe #34084-49
Mattingly Burke Cohen & Biederman LLP
155 E. Market St., Suite 400
Indianapolis, IN 46204
Sean.Burke@mbcblaw.com
Brenda.Kpotufe@mbcblaw.com

Marx Sterbcow
Sterbcow Law Group
824 Elmwood Park Blvd #205
New Orleans, LA 70123
marx@sterbcowlaw.com

*Attorneys for Defendant Townstone
Financial, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on April 12, 2021, a copy of the foregoing was filed electronically. Service of this filing was also made by operation of the Court's CM/ECF system:

    Barry Reiferson
    Vincent Herman
    Michael G. Salemi
    Mary E. Olson
    Bureau of Consumer Financial Protection
    230 S. Dearborn St., Suite 1590
    Chicago, IL 60604

    And

    1700 G Street, NW
    Washington, DC 20552

                               */s/ Sean P. Burke*
                                   Sean P. Burke