IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) | Case No. 1:20-cv-04176 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Franklin U. Valderrama |
| | ) | Magistrate Judge Gabriel A. Fuentes |
| | ) | |
| Townstone Financial, Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSE TO DEFENDANTS' MEMORANDUM
OF SUPPLEMENTAL AUTHORITY**

Defendants' memorandum of supplemental authority confirms that *West Virginia v. EPA*[1]

has no impact on Defendants' pending motion to dismiss. For the same reasons identified in the

Bureau's opposition,[2] Defendants' motion should be denied.

As Defendants concede, *West Virginia v. EPA* did not announce a new legal rule or

standard.[3] Instead, the Supreme Court applied an existing "identifiable body of law that has

developed over a series of significant cases" for interpreting statutory delegations of authority to

administrative agencies.[4] But nowhere in Defendants' motion to dismiss, memorandum in support,

or reply brief did they refer to the major-questions doctrine or even cite to any of the "significant

cases" that have applied its principles over the last twenty years. Nevertheless, Defendants now

claim that this case presents four distinct "major questions of statutory interpretation."[5] It does not.

---

[1] 142 S. Ct. 2587 (2022).
[2] Bureau Opp'n to Mot. to Dismiss, (Bureau Opp'n.), ECF No. 35.
[3] Defs. Mem. Suppl. Authority 1, ECF No. 67.
[4] 142 S. Ct. at 2609.
[5] Defs. Mem. Suppl. Authority 4, ECF No. 67.

This case involves a single, straightforward question of statutory interpretation to which the major-questions doctrine has no application: Whether the Equal Credit Opportunity Act authorized a longstanding provision of Regulation B that prohibits creditors from making "any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application."[6] The answer is yes.[7] In ECOA, Congress expressly authorized the Federal Reserve Board and later the Bureau to issue rules that are "necessary or proper to effectuate the purposes of [ECOA]" and "to prevent circumvention or evasion thereof."[8] Since 1975, Regulation B's anti-discrimination provision has effectuated "the purposes of" ECOA and prevented "circumvention or evasion thereof" by ensuring that creditors cannot evade ECOA's prohibition on credit discrimination by discouraging protected groups from applying for credit in the first place. And Congress has endorsed the discouragement prohibition by incorporating it into ECOA's enforcement provisions, requiring agencies to refer to the Attorney General matters involving a pattern or practice of "discouraging or denying applications for credit."[9] It is therefore clear that "Congress in fact meant to confer the power [that] the agency . . . asserted" when the Federal Reserve Board promulgated the anti-discouragement provision.[10]

**A.      This is not an extraordinary case to which the major-questions doctrine applies.**

Regulation B's longstanding rule against discriminatorily discouraging credit applications is authorized by ECOA and does not present a major question under *West Virginia v. EPA*.

---

[6] 12 C.F.R. § 1002.4(b).
[7] Bureau Opp'n. 6-10, ECF No. 35.
[8] 15 U.S.C. § 1691b(a).
[9] *See* 15 U.S.C. § 1691e(g).
[10] *West Virginia v. EPA*, 142 S. Ct. at 2607-08.

Quoting its two-decades-old decision in _FDA v. Brown & Williamson Tobacco Corp.,_[11] the Supreme Court in _West Virginia v. EPA_ observed that in some "extraordinary" statutory interpretation cases, the "'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."[12] In such cases, the agency must point to "clear congressional authorization for the power it claims."[13]

In this case, the relevant assertion of agency authority is modest and longstanding. Since 1975, Regulation B has ensured that ECOA's general prohibition on discriminating against credit applicants cannot be evaded by discouraging applications on a protected basis. Far from engendering economic upheaval or political controversy, the validity of the anti-discouragement rule is so interwoven into the statutory scheme that Congress expressly took the rule into account when it amended ECOA in 1991.[14] If that were not enough, in ECOA's central rulemaking provision, 15 U.S.C. § 1691b(a), Congress chose to expressly authorize the responsible agency to make rules that in its "judgment . . . are necessary or proper to effectuate the purposes of [ECOA]" and "to prevent circumvention or evasion thereof."[15] As the Supreme Court has explained in interpreting a similar grant of rulemaking authority in the Truth in Lending Act (TILA), this language represents a "clear" grant of "power to deal with . . . attempted evasion" by creditors who might attempt to characterize their conduct "so as to fall one step outside whatever boundary Congress attempted to establish."[16]

