IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,**<br><br>       **Plaintiff,**<br><br>  v.<br><br><br><br>**TOWNSTONE FINANCIAL, INC., et al.,**<br>       **Defendants.** | Civil Action No. 1:20-cv-04176<br><br>Judge Franklin U. Valderrama<br><br>Magistrate Judge Gabriel A. Fuentes |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO COMPEL DISCOVERY RESPONSES**

  The Consumer Financial Protection Bureau's case turns almost entirely on the claim that five statements Townstone made over several years on its weekly talk show "would discourage prospective applicants, on the basis of race, from seeking or obtaining credit for properties within the Chicago MSA." Am. Cmplt. ¶ 22. Whether the statements would discourage a reasonable person from seeking credit is a matter of interpretation, both of the statements and of the context in which they were made. Townstone thus requested that CFPB produce all documents pertaining to its interpretation of Townstone's statements, including any documents concerning the political and social views of the speakers (Townstone and its employees) and the radio stations that broadcasted the Townstone Financial Show. These documents would shed light on why CFPB believes that a handful of innocuous statements plucked out of thousands of minutes of broadcasts violates federal law. And they are clearly relevant to two of Townstone's defenses: (1) that the statements would not discourage anyone from seeking credit on the basis of race; and (2) that Regulation B and CFPB's enforcement of it are unconstitutionally content- and viewpoint-based. Despite the obvious relevance of this information, CFPB refuses to search for any documents

1

pertaining to the political and social views of Townstone or the radio stations. Townstone accordingly moves the Court for an order compelling CFPB to produce this information.

## BACKGROUND

Following a three-year investigation, CFPB sued Townstone in July 2020, alleging that Townstone violated the Equal Credit Opportunity Act and its implementing regulation, Regulation B. CFPB's case is based primarily on its allegation that five statements Townstone made on a weekly radio show over a four-year period "would discourage prospective applicants, on the basis of race, from seeking credit for properties within the Chicago MSA." Am. Cmplt. ¶ 22. *See also id*. at ¶¶ 32, 38, 39, 41. Notably, CFPB does not allege that any individuals were in fact discouraged from seeking credit. And CFPB has admitted in interrogatory responses that it knows of no individual who was in fact discouraged. *See* Exhibit A, CFPB Response to Interrogatory No. 2; *see* Exhibit B, Aug. 23, 2022 Letter from Defendants to Plaintiff ("[W]e were able to confirm that CFPB is not aware of any identifiable individuals who were discouraged (or who have stated they would have been discouraged) from seeking credit on the basis of Townstone's statements quoted in the complaint.").

Townstone filed a motion to dismiss in October 2020, and renewed it in February 2021 after CFPB filed its Amended Complaint. Townstone's motion pointed out that ECOA prohibits only *discrimination* against *applicants* for credit. It does not prohibit statements that "would discourage prospective applicants" from seeking credit. That latter prohibition is found in Regulation B, which extends liability under ECOA to "any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application." 12 C.F.R. § 1002.4.

Townstone thus argued, among other things, that CFPB assumed power far beyond what

Congress authorized in ECOA and that CFPB's interpretation of Regulation B violated the First and Fifth Amendments. By expanding ECOA—through Regulation B—to reach statements that "would discourage" "prospective applicants," and by reading Regulation B to encompass public statements to individuals with no connection to the lender, CFPB has read ECOA to grant roving power to censor and chill creditors' speech. *See* Townstone Mem. [Dkt. No. 32] at 12–15. Here, for example, CFPB seeks to impose massive financial penalties on Townstone for five statements over a four-year period that constituted a tiny fraction of thousands of minutes of broadcast time. As Townstone explained in its motion to dismiss briefs, and as the face of the Amended Complaint makes clear, these statements came as part of innocuous discussions of crime in Chicago and various aspects of homebuying. *See, e.g.*, *id*. at 18–20. But whatever one concludes about the nature of the discussions, the statements undeniably arose in a broader context, each as part of a one-hour radio show. That context, and a listener's interpretation of it (including the only listener CFPB has thus far identified, which is CFPB itself), is relevant to understanding whether the statements at issue "would discourage" a reasonable prospective applicant from seeking credit.

