**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,** | **Civil Action No. 1:20-cv-04176** |
| **Plaintiff,** | Judge Franklin U. Valderrama |
| **v.** | Magistrate Judge Gabriel A. Fuentes |
| **TOWNSTONE FINANCIAL, INC., et al.,** **Defendants.** | |

## <u>DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO COMPEL</u>

CFPB's motion to compel is not made on a blank slate. It comes after a three-year investigation in which Townstone produced over 100 GB of information, answered detailed interrogatories, and produced Mr. Sturner for a sworn interview. As part of the investigation, Townstone searched emails and other documents for a long list of derogatory terms provided by CFPB. These searches revealed nothing that CFBP relied on in its complaint, amended complaint, or in the instant motion. As part of this lawsuit, CFPB has made identical requests to Townstone and Mr. Sturner for documents "discussing, disparaging, or generalizing particular groups or communities." CFPB Mot. to Compel [Dkt. No. 87] at 6.[1] Despite having a number of objections to all of the requests, Defendants have agreed to produce documents responsive to the requests to Townstone and business documents responsive to the requests to Mr. Sturner.

What Defendants oppose, however, is producing Mr. Sturner's personal communications. This is hardly an unreasonable objection. Among other things, this case concerns Townstone's statements to prospective applicants, not Mr. Sturner's personal affairs or conversations with friends and family. But even if CFPB's requests sought relevant information, they are absurdly

---

[1] Compare CFPB Doc Requests Nos. 1-3 to Townstone to CFPB Requests Nos. 1-3 to Mr. Sturner.

overbroad, as they would cover virtually any comment about any neighborhood or geographic area and any discussion of issues such as race, religion, gender, sex, and national origin, as it is virtually impossible to discuss any of these issues without using generalizations. Finally, CFPB's requests threaten the privacy and First Amendment rights of Mr. Sturner and any of the friends, acquaintances, or family members who happened to have had a discussion with him about issues such as crime in Chicago, race relations in America generally, gay marriage, the #MeToo movement, or immigration, to name just a few. This Court should deny CFPB's motion to compel.

## ARGUMENT

While it is true that relevance for discovery purposes is broad, after the 2015 amendments to Rule 26, relevancy is "now gauged in relation to claims or defenses in the action." *Coleman v. State of Illinois*, No. 19 C 3789, 2020 WL 5752149, at *3 (N.D. Ill. Sept. 25, 2020). As a consequence, whether information is relevant will turn on the facts and claims in a given case. *Id*. at *5. And the party seeking discovery has the burden of showing that it is relevant. *Contreras v. Ill. State Bd. of Elections*, No. 21-CV-3139, 2021 WL 7708965, at *3 (N.D. Ill. Aug. 20, 2021). Discoverable information must also be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Proportionality turns not only on financial burdens, but also on whether production would impact policy considerations or the exercise of rights such as privacy and freedom of speech. *See, e.g., Washtenaw Cty. Employees' Retirement Sys. v. Walgreen Co.*, No. 15 C 3187, 2019 WL 6108220, at *5-*6 (N.D. Ill. Nov. 15, 2019); *Henson v. Turn, Inc.*, No. 15-cv-01497-JSW (LB), 2018 WL 5281629, at *5 (N.D. Cal. Oct. 22, 2018) ("[P]rivacy interests

can be a consideration in evaluating proportionality, particularly in the context of a request to inspect personal electronic devices.").

CFPB cannot meet this standard for three reasons. First, Mr. Sturner's private conversations simply cannot be relevant to whether Townstone's public statements "would discourage" a reasonable person from seeking credit. Regulation B pertains to statements made to applicants or prospective applicants, not anything CFPB might imagine to be discouraging to someone. And private conversations between Mr. Sturner and his friends and family cannot affect whether Townstone's on-air statements "would discourage" anyone from seeking credit. Second, CFPB's requests are wildly overbroad. CFPB obtained a giant amount of information from Townstone during its investigation and is getting more as part of this lawsuit. Mr. Sturner has tens of thousands of text messages during the relevant time period and, given the breadth of CFPB's requests, searching them will be burdensome and costly. As a result, CFPB's request is not proportional to the needs of the case. Finally, and independently, compelling production of Mr. Sturner's private conversations would violate the First Amendment.

