## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CONSUMER FINANCIAL )
PROTECTION BUREAU, )
         )    Case No. 20 C 4176
       Plaintiff, )
         )    District Judge: Franklin U. Valderrama
       v. )
         )    Magistrate Judge: Gabriel A. Fuentes
TOWNSTONE FINANCIAL, INC., et al., )
         )
       Defendants. )

## ORDER

The motion by Defendants Townstone Financial, Inc., and Barry Sturner ("Defendants") to stay discovery ("Motion to Stay"; D.E. 77) is before the magistrate judge on referral (D.E. 92). Discovery already has commenced with initial disclosures and an exchange of written discovery requests and responses. Defendants' Memorandum of Law in Support of the Motion to Stay ("Def. Mem." (D.E. 78)) at 2. Defendants argue that further discovery, including oral depositions and likely motion practice to resolve discovery disputes, should be put on hold while the district court decides Defendants' motion to dismiss the action under Federal Rule of Civil Procedure 12(b)(6). *Id.*; *see* Defendants' Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss"; D.E. 31). Since the filing of the Motion to Stay, Defendants and Plaintiff Consumer Financial Protection Bureau ("CFPB") have filed dueling, fully briefed motions to compel various discovery. (D.E. 87, 89.) The Court in this order addresses the Motion to Stay first, and then the dueling motions to compel.

## BACKGROUND

The CFPB, an enforcement agency of the federal government, brought this action against Defendants under federal law to remedy Defendants' alleged "unlawful discrimination, including redlining and acts or practices that would discourage prospective applicants, on the basis of race, from applying for credit in the Chicago [area]." Amended Complaint (D.E. 27) ⁋⁋ 1-5, citing the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5536(a)(1)(A), and the ECOA's implementing regulation, known as Regulation B, 12 C.F.R. §§ 1002.1-16 (2022). Townstone and its principal, Sturner, are alleged to have been in the mortgage lending and mortgage brokering business in the Chicago area and other parts of the Midwest. *Id.* ⁋⁋ 4, 9, 13. CFPB alleges that Townstone "has acted to meet the credit needs of majority-white neighborhoods in the Chicago [area] while avoiding the credit needs of majority- and high-African-American neighborhoods," by "engag[ing] in acts or practices directed at prospective applicants that, together and separately, would discourage prospective applicants, on the basis of race, from seeking or obtaining credit for properties within the Chicago [area]." *Id.* ⁋⁋ 14, 22. More specifically, the CFPB alleges that through radio programming and advertising, and through a weekly podcast available online, Defendants "have discussed mortgage-related issues on the show and have taken questions from prospective applicants. The hosts have regularly referred to their work at Townstone and promoted the benefits that prospective applicants might expect from applying for mortgage loans from Townstone." *Id.* ⁋ 26. Further, CFPB alleges that at various times on these forms of programming and marketing, Townstone has:

> regularly included statements that would discourage African-American prospective applicants from applying for mortgage loans, or making or pursuing an application, including from Townstone; would discourage prospective applicants living in majority- or high-African-American neighborhoods from applying for mortgage

2

loans, or making or pursuing an application, including from Townstone; and would discourage prospective applicants from applying for mortgage loans, or making or pursuing an application, for properties in majority- or high-African-American neighborhoods, including from Townstone.

*Id.* ¶ 32. The foregoing statements, CFPB alleges, include the following:

- Telling a caller from a majority African-American Chicago suburb, the town of Markham, that "it's crazy in Markham on weekends" and that "I know, I've been to Markham …. You drive very fast through Markham … and you don't look at anybody or lock on anybody's eyes in Markham …. You look at your dashboard, you don't lock on anybody"; and also disparaging the caller's wife by saying the caller should "keep those women in line over there in Markham" and "tell her to get a better job." *Id.* ¶ 33.

- Stating that "it's a great time to sell" a home, and that ways to ready a home for sale included "tak[ing] down the Confederate flag." *Id.* ¶ 34.

- Calling Friday through Monday on the Chicago's South Side, a majority African-American part of the city, "hoodlum weekend," and stating that the police "are the only ones between that turning into a real war zone and keeping it kind of where it's at." *Id.* ¶ 35.[1] In a similar vein, a host on one of these Townstone programs is alleged to have compared the "rush" from a skydive to the "rush" a person might experience from "walking through the South Side at 3 a.m." *Id.* ¶ 37.

