# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION, <br><br> Plaintiff, <br><br> v. <br><br> TOWNSTONE FINANCIAL, INC. and BARRY STURNER, <br><br> Defendants. | No. 20-cv-4176 <br> Judge Franklin U. Valderrama |

### MEMORANDUM OPINION AND ORDER

The Equal Credit Opportunity Act (ECOA) makes it "unlawful for any creditor to discriminate against any applicant with, respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age . . . ." 15 U.S.C. § 1691(a). The ECOA's implementing regulation, Regulation B, extends the ECOA's prohibition to "prospective applicants." 12 C.F.R. § 1002.4(b). The Bureau of Consumer Financial Protection (CFPB) filed this lawsuit against Townstone Financial, Inc. (Townstone), a mortgage broker/lender and its owner Barry Sturner (Sturner) (collectively, Defendants) for allegedly discouraging prospective African-American applicants in the Chicago metropolitan area from applying for mortgages. R. 27, First Amended Complaint (FAC).[1] Defendants have moved to dismiss the FAC with prejudice. R. 31, Mot. Dismiss. For the following reasons, Defendants' motion to dismiss is granted.

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

## Background

### I.      The Parties

The CFPB is an independent agency of the United States created by the Consumer Financial Protection Act of 2010 (CFPA), with authority to enforce the CFPA and ECOA. FAC ¶ 8.[2] Townstone is a mortgage broker/lender headquartered in Chicago, which operates in Illinois, Indiana, Michigan, Wisconsin, and Florida. *Id.* ¶ 9. Most of Townstone's mortgage lending and brokering takes place in the Chicago-Naperville-Elgin Metropolitan Statistical Area (Chicago MSA). *Id.* ¶¶ 4, 9. Sturner is Townstone's co-founder, sole owner, sole director, President, and Chief Executive Officer. *Id.* ¶ 13. Sturner is also a loan officer. *Id.*

### II.      The Townstone Financial Show

Starting as early as 2014, Townstone has marketed its services through its own radio show and podcast called "The Townstone Financial Show." FAC ¶ 24. The Townstone Financial Show was conducted weekly on AM radio and reached the entire Chicago MSA. *Id.* ¶ 29. A weekly podcast of the radio show is also made available online, and the show has been streamed on Facebook Live and advertised on Facebook, Twitter, and LinkedIn. *Id.* The Townstone Financial Show is a long-form commercial advertisement, in which the hosts discuss mortgage-related issues on the show and take questions from prospective applicants. *Id.* ¶ 26. Since about January 2015, the Townstone Financial Show has been co-hosted by Sturner and another

---

[2] The Court accepts as true all of the well-pled facts in the FAC and draws all reasonable inferences in favor of the CFPB. *Smith v. City of Chicago*, 3 F.4th 332, 334 n.1 (7th Cir. 2021) (internal citation omitted).

senior loan officer. *Id.* ¶ 27. Townstone's website and the Townstone Financial Show characterize the hosts of the Townstone Financial Show as "Chicago real-estate experts." *Id.* ¶ 28.

The Townstone Financial Show has allegedly included statements that would discourage African-American prospective applicants from applying for mortgage loans from Townstone. FAC ¶ 32. For instance, during a January 2014 broadcast of the Townstone Financial Show, a caller from Markham, Illinois, a city with an 80.3% African-American population, asked how he and his wife could improve their credit scores. *Id.* ¶ 33. The Townstone host responded that "[you've] got to keep those women in line over there in Markham." *Id.* The host went on to state that the caller should "stop spending freaking money [on his wife] and tell her to get a better job." *Id.* While discussing the couple's credit concerns, the host turned his comments toward Markham generally, claiming that "it's crazy in Markham on weekends" and stating, "I know, I've been to Markham." *Id.* "You drive very fast through Markham," he continued, "and you don't look at anybody or lock on anybody's eyes in Markham . . . . You look at your dashboard, you don't lock on anybody." *Id.*

In the same month, Townstone's then-president informed listeners on the Townstone Financial Show that it was a great time to buy, rent, and sell. FAC ¶ 34. The show's hosts, including a local realtor and a bankruptcy attorney, recommended that the listeners who were preparing a home for sale should take down their Confederate flags. *Id.*

In a June 2016 episode of the Townstone Financial Show, Sturner volunteered his view of the South Side of Chicago, an area that is majority-African American. FAC ¶ 35. Sturner stated that the South Side of Chicago is "hoodlum weekend" between Friday and Monday, and that the police are "the only ones between that [area] turning into a real war zone and keeping it where it's kind of at." *Id.*

