CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 23-1654

CONSUMER FINANCIAL PROTECTION BUREAU,

                          *Plaintiff-Appellant*,

v.

TOWNSTONE FINANCIAL, INC. and BARRY STURNER,

                          *Defendants-Appellees*.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-04176 — **Franklin U. Valderrama**, *Judge*.

---

ARGUED DECEMBER 8, 2023 — DECIDED JULY 11, 2024

---

Before SYKES, *Chief Judge*, and RIPPLE and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Congress originally enacted the Equal Credit Opportunity Act (the "ECOA"), 15 U.S.C. § 1691 *et seq.*, in order to ensure that firms engaged in the extension of credit make that credit equally available without regard to an applicant's sex or marital status. The ECOA was soon amended to prohibit creditors from discriminating on the basis of additional categories: race, color, religion, national

origin, and age. Congress delegated authority to the Federal Reserve Board (the "Board") to enact regulations to carry out the ECOA's purpose. Pursuant to that authority, the Board enacted "Regulation B," which exists in substantially the same form today and prohibits creditors from discouraging, on a prohibited basis, applicants or prospective applicants from making or pursuing an application for credit. Congress later transferred the Board's authority to the Consumer Financial Protection Bureau (the "CFPB" or "Bureau").

In July 2020, the CFPB brought this action against mortgage lender Townstone Financial, Inc. ("Townstone") and its cofounder and chief executive officer, Barry Sturner. The CFPB alleged that Townstone and Mr. Sturner had discouraged black prospective applicants from applying for mortgage loans with Townstone, in violation of Regulation B, by making, over a period of years, several statements on their long-form commercial advertisement radio show.

Townstone and Mr. Sturner filed a motion to dismiss, and the district court granted the motion. The district court held that the ECOA does not authorize the imposition of liability for the discouragement of *prospective* applicants.

For the reasons set forth in the following opinion, we take a different view. When the text of the ECOA is read as a whole, it is clear that Congress authorized the imposition of liability for the discouragement of prospective applicants. Regulation B's prohibition on discouraging prospective applicants is therefore consistent with the ECOA's text and purpose. We accordingly reverse the decision of the district court and remand for proceedings consistent with this opinion.

# I

# BACKGROUND

## A.

This case comes to us from the district court's grant of Townstone's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. We therefore take as true the allegations of the amended complaint and base the following factual recitation on those allegations.

Townstone is a non-depository mortgage lender or mortgage broker engaged exclusively in mortgage lending. Mr. Sturner is the cofounder, sole owner, and sole director of Townstone. He also serves as Townstone's president and chief executive officer. Incorporated in Illinois and headquartered in Chicago, Townstone operates in four other states: Indiana, Michigan, Wisconsin, and Florida. Most of its mortgage lending and brokering activity occurs in the Chicago-Naperville-Elgin Metropolitan Statistical area (the "Chicago MSA").[1] The population of the Chicago MSA is approximately 9.46 million persons. About 1.6 million (17%) of those persons are black.

Beginning in 2014 or earlier, Townstone started broadcasting its own radio show and podcast, called "The Townstone Financial Show." The show is co-hosted by Mr. Sturner and another senior loan officer in a format often referred to as a "long-form commercial advertisement."[2]

---

[1] The Chicago MSA comprises fourteen counties, including counties from Illinois (nine counties), Indiana (four counties), and Wisconsin (one county).

[2] First Am. Compl. ¶ 26.

During the Townstone Financial Show, the hosts discuss mortgage-related issues, take questions from prospective applicants, and discuss their work at Townstone. When the hosts take a commercial break, the radio show plays shorter advertisements for Townstone. The Townstone Financial Show was originally broadcast on AM radio to the Chicago MSA. It has also been available in podcast form on Townstone's website, streamed on Facebook Live, and advertised on various social media platforms.

According to the CFPB's complaint, the hosts of the Townstone Financial Show regularly have made statements that would discourage black prospective applicants from applying for mortgage loans. The complaint identifies five such instances.

First, in January 2014, a caller from Markham, Illinois, a municipality in Cook County with a population that is predominantly black, asked the hosts how he and his wife could improve their credit scores. In response, one of the hosts responded: "[You've] got to keep those women in line over there in Markham. … [S]top spending freaking money [on your wife] and tell her to get a better job."[3] The host then discussed Markham generally and made statements such as "it's crazy in Markham on weekends" and "[y]ou drive very fast through Markham, … and you don't look at anybody or lock on anybody's eyes in Markham."[4]

Second, again in January 2014, the hosts informed listeners that it was a "great time" to buy, sell, and rent, and

---

[3] *Id.* ¶ 33.