---

[11] 529 U.S. 120 (2000).
[12] 142 S. Ct. at 2608 (quoting _Brown & Williamson,_ 529 U.S. at 159-60).
[13] _Id._ at 2609 (cleaned up).
[14] FDIC Improvement Act of 1991, Pub. L. 102-242, § 223, 105 Stat 2236 (1991), codified at 15 U.S.C. § 1691e(g).
[15] 15 U.S.C. § 1691b(a).
[16] _Mourning v. Family Publications Serv., Inc.,_ 411 U.S. 356, 365 (1973).

The major-questions doctrine is reserved for cases in which an agency asserts "extraordinary" or "extravagant statutory power" based on "ambiguous statutory text."[17] It is based on the insight that "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices" and that Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme."[18]

Here, unlike in *West Virginia v. EPA*, neither the Board nor the Bureau "claimed to discover" in "an ancillary provision" of a "long-extant statute an unheralded power representing a transformative expansion in its regulatory authority."[19] Nor did any such "discovery" of a "newfound power" allow the agencies to "adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."[20] This is not, therefore, a major-questions case.

1. **This case does not involve an assertion of extravagant statutory power that would represent a transformative expansion of an agency's regulatory authority.**

To begin, the asserted power in this case—to effectuate and prevent evasion of ECOA by barring creditors from discouraging applications on a prohibited basis—is far from extravagant or transformative. Since 1975, when Regulation B was first issued, the anti-discouragement rule has ensured that creditors cannot evade the statutory prohibition on discrimination by simply discouraging applications—in effect, telling or signaling to prospective applicants that their applications are not welcome.[21] This is hardly a surprising or novel extension of ECOA's broad prohibition of "discriminat[ion] against any applicant, with respect to any aspect of a credit

---

[17] *West Virginia v. EPA*, 142 S. Ct. at 2609 (cleaned up).
[18] *Id.* (cleaned up).
[19] *Id.* at 2610 (cleaned up).
[20] *Id.*
[21] *See* 40 Fed. Reg. 49,298 (Oct. 22, 1975) (promulgating Regulation B, 12 C.F.R. pt. 202).

transaction."[22] Indeed, prohibitions on discrimination commonly restrict regulated parties from

announcing discriminatory preferences or discouraging or deterring protected groups from seeking

out an opportunity.[23] As a result, the issuance of a rule against discriminatory discouragement of

credit applications by the agency tasked with administering a federal law barring credit

discrimination hardly "raises an eyebrow."[24]

Not surprisingly then, there is no evidence that the Board's anti-discouragement rule

engendered any substantial social or political controversy when it was first promulgated in 1975,

when it took on its current substantive form in 1977,[25] or in the decades to follow. While

Defendants cite a 1994 journal article that criticizes a particular government action enforcing

Regulation B's discouragement provision,[26] even those who criticized the merits of particular

enforcement actions recognized the validity of Regulation B's anti-discouragement rule. For

instance, the article cited by Defendants describes ECOA as "commonly understood" to prohibit

"discouraging individuals on a prohibited basis from submitting an application for credit."[27]

Defendants fare no better by suggesting that the anti-discouragement rule must present a

major question because the market for consumer credit is very large, and the rule applies (along with

---

[22] 15 U.S.C. § 1691(a).

[23] *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (observing that a "ban on race-based hiring may require employers to remove 'White Applicants Only' signs"); *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383-84 (7th Cir. 2016) (recognizing that a "prospective employee" who was deterred or prevented from applying for a position "suffers an adverse employment action despite not applying" and that to hold otherwise would "effectively bar 'victims of the most entrenched forms of discrimination' from Title VII relief" (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367 (1977)).