The parties served initial written discovery requests on May 6, 2022. Townstone sought information concerning the CFPB's interpretation of Regulation B and its application to Townstone, including how CFPB interpreted the radio statements at issue. *See, e.g.*, Exhibit C, Document Requests 34–38; 41, 42. In Requests Nos. 41 and 42, Townstone asked CFPB to produce:

- RFP 41: "All document concerning the political leaning, political viewpoints, or social commentary of Townstone and/or Townstone's staff."

- RFP 42: "All documents concerning the political leaning or viewpoints of the AM-radio stations in the Chicago MSA."

CFPB objected to both requests, claiming that they seek "information beyond the scope of

Rule 26(b)(1)" that is "not relevant" and "has no relationship to the allegations in the Amended Complaint." *See* Exhibit D, CFPB Responses to Townstone Requests for Production, June 10, 2022. Accordingly, CFPB stated that it "did not conduct a search to determine if any such documents are in its possession, custody, or control." *Id*. The parties have had many discussions about discovery and their respective disagreements. *See, e.g.*, Exhibit E, Oct. 3, 2022 Letter from Defendants to Plaintiffs. Those discussions have been cordial, professional, and productive. The parties have resolved several disputes in an amicable fashion, but they have been unable to reach agreement on CFPB's objections to RFPs 41 and 42. CFPB has made clear that it views the requested documents to be irrelevant and will not search for responsive documents.[1]

While the parties worked through discovery, Townstone filed a Notice of Supplemental Authority arguing that the Supreme Court's decision in *West Virginia v. EPA* supported dismissal. Dkt. Nos. 65, 67. The Court held argument on the motion to dismiss on August 10. Dkt. No. 74. A month later, Townstone filed a Motion to Stay Discovery pending the resolution of the Motion to Dismiss. Dkt. Nos. 77, 78. Those motions remain pending.

## ARGUMENT

Understanding how CFPB interpreted Townstone's statements—and why it thinks they would discourage a reasonable person from seeking credit—is fundamental to this case. None of the statements CFPB identifies in its complaint even hint that Townstone would not do business with anyone from any location for any reason. Indeed, only one of the statements has any connection to race, and it was made by a guest on the Townstone Financial Show who told listeners

---

[1] As CFPB's response makes clear, it construed the requests to mean "documents specifically addressing the opinions of Defendants or Defendants' employees as to specific political candidates or parties." Exhibit D. Townstone does not believe that this is an accurate construction of the requests and has made that clear to CFPB that in Townstone's view, these requests call for any documents pertaining to Townstone's views on any political or social issue, including crime, race, any politician, or social issue. *See* Exhibit F, Nov. 3, 2022 Letter from Defendants to Plaintiffs.

4

to "*take down* the confederate flag" in a discussion of preparing homes to be sold. It is only through a series of inferences—among others, that calling a high-crime neighborhood a "warzone" is tantamount to disparaging African-American residents of that neighborhood and that any mention of the confederate flag or a supermarket known as the "jungle jewel" is "discouraging" to African Americans—that one could come to the same conclusion as the CFPB. Townstone is entitled to know what inferences the CFPB made and why. After all, CFPB is the only listener in this case who claims the statements are discouraging. If this case were instead brough by an individual claiming to have been discouraged by the statements, Townstone would be entitled to know how and why that person concluded the statements were discouraging. Townstone is entitled to the same information from CFPB.

Beyond that, the requested documents are relevant to at least two of Townstone's defenses. First, Townstone will argue that the statements could not have discouraged any reasonable person from seeking credit. If it turns out that CFPB brought this case, in whole or in part, because it found objectionable Townstone's views on, say, crime, the police, race, or anything that could bear on those issues, that would call into question CFPB's claim that a "reasonable person" would be discouraged by the statements. Second, Townstone will argue that Regulation B and CFPB's enforcement of it violate the First and Fifth Amendments. If it turns out that CFPB considered Townstone's political and social viewpoints in bringing this case, that would obviously be relevant to Defendants' First and Fifth Amendment defenses.