## I.    Mr. Sturner's Personal Communications are not Relevant.

This case is about alleged discouragement under Regulation B. CFPB does not allege that Townstone violated ECOA by discriminating against applicants. It alleges that Townstone violated Regulation B by making statements on its radio show that allegedly "would discourage" reasonable people from seeking credit on the basis of race. *See* Am. Cmplt. ¶ 22. As CFPB made clear in its opposition to Townstone's motion to dismiss, Regulation B "is the basis for the Bureau's claims against Townstone." CFBP Opp. to Mot. to Dismiss [Dkt. No. 35] at 4.

Regulation B applies only to statements, and, in particular, "oral or written statements" made to "applicants or prospective applicants." 12 C.F.R. § 1002.4(b). Thus, by its terms,

3

Regulation B does not apply to conduct, acts, or practices, and it certainly does not apply to the alleged *failure* to take any actions. While CFPB often implies otherwise,[2] the regulation's official commentary confirms that only statements could constitute "acts" that violate Regulation B's discouragement provision. Quoted in full, the commentary states:

**Paragraph 4(b)**
1. Prospective applicants. Generally, the regulation's protections apply only to persons who have requested or received an extension of credit. In keeping with the purpose of the Act - to promote the availability of credit on a nondiscriminatory basis - § 202.4(b) covers acts or practices directed at prospective applicants that could discourage a reasonable person, on a prohibited basis, from applying for credit. *Practices prohibited by this section include*:

i. *A statement* that the applicant should not bother to apply, after the applicant states that he is retired.

ii. *The use of words, symbols, models or other forms of communication in advertising* that express, imply, or suggest a discriminatory preference or a policy of exclusion in violation of the Act.

iii. The use of *interview scripts* that discourage applications on a prohibited basis.[3]

Thus, the only "actions" alleged in the complaint that could conceivably violate Regulation B are Townstone's on-air statements. While CFPB also alleges that Townstone failed to draw enough loan applications from African Americans and failed to hire African-American loan officers, these allegations cannot form the basis of separate claims under either Regulation B or ECOA. They are not statements or even actions, but only alleged *inaction*, and neither Regulation B nor ECOA requires creditors to lend to or hire from particular segments of the population. Indeed, the official commentary to Regulation B makes clear that a creditor "*may* affirmatively

---

[2] *See, e.g.*, CFPB Mot. to Compel [Dkt. No. 87] at 2 (referring to allegedly discouraging "business practices" including "hiring and marketing practices"); Am. Cmpl. at ¶ 2 (claiming that Regulation B applies to discouraging "acts or practices.")
[3] *See Official interpretation of Paragraph 4(b)*, available at https://www.consumerfinance.gov/rules-policy/regulations/1002/4/#a (emphasis added).

solicit or encourage members of traditionally disadvantaged groups to apply for credit,"[4] but nothing in Regulation B or ECOA *requires* a creditor to do so.

Townstone raised these points in its motion to dismiss, and CFPB responded that it is not claiming ECOA or Regulation B "creat[es] new affirmative obligations" to market to or hire from any particular population or racial group. CFBP Opp. to Mot. to Dismiss [Dkt. No. 35] at 13; *id.* at 26 n.128. Instead, according to CFPB, these allegations "support the Bureau's claims that Townstone made statements that 'would discourage on a prohibited basis a reasonable person from making or pursuing an application'" because "the most likely explanation for these disparities is Townstone's discouraging" statements. *Id.*[5] In other words, according to CFPB, the allegations that Townstone failed to market to or hire from the right racial groups is allegedly *evidence* of discouragement; it is not itself discouragement—nor could it be under the law.

The point is that the only actual legal claim at issue is the claim that Townstone violated Regulation B by doing what Regulation B prohibits, which is making discouraging statements. And the question for purposes of this motion is therefore whether Mr. Sturner's personal communications are relevant to that claim. The answer is "no." And the reason is straightforward. Whatever Mr. Sturner's personal conversations reveal, they cannot impact whether on-air statements "would discourage" a "reasonable" "prospective applicant" from seeking credit. The meaning or impact of the statements will not change no matter what Mr. Sturner said in private

---

[4] *Id.* (emphasis added).