- Referring to the former iteration of a Jewel-Osco supermarket (since refurbished) at Clark and Division Streets in Chicago as a "packed" and "scary" place known as "the Jungle Jewel" because "people from all over the world" went there. *Id.* ¶ 36.[2]

---

[1] "Hoodlum" is a pejorative term believed to have originated in the 1870s in San Francisco, when it was used to describe gangs of young men who were reported to have preyed upon Chinese immigrants. Lakshmi Gandhi, "Where Do 'Hoodlums' Come From? San Francisco," National Public Radio (Nov. 6, 2013 (https://www.npr.org/sections/codeswitch/2013/11/06/243262138/where-do-hoodlums-come-from-san-francisco). The term now is a synonym for "thug." Definition of "Hoodlum," Vocabulary.com (https://www.vocabulary.com/dictionary/hoodlum#:~:text=A%20hoodlum%20can%20also%20be,gangster%2C%20thug%2C%20or%20toughie) (last visited Dec. 10, 2022). The term "thug" is considered by some to be a modern-day code word for a racist slur directed at Africa Americans. Jamelle Bouie, "Richard Sherman Is Right: 'Thug' Is the New N-Word," *The Daily Beast* (Apr. 14, 2017) (https://www.thedailybeast.com/richard-sherman-is-right-thug-is-the-new-n-world).

[2] Chicago has a long and ingrained history of racism and the use of racist references to describe particular neighborhoods and places in the city. The Court takes judicial notice that many in Chicago considered the term "Jungle Jewel" a historically racist reference to the fact that many customers of the Jewel store at Clark and Division were African-American residents of the public housing project known as Cabrini Green, located about a half-mile west of the store. Wreckers demolished the last of the Cabrini Green high-rise buildings in 2011.

CFPB alleged that the foregoing statements, insofar as they disparaged African-American neighborhoods or persons, characterized those "areas and people in a manner that would discourage those who identify or associate with those areas of people from applying for credit," insofar as prospective applicants reasonably may consider statements made by persons "marketing themselves as real-estate experts" when house-hunting or seeking credit to buy residential property. *Id.* ¶¶ 38-39. In addition, CFPB has alleged that Townstone did not direct its marketing at the African-American community and that statistically, Townstone drew few African-American mortgage applicants and fewer applications from African-American applicants compared to "peer" lenders. *Id.* ¶¶ 40, 42-46, 49. CFPB alleged that Townstone employed no African-American loan officers during the relevant period. *Id.* ¶ 51. CFPB pointed to the totality of "Townstone's hiring practices, consumer outreach, consumer interactions, and other business acts or practices" as "exclud[ing] or treat[ing] differently African-American prospective applicants for credit, as well as prospective applicants for credit in African-American census tracts." *Id.* ¶ 52.

Defendants' Rule 12(b)(6) motion to dismiss asserts that the Amended Complaint does not state a claim against them under the ECOA because the statute addresses discrimination against mortgage applicants, and not persons alleged to have been discouraged from applying for mortgages. Memorandum of Law in Support of Defendants' Combined Motion to Dismiss ("Dismissal Mem."; D.E. 32) at 4-10. Defendants also argue that the statements made on the radio and podcast programming are protected speech under the First Amendment. *Id.* at 12-20. Further, Defendants argue that the district court should extend the U.S. Supreme Court's recent holding in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), to hold that CFPB's claims represent an unlawful

expansion of the agency's authority per the "major questions" doctrine developed in *West Virginia*. Defendants' Memorandum of Supplemental Authority (D.E. 67).

Several discovery-related motions are pending. In seeking to stay discovery, Defendants argue that the Motion to Dismiss is dispositive of CFPB's claims in the case, so that a stay would preserve the Court's and the parties' resources and would avoid what Defendants say is a disproportionate level of prejudice upon them if discovery proceeds during the pendency of the Motion to Dismiss. Motion to Stay at 1-2. Meanwhile, CFPB moves to compel Sturner to comply with the following document three document requests:

1. All Documents, including all emails, chats, and text messages, referencing any ethnic, gender, religious, racial, or group-based slur or making any generalization, differentiation, or stereotyping, or referring to any generalization, differentiation, or stereotyping, based on race, color, religion, national origin, sex, marital status, or age.

2. All Documents referring to Mexicans or Canadians.

3. All Communications, including emails, chats, social-media posts, and text messages, referring to characteristics of any geographic areas or neighborhoods.