In January 2017, on the Townstone Financial Show, Sturner and the other hosts discussed a now-replaced grocery store in downtown Chicago that was part of the Jewel-Osco grocery-store chain. FAC ¶ 36. Sturner described "[having] to go to the Jewel on Division," which he referred to as "Jungle Jewel." *Id.* Sturner called the "Jungle Jewel" a "scary place," attributing his fear and the store's nickname to the "Jungle Jewel's" patrons who "packed" the store and "were people from all over the world." *Id.*

In a November 2017 episode, Townstone's senior loan officer discussed a recent skydiving experience and the ensuing "rush" from the jump. FAC ¶ 37. Another Townstone host responded that he thought skydiving was crazy, and suggested that someone who walked "through the South Side at 3AM." could get the "same rush." *Id.*

Despite African Americans making up 30% of the population of the City of Chicago, Townstone has not targeted any marketing toward African Americans in the Chicago MSA. FAC ¶ 40.

### III. Applications from African-American Neighborhoods

Based on Home Mortgage Disclosure Act data from 2014 through 2017, Townstone received an average of 740 mortgage-loan applications each year. FAC

4

¶ 42. Townstone brokered an average of 60 total Federal Housing Administration and Veterans Administration home loans each year. *Id.*

Townstone has drawn few mortgage applications from African-American applicants throughout the Chicago MSA. FAC ¶ 43. From 2014 to 2017, for example, Townstone drew around 2,700 applicants, only 37 (1.4%) of which came from African Americans in the Chicago MSA. *Id.* During the same period, Townstone drew an average of five or six applications each year (0.8%, 0.8%, 0.7%, and 0.9% of all Townstone applications) for properties in high-African-American neighborhoods, even though such neighborhoods made up 13.8% of the Chicago MSA's census tracts. *Id.* ¶ 44. Of Townstone's five or six applications each year for properties in high-African-American neighborhoods (more than 80% African American), more than half each year were from non-Hispanic white applicants. *Id.*

Similarly, only 2.3%, 1.4%, 1.4%, and 2.2% of Townstone's applications for the years 2014 through 2017, respectively, came from applicants applying for mortgage loans for properties in majority-African-American areas, even though 18.7% of the Chicago MSA's census tracts were majority-African American. FAC ¶ 45. While Townstone drew 2.3%, 1.4%, 1.4%, and 1.3% of its applications for properties in majority-African-American neighborhoods from 2014 through 2017, respectively, Townstone's peers drew many times more—8.2%, 7.6%, 7.7%, and 8.1%. *Id.* ¶ 49.

## IV. Procedural History

The CFPB filed suit against Defendants on July 15, 2020, R. 1, and amended its complaint on November 25, 2020, FAC. The three-count complaint alleges that:

(1) Townstone violated the ECOA, 15 U.S.C. § 1691(a), and its implementing regulation, Regulation B, 12 C.F.R. § 1002.4(b) (Count I); (2) Townstone violated the CFPA, 12 U.S.C. § 5536(a)(1)(A) (Count II); and (3) Sturner fraudulently transferred assets in violation of 28 U.S.C. §§ 3301–3308. FAC ¶¶ 53–78. Defendants have moved to dismiss the FAC. Mot. Dismiss. Defendants subsequently filed a motion for leave to file a notice of supplemental authority regarding *W. Virginia v. Env't Prot. Agency*, 213 L. Ed. 2d 896, 142 S. Ct. 2587 (2022). R. 65; R. 67. The CFPB responded to Defendants' notice of supplemental authority. R. 71.[3] The Court subsequently held an in-person hearing on Defendants' motion to dismiss the FAC. R. 74.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

---

[3]In *West Virginia*, the Supreme Court held that the Environmental Protection Agency (EPA) did not have authority to adopt the regulation at issue because it raised a "major question" of "economic and political significance" as to which Congress had not clearly delegated authority to the EPA. 142 S. Ct. at 2613. The Court has considered Defendants' arguments as to the applicability of *West Virginia* to this case, R. 67, and the CFPB's response, R. 71, and agrees with the CFPB that the major-questions doctrine is unimportant to the issue presented here.

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## Analysis

### I.     The ECOA and Regulation B (Count I)

The CFPB alleges that Townstone's acts and practices would discourage African-American prospective applicants, as well as prospective applicants in majority- and high-African-American neighborhoods in the Chicago MSA from seeking credit, in violation of Regulation B and the ECOA. FAC ¶¶ 54–55.

The ECOA provides, in relevant part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . . ." 15 U.S.C. § 1691(a). The ECOA was a landmark civil rights law enacted in 1974 to protect individuals and businesses against discrimination in accessing and using credit, "a virtual necessity of life" for most Americans. S. Rep. No. 94-589, at 3–4 (1976); *see also Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 975 (7th Cir. 2004) (the ECOA enacted to prohibit discrimination in credit transactions).