[4] *Id.*

No. 23-1654 5

recommended that those doing so should "take down the Confederate flag."[5]

Third, in June 2016, Mr. Sturner stated that the South Side of Chicago is "hoodlum weekend" between Friday and Monday, and that the police are "the only ones between that [area] turning into a real war zone and keeping it where it's kind of at."[6]

Fourth, in January 2017, Mr. Sturner described a Jewel-Osco grocery store in downtown Chicago as "Jungle Jewel."[7] He described the store as "a scary place" because the store's patrons "were people from all over the world."[8]

Fifth and finally, in November 2017, when discussing one host's recent skydiving experience, another host stated that a person "walking through the South Side at 3AM [would] get the same rush" as they would skydiving.[9]

In addition to these five instances, the CFPB's complaint also provides statistical information supporting its view that Townstone's business acts and practices led to less black prospective applicants applying for credit from Townstone than would have been the case in the absence of these discriminatory practices. The CFPB alleges that, during the years 2014 through 2017, when compared to its peer institutions operating in the Chicago MSA, Townstone

---

[5] *Id.* ¶ 34.

[6] *Id.* ¶ 35.

[7] *Id.* ¶ 36.

[8] *Id.*

[9] *Id.* ¶ 37.

received fewer mortgage applications from black applicants, fewer mortgage applications for properties in neighborhoods with a high-black population (defined as neighborhoods in which 80% or more of residents are black), and fewer mortgage applications for properties in neighborhoods with a majority of black residents.

**B.**

In July 2020, the CFPB brought the present action against Townstone in the United States District Court for the Northern District of Illinois.[10] The CFPB later amended its complaint and added Mr. Sturner as a defendant. Based on the allegations just described, the CFPB's amended complaint presents three claims: one count of violating the ECOA, *see* 15 U.S.C. § 1691(a)(1), and one of its regulations, Regulation B, *see* 12 C.F.R. § 1002.4(b); one count of violating the Consumer Financial Protection Act of 2010, *see* 12 U.S.C. § 5536(a)(1)(A); and one count of fraudulent transfer, in violation of 28 U.S.C. §§ 3301–3308. Townstone and Mr. Sturner filed a motion to dismiss.

The district court granted the motion to dismiss. The court focused on the ECOA's definition of applicant as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). Based on this definition, the district court concluded that "it is clear that the ECOA does not apply to prospective

---

[10] The CFPB has authority to enforce the ECOA and its corresponding regulations by commencing a civil action. *See* 15 U.S.C. § 1691c(a)(9); 12 U.S.C. § 5564.

No. 23-1654 7

applicants." *CFPB v. Townstone Fin., Inc.*, No. 20-cv-4176, 2023 WL 1766484, at *5 (N.D. Ill. Feb. 3, 2023).

To support its conclusion, the court also relied on a line of cases from this circuit and others holding that a "guarantor" was not an "applicant" under the ECOA. It then rejected the CFPB's argument that its enforcement and rulemaking authority allowed it to prohibit discouragement of prospective applicants. It reasoned that the "[t]he CFPB cannot regulate outside the bounds of the ECOA, and the ECOA clearly marks its boundary with the term 'applicant.'" *Id.* at *7.

Because the district court determined that the ECOA could not apply to prospective applicants, it dismissed Count I. It then dismissed Counts II and III, explaining that those counts were dependent on the success of Count I.

The CFPB appealed.

## II

## DISCUSSION

### A.

We begin our analysis with an examination of the textual history of the statute and the regulation. Congress enacted the ECOA in 1974. In the initial version of the statute, Congress stated that the legislation's purpose was to ensure "that financial institutions and other firms engaged in the extension of credit make that credit equally available to all creditworthy customers without regard to sex or marital status." Equal Credit Opportunity Act of 1974, Pub. L. No. 93-495, § 502, 88 Stat. 1500, 1521 (1974). In 1976, Congress amended the ECOA to prohibit discrimination on the basis of additional

categories: race, color, religion, national origin, and age. Equal Credit Opportunity Act Amendments of 1976, Pub. L. No. 94-239, § 701, 90 Stat. 251, 251 (1976). Since then, the ECOA's scope of prohibition has provided that:

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—
> (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract).

15 U.S.C. § 1691(a). The ECOA defines "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." *Id.* § 1691a(b).

The text of the ECOA vested the Board with broad regulatory authority:

> The Board shall prescribe regulations to carry out the purposes of this title. These regulations may contain but are not limited to such classifications, differentiation, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this title, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith. Such regulations shall be

> prescribed as soon as possible after the date of enactment of this Act, but in no event later than the effective date of this Act.

Pub. L. No. 93-495, § 703, 88 Stat. at 1522.