[24] *West Virginia v. EPA*, 142 S. Ct. at 2613 (cleaned up); *compare* 12 U.S.C. § 5511(b) (providing that one of the Bureau's statutory objectives is exercising its authorities to ensure that "consumers are protected … from discrimination"), *with West Virginia v. EPA*, 142 S. Ct. at 2612-13 (emphasizing EPA's lack of relevant "expertise").

[25] 42 Fed. Reg. 1242, 1254 (Jan. 6, 1977).

[26] Defs. Mem. Suppl. Authority 11-12, ECF No. 67.

[27] Thomas P. Vartanian, et al., *Chevy Chase Case Sets New Standards for Fair Lending Law Compliance*, 13 No. 17 Banking Pol'y Rep. at 7 (Sept. 19, 1994); *see also* John J. Spina, *United States v. Albank, FSB: Is Justice Being Served in the Enforcement of Fair Lending Laws*, 2 N.C. Banking Inst. 207, 223-24 (1998) (stating that "discouraging individuals on a prohibited basis from submitting an application for credit" is one of "two types of conduct understood to violate the FHA and ECOA from prior precedent").

the rest of ECOA and Regulation B) to all creditors.[28] Defendants' view would transform the major-questions doctrine from a special exception for "extraordinary cases" into the new standard for ordinary cases that happen to involve rules of general applicability.

Nor are Defendants aided by rehashing their mistaken claims that the Amended Complaint asserts that "ECOA includes affirmative marketing, lending, and even hiring requirements based on race" or "relies on a disparate impact theory of liability."[29] The Amended Complaint does neither, as the Bureau has previously explained.[30] Instead, the allegations in the Amended Complaint track the express terms of Regulation B's anti-discouragement rule: Townstone made a series of "oral or written statement[s]"[31] in its "advertising"[32] to "prospective applicants"[33] "that would discourage on a prohibited basis a reasonable person from making or pursuing an application."[34] Defendants try to characterize the discouraging statements as "impromptu public statements"[35] or akin to "an errant comment on social media."[36] But Defendants' self-serving interpretations are contrary to the Amended Complaint's factual allegations that the statements were made as part of a radio infomercial through which Townstone marketed its products and touted the benefits of applying for mortgage loans from Townstone.[37] And the allegations in the Amended Complaint that Defendants argue establish new affirmative obligations are actually facts that support the conclusion that Townstone engaged in conduct that would discourage prospective applicants on the basis of race.[38]

---

[28] Defs. Mem. Suppl. Authority 8-9, ECF No. 67.
[29] Defs. Mem. Suppl. Authority 8, ECF No. 67.
[30] *See, e.g.*, Bureau Opp'n at 13 (explaining that disparities in marketing, lending, and hiring supported the Bureau's claims that Defendants engaged in disparate-treatment discrimination).
[31] *See* Am. Compl. ¶¶ 32-38, ECF No. 27.
[32] *See* Am. Compl. ¶¶ 23-32, ECF No. 27.
[33] *See* Am. Compl. ¶ 26, ECF No. 27.
[34] *See* Am. Compl. ¶¶ 32-41, ECF No. 27.
[35] Defs. Mem. Suppl. Authority 4, 8, ECF No. 67.
[36] Defs. Mem. Suppl. Authority 9, ECF No. 67.
[37] *See* Am. Compl. ¶¶ 23-32, ECF No. 27.
[38] *See* Bureau Opp'n 13, ECF No. 35.

Because the longstanding and uncontroversial understanding that the Board (and now the Bureau) has the power to effectuate and prevent evasion of ECOA by barring creditors from discouraging applications on a prohibited basis does not represent an agency effort to arrogate to itself "sweeping and consequential authority" to resolve a matter of great "economic and political significance,"[39] this Court need go no further to conclude that the major-questions doctrine does not apply in this case. Instead, as the Bureau has previously explained,[40] Regulation B's anti-discouragement provision should be given "controlling weight" because it is not "arbitrary, capricious, or manifestly contrary to the statute."[41]

### 2. The provision that provided the agency authority in this case is not a long-extant, rarely used, ancillary provision.