At this point, Townstone need not show that they will prevail on these arguments or even that the requested information would be admissible. *See Coleman v. Illinois*, Case No. 19 C 3789, 2020 WL 5752149, at *3 (N.D. Ill. Sept. 25, 2020). Townstone need show only that the information is relevant and proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1); *Oppenheimer*

*Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). It clearly is.

Indeed, courts often allow discovery of documents that would bear on a party's interpretation of language at issue. *See, e.g.*, *Marriott Int'l Resorts, L.P. v. United States*, 61 Fed. Cl. 411, 415 (Fed. Cl. 2004) (holding documents "necessary to shed light on the IR's interpretation of the relevant statute" were relevant and discoverable); *Pub. Service Ins. Co. v. Mount View Realty, LLC*, 2016 WL 4697717, at *2 (D. Conn. Sept. 7, 2016) (discovery proper where contract term is susceptible to multiple meanings). And here, Townstone's comments do not facially discourage anyone—they must be interpreted to have such meaning. How CFPB reached that conclusion is plainly relevant. *See Ford Motor Co. v. United States*, 2009 WL 2922875, at *2 (E.D. Mich. Sept. 9, 2009) ("[D]ocuments Ford seeks are relevant and discoverable" because they would "shed light on a legal issue—specifically the IRS' interpretation of the statutory and regulatory scheme."). Accordingly, absent some claim of privilege—which CFPB has not asserted—or some other constitutional or statutory defense to production—which CFPB has not and cannot assert—the documents must be produced.

### I. The Requested Documents Are Relevant to the Central Question in this Case: Whether Townstone's Statements Would Discourage Anyone from Seeking Credit

Two things make CFPB's consideration of Townstone's political and social views relevant and discoverable. First, nothing about the statements even hints that Townstone does not want to do business with anyone. Second, the meaning of "discourage" in Regulation B is far from clear, and what would discourage someone from seeking credit is therefore very much in the eye of the beholder. As a result, CFPB had many interpretive choices to make in deciding to bring suit against Townstone claiming that a handful of statements made over a four-year period discouraged hypothetical "reasonable persons" on the basis of anything at all, much less race.

Take, for example, the statements concerning crime. In one, according to CFPB's complaint, a Townstone host stated that "it's crazy in Markham on weekends" and that "[y]ou drive very fast through Markham" and "don't look at anybody or lock on anybody's eyes in Markham." Dkt. No. 27 (Amended Complaint) at ¶33. In another, a Townstone host suggested that someone "walking through the South Side at 3AM [would] get the same rush" that a person would get from skydiving. *Id.* at ¶ 37. And in another, according to CFPB, Townstone's CEO, Barry Sturner, stated that between Friday and Monday, the South Side is "hoodlum weekend," and the police are "the only ones between that [area] turning into a real war zone and keeping it where it's kind of at." *Id.* at ¶ 35.

Nothing about these statements pertains to race, and none disparages anyone—other than, possibly, criminals. And all of the statements are the types of things individuals in cities often say about high-crime areas. Indeed, Mayor Lightfoot, among many other prominent people, has referred to parts of Chicago as a "war zone." *Can Chicago's new mayor stop the bloodshed from gun violence*, THE GUARDIAN (Aug. 1, 2019), https://www.theguardian.com/us-news/2019/jul/31/chicagos-lori-lightfoot-mayor-gun-violence. To conclude that these statements disparage African Americans, one has to make at least two inferences: (1) statements about crime in a neighborhood are necessarily statements about the residents of those neighborhoods; and (2) statements about crime are necessarily statements about race.

The same is true for the other statements. Telling listeners to take down the confederate flag or referring to a supermarket as the "jungle jewel" are not on their face discouraging to anyone, let alone African Americans. Indeed, in Townstone's view, the context of this statement, as with all the others, demonstrates the opposite of CFPB's interpretation. But the point for present purposes is that CFPB's interpretation of the statements betrays a certain perspective about issues

7

like crime, policing, race, and life in a city such as Chicago, among many other things. Townstone is entitled to discovery concerning that perspective and what impact it had on CFPB's interpretation of Townstone's statements.