[5] *See also id.* at 26 n.128 ("Contrary to Townstone's allegations that the Bureau punished Townstone for things like not hiring loan officers 'that include every specific racial or ethnic demographic in their market area,' (Townstone Mem. at 22–23), as explained above, the Bureau focused on conduct that would discourage, on the basis of race, a reasonable potential applicant."). Here, again, CFPB misuses the work "conduct," but the point of this passage is to make clear that CFPB is not claiming the failure to hire particular types of loan officers is itself a violation of ECOA. And it cannot coherently claim that this alleged failure violates Regulation B.

conversations to friends and family. Regulation B, by its terms, establishes an objective test of discouragement. *Cf. FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 122 (3d Cir. 2022) (interpreting requirement that employers not make statements that "tend to coerce a *reasonable employee*," as embodying an objective test (emphasis added)). And CFPB has made clear in its own guidance that even disparate-treatment claims against applicants under ECOA do not turn on whether a creditor intended to discriminate. *See Official interpretation of Paragraph 4,* available at https://www.consumerfinance.gov/rules-policy/regulations/1002/4/ ("conscious intent to discriminate" is irrelevant). Unless CFPB is prepared to concede that Townstone's intentions or views about the meaning of its on-air statements are controlling—in which case, this action can be dismissed immediately—it cannot demand that Mr. Sturner turn over his private conversations anymore than it could require him to turn over a list of books he has read, or magazines to which he subscribes, or websites he reads. None of that information will make it more or less likely that Townstone's statements "would discourage" a reasonable prospective applicant from seeking credit.

All of the arguments CFPB raises in its motion proceed from the same flawed premise, which is that by stating something in the complaint, it necessarily becomes the basis for discovery. But that is not so. Conclusory or legally irrelevant allegations cannot sustain a cause of action. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). It follows that they cannot support discovery, especially as relevance must be "gauged in relation to" to those causes of action. *Coleman*, 2020 WL 5752149, at *3.

Thus, CFPB's argument that "statements regarding African Americans made by Sturner to a personal friend may influence whether that friend refers any African American prospective borrowers or employees to Townstone" is a red herring. CFPB Mot. to Compel [Dkt. No. 87] at 7.

Neither ECOA nor Regulation B requires Townstone to seek referrals at all, let alone referrals of prospective applicants of any particular race. Like much of what CFPB alleges in this case, this argument is an attempt to twist legal prohibitions on discrimination against applicants and discouragement of prospective applicants into requirements that creditors market, lend, and hire based on race. But ECOA does not and could not impose such requirements, and no amount of clever pleading can create in the law what is not there or entitle CFPB to discovery on matters irrelevant to its actual *legal* claims. *See BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, No. 15 C 10340, 2018 WL 946396, at *3 (N.D. Ill. Feb. 20, 2018) (The rules of discovery are "not intended to be a ticket to unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest. Were it otherwise, discovery would be measured by the creativity and skill of counsel. It is not.").

Finally, CFPB's claim that there is no distinction between Mr. Sturner's business and personal communications does not make the communications they seek more relevant. First, CFPB does not take its own distinction seriously, as it seeks personal communications whether the distinction Defendants draw is valid or not. Second, CFPB's claim that there is no such distinction is not serious judged from any perspective. People have jobs and they have personal lives, and although the twain sometimes meets, it is not difficult to tell the difference between shop talk and personal talk. Mr. Sturner's conversations with friends and family about crime in Chicago are not somehow transformed into "business communications" because sometimes he discusses his business with the same people. In any event, Townstone's argument is not that whatever it deems to be personal is by that fact alone not discoverable. Townstone's argument is that Mr. Sturner's private communication are not relevant and proportional to the needs of the case.