Plaintiff's Motion to Compel (D.E. 87) at 3-4. Defendants claims the requests seeking Sturner's personal communications are not relevant to claims and defenses in the case, are disproportionate to the needs of the case, and impermissibly burden his First Amendment speech and associational rights. Defendants' Response to Plaintiff's Motion to Compel ("Def. MTC Resp."; D.E. 100). Defendants have moved to compel CFPB to comply with (1) five document requests (Nos. 34-38) seeking "[a]ll documents you allege establish, or that otherwise relate to, your allegations regarding the content, meaning and effect" of the statements CFPB quotes and relies on in Paragraphs 33-37 of the Amended Complaint, i.e.,

the statements alleged to have discouraged prospective applicants from applying for credit;

and (2) the following two document requests:

> 41.   All documents concerning the political leaning, political viewpoints, or social commentary of Townstone and/or Townstone's staff.

> 42.   All documents concerning the political leaning or viewpoints of the AM radio stations in the Chicago MSA [area].

The parties disagree as to the relevancy and proportionality of the foregoing document requests, but their arguments are focused on Request Nos. 41 and 42. *See* Plaintiff's Motion to Compel; Defendant's Memorandum of Law in Support of Their Motion to Compel ("Def. MTC Mem."; D.E. 90). In addition, the parties have filed a joint motion to extend the discovery schedule. (D.E. 97).

## DISCUSSION

The Court considers each of the motions by exercising the broad discretion afforded it in the management of discovery issues in civil litigation, with a view toward promoting the just, speedy, and inexpensive determination of the action. *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013); Fed. R. Civ. P. 1. The scope of federal civil discovery includes information that is relevant to any claim or defense in the case, and that is proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). The Court will address the motions in turn, beginning with the Motion to Stay.

### I.    Motion to Stay Discovery

As movants on the Motion to Stay, Defendants have the burden to show that good cause exists for a stay. *Harper v. Cent. Wire*, Inc., No. 19 C 50287, 2020 WL 5230746, at *1 (N.D. Ill. Sept. 2, 2020). In determining whether good cause exists to stay discovery during the pendency of a motion to dismiss, courts consider the following factors: (1) whether a stay will prejudice the

non-moving party; (2) whether a stay will simplify the issues in the case; and (3) whether a stay will reduce the burden of litigation for the parties or the court. *Id.; Liggins v. Reicks,* No. 19 C 50303, 2021 WL 2853359, at *1 (N.D. Ill. July 8, 2021).

The mere filing of a motion to dismiss does not automatically stay discovery. *SK Hand Tool Corp. v. Dresser Indus.,* 852 F.2d 936, 945 (7th Cir. 1988). Nor does filing a motion to stay mean that a court will automatically grant it. *DSM Desotech Inc. v. 3D sys. Corp.*, No. 08 C 1531, 2008 WL 4812440, at *2 (N.D. Ill. Oct. 28, 2008). In most cases, the existence of a dispositive motion is not the sole reason for granting the stay. *Syngenta Seeds, Inc. v. BTA Branded, Inc.,* No. 05 C 6673, 2007 WL 3256848, at *1 (N.D. Ill. Nov. 1, 2007). Instead, a stay of discovery is generally appropriate only when a party raises a potentially dispositive threshold issue such as a challenge to a plaintiff's standing, *see U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.,* 487 U.S. 72, 79-80 (1988), or pending resolution of qualified immunity claims, *see Landstrom v. Illinois Dep't of Children & Family Servs.,* 892 F.2d 670, 674 (7th Cir. 1990) and *Liggins,* 2021 WL 2853359, at *2-3. Accordingly, courts have denied discovery stays where the movant's primary argument is that the motion to dismiss has a high likelihood of success, because if that somewhat speculative rationale were enough, discovery arguably ought to be stayed every time a defendant files a dismissal motion it considers meritorious. *New England Carpenters Health and Welfare Fund v. Abbott Labs.*, No. 12 C 1662, 2013 WL 690613, at *2-3 (N.D. Ill. Feb. 20, 2013).