7

In Section 1691b of the ECOA, Congress directed, first the Federal Reserve Board, and then the CFPB,[4] to make regulations to carry out the purposes of the ECOA:

> The Bureau shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain but are not limited to such classifications, differentiation, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith.

15 U.S.C. § 1691b(a).

The resulting regulations enacted in 1975, known collectively as Regulation B, provide in pertinent part:

> Discouragement. A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

12 C.F.R. § 1002.4(b).

Defendants move to dismiss Count I based on Regulation B and the ECOA, arguing that the CFPB improperly attempts to expand the ECOA's reach beyond the express and unambiguous language of the statute. R. 32, Memo. Dismiss at 5 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984)). Specifically, Defendants argue that while the ECOA regulates behavior towards applicants for credit, it does not regulate any behavior relating to prospective

---

[4]In 2010, Congress transferred the Federal Reserve Board's rulemaking authority to the CFPB. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2083–84 (2010); *see Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1208 n.9 (11th Cir. 2019).

applicants who have not yet applied for credit. Memo Dismiss at 4. The CFPB responds that Regulation B's longstanding discouragement prohibition is authorized by and necessary to the ECOA, and that courts have consistently recognized Regulation B's discouragement prohibition, even when applied to prospective applicants. R. 35, Resp. at 8–10 (citing *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698 (5th Cir. 2017); *Dhade v. Huntington Learning Centers, Inc.*, 414 F. Supp. 3d 703 (D. Del. 2019); *Page v. Midland Fed. Sav. & Loan Ass'n*, 2013 WL 5211747, at *5 (N.D. Ill. Sept. 13, 2013)).

The parties' arguments present the question of whether the agency's interpretation of the ECOA in Regulation B is one that the ECOA permits. The Court approaches that inquiry, as it must, "through the two-step framework set forth in *Chevron*[.]" *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (citing *Chevron*, 467 U.S. 837). The first step of *Chevron* is to determine "whether Congress has directly spoken to the precise question at issue." *Id.* (internal quotation marks omitted). If Congress has spoken to the precise question at issue "unambiguously," then "that is the end of it: the agency and courts alike are bound by what Congress wrote." *Id.* However, if Congress has "not spoken clearly," the court moves on to step two, in which the court "consider[s] whether the agency's interpretation reflects a permissible construction of the statute." *Id.*

## A. *Chevron* Step One

Turning to step one of *Chevron*, as stated above, the Court looks to the text of the ECOA to determine "whether Congress has directly spoken to the precise question

9

at issue," *Wolf*, 962 F.3d at 221, namely, whether the ECOA prohibits discouragement of prospective applicants on the basis of race. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Turley v. Gaetz*, 625 F.3d 1005, 1008 (7th Cir. 2010) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)) (internal quotation marks omitted). "Statutory interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy." *Commodity Futures Trading Comm'n v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550 (7th Cir. 2013) (internal quotation marks and citation omitted). "Indeed, statutory interpretation is a holistic endeavor and, at a minimum, must account for the statute's full text, language as well as punctuation, structure, and subject matter." *Trs. of Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 828 (7th Cir. 1996) (internal quotation marks and citation omitted); *see also Estate of Moreland v. Dieter*, 576 F.3d 691, 699 (7th Cir. 2009).

The ECOA states that "[i]t shall be unlawful for any creditor to *discriminate against any applicant*, with respect to any aspect of a credit transaction—*on the basis of race*, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . . ." 15 U.S.C. § 1691(a) (emphases added). The ECOA further defines "applicant" to mean "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor

10

indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." *Id.* § 1691a(b).

The plain text of the ECOA thus clearly and unambiguously prohibits discrimination against *applicants*, which the ECOA clearly and unambiguously defines as a person who applies to a creditor for credit. 15 U.S.C. §§ 1691(a), 1691a(b). The Court therefore finds that Congress has directly and unambiguously spoken on the issue at hand and only prohibits discrimination against applicants. As such, "that is the end of it," *Wolf*, 962 F.3d at 221, and the Court need not move on to the second step of the *Chevron* analysis because it is clear that the ECOA does not apply to prospective applicants.[5] The Court consequently affords no deference to 12 C.F.R. § 1002.4. *See, e.g.*, *Zimmerman v. Oregon Dep't of Just.*, 170 F.3d 1169, 1173 (9th Cir. 1999) (affording no weight to 28 C.F.R. § 35.140(a), having found that "Congress unambiguously expressed its intent for Title II not to apply to employment"); *Patterson v. Illinois, Dep't of Corr.*, 35 F. Supp. 2d 1103, 1108 (C.D. Ill. 1999) (same).