This broad grant of authority was modeled after similar language found in the Truth In Lending Act ("TILA"). *See* 15 U.S.C. § 1604(a). An earlier proposed version of the ECOA had granted the Board notably diminished authority,[11] but as the statute progressed through congressional deliberation, the Board suggested that Congress grant it "the same regulatory authority accorded it in … the Truth in Lending Act." *Credit Discrimination: Hearing on H.R. 14856 and H.R. 14908 Before the Subcomm. on Consumer Affs. of the Comm. of Banking & Currency*, 93d Cong. 72 (1974) (appendix to statement by Jeffrey M. Bucher, Member, Bd. of Governors of the Fed. Rsrv. Sys.). The Board explained that TILA's "grant of authority ha[d] successfully withstood several litigation challenges since 1969 and thus appear[ed] to be an appropriate model." *Id.* Congress accepted this view, and the ECOA's grant of authority to the Board was thus modeled after the language found in TILA.

In 1991, Congress modified the ECOA to require its enforcing regulatory agencies to refer suspected substantive pattern and practice cases under the ECOA to the Attorney General. FDIC Improvement Act of 1991, Pub. L. No. 102-242, § 223, 105 Stat. 2236, 2306 (1991); *see also* S. Rep. No. 102-167,

---

[11] The earlier suggested language stated: "The Board shall prescribe such regulations which in its judgment are necessary or proper to carry out this Act." H.R. 14856, 93d Cong. § 5(a) (2d Sess. 1974).

10 No. 23-1654

at 93 (1991).[12] The relevant portion of the ECOA remains the same today and states:

> Each agency referred to in paragraphs (1), (2), and (9) of section 1691c(a) of this title *shall refer* the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has *engaged in a pattern or practice of discouraging or denying applications* for credit in violation of section 1691(a) of this title. Each such agency may refer the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has violated section 1691(a) of this title.

15 U.S.C. § 1691e(g) (emphasis added). At the time, members of Congress were concerned that the regulatory agencies responsible for enforcing the provisions of the ECOA were not taking appropriate action to resolve issues of credit discrimination.[13]

---

[12] Previously, the ECOA authorized but did not require the enforcing agencies to refer matters to the Attorney General. The 1976 amendments to the ECOA provided that, "if unable to obtain compliance" with the statute, the enforcing agencies were "authorized to refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted." Pub. L. No. 94-239, § 706(g), 90 Stat. at 254.

[13] *See* S. Rep. No. 102-167, at 92–93 (1991) ("The Committee also found problems with fair lending enforcement, even after evidence of discrimination was identified. The regulatory agencies showed great reluctance to take strong action against any depository institution found to be discriminating. … [T]he Justice Department would likely take a more appropriate approach to remedying discrimination. … The legislation, therefore,
( … continued)

No. 23-1654 11

The first version of Regulation B tracked the ECOA and prohibited creditors from discouraging applications on the basis of sex or marital status. 40 Fed. Reg. 49,298, 49,307 (Oct. 22, 1975). The exact language stated: "A creditor shall not make any statements to applicants or prospective applicants which would, on the basis of sex or marital status, discourage a reasonable person from applying for credit or pursuing an application for credit." *Id.* When the ECOA was amended to expand its categories of prohibition, the Board amended Regulation B to prohibit discouragement on a "prohibited basis," which the regulations defined as "race, color, religion, national origin, sex, marital status, or age." 42 Fed. Reg. 1242, 1253–54 (Jan. 6, 1977). Later, in 2010, Congress transferred rulemaking authority from the Board to the Bureau. Dodd-Frank Wall Street Reform & Consumer Protection Act, Pub. L. No. 111-203, § 1085, 124 Stat. 1376, 2083–84 (2010). The Bureau then republished Regulation B, 81 Fed. Reg. 25,323, 25,325 (Apr. 28, 2016), which states in full:

> ***Discouragement.*** A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a

---

requires the financial regulatory agencies to refer suspected substantive pattern and practice cases of discrimination under the [ECOA] to the Justice Department."); 137 Cong. Rec. S2519 (daily ed. Feb. 28, 1991) (statement of Sen. Dixon) ("The subcommittee heard troubling statistics which showed that blacks and minority neighborhoods got fewer loans and got rejected for loans more often than whites and white neighborhoods—even when incomes were comparable. We also heard about the inadequate regulatory response to this situation.").

>    prohibited basis a reasonable person from making or pursuing an application.