The statutory authorization for Regulation B's anti-discouragement rule comes from 15 U.S.C. § 1691b(a), ECOA's primary rulemaking provision. For as long as ECOA has been in effect, it has—through Regulation B—prohibited discriminatory discouragement of prospective applicants to prevent evasion of ECOA's general rule against credit discrimination. This case is therefore the opposite of *West Virginia v. EPA*. There, the agency had only relied on the relevant statutory provision a "handful of times" over forty-five years before abandoning its prior "consistent understanding" of the authority that the provision conferred in favor of an "unprecedented" view that "effected a fundamental revision of the statute."[42] Likewise, in the foundational major questions case *FDA v. Brown & Williamson Tobacco Corp.*, the agency had made "consistent and repeated statements that it lacked [the] authority" that it later asserted.[43] Here, by contrast, the Board and the

---

[39] *West Virginia v. EPA*, 142 S. Ct. at 2608.

[40] *See* Bureau Opp'n 6, 8, ECF No. 35.

[41] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *see also id.* ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").

[42] *Id.* at 2602, 2612 (cleaned up).

[43] 529 U.S. at 144.

Bureau have maintained a consistent understanding of the authority granted by ECOA's primary rulemaking provision, and it is Defendants who seek to upset that understanding more than forty-five years later.

### 3. Congress incorporated the anti-discouragement rule into ECOA's statutory regime.

Unlike in *West Virginia v. EPA*, this case does not involve a situation in which a "newly uncovered" power "conveniently enabled" an agency to "enact a program" that "Congress considered and rejected multiple times."[44] Indeed, when Congress amended ECOA in 1991, it considered and *accepted* the anti-discouragement rule.

The anti-discouragement rule has been an integral part of ECOA's implementation since the very beginning.[45] And, as the 1991 Senate Report makes clear, Congress was well aware when it amended ECOA that Regulation B's anti-discouragement rule prohibited "[d]iscouraging applications on a prohibited basis and advertising which implies a discriminatory preference."[46] And Congress did not merely acquiesce in the anti-discouragement rule—Congress took care to incorporate the rule into a new ECOA provision that required referrals to the Attorney General when agencies suspected a pattern or practice of certain ECOA violations. Congress chose to require referrals not only when there was a pattern or practice of "denying applications" in violation of § 1691(a), but also when there was a pattern or practice of "*discouraging* . . . applications" in violation of that provision.[47]

Defendants have previously suggested that the Court should not read too much into Congress's requirement of referrals for "discouraging" applications because "Congress was not even

---

44 142 S. Ct. at 2614; *see also id.* (citing similar situations in other major-questions cases).
45 *See* 40 Fed. Reg. 49,298, 49,307 (Oct. 22, 1975).
46 S. Rep. 102-167, at *86, 93 & n.8 (Oct. 1, 1991) (citing Regulation B).
47 FDIC Improvement Act of 1991, Pub. L. 102-242, § 223, 105 Stat 2236 (1991), codified at 15 U.S.C. § 1691e(g) (emphasis added).

considering the [anti-discouragement rule] at the time."[48] But even if that were so (and the statutory reference to "discouraging" applications could be waved away as an inadvertent coincidence rather than a deliberate reference to an agency rule described in the Senate Report), it would only confirm that the anti-discouragement rule does not present a major question. After all, if the rule actually effected some great transformation of the agency's power in connection with a question of major political and economic significance, surely Congress would have avoided amending the statute to inadvertently include a reference that is most naturally read as an endorsement of that rule.

### B. Congress provided clear authorization for the anti-discouragement rule.

Even if this were a major-questions case (it isn't), Congress provided clear statutory authorization for the anti-discouragement rule. As the Bureau has previously explained,[49] the anti-discouragement rule is based on Congress's express delegation to the Board (and now the Bureau) to issue rules that "in the judgment of the [agency] are necessary or proper to effectuate the purposes of [ECOA], to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith."[50] The anti-discouragement rule ensures that creditors cannot evade ECOA's general prohibition on credit discrimination by simply discouraging consumers from seeking credit in the first place. Accordingly, when the Board issued the anti-discouragement rule more than 45 years ago, it concluded that the rule is "necessary to protect applicants against discriminatory acts occurring before an application is initiated."[51]