That is especially true because of the political and social views of Barry Sturner and AM 560, which broadcast the Townstone show. Both are conservative. And Mr. Sturner is an outspoken supporter of President Trump, an unabashed supporter of the police, and a vocal critic of crime in Chicago. *See* Exhibit G, Sturner Decl., at ¶¶ 6–10. Over at least the last decade, and increasingly as the 2020 election approached and during the controversy surrounding the shooting of George Floyd, political and social views such as Mr. Sturner's were seen in many quarters as racially insensitive if not outright racist. As a result, it would not be at all surprising if the CFPB considered Mr. Sturner's, Townstone's, and the AM 560's political and social views in interpreting the relevant statements. Indeed, it would be surprising if CFPB *did not* consider their views.

## II. The Requested Documents Are Relevant to Townstone's First Amendment Defenses

For the same reasons discussed above, the requested documents are relevant to Townstone's arguments that Reg B and the CFPB's enforcement of it are content- and viewpoint-based and that Regulation B is unconstitutionally vague. Put simply, Townstone's statements express views, certainly about crime in certain neighborhoods. And CFPB's conclusion that the statements violate ECOA and Regulation B is based on the views expressed—namely, that they allegedly disparage entire neighborhoods and their occupants. There could be no clearer example of government officials considering the viewpoint and content of speech. Townstone need not show that it will prevail on its constitutional arguments to obtain the requested discovery. It need only make the case that the information sought is relevant. Unquestionably, it is.

The law supporting this point, which Townstone recited it its motion to dismiss, is

straightforward. Government may not discriminate against speech on the basis of content or viewpoint. *See, e.g.*, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 (1992); *see Iancu v. Brunetti*, 139 S.Ct. 2294, 2299 (2019). Viewpoint discrimination is especially egregious and forbidden whether speech is commercial or non-commercial. *See Brunetti*, 139 S.Ct. at 2299 ("The government may not discriminate against speech based on the ideas or opinions it conveys."); *id.* at 2302 (Alito, J., concurring) ("Viewpoint discrimination is poison to a free society"); *Matal v. Tam*, 137 S.Ct. 1744, 1757 (2017) (cleaned up) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."). Whether speech is commercial or not, "the viewpoint based discrimination at issue . . . necessarily invokes heightened scrutiny." *Matal*, 137 S.Ct. at 1767 (Kennedy, J., concurring); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Commercial speech is no exception" to the viewpoint-discrimination doctrine). And where government officials have broad discretion, the risk of content- and viewpoint-discrimination is especially acute. *See Shurtleff v. City of Boston*, 142 S.Ct. 1583, 1593 (2022) (First Amendment violation where government had "unfettered discretion" to discriminate against religious viewpoints).

*Matal* and *Brunetti* are especially relevant here. *Matal* required the Court to wrestle with whether certain terms were "disparag[ing]" such that they could not be trademarked under federal law. 137 S.Ct. at 1751. *Brunetti* asked whether the government could prohibit registration of "immoral[] or scandalous" trademarks. 139 S.Ct. at 2297. Both reached the same conclusion, holding that the broad terms at issue violated the First Amendment because they allowed government officials to engage in viewpoint discrimination that "disfavors certain ideas." *Id.* In *Matal*, the disparagement clause of the Lanham Act allowed the government to consider the words used, but also broader context, such as whether certain groups would find the language

"disparaging in the context of contemporary attitudes." 137 S.Ct. at 1753. And in *Brunetti*, the court struck down the "immoral or scandalous" provision of the Lanham Act because, in part, it required the government to interpret trademarks and decide whether they communicated messages "inducing societal nods of approval" or "those provoking offense and condemnation." 139 S.Ct. at 2300. Because in both cases the government discriminated against views it did not like, the statutes at issue violated the First Amendment. *See Brunetti*, 139 S.Ct. at 2301 (A "law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." (quoting *Matal*, 137 S.Ct. at 1751)).