## II.   Mr. Sturner's Personal Communications are not Proportional to the needs of the Case.

CFPB contends that its requests are not burdensome, but this is belied by the requests themselves. They seek not only disparaging comments about people based on the prohibited categories in ECOA, but also all communications making or referring to "any generalization, differentiation, or stereotyping" based on ECOA's categories, and all communications "referring to characteristics or *any* geographic areas or neighborhoods." (Emphasis added). These requests are incredibly broad and would cover virtually any discussions of race, sex, gender, religion, and national origin and any discussions of life in Chicago or any other geographic area. The prohibited bases listed in ECOA are the subjects of some of the most significant, and often controversial, issues in America today. Race pertains to issues such as crime, affirmative action, and the Black Lives Matter movement. Sex pertains to issues such as wage gaps, the #MeToo movement, and gay marriage. Religion involves issues such as terrorism in the Middle East, abortion, and antisemitism. And national origin pertains to immigration, among other things. Both political parties, along with polarizing political figures such as former President Trump, are often implicated in discussions of such topics. Any discussion of these issues or topics will almost certainly involve generalizations about groups, as the subjects of race, sex, religion, and national origin are necessarily about groups. They are *themselves* generalizations, so it is practically impossible to discuss any of these subjects without making some sort of a generalization.

Thus, for example, if any of Mr. Sturner's friends or family members were to share a video of Dave Chappelle's recent opening monologue on Saturday Night Live, that would implicate virtually every one of the categories in ECOA and every aspect of CFPB's requests. That is just one example, but one can imagine an endless number of examples of discussions of important

social and political issues, or simply personal experiences, that pertain to the issues of race, sex, religion, and national origin that would be responsive to CFPB's requests.

The same is true for the request concerning characteristics of geographic areas. People discuss the characteristics of where they live and the surrounding neighborhoods constantly. This includes mundane conversations: "I don't want to eat there, it's in a shabby neighborhood." "Before you start at U. Chicago, let me tell you how to navigate the dangerous neighborhood." "I don't feel comfortable going to that park. It's in a scary part of town." "I hate driving through that area. Traffic is horrible." "I love New York City. It's so diverse." And it includes discussions of salient issues of the day, such as crime, homelessness, the ethnic makeup of cities, corruption in government, even potholes in the streets. Indeed, during the hearing on the motions to compel, Defendants' counsel pointed the Court to an example from a recent news story about crime on the South Side, which included the quote: "'It looks like a war zone, police cars everywhere. People can't even live in this area, they're coming home to all this chaos and anarchy,' one neighbor said."[6] Simply sharing the news story would be "referring to the characteristics of a neighborhood." Any discussions of the story would be responsive as well. (And, indeed, if the quoted neighbor were a creditor, he or she would be subject to a claim under Regulation B, according to CFPB's theory in this case.)

Mr. Sturner has tens of thousands of text messages during the relevant time frame (likely more than 50,000). He has texted with approximately 250 people during that time. These include his mother and sisters, his in-laws, his wife and kids, childhood and college friends, his children's friends and the parents of his children's friends, people with whom he attends hockey and baseball

---

[6] Nate Rodgers, *CPS student chased by car, fatally shot on South Side identified*, Fox 32 Chicago (Sept. 9, 2022), https://www.fox32chicago.com/news/chicago-police-to-provide-update-after-17-year-old-boy-fatally-shot-on-south-side.

games, contractors who work on his home, parents and coaches involved in hockey and baseball leagues with Mr. Sturner, and many others. In short, like everyone, Mr. Sturner has a private life and, also like virtually everyone today, he texts with those involved in his private life. Searching his texts will be tremendously burdensome and expensive because someone will have to read the texts and understand the context, as individual text messages are often cryptic or partial communications. But the burden is more than that. It is a profound intrusion into Mr. Sturner's personal life and the personal lives of those close to him. Proportionality involves more than an assessment of time and money, and even more than an assessment of whether the request will trample an individuals' rights. It also involves a common-sense assessment of whether discovery is truly *necessary*. CFPB's intrusive, far-reaching requests do not come close to meeting this standard.

III. **Requiring Mr. Sturner to Produce Personal Communications Would Violate His and Others' Privacy and First Amendment Rights.**