In *New England Carpenters*, Judge Rowland, who was then a magistrate judge considering a party's motion to stay discovery that Judge Rowland was supervising on referral, suggested that the sufficiency of a complaint's allegations could sometimes, but relatively rarely, be akin to a threshold standing or qualified immunity issue, so as to justify a discovery stay. *Id.* at *3. Judge

Rowland noted that the Supreme Court's seminal Rule 12(b)(6) cases, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), "do not mandate that a motion to stay should be granted *every time* a motion to dismiss is filed." *New England Carpenters*, 2013 WL 690613, at *3 (emphasis added). Judge Rowland also recognized that circumstances warranting a stay during the pendency of a motion to dismiss have included, for example, antitrust cases in which the breadth of the discovery in question was considered "'especially burdensome and costly,' and 'extensive, voluminous, and expensive to produce.'" *Id.*, quoting *DSM Desotech*, 2008 WL 4812440, at *2-3. In *New England Carpenters*, Judge Rowland denied the requested stay pending the movant's Rule 12(b)(6) motion attacking the sufficiency of a complaint's allegations under RICO and the Robinson-Patman Act in the absence of a clear showing as to the burden or cost of the discovery sought. *Id.* Judge Rowland relied in part on *Gray v. First Winthrop Corp.*, 133 F.R.D. 39 (N.D. Cal. 1990):

> "Had the Federal Rules contemplated that a motion to dismiss under Fed. R. Civ. P. 12(b)(6) would stay discovery, the Rules would contain a provision to that effect. In fact, such a notion is directly at odds with the need for expeditious resolution of litigation .... Since motions to dismiss are a frequent part of federal practice, this provision only makes sense if discovery is not to be stayed pending resolution of such motions."

*New England Carpenters*, 2013 WL 690613, at *2, quoting *Gray*, 133 F.R.D. at 40. Even the decisions granting stay motions amid threshold questions (such as qualified immunity) presented on Rule 12(b)(6) motions to dismiss have noted that "delaying discovery could delay the ultimate resolution of this case should Defendants' motion to dismiss be denied." *Liggins*, 2021 WL 2853359, at *2-3. Per the foregoing decisions, motions to stay pending a motion to dismiss will commonly turn on the nature of the issue presented in the motion to dismiss, the nature of the discovery sought to be stayed, and the policy considerations presented by the Court's obligation

8

to construe, administer, and employ the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

The Court has considered each of the factors of prejudice to the non-moving party (i.e., the claim by Defendants that they bear the lion's share of prejudice or burden if discovery proceeds), the degree to which a stay would simplify the issues, and the issue of the litigation's burden on the parties and the Court. For the following reasons, the Court is denying the Motion to Stay in consideration of these factors:

*First*, discovery is hardly in its infancy, and neither is this action. The parties have exchanged Rule 26(a)(1) disclosures and written discovery requests. The Court's ruling today on the two motions to compel will allow for the completion of written discovery and the beginning of oral depositions. The case is already almost two-and-a-half years old, having been filed in July 2020. Defendants filed their motion to dismiss the Amended Complaint in February 2021, before the parties entered into unsuccessful settlement negotiations that forestalled the district court's consideration of the motion to dismiss into 2022. (D.E. 40, 42, 43.) In January 2022, the parties appeared to have settled the case and so advised the Court (D.E. 46), only to report in March 2022 that the settlement had collapsed. (D.E. 52.) Defendants promptly secured new counsel, and by April 26, 2022, new counsel was in place, and this Court set a discovery schedule with the parties' input. 4/26/22 Order (D.E. 64). But the schedule was notably shorter than what the parties had proposed, because, this Court said:

> This is a 2020 case in which both sides have had ample time to consider the subject matter and witness candidates with respect to expert testimony; considerable time was spent on settlement, and that is commendable, but now that settlement is not in the offing, the parties have opted for the litigation train, and it is moving, and it will pick up speed.

9

*Id.* Additional months passed, in which Defendants offered to the district court their argument based on the Supreme Court's *West Virginia* case, and the Motion to Stay did not hit the docket until September 16, 2022, more than a year and half after the filing of the motion to dismiss. (D.E. 65, 77). The Court does not "fault" Defendants or anyone for the long pendency of the motion to dismiss, or for the time taken by the settlement negotiations, but the reality now is that the entire case is back on the litigation track, so that the district court's determination of the motion to dismiss is now reasonably nigh. The district court even heard oral argument on the motion to dismiss on August 10, 2022. (D.E. 74.) As the Court has said before, discovery in this case needs to begin and needs to move. If the district court ultimately grants the motion to dismiss relatively soon, the resources spent on discovery will not be overwhelming. If Defendants had moved to stay sooner, they might have had a better argument on the prejudice factor, but the Court today deals with the reality of what has happened in the case.