Case law supports the Court's interpretation of the ECOA. The Seventh Circuit similarly found the ECOA's definition of "applicant" to be unambiguous in *Moran Foods, Inc. v. Mid-Atlantic Market Development Co., LLC*, 476 F.3d 436, 441 (7th Cir. 2007), a case cited by Defendants. There, Susan Camp, a party who had guaranteed her husband's debt, brought a counterclaim alleging that a grocery store had violated

---

[5]Because the Court finds that the ECOA unambiguously applies to "applicants" and not "prospective applicants," the Court does not analyze whether the ECOA's prohibition on "discrimination" encompasses "discouragement." The Court likewise does not reach Defendants' argument that the CFBP is attempting to create affirmative obligations with respect to marketing and the hiring of loan officers, nor its arguments under the First and Fifth Amendments. Memo. Dismiss at 8–9, 12–23.

the ECOA by discriminating against her based on her marital status. *Id.* at 437. Camp obtained a jury verdict on her ECOA counterclaim. *Id.* On appeal, Camp asked to be awarded the attorney's fees that she incurred in litigating her ECOA case and pursued additional relief under the ECOA. *Id.* at 437–38.

In assessing Camp's ECOA claim, the Seventh Circuit initially concluded that she was not an applicant at all: "Susan Camp was not an applicant for credit, and neither received credit nor was denied it. Instead, she guaranteed her husband's debt and by doing so enabled his company to buy groceries from Moran on credit." *Moran*, 476 F.3d at 441. The court recognized, however, that the Federal Reserve Board had "defined 'applicant' for credit (the term in the statute) to include a guarantor." *Id.* (citing 12 C.F.R. §§ 202.2(e), 202.7(d)). While the Seventh Circuit acknowledged that "courts defer to administrative interpretations of statutes when a statute is ambiguous," the court found that "there is nothing ambiguous about ' applicant' and no way to confuse an applicant with a guarantor." *Id.* (citations omitted). The court in *Moran* elaborated that "to interpret 'applicant' as embracing 'guarantor' opens vistas of liability that the Congress that enacted the Act would have been unlikely to accept." *Id.*[6] So too here, the Court doubts that the ECOA can be "stretched far

---

[6] Ultimately, the court in *Moran* found that even if the Federal Reserve Board's interpretation were authorized, Camp's ECOA claim "must lose because she failed to prove discrimination." 476 F.3d at 441. The court therefore reversed the judgment of the district court. *Id.* at 442. As a result, the Seventh Circuit's ECOA discussion in *Moran* is non-binding dicta. *See FirstMerit Bank, N.A. v. Ferrari*, 71 F. Supp. 3d 751, 758–59 (N.D. Ill. 2014). Even so, the analysis provides a straightforward interpretation of the ECOA, which the Court finds persuasive.

enough" to interpret a prohibition of discrimination against *applicants* as prohibiting discrimination of *prospective applicants. Id.*

Defendants direct the Court to other Court of Appeals decisions as well, which hold that an "applicant" does not encompass a "guarantor" under the ECOA. Memo. Dismiss at 7 (citing *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 942 (8th Cir. 2014); *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1193 (11th Cir. 2019)). Both decisions buttress this Court's finding that no deference is owed to Regulation B's anti-discouragement provision for prospective applicants.

In *Hawkins*, for example, the plaintiffs, guarantors, brought an ECOA claim alleging that the defendant bank discriminated against them based on their marital status. 761 F.3d at 939. The district court granted summary judgment against the plaintiffs, holding that they did not constitute "applicants" under the ECOA. *Id.* at 940. On appeal, the plaintiffs insisted they could bring a claim under the ECOA because 12 C.F.R. § 202.2(e) of Regulation B provided that the definition of "applicant" included a guarantor. *Id.* Observing that the case turned on whether the court should defer to Regulation B Section 202.3(e)'s definition of "applicant," which would allow the plaintiffs' suit, the court applied the *Chevron* two-step framework. *Id.* At step one, the Eighth Circuit found that the "text of the ECOA clearly provides that a person does not qualify as an applicant under the statute solely by virtue of executing a guaranty to secure the debt of another." *Id.* at 941. The court looked to the ECOA's definition of "applicant," reviewed the dictionary definition for "apply," and concluded that "the plain language of the ECOA unmistakably provides that a

person is an applicant only if she requests credit." *Id.* (citing 15 U.S.C. § 1691a(b); Webster's Third New International Dictionary 105 (2002)). "Because the text of the ECOA is unambiguous regarding whether a guarantor constitutes an applicant," the Eight Circuit stopped after *Chevron* step one and did not defer to the agency's interpretation of applicant. *Id.* at 942.