12 C.F.R. § 202.4(b).[14]

### B.

We now turn to an examination of the problem before us. This case requires us to determine whether Regulation B's prohibition on the discouragement of *prospective* applicants is consistent with the ECOA. We review questions of statutory interpretation de novo. *Coyomani-Cielo v. Holder*, 758 F.3d 908, 912 (7th Cir. 2014).[15]

We begin with the text of the statute. We read a statute "'as a whole' rather than 'as a series of unrelated and isolated provisions.'" *United States v. Pace*, 48 F.4th 741, 753 (7th Cir. 2022) (quoting *Arreola-Castillo v. United States*, 889 F.3d 378, 386 (7th Cir. 2018)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil*

---

[14] At the time of the 1991 amendment to the ECOA, Congress was aware of Regulation B and its prohibition on discouragement. *See* S. Rep. No. 102-167, at 86 (1991) (noting that "[d]iscouraging applications on a prohibited basis and advertising which implies a discriminatory preference are … prohibited" under the ECOA regulations).

[15] This case was litigated before the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, No. 22-451, 603 U.S. ___ (2024). Our decision today takes into account that *Loper Bright* overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). We approach this case as presenting a question of statutory interpretation subject to our de novo review.

*Co.*, 519 U.S. 337, 341 (1997). We therefore cannot constrain artificially the ECOA to a single provision.[16]

An analysis of the text of the ECOA as a whole makes clear that the text prohibits not only outright discrimination against applicants for credit, but also the discouragement of prospective applicants for credit. Congress vested the Board (and later the Bureau) with the authority to issue regulations "necessary or proper to effectuate the purposes of this title" or "to prevent circumvention or evasion thereof." 15 U.S.C. § 1691b(a). In endowing the Board with authority to prevent "circumvention or evasion," Congress indicated that the ECOA must be construed broadly to effectuate its purpose of ending discrimination in credit applications. Moreover, other provisions of the ECOA strongly confirm that discouraging applications for credit constitutes a violation of the statute. When Congress amended its civil liability provision so that the regulatory agencies responsible for enforcing the ECOA would be required to refer a case to the Attorney General whenever the agency believed a creditor "has engaged in a pattern or practice of discouraging … applications for credit in violation of section 1691(a) of this title," 15 U.S.C. § 1691e(g), Congress thus confirmed that discouraging an application for credit is a violation of the ECOA.

Reading the statutory language as a whole, including the strong congressional direction that the cognizant agencies and the Department of Justice prevent "circumvention and evasion," makes clear that the prohibition against

---

[16] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("[A] reviewing court should not confine itself to examining a particular statutory provision in isolation.").

discouragement must include the discouragement of prospective applicants. The term "applicant" cannot be read in a crabbed fashion that frustrates the obvious statutorily articulated purpose of the statute. Indeed, the ECOA's scope of prohibition prohibits discrimination "with respect to *any aspect of a credit transaction*." 15 U.S.C. § 1691(a) (emphasis added). Congress well understood that "any aspect of a credit transaction" had to include actions taken by a creditor before an applicant ultimately submits his or her credit application.[17]

## C.

Townstone submits that Regulation B violates the First Amendment. As Townstone sees it, Regulation B is invalid facially and as applied to Townstone's speech on the Townstone Financial Show. Although the issue was briefed by both parties in the proceedings in the district court, the district court declined to reach the argument, deeming it unnecessary to do so in light of its conclusion that the ECOA could not apply to prospective applicants.

"It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."

---

[17] Our conclusion that Regulation B is authorized by and consistent with the ECOA's plain text is not altered by previous opinions, from this circuit and others, holding that the ECOA's definition of "applicant" cannot include "guarantor." In *Moran Foods v. Mid-Atlantic Market Development, Co., LLC*, 476 F.3d 436, 441 (7th Cir. 2007), we explained that "to interpret 'applicant' as embracing 'guarantor' opens vistas of liability that the Congress that enacted the [ECOA] would have been unlikely to accept." No such unexpected or unacceptable vistas of liability are opened here. Congress enacted the ECOA to prohibit discrimination in credit applications, mandated a broad construction of the statute, and explicitly stated that discouragement constitutes a violation of the statute.

No. 23-1654                                                              15

*Singleton v. Wulff*, 428 U.S. 106, 120 (1976). This rule is subject to limited exceptions, *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 523 (7th Cir. 2001), but ultimately is a decision "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases," *Singleton*, 428 U.S. at 120. "In exercising this discretion, we have resolved issues which were not resolved below where, *inter alia*, 'both parties have briefed and argued [the issue's] merits,' and where 'the benefit of a district court hearing is minimal because proper resolution of the issue is clear.'" *AAR Int'l*, 250 F.3d at 523 (quoting *United States v. Brown*, 739 F.2d 1136, 1145 (7th Cir. 1984)). We adhere to the general rule today. If Townstone renews this argument on remand, the district court can address it in the first instance.

## Conclusion

We hold that Regulation B's prohibition on the discouragement of prospective applications is consistent with the plain text of the ECOA. We do not, however, express an opinion on the underlying merits of the CFPB's claim. Such analysis is best left for the district court to address on remand.

REVERSED AND REMANDED