The Supreme Court's decision in *Mourning v. Family Publications Service, Inc.* [52] confirms that ECOA's rulemaking provision supplies clear congressional authorization for the anti-discouragement rule. *Mourning* involved a delegation of nearly identical authority to the Federal

---

[48] Defs.' Reply 7, ECF No. 38.
[49] Bureau Opp'n 2-3, 6-7, ECF No. 35.
[50] 15 U.S.C. § 1691b(a).
[51] 40 Fed. Reg. 49,298, 49,299 (Oct. 22, 1975).
[52] 411 U.S. 356 (1973).

Reserve Board to issue rules that "are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith."[53] There, just as here, the Federal Reserve Board had exercised its delegated rulemaking authority to prevent an evasion of a consumer-financial-protection statute. In *Mourning,* the Supreme Court considered the Board's "four installment rule."[54] The rule expanded TILA's scope to prevent evasion: Instead of covering only persons who regularly extended credit that carried a finance charge, the Board's rule ensured that the statute would also apply to those who regularly extended credit that is payable in more than four installments.[55] The Board believed that this expanded coverage was necessary to prevent evasion of TILA's core purpose of ensuring the informed use of credit, and that without it, the statute would provide creditors with a perverse incentive to hide the finance charge from consumers.[56]

The Supreme Court held that the Board's four-installment rule was a valid exercise of the agency's authority in light of the language of TILA's rulemaking provision, which "evince[d] the awareness of Congress that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish" and "indicate[d] . . . the *clear* desire of Congress to insure that the Board had adequate power to deal with such attempted evasion."[57] Just one year after *Mourning* was decided, Congress chose nearly identical language for ECOA's rulemaking provision. Congress's repetition of language whose meaning had just been settled by the Supreme Court is powerful evidence that Congress intended to incorporate the

---

[53] *Compare id.* 411 U.S. 356, 361-62 (1973) (quoting TILA rulemaking provision), *with* 15 U.S.C. § 1691b(a) (ECOA rulemaking provision).
[54] *Mourning,* 411 U.S. at 358.
[55] *Id.* at 361-62.
[56] *Id.* at 368-69.
[57] *Id.* at 365 (emphasis added).

Supreme Court's interpretation into ECOA.[58] Accordingly, ECOA's rulemaking provision (just like TILA's) should be understood to convey Congress's "clear desire" that the Board (and now the Bureau) have the power necessary to prevent evasions of ECOA's anti-discrimination regime.

The Supreme Court's decision in *Board of Governors of Federal Reserve System v. Dimension Financial Corp.*,[59] on which Defendants have previously relied, is not to the contrary. Even assuming that the Supreme Court's brief reference to the Board's authority to prevent evasions under the Bank Holding Company Act of 1956[60] was intended to depart from *Mourning*'s general approach to interpreting delegations of rulemaking authority, that would not justify ignoring Congress's specific intent in repeating language that the Supreme Court had authoritatively interpreted just one year earlier.

In light of the "clear desire" expressed in ECOA's rulemaking provision, it is not surprising that, for more than forty-five years, the Board and the Bureau have consistently understood that provision to authorize the anti-discouragement rule. Nor is it surprising that Congress incorporated the prohibition on discouragement into the statute's enforcement scheme more than thirty years ago. This long-established practice provides yet further confirmation that Congress provided clear authorization for the anti-discouragement rule.[61]

---

[58] *See Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("When judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." (cleaned up)).

[59] 474 U.S. 361 (1986).

[60] *See id.* at 373 n.6.

[61] *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 537 (2015) (explaining that Congress's subsequent amendment of a statute that "assume[d] the existence" of a certain type of liability provided "convincing confirmation of Congress' understanding" that such liability existed under the statute); *cf. West Virginia v. EPA*, 142 S. Ct. at 2610, 2614 (noting that agency had administered statute for years before relying on challenged interpretation of statutory authority, and the agency used that novel interpretation "to enact a program that . . . Congress considered and rejected multiple times" (cleaned up)).