Likewise, here, CFPB obviously considered Townstone's views in concluding that Townstone violated ECOA and Regulation B. If, for example, Mr. Sturner had described the South Side as a "peace-zone" instead of a "warzone," CFPB would not have claimed he was disparaging either the South Side or its inhabitants. Likewise, if he had discussed the "jungle jewel" as a "wonderful" rather than a "scary" place, the CFPB would not have sued. *See Brunetti*, 139 S.Ct. at 2300–01 (detailing trademark decisions approving some views but rejecting those "offensive to many Americans"). *Cf. Snyder v. Phelps*, 562 U.S. 443, 457 (2011) (speech that "turned on the content and viewpoint of the message conveyed" was protected, and noting that defendants "would not have been subjected to liability" if they held "signs that said 'God Bless America' and 'God Loves You'").

Townstone will argue that this is textbook viewpoint discrimination. *See*, *e.g.*, *Brunetti*, 139 S.Ct. at 2300 (viewpoint discrimination occurs where government silences some views but approves of "more accepted views on the same topics"); *R.A.V.*, 505 U.S. at 388 (viewpoint discrimination exists where government allows speech conveying one point of view but not the opposite view). What is important for purposes of this motion is that it is viewpoint and content

10

*evaluation*. It simply cannot be denied that CFPB is taking a position on the views Townstone expressed. And given the charged cultural atmosphere concerning crime, the police, race, and President Trump—both then and now—it is fanciful for CFPB to suggest that it could not have considered Townstone's political and social views or that such consideration would not be relevant to this case. *See FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 122–23 (3d Cir. 2022) (explaining that government agency must consider broader context to give meaning to words when attempting to determine the meaning of a party's speech and whether that speech violated a statute); *Doe v. Loyola Univ. of Chicago*, 2020 WL 406771, at *2 (N.D. Ill. Jan. 24, 2020) (holding that cases must be viewed "against the 'backdrop'" of ongoing social issues).

## CONCLUSION

CFPB, like all government agencies, cannot discriminate against views that it finds offensive or distasteful. Yet that is precisely what Regulation B allows. And Townstone alleges that is what CFPB did here. The documents requested are plainly relevant to that issue, so Townstone's Motion to Compel should be granted.

Dated: November 14, 2022.

                                                                                                Respectfully submitted,

                                                                                                */s/ Steven M. Simpson*
                                                                                                STEVEN M. SIMPSON
                                                                                                DC Bar No. 462553
                                                                                                JESSICA L. THOMPSON
                                                                                                DC Bar No. 1542170
                                                                                                Pacific Legal Foundation
                                                                                                3100 Clarendon Boulevard, Suite 1000
                                                                                                Arlington, VA, 22201
                                                                                                Tel: (916) 288-1398
                                                                                                SSimpson@pacificlegal.org
                                                                                                JLThompson@pacificlegal.org

                                                                                                OLIVER DUNFORD
                                                                                                FL Bar No. 1017991
                                                                                                Pacific Legal Foundation

4440 PGA Boulevard Suite 307
Palm Beach Gardens, FL 33410
Tel: (916) 503-9060
ODunford@pacificlegal.org

Sean P. Burke
Mattingly Burke Cohen & Biederman LLP
155 E. Market St., Suite 400
Indianapolis, IN 46204

Marx David Sterbcow
The Sterbcow Law Group LLC
824 Elmwood Park Boulevard, Suite 205
New Orleans, LA 70123

## RULE 37.2 STATEMENT

On August 17 at 9:00 a.m., October 21 at 3:30 p.m., and November 2, 2022 at 12:00 p.m., the parties met and conferred via video conference to discuss outstanding discovery issues. After a good-faith effort, the parties agreed that they had reached an impasse thus necessitating this Motion. Attending on behalf of Plaintiff was Jacob Schunk and Gregory Jones. On behalf of Defendants were Steven Simpson, Oliver Dunford, Jessica Thompson, and John Kerkhoff. Plaintiff opposes the Motion.

*/s/ Steven M. Simpson*
STEVEN M. SIMPSON

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 14, 2022, I electronically filed the foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a copy to be served upon counsel of record.

*/s/ Steven M. Simpson*
STEVEN M. SIMPSON