The abridgment of the "indispensable liberties" of "speech, press, or association, . . . even though unintended, may inevitably follow from varied forms of governmental action." *NAACP v. Alabama ex rel Patterson*, 357 U.S. 449, 461 (1958). Here, the government's attempted abridgment of speech is intentional. That's what CFPB's lawsuit is all about. It contends Townstone and Mr. Sturner's statements about controversial issues of the day—crime, policing, and others—are unlawful. And it now demands that Mr. Sturner produce *personal* text messages. But courts have long applied the First Amendment to quash discovery that chills the rights of speech and association. *See Marrese v. Am. Academy of Orthopedic Surgeons*, 726 F.2d 1150, 1159 (7th Cir. 1984) (en banc), *rev'd on other grounds*, 470 U.S. 373 (1985); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1152 (9th Cir. 2010). Accordingly, CFPB may not obtain Mr. Sturner's personal text messages unless it can satisfy an exacting scrutiny; it must show that its

requests are narrowly tailored and that Mr. Sturner's texts are essential to the case. *See, e.g.*, *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-cv-660-DRH-SCW, 2014 WL 6854416, at *2 (S.D. Ill. Dec. 5, 2014). CFPB comes nowhere close to meeting this standard—its requests are wildly overbroad and personal texts have no bearing whatsoever on CFPB's claims.

The First Amendment doctrine precluding the disclosure of private information originated in association cases, but it applies with equal force to protect all First Amendment rights because such "freedoms need breathing space to survive." *Americans for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2389 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)); *see id.* at 2382 (noting that the right to associate is itself implicit in and derived from the First Amendment rights of speech, press, assembly, and petitioning the government). In *Bonta*, therefore, the Supreme Court took pains to protect merely the *identity* of donors to a nonprofit organization to protect those donors from harassment and reprisals that might result from the organization's controversial views. *Id*. at 2388–89.

If the First Amendment protects *donors* from publicly associating with an organization's views, then it necessarily protects an individual's own views from compelled disclosure. And, indeed, the Supreme Court has recognized the right to keep one's views or one's identity in connection with one's views private. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) (striking down law requiring disclosure of authors of election-related publications for violating First Amendment); *Watchtower Bible and Tract Soc. of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 166-67 (2002) (striking down law making door-to-door advocacy without a permit a misdemeanor because it would "result[] in a surrender of . . . anonymity"). The reason is simple. "[B]road and sweeping state inquiries into these protected areas" will unlawfully "discourage citizens from exercising rights protected by the Constitution." *Bonta*, 141 S.Ct. at 2382 (cleaned

up). *See also Hale*, 2014 WL 6854416, at *2 ("A First Amendment privilege" "applies to discovery issues, and it protects "against the disclosure of the identity of members and the content of internal communications between members, employees, and agents of associations.") (cleaned up); *Dunnet Bay Const. Co. v. Hanning*, No. 10-cv-3051, 2011 WL 5417123, at *3 (C.D. Ill. Nov. 9, 2011) (same).

Here, CFPB's investigation, lawsuit, and its latest document requests have chilled Townstone's and Mr. Sturner's speech. As he explains in his declaration, Mr. Sturner has engaged in self-censorship since the CFPB began its investigation in 2017. For example, while talking on the Townstone Financial Show, Mr. Sturner has made great efforts to avoid discussions about crime in Chicago and his decision to move his family out of Chicago because he is concerned that CFPB will (mis-)interpret his statements to be a violation of ECOA and Regulation B. *See* Ex. A, Sturner Decl., ¶¶ 3–8. And Mr. Sturner has censored even his private messages concerning crime and other social issues. *Id*. ¶¶ 9–12. His friends and family have similarly watched what they say to him through text messages. *Id*. ¶ 13. This reaction is, of course, entirely sensible, given that no one wants to have their personal views dragged into a federal lawsuit or scrutinized by the government. *See McIntyre*, 514 U.S. at 341–42 ("The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible.").

These private discussions about current issues—crime, affirmative action, Black Lives Matter, social security, gay marriage, abortion, transgender issues, and more—fall within core protected speech. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (The First Amendment protects speech "fairly considered as relating to any matter of political, social, or other concern to the community . . . or when it is a subject of a legitimate news interest." (cleaned up)).

As noted in the previous section, CFPB's broad requests would implicate all these issues and many more. Even comments such as the popular "OK Boomer" (or any in-kind rejoinder to a young person) would be subject to CFPB's scrutiny, because they involve generalizations about "attitudes typically associated with baby boomers," a demographic group defined by age.[7] Similarly, discussions about affirmative action and Black Lives Matter involve generalizations about race; abortion and transgender issues involve generalizations about sex; and so on.