*Second*, the Court looks not only at the nature of the discovery in the case but the nature of the motion to dismiss, which is more garden-variety than threshold. To a certain degree, all motions to dismiss present "threshold" issues that could stop a case in its tracks. But cases like *New England Carpenters* suggest that a court's evaluation of the motion to dismiss, as a basis for a motion to stay, are to some degree qualitative. Here, the undersigned magistrate judge naturally leaves resolution of the motion to dismiss fully in the hands of the district court. The district court could well find that ECOA and its Regulation B applies to prospective applicants and/or that CFPB's administrative authority properly extends to allow it to seek the relief it demands in this action. The district court could well find that the radio and podcast comments alleged by CFPB would have served to discourage minority applicants from asking Townstone for a mortgage, insofar as the comments, if taken as having been made, might be construed to send a hostile

10

message to certain ethnic groups, and particularly African Americans. Or, the district court might make none of those findings. For our purposes today, the motion to dismiss facially does not present the kind of threshold issue that ordinarily would support a stay of discovery a this phase of the case.

   *Third*, as for simplification of the issues, Defendants' argument for a stay is stronger because a district court ruling pulling back the extent of allegations that may be at issue during discovery would obviously conserve resources by simplifying the case. This argument, though, is subsumed within Defendants' prejudice argument, and a ruling favorable to Defendants on the motion to dismiss at this point would relieve the parties of the costs and burdens of only the discovery they conduct between now and the ruling, and the Court is exercising its discretion not to stay the case on that basis.

## II.   The Dueling Motions to Compel

### A.  CFPB's Motion to Compel

   Sturner's objection to CFPB's Document Request Nos. 1-3 is that responding to them would require him to search his personal cellular devices and computers for text or email communication that touch broadly upon his social views or leanings toward ethnic groups or particular geographical areas and then to disclose communications he calls "personal" and not "business," all in a manner that unduly invades his personal privacy interests and even burdens his First Amendment rights of speech and association. Def. MTC Resp. at 9-11, citing *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021). CFPB responds that the requests are directed at relevant information concerning Townstone's "general business practices" and "intent," that those issues bring the requests within Rule 26(b)(1)'s broad relevancy scope, and that they are not disproportional to the needs of the case. Reply in Support of Plaintiff's Motion to Compel

11

(D.E. 101) at 2-4. CFPB also claims that the information is relevant and discoverable because statements Sturner made in an under-oath investigative hearing in this case show that he "relied on his personal network as a source of potential loan applicants as well as a source of potential employees." Plaintiff's Motion to Compel at 6.

The Court does not doubt that Sturner's personal beliefs about ethnic groups or geographical neighborhoods may well be relevant to CFPB's claims that he and Townstone acted in an unlawfully discriminatory manner in their marketing, and the Court agrees that Sturner's characterization of his communications as "personal" does not win the day. The question for the Court is how relevant that information might be, and what burdens its compelled discovery places on the privacy of Sturner and the family members, friends, or other associates with whom he had private communications during the relevant period. The expansion of electronic platforms for human communication in the past 30 years has had a dramatic effect on how individuals and courts view privacy when it comes to individuals' electronic devices. As the U.S. Supreme Court stated in 2014, "[m]odern cell phones are not just another technical convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'" *Riley v. California*, 573 U.S. 373, 403 (2014), quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886). *Riley* and *Boyd* were criminal cases about the limits of state power to seize personal documents under the Fourth Amendment, but the passage from *Boyd* referenced by *Riley* drew upon a more general notion of privacy, as in "all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life." *Boyd*, 116 U.S. at 630. The Court added:

> It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense, but it is the invasion of the indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited ….