In *Regions Bank*, defendants who had been sued for breach of promissory notes and breach of guaranties brought counterclaims alleging they were discriminated against on the basis of marital status in violation of the ECOA. 936 F.3d at 1187. After losing on summary judgment, the defendants appealed, relying on the definition of "applicant" in Regulation B to argue that they could bring their ECOA counterclaims. *Id.* at 1190. The Eleventh Circuit, like the Eighth, applied the two-step *Chevron* framework to determine whether it owed deference to Regulation B's interpretation of "applicant." *Id.* Because the court "agree[d] with the Seventh and Eighth Circuits that the ordinary meaning of 'applicant' does not encompass a guarantor," the Eleventh Circuit concluded that no deference was due Section 202.2(e). *Id.* at 1193 (citing *Moran*, 476 F.3d at 441; *Hawkins*, 761 F.3d at 942). *But see RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 385 (6th Cir. 2014) (proceeding to *Chevron* step two and deferring to section 202.2(e) on theory that the term "applies" is ambiguous and that guarantors qualify as requesting credit because they "make formal requests for aid in the form of credit for a third party").

The CFPB attempts to distinguish Defendants' authority by arguing that the cases are inapposite because they analyze whether a "guarantor" is within the definition of "applicant" for purposes of bringing a private action under the ECOA. Resp. at 8–9. The CFPB posits that neither the definition of "applicant," nor the question of whether a private right of action exists, is at issue in this case. *Id.* at 9. True, the cases cited by Defendants involved the question of whether individual guarantors could maintain an action under the ECOA. But the analysis employed by the courts to resolve the issue in those cases provides a sound framework to resolve the issue in this case.

The CFPB argues that it has more expansive enforcement powers than the private right of action, and moreover, its authority to prohibit discouragement of "prospective applicants" does not require stretching the term "applicant" to encompass "prospective applicants." *Id.* The Court disagrees.

The CFPB's authority to enact regulations is not limitless. Under Section 1691b, the CFPB "shall prescribe regulations to carry out the purposes of [the ECOA]." 15 U.S.C. § 1691b(a). While the delegating section is, no doubt, broad,[7] the ECOA explicitly defines its "Scope of prohibition" as: "[i]t shall be unlawful for any creditor to discriminate against any *applicant*, with respect to any aspect of a credit transaction—on the basis of race[.]" *Id.* § 1691(a) (emphasis added). Indeed, the entire statutory scheme revolves around applicants. As Defendants point out, the word

---

[7]The CFPB, relying on the *Mourning* test, argues that the broad language in Section 1691b means that it can enact any regulations "reasonably related" to the purposes of the ECOA. Resp. at 6–7. As discussed further below, the CFPB cannot use the *Mourning* test to avoid the two-step *Chevron* framework. *See infra* Section I.B.

"applicant" is used twenty-six times in the statute, and the statute does not prohibit or discuss conduct prior to the filing of an application. *See* Memo. Dismiss at 4. So, contrary to the CFPB's position, the statute's expression of "applicant," is essential to understanding whether the CFPB can regulate with respect to "prospective applicants." The CFPB cannot regulate outside the bounds of the ECOA, and the ECOA clearly marks its boundary with the term "applicant."

The Court's reading of the ECOA, moreover, is not limited to the civil liability section of the ECOA, which provides that "[a]ny creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class." 15 U.S.C. § 1691e(a).[8] That is, the Court is not looking exclusively at the private right of action section of the ECOA to conclude that the whole act applies only to those who qualify as proper plaintiffs under that section. While this case may not present the specific issue of whether a private right of action exists for a private prospective applicant under Section 1691e, Count I, nevertheless,

---

[8] By contrast, the holding in one of the cases relied on by the CFPB, *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698 (5th Cir. 2017), was limited to the court's interpretation of the civil liability section, Section 1691e. There, the court found, without applying the *Chevron* framework, that "[d]iscouragement of a 'prospective applicant' may be regulatorily prohibited, but it cannot form the basis of a private claim or cause of action under the ECOA." *Id.* at 708. The Court finds *Alexander* of limited utility because the court did not address whether the court should defer to Regulation B under the two-step *Chevron* framework. Similarly, in *Dhade*, 414 F. Supp. 3d at 707, another case relied on by the CFPB limited to a claim brought under the civil liability section, the court found that Regulation B did not expand the definition of "applicant" to include "prospective applicant" in Section 1691e. Although the court noted that "the ECOA vested the CFPB with enforcement powers that are more expansive than the private right of action," it also applied *Chevron* step one to find that "[t]here is nothing ambiguous about 'applicant,'" meaning the court should not defer to an agency's interpretation of the statute. *Id.* at 706–07.