The "clear congressional authorization" section of Defendants' supplemental brief ignores the text and history of ECOA's rulemaking provision and raises arguments not at issue in this case.[62] Contrary to Defendants' suggestion,[63] the Bureau is not arguing that ECOA requires creditors to affirmatively target their advertising toward particular groups or to hire particular employees. Instead, the Amended Complaint's references to Townstone's broader advertising and hiring choices support and contribute to the Bureau's allegations that Townstone's conduct would discourage prospective applicants on the basis of race. Likewise, because the Bureau is not relying on a disparate-impact theory of liability, it is beside the point that Defendants evidently disagree with the Supreme Court about the availability of that theory under the Fair Housing Act.[64]

And Defendants' suggestion that Regulation B's anti-discouragement rule does not cover discouraging advertisements[65] is directly contradicted by the rule's express application to "oral or written statements, *in advertising or otherwise.*"[66]

Finally, Defendants wander particularly far afield from whether Congress clearly authorized the anti-discouragement rule (it did) when they offer[67] a belated rejoinder to a portion of the First Amendment argument in the Bureau's opposition to the motion to dismiss. The gravamen of Defendants' position appears to be that, under the First Amendment, the government can make it unlawful to advertise a discriminatory preference expressly (by, for instance, putting up a "white applicants only" sign) but cannot make it unlawful to do so implicitly (by, for instance, describing majority-African-American neighborhoods as "hoodlum weekend" or "crazy" during paid

---

[62] Defs. Mem. Suppl. Authority 10-15, ECF No. 67.
[63] Defs. Mem. Suppl. Authority 11-12, ECF No. 67.
[64] Defs. Mem. Suppl. Authority 12-14, ECF No. 67.
[65] Defs. Mem. Suppl. Authority 14, ECF No. 67.
[66] 12 C.F.R. § 1002.4(b) (emphasis added).
[67] Defs. Mem. Suppl. Authority 15, ECF No. 67.

advertisements). This position is mistaken. Thinly veiled innuendo does not immunize the advertising of discriminatory preferences.[68]

To the extent that Defendants intend to suggest that the principle of constitutional avoidance justifies invalidating Regulation B's anti-discouragement rule, they are likewise mistaken. Even assuming that the argument is not waived, it is without merit. Regulation B's interpretation of ECOA's delegation of rulemaking authority does not raise any serious constitutional concerns. And even if there were some constitutional doubt, Congress's intent is clear. It provided clear authorization for the anti-discouragement rule when it enacted ECOA in 1974 and subsequently endorsed the rule with its amendment of the Act in 1991.

---

[68] *See, e.g.*, *Ragin v. New York Times Co.*, 923 F.2d 995, 999-1000, 1002-03 (2d Cir. 1991) (upholding constitutionality of Fair Housing Act's advertising restriction, which applied not only to "the hypothetical swastika or burning cross" but also to "subtle methods of indicating racial preferences").

13

## CONCLUSION

Regulation B has been effectuating ECOA's purpose for more than 45 years, and ECOA has never operated without it. Congress endorsed the anti-discouragement provision in its 1991 amendment of ECOA. This case does not present a "major question," and there is no reason to disturb this statutory regime that has been in place for nearly half a century to protect consumers against discrimination. Defendants' motion to dismiss should be denied.

Respectfully submitted,

ERIC HALPERIN
Enforcement Director
ALUSHEYI J. WHEELER
Deputy Enforcement Director
KARA K. MILLER
Assistant Litigation Deputy

/s/ Barry E. Reiferson
BARRY REIFERSON NY Reg. #4343893
Email: barry.reiferson@cfpb.gov
JACOB A. SCHUNK, Iowa AT001908
Email: jacob.schunk@cfpb.gov
VINCENT HERMAN DC Bar #974596
Email: vincent.herman@cfpb.gov
MARY E. OLSON, IL ARDC 6297334
Email: mary.olson@cfpb.gov

230 S. Dearborn Street
Suite 1590
Chicago, IL 60604

and

1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-9599

Attorneys for the Bureau of Consumer Financial Protection

14