Speech about such issues is entitled to protection, not punishment. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (recognizing a "profound national commitment to the principle that debate on public issues should be uninhibited"). As courts have recognized, compelled disclosure of one's connection with controversial views can subject one to reprisals of all sorts, which will, in turn, often chill speech. *See, e.g.*, *Bonta*, 141 S.Ct. at 2388; *McIntyre*, 514 U.S. at 341–42. *Compare Wisconsin Family Action v. FEC*, 2022 WL 844436, at *8 (E.D. Wis. Mar. 22, 2022) (describing how the Internet enables "cancel culture" by allowing people to "aggressively target[] individuals or groups, whose views aggressors deem unacceptable, in an effort to destroy them personally and/or professionally," which "undermines and stifles First Amendment privileges."). Indeed, this principle goes back to the beginning of the republic. *See McIntyre*, 514 U.S. at 342 (discussing Federalist Papers).

Further, disclosure of personal texts would chill not only Mr. Sturner, but *anyone* engaged in private text conversations with him. "If the First Amendment means anything it means that a state has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch" because "the right to be let alone [is] the most comprehensive rights and the right most valued by civilized man." *Stanley v. Georgia*, 394 U.S. 557, 564–65 (1969). And it is

---

[7] *See* OK Boomer, WIKIPEDIA *available at*, https://en.wikipedia.org/wiki/OK_boomer.

"well settled . . . that the constitution protects the right to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). By peering into the private conversations of Mr. Sturner and anyone he associates with, the government violates this fundamental precept.

Here, the threats faced by Mr. Sturner (and his friends and family) fall well within the Supreme Court's decision in *Bonta*, which explained that unconstitutional "chills" occur when compelled disclosure would pose a "reasonable probability of threats, harassment, and reprisals," whether economic, personal, or otherwise. 141 S. Ct. at 2382, 2388, 2388 n.*; *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 207 (2010) (Alito, J., concurring) (noting that "a half century of our case law . . . firmly establishes that individuals have a right to privacy of belief and association").

Because disclosure of the sought text messages would chill core speech rights, CFPB must show a "compelling need" for the information. *Marrese*, 726 F.2d at 1159. The inquiry mirrors the *Bonta* "exacting scrutiny" standard: To obtain protected information, the government must show it is necessary for its case. *Nat. Resources Defense Council Inc. v. Ill. Power Resources, LLC*, 2015 WL 4910204 (C.D. Ill. Aug. 17, 2015) (holding that party seeking protected information must show information is "highly relevant" and the request must be "carefully tailor[ed]"); *Hale*, 2014 WL 6854416, at *2 ("The party seeking the document must then show that the information is essential to their case.").

Courts consider three factors in making this determination: (1) relevance, (2) the need for the information, and (3) the extent of the injury that disclosure may cause. *Hale*, 2014 WL 6854416, at *2. As explained above, Mr. Sturner's texts are not relevant *at all* to the underlying case, and CFPB has received mountains of information from Townstone, so it has no need for personal communications. CFPB's requests are extremely broad and burdensome, and the threat

14

to First Amendment rights is severe. Thus, CFPB can meet none of the factors that would overcome the First Amendment privilege, and the texts must be kept private.

## CONCLUSION

For the reasons stated above, CFPB's motion should be denied.

Dated: November 30, 2022

Respectfully submitted,

*/s/ Steven M. Simpson*
STEVEN M. SIMPSON
DC Bar No. 462553
JESSICA L. THOMPSON
DC Bar No. 1542170
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, VA, 22201
Tel: (916) 288-1398
SSimpson@pacificlegal.org
JLThompson@pacificlegal.org

OLIVER DUNFORD
FL Bar No. 1017991
Pacific Legal Foundation
4440 PGA Boulevard Suite 307
Palm Beach Gardens, FL 33410
Tel: (916) 503-9060
ODunford@pacificlegal.org

Sean P. Burke
Mattingly Burke Cohen & Biederman LLP
155 E. Market St., Suite 400
Indianapolis, IN 46204

Marx David Sterbcow
The Sterbcow Law Group LLC
824 Elmwood Park Boulevard, Suite 205
New Orleans, LA 70123

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 30, 2022, I electronically filed the

foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a

copy to be served upon counsel of record.

*/s/ Steven M. Simpson*
STEVEN M. SIMPSON