12

*Id.* The Court is not deciding this discovery dispute under the Fourth or the Fifth Amendments, or, for that matter, the First Amendment. And the Court makes no ruling on whether being compelled to produce documents in federal civil discovery satisfies the state action component of federal constitutional law. Rather, the Court simply takes note of the fact that, according to the U.S. Supreme Court dating back to 1886, the Founders understood that citizens and subjects of the United States had basic privacy rights or commonly understood notions of "indefeasible" rights of personal security and liberty that were never forfeited. *See also* U.S. Const., amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage *others retained by the people*.") (emphasis added). And in 2014, in *Riley*, the Supreme Court acknowledged that those notions remained very much alive and placed into greater relief by the advent of technology that can store the virtual whole of a person's private life in the palm of a hand. In the field of federal civil discovery, courts have proceeded cautiously before ordering the "extraordinary" remedy of a forensic examination of a litigant's electronic devices, as a nod to "undue intrusiveness and "the non-moving privacy interests." *Belcastro v. United Air Lines*, No. 17 C 1682, 2019 WL 7049914, at *2 (Dec. 23, 2019).

With those principles in mind, the Court moves directly to the proportionality component of Rule 26(b)(1). The Court is not persuaded that Sturner must turn over all communications with his friends, family and associates touching upon his racial, religious, gender-based, or age-based biases, if he had any. Or that he must turn over all of his communications about Mexicans or Canadians, or about particular neighborhoods. CFPB's construction of Document Request Nos. 1-3 is that they "relat[e] directly to the Bureau's allegations," Plaintiff's Motion to Compel at 6, but the Court disagrees. The relation is indirect. Whatever personal biases Sturner may have harbored – and the Court is not saying he did – might be relevant to his or Townstone's intent

13

toward prospective applicants and might make more probable than not CFPB's allegations that Defendants acted in a discriminatory way, but the communications sought to be discovered are not public or external communications. CFPB's allegations are that Townstone discriminated by taking to the airwaves through its informercials and making statements that persons including African Americans might find so revolting that such persons were discouraged from applying for credit from Townstone. Sturner's private communications to friends, family members and associates, and not made publicly or to prospective applicants, might bear only indirectly and tangentially on how Townstone treated prospective applicants. The relationship between CFPB's allegations and "bias or motivation" in Sturner's personal communications is similarly tenuous, as is the relevance of rebutting Sturner's claims that he was merely repeating statements made by others or identifying additional witnesses in the matter. The Court does not see the foregoing theories of discovery relevancy as central enough to the case to warrant the privacy invasion that would result from compelled production of every Sturner email, text, or "chat" communication that discusses the biases or proclivities set forth in Document Request Nos. 1-3. Accordingly, those requests' demand for all such communications is disproportionate to the needs of the case and will be disallowed.

The one theory of relevancy that the Court finds more central to the case is CFPB's claim that Sturner made such communications relevant because he admitted using his personal network to develop loan applicant leads or to recruit employees. *Id.* Compelled production of those emails is not disproportionate to the needs of the case because it will be far more limited, and far more tailored to the CFPB theories of relevancy that are far more central and less tangential to proof of its allegations. Without the same disproportionate impact on privacy interests, Sturner certainly may be ordered to produce documents responsive to Request Nos. 1-3 to the extent they concern

14

the identification of, or communication with, prospective loan applicants and/or prospective employees. Plaintiff's Motion to Compel is granted in part and denied in part, with Sturner required to produce "business documents responsive to the requests," as Sturner already has agreed to do, Def. MTC Resp. at 1, *and* his responsive (to Request Nos. 1, 2, and 3) communications to anyone, during the relevant period, concerning the identification of, or communication with, prospective loan applicants and/or prospective employees. Having decided this discovery dispute purely on Rule 26(b)(1) grounds, the Court does not reach Sturner's arguments based on the First Amendment or the extension of *Bonta* to the federal civil discovery context.

### B. Defendant's Motion to Compel

Defendants' Request Nos. 41 and 42, seeking documents disclosing CFPB staff's political opinions or viewpoints, and relating to the staff's assessments of or comments upon the political leanings of various Chicago AM radio stations, is simply irrelevant to the claims and defenses in the case. Perhaps Defendants want to argue that CFPB itself harbors some kind of content-based or other bias against Sturner or Townstone, and if so, that argument might have some marginal relevancy, but the Court sees such a theory of discovery relevancy as extremely remote. More likely, Defendants want to turn the tables on CFPB and make the case about agency biases. Request Nos. 41 and 42 do not implicate the same privacy interests as the CFPB requests, but they are a frolic and detour, and they will be disallowed, before we even reach a proportionality analysis. The Court agrees with CFPB that Defendants do not state an adequate theory of discovery relevancy through their suggestion that "the Bureau filed this lawsuit because it disagreed with the content of Defendant Sturner's speech or his general political view…." Plaintiff's Opposition to Defendants' Motion to Compel ("Pl. MTC Opp."; D.E. 99) at 1. The Court respectfully declines Defendants' invitation to politicize this lawsuit and would prefer to