16

cannot stand if it is based on a portion of Regulation B to which the Court owes no deference. Put another way, the ECOA says nothing about "prospective applicants," so if the Court does not defer to Regulation B, Count I fails to state a claim, regardless of Section 1691e. *C.f. Dhade*, 414 F. Supp. 3d at 707.

To further rebut Defendants' authority, the CFPB cites to cases which purportedly acknowledge and treat Regulation B's discouragement of prospective applicants as presumptively valid. Resp. at 9–10 (citing *Treadway*, 362 F.3d at 979–80; *Harbaugh v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 615 F.2d 1169, 1174 (7th Cir. 1980)). Yet, a court's acknowledgment of—or even reliance on—a regulation, when the validity of that regulation is not dispute, does not help the Court resolve the *Chevron* deference question at play here. The CFPB points to *Page*, 2013 WL 5211747, at *5, in which the court rejected Defendant's argument that the individual plaintiff's claim under the civil liability provision failed because she never submitted an application. The court looked to Regulation B's language and found that "the ECOA applies to all stages of a credit transaction." *Id.* However, the court did not engage in the two-step *Chevron* analysis to determine whether the court should defer to Regulation B. *Id.* After applying the *Chevron* analysis, the Court respectfully disagrees with the court's deference to Regulation B in *Page*. The CFPB cites to no authority in which a court engaged in a *Chevron* analysis and after doing so, deferred to the anti-discouragement provision in Regulation B. For the reasons stated above, the Court finds that, when applying step one of *Chevron*, it cannot defer to Regulation

B's anti-discouragement provision of with respect to "prospective applicants," no matter how desirable it might be to do so as a policy matter.

### B. The CFPB's Reliance on the *Mourning* Standard

Rather than engage in any *Chevron* analysis, the CFPB attempts to skirt the *Chevron* framework by emphasizing the broad language of the delegation provision of the ECOA, Section 1691b. Resp. at 6 (citing 15 U.S.C. § 1691b(a)). According to the CFPB, "Congress understood that additional rules may be necessary to prevent evasion of [the] ECOA's prohibitions and expressly instructed the Board, then the [CFPB], to enact any such rules." *Id.* The CFBP essentially suggests that Congress gave the CFPB rulemaking carte blanche in Section 1691b. In support, the CFPB directs the Court to a similar "anti-evasion provision" in the Truth in Lending Act (TILA), 15 U.S.C. § 1604(a)), as well as a pre-*Chevron* case interpreting the TILA, *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356 (1973). *Id.* at 6–7.

In *Mourning*, the Supreme Court addressed whether the Federal Reserve Board had exceeded its authority under the TILA in promulgating a portion of its Regulation Z, commonly referred to as the "Four Installment Rule." 411 U.S. at 358. Section 121 of the TILA required merchants who regularly extend credit with attendant finance charges to disclose certain contract information. 15 U.S.C. § 1631. The Federal Reserve Board promulgated Regulation Z, which required disclosure under Section 121 of the TILA whenever credit is offered to a consumer "for which either a finance charge is or may be imposed or which pursuant to an agreement, is or may be payable in more than four installments." 411 U.S. at 362 (citing 12 CFR

18

§ 226.2(k)). To determine whether the Federal Reserve Board had exceeded its rulemaking authority, the Supreme Court looked to the delegation provision of the TILA, Section 105, which provided that the Federal Reserve Board "shall prescribe regulations to carry out the purposes of (the Act). These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of (the Act), to prevent circumvention or evasion thereof, or to facilitate compliance therewith." 15 U.S.C. § 1604.

From this language, the Supreme Court found that Congress gave the Federal Reserve Board "broad authority to promulgate regulations necessary to render the Act effective." 411 U.S. at 365. Specifically, the Court in *Mourning* highlighted both the general grant of authority to promulgate regulations designed to carry out the purposes of the act, as well as the language in Section 105 allowing regulations that may define classifications and exceptions to ensure compliance with the TILA. *Id.* Under the applicable precedent at the time, where an empowering provision of a statute, like Section 105, gave the agency the power to make such rules and regulations as may be necessary to carry out the act, the validity of a regulation promulgated under such an empowering provision would be sustained, so long as it was "reasonably related to the purposes of the enabling legislation." 411 U.S. at 369 (internal quotation marks and citations omitted). The Supreme Court therefore upheld the "Four Installment Rule" because the rule was reasonably related to the

19

TILA's objectives of preventing the evasion of its reporting requirements by concealing credit charges. *Id*. at 371.