stick to the facts. The power of facts always is more useful than the power of hyperbole. *See Sanchez v. City and Cnty. of Honolulu*, No. 19-cv-00072-DKW-WRP, 2019 WL 5929735, at *6 (D. Haw. Nov. 12, 2019). The Court agrees with CFPB that denying Defendants' their proposed foray into the politics of CFPB staff members will not deny Defendants their opportunity to stick to the facts, namely those concerning whether the statements Sturner or Defendants directed at prospective applicants violated the ECOA. *See* Pl. MTC Opp. at 6.

Defendants' Request Nos. 34-38 are a different story. These requests seek disclosure of documents relating to CFPB's allegations about the statements allegedly made by Sturner (or other Townstone infomercial hosts) in a manner that discouraged prospective applicants. CFPB's opposition to Defendants' Motion to Compel is focused mostly on Request Nos. 41 and 42, and the dispute concerning Request Nos. 34-38 seems to center on whether they call for disclosure of internal CFPB communications about staff interpretations or opinions concerning how the Sturner external communications cited in the Amended Complaint may have operated to discourage prospective applicants. Pl. MTC Opp. at 1, 5. The Court does not see Request Nos. 34-38 as necessarily calling for disclosure of such potentially privileged communications. Without reaching the question of privilege, the Court simply holds that the internal staff interpretations of governing statutes like ECOA or regulations like Regulation B are not relevant to whether Defendants discriminated against prospective applicants in violation of those regulations. The parties are well able to leave the statutory and regulatory interpretations to the district court, or ultimately to the fact finder, when it comes to whether referring to South Side residents as "hoodlums," to Markham as a no-go zone, or to the old Jewel at Clark and Division as "the Jungle Jewel" operated to discourage prospective applicants or constituted a general business practice that did so. Discovery as to CFPB's beliefs about that interpretation, or of staff members' off-the-cuff

16

ruminations about it, are not necessary, and in fact, in the pleadings, CFPB has made clear its interpretation. On the other hand, to the extent Request Nos. 34 through 38 are construed to seek documents relevant to CFPB's proof of its discouragement claims, that sort of discovery request is common in federal civil litigation and will not be denied.

Accordingly, Defendants' Motion to Compel is denied in full as to Request Nos. 41 and 42. As to Request Nos. 34-38, Defendants' motion is granted only insofar as CFPB is to produce documents that tend to establish, factually, its claims that Sturner's statements discouraged prospective applicants. Responsive documents could include witness statements from prospective applicants or other witnesses who heard the statements. Responsive documents could include statistical analyses. This relevancy also includes any non-privileged documents that CFPB possesses and that tend to disprove CFPB's allegations of discouragement. But the documents to be produced are not to include internal CFPB ruminations about what the applicable statutes and regulations do or do not cover.

### III. Motion to Extend the Discovery Schedule

The Court agrees with the joint motion's assertion that good cause exists to extend the schedule, in view of the pending discovery-related motions decided today by the Court. Accordingly, the Court grants the motion to extend, by agreement and as follows: (1) the fact discovery cutoff is moved from December 23, 2022 to February 28, 2023; (2) Rule 26(a)(2) expert reports are due to be served by CFPB no later than 5 p.m. on March 24, 2023, and by Defendants no later than 5 p.m. on April 28, 2023; and (3) expert depositions are to be completed by May 26, 2023 for CFPB's experts and by June 30, 2023 for Defendants' experts, with all discovery thus closed on June 30, 2023. The "good cause" requirement for any extension would be the same for any future extension request, except that "good cause" is interpreted within the context of the

progress and needs of the case.  The parties should consider the current schedule to be firm.  A further joint written status report on the anticipated closure of fact discovery is due by noon on February 23, 2023.

## CONCLUSION

For the foregoing reasons, the Motion to Stay (D.E. 77) is denied, the motions to compel discovery by CFPB (D.E. 87) and by Defendants (D.E. 89) are each partially denied and partially granted as set forth in this order.  The joint motion to extend the discovery schedule (D.E. 97) is granted as stated in this order.


**SO ORDERED.**

ENTER:


**GABRIEL A. FUENTES**
**United States Magistrate Judge**


**DATED: December 12, 2022**