The CFPB submits that, per the *Mourning* decision, the anti-discouragement provision of Regulation B must be sustained, so long as it is reasonably related to the ECOA's objectives. Resp. at 7. The Seventh Circuit, contends the CFPB, "has likewise held that rules necessary to render TILA effective must be sustained so long as they are reasonably related to the legislation's purposes." *Id*. (citing *Muro v. Target Corp*., 580 F.3d 485, 494 n.9 (7th Cir. 2009)). However, neither *Mourning* nor *Muro* permits this Court to dodge the two-step *Chevron* framework.

First and foremost, the Supreme Court mandates that a court faced with a disputed agency interpretation must apply *Chevron*. In *City of Arlington, Tex. v. F.C.C.*, for example, the Supreme Court rejected using a non-*Chevron* standard when an agency interprets the scope of its own statutory authority. 569 U.S. 290, 296–97 (2013). The Supreme Court held that the *Chevron* framework applied, reasoning that "[n]o matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *Id*. at 297 (emphasis in original). And in an earlier, post-*Mourning* case analyzing the TILA, the Supreme Court approached a regulation, not by asking whether the Federal Reserve Board's interpretation was reasonably related to TILA's objectives (the *Mourning* test), but by asking whether the statute had spoken on the issue (*Chevron* step one): "In determining whether the Board was empowered to make such a change, we begin, of

course, with the language of the statute. If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368 (1986) (citing *Chevron*, 467 U.S. at 842–43); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 92 (2002) (explaining that *Mourning* does not authorize agencies to "contravene Congress' will").

Seventh Circuit decisions, too, plainly require the Court to apply the *Chevron* framework when faced with a disputed agency interpretation that merits *Chevron* deference.[9] *See, e.g., Zaragoza v. Garland*, 52 F.4th 1006, 1019 (7th Cir. 2022) (applying two-step *Chevron* framework to decision of Attorney General interpreting federal immigration statutes); *Wolf*, 962 F.3d at 221 ("The overriding question is whether the agency's interpretation of the relevant statute is one the text will permit. We approach this inquiry through the two-step framework set forth in *Chevron*[.]"); *Khan v. United States*, 548 F.3d 549, 554 (7th Cir. 2008), *as amended* (Dec. 4, 2008) (reviewing general authority regulations under the two-step *Chevron* framework).

Because the *Chevron* framework reigns supreme, numerous courts have rejected similar agency attempts to eschew *Chevron* in favor of *Mourning*. For instance, Defendants point to *First Premier Bank v. U.S. Consumer Fin. Prot. Bureau*,

---

[9]An agency interpretation qualifies for *Chevron* step one when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *see also Brumfield v. City of Chicago*, 735 F.3d 619, 625–26 (7th Cir. 2013). This threshold question, sometimes referred to as "Chevron step zero," *see, e.g., Pugin v. Garland*, 19 F.4th 437, 441 (4th Cir. 2021), is not disputed in this case.

819 F. Supp. 2d 906, 909 (D.S.D. 2011). R. 38, Reply at 2–3. In *First Premier Bank*, a bank sued the CFPB, seeking a preliminary injunction to postpone and enjoin the effective date of an amendment to a credit card fee regulation. 819 F. Supp. 2d at 909. The bank attacked the regulation amendment under the Administrative Procedure Act. *Id.* at 911–12. In analyzing the disputed regulation amendment, the court applied the two-step *Chevron* framework. *Id.* at 914. The CFPB argued that the *Chevron* framework did not apply, citing *Mourning* and two other pre-*Chevron* cases. *Id.* at 917 (citing *Anderson Bros. Ford v. Valencia*, 452 U.S. 205 (1981); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980); *Mourning*, 411 U.S. 356). The court rejected the CFPB's contention, stating "the language of *Mourning* and its progeny make sense standing alone only in a pre-*Chevron* setting" in which "'pre-*Chevron* courts frequently looked to the relative competence of the agency and the court in deciding the matter in question.'" *Id.* at 917–18 (quoting *Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. N.L.R.B.*, 46 F.3d 82, 90 (D.C. Cir. 1995)).

Similarly in *Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, the National Indian Gaming Commission argued that its minimum internal control standards for a casino should be sustained under *Mourning*, as the rules were "reasonably related to the statutory purposes of the [Indian Gaming Regulatory Act]." 383 F. Supp. 2d 123, 143 (D.D.C. 2005), *aff'd,* 466 F.3d 134 (D.C. Cir. 2006). The court disagreed, explaining that "courts and agencies 'are bound, not only by the ultimate purposes Congress has selected but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Id.* (quoting *MCI Telecommunications*

22

*Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994)). The court concluded that "although *Mourning* stated that a broad grant of rule-making authority allows an agency to issue regulations that are 'reasonably related to the purposes of the enabling legislation,' courts have consistently read this language to describe a heightened level of deference that is due the agency's interpretation of an ambiguous statute under *Chevron* step two, *rather than a warrant to override a clear statute under Chevron step one.*" *Id.* at 144 & n.15 (emphasis added) (collecting cases).

The Court joins *First Premier Bank* and *Colorado River Indian Tribes* in declining the agency's invitation to bypass *Chevron* by way of *Mourning*. The Court further sides with the numerous courts who have held that *Mourning*'s application belongs, if anywhere, in *Chevron* step two. *See, e.g.*, *Merck & Co. v. United States Dep't of Health & Hum. Servs.*, 385 F. Supp. 3d 81, 88–89 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020) (rejecting agency's attempt to circumvent *Chevron* in light of *Mourning* and collecting cases situating *Mourning* with *Chevron*'s second step); *Chamber of Com. of U.S. v. N.L.R.B.*, 721 F.3d 152, 161 (4th Cir. 2013) (holding *Mourning* analysis only relevant once the court has determined that a statute is ambiguous, concluding "*Mourning*'s exhortation that we 'defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority,' . . . cannot be read as requiring [the court] to defer to the agency's interpretation as [the court] conduct[s its] initial analysis of the Act."); *Brackeen v. Haaland*, 994 F.3d 249, 360 (5th Cir. 2021) (applying *Mourning* test in second step of

*Chevron*). Here, because the ECOA is unambiguous, the Court does not reach *Chevron* step two,[10] and *Mourning* is inapplicable.

The Seventh Circuit's *Muro* decision does not revive *Mourning*'s significance either. In *Muro*, the Seventh Circuit reviewed a district court's denial of class certification in an attempted TILA class action. 580 F.3d at 487. When interpreting Section 1637(a) of TILA, the court found that TILA was silent on "when an account is 'open.'" *Id.* at 493. Having found a gap in the statute, the court looked to Regulation Z's specification that initial disclosures must be made before the first transaction is made under the plan. *Id.* (citing 12 C.F.R. § 226.5(b)(1)). Dropping a footnote, the Seventh Circuit cited *Mourning* generally for the proposition that "[t]he provisions of Regulation Z are afforded substantial weight." *Id.* at 493 n.9. So, although the court in *Muro* cited *Mourning*, Regulation Z was not under review, and even if it were, the court only looked to *Mourning* after the court had determined that Congress had been silent on the issue the court was concerned with. *Muro* in no way stands for the proposition that a court can avoid the *Chevron* framework in light of *Mourning*.

In sum, the *Chevron* framework requires the Court to begin its analysis with the plain language of the ECOA. Because the Court finds the ECOA unambiguously prohibits discrimination of "applicants," and not "prospective applicants," the Court does not assess Regulation B for the soundness of its policy, the need for it in the

---

[10]Because the Court does not reach *Chevron* step two, the CFPB's arguments about legislative history and the ineffectiveness of the ECOA without Regulation B's anti-discouragement provision, *see* Resp. at 4–5, 7–8, are inapposite. *Coyomani-Cielo v. Holder*, 758 F.3d 908, 914 (7th Cir. 2014) (holding legislative history is reserved for *Chevron*'s second step, in which court deferentially determines whether the agency's interpretation is reasonable).

statute, or even whether it is reasonably related to the ECOA's objectives. To be clear, the Court appreciates the expertise of the CFPB in implementing the ECOA and commends its attempts to prevent the deplorable practice of discouraging people, on the basis of race, from applying for credit. The practice of limiting credit to individuals based on criteria other than creditworthiness is as odious as it is offensive. However, the Court is duty-bound to follow precedent, which means the Court can only defer to an agency's interpretation of a statute, no matter how laudable its purpose, when it survives the two-step *Chevron* framework. The anti-discouragement provision of Regulation B with respect to "prospective applicants" does not survive *Chevron* step one, so the Court does not defer to the CFPB's interpretation.

Accordingly, the CFPB's ECOA count is dismissed. The dismissal is with prejudice because any amendment would be futile. *See Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017). The CFPB cannot amend its pleading in a way that would change the language of the ECOA. Counts II and III, which are dependent on the CFPB's ECOA claim, *see* FAC ¶¶ 59–78, are likewise dismissed with prejudice.

## Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss the FAC [31] and dismisses the FAC with prejudice. Civil case terminated.

Dated: February 3, 2023

United States District Judge
Franklin U. Valderrama