IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Bureau of Consumer Financial Protection, <br><br> Plaintiff, <br><br> v. <br><br> Townstone Financial, Inc and Barry Sturner, <br><br> Defendants. | Case No. 1:20-cv-04176 <br><br><br> Judge Franklin U. Valderrama <br> Magistrate Judge Heather K. McShain |

### DECLARATION OF DAN BISHOP IN SUPPORT OF JOINT MOTION FOR RELIEF FROM AND VACATUR OF THE STIPULATED FINAL JUDGMENT AND ORDER

I, Dan Bishop, declare as follows under penalty of perjury:

1. On January 20, 2025, the newly inaugurated President of the United States ordered the agency heads to "identify and take appropriate action to correct past misconduct by the Federal Government related to censorship of [constitutionally] protected speech" and "to review the activities of … agencies exercising civil and criminal enforcement authority … and identify any instances" reflecting improper targeting of enforcement actions "oriented more toward inflicting political pain than toward pursuing actual justice or legitimate governmental objectives." Exec. Order No. 14149 § 2(d), 90 Fed. Reg. 8,243 (Jan. 20, 2025); Exec. Order No. 14147 §§ 1, 3, 90 Fed. Reg. 8,235 (Jan. 20, 2025).

2. I am employed as Senior Advisor to the Office of Management and Budget and detailed part time to the Plaintiff ("CFPB"). In both capacities, I serve under the direct supervision of Russell T. Vought, who is the Senate-confirmed Director of OMB and Acting Director of CFPB.

3. Director Vought directed me to undertake a general review of the supervisory and enforcement activities of CFPB and to examine the agency's handling of this matter. To perform

1

this task, I arranged for personal access to the agency's electronic records, which are maintained in SharePoint and can be browsed and searched through that interface and custom software tools.

4. To preserve agency enforcement prerogatives and privileges to the greatest extent possible consistent with fundamental fairness, I set forth below details that I have observed in agency records but am forbearing to place the referenced documents themselves on public record.[1] The documents I reviewed make clear that the CFPB lacked a sufficient factual predicate for the seven-year saga to which it subjected Defendant Townstone. Those documents also make clear that agency lawyers misled their superiors in enforcement decisions and were affected by animus toward the publicly expressed viewpoints of Townstone's owner. This Declaration cites authorities solely to illustrate how investigative and prelitigation decisions turned on misstatements and omissions of requested information about law and fact and, at key points, on Defendant's expressed political viewpoints. The Motion explains why this targeting was impermissible.

THE BEGINNING OF THE INVESTIGATION

5. CFPB's Townstone investigation commenced following a May 5, 2017 memo reporting that a research team had run a "redlining screen" on Home Mortgage Disclosure Act (HMDA) data, identifying "more than 22,000 institution/MSA combinations" to consider for investigation. To reduce that number, researchers used "characteristics" such as "fewer than 500 applications overall," an "average loan amount [ ] greater than $1M," and a "shortfall" in the "number of applications needed to reach parity [i.e. quota] with peers in majority-minority areas" less than 30. This produced 75 potential targets, further reduced, by certain "qualitative research"

---

[1] Defendants' counsel likewise only reviewed this Declaration and were not disclosed the underlying referenced documents.

2

factors, to 17. The memo did not address whether the selection of "characteristics" or "qualitative research" biased the statistical disparities data.

6. The memo described Townstone as "small," having "application volume under 1K," 876 total over the three-year period, but not low enough to be culled by the minimum of 500. Townstone's "shortfall" of applications was 60 — 31 shy of escaping scrutiny.

7. The memo also noted Townstone was "founded by people with a background in real estate" who "work closely with real estate agents and host a local radio show." Without any articulated suspicion of a practice that caused the statistical disparity, CFPB initiated a civil investigative demand (CID).

THE INVESTIGATIVE DEMAND

8. In an April 2018 memo, CFPB's fair lending staff recommended to leadership that Townstone should continue to be investigated, reporting these additional details:

   a. It "generated the vast majority of its business through radio outreach."
   b. It received significant repeat and referral applications, which "may explain why" it had few from African-American and Hispanic consumers.
   c. Its "single office in downtown Chicago," limited billboard advertising, "targeted marketing areas, and business methodology or plan, do not appear to have any significant impact on Townstone's lending in majority-minority areas."
   d. Sole owner Barry Sturner "encouraged" Townstone's "7 active loan officers" to promote and use "mortgage products geared toward … low-income applicants."
   e. Townstone had employed Chinese- and Spanish-speaking ethnic minority loan officers to do outreach to non-English-speaking communities, though "Townstone has never had an African-American loan officer."

 f.  CFPB professed to see a "possib[ility]" that Townstone's "choice of [radio] stations and corresponding demographics ... limit[s] awareness ... among African-American and Hispanic consumers."

 g.  CFPB used "an audio analytics mining software called Nexidia" to term-search 78.5 hours of Townstone's live-recorded content — 31 hour-long Townstone Saturday AM radio programs coupled with 95 30-minute Townstone podcasts published on social media. "Much of the content of the show is overtly political, and often highly critical of the Bureau ..." CFPB "mined" <u>six</u> remarks by Townstone hosts out of just <u>one</u> radio show and <u>five</u> podcasts. The mined remarks occurred within 16 audio minutes, 0.33 percent of the total recorded content. The remarks were "disconcerting" and "could be interpreted as inappropriate, incorrect, or insensitive." Two of the remarks were referenced in the Complaint (referring to "hoodlum weekend" and police presence being the sole factor preventing an urban area from descending into a "war zone" and describing the "Jungle Jewel on Division"). The others were similar.

9. In sum, CFPB's own assessment of the results of its investigation (1) identified six comments that were politically controversial; but recognized that (2) racial disparity in lending statistics did <u>not</u> appear to be explained by Townstone's office location, any targeted marketing area or advertising, or business methodology or plan; (3) Townstone encouraged the use of programs to help disadvantaged populations and hired racial and language minority loan-officers; and (4) Townstone's use of an AM talk radio station could explain its applicant demographics. Nevertheless, CFPB staff proposed to keep pressing ahead on the matter to "provide an opportunity for further investigation into Townstone's views on race and racism": "[G]iven the gravity of intentional discrimination in the consumer financial marketplace (here, potentially with animus)

there is strong need for deterrence."

10. After taking testimony from all loan officers, CFPB enforcement attorneys submitted a recommendation memo to "settle or sue" in April 2019. The only new evidence was testimonial admissions by Townstone's owner that one or more of the statements "could have" or "would possibly" discourage a prospective black loan applicant. To this, agency attorneys added their conclusory assertions that the remarks "could have been perceived as insulting to African-American and Hispanic listeners." They furnished no evidence of actual consumers offended.

11. Nevertheless, the memo advised the Director:

a. That "[t]he investigation revealed direct evidence" of discrimination in the six remarks.

b. That CFPB had "a strong case" of violation of Reg B under ECOA, which forbids "[a] creditor [to] make any oral or written statement, in advertising or otherwise, … that would discourage on a prohibited basis a reasonable person from making … an application." 12 C.F.R. § 1002.4(b). The memo flagged Townstone's argument that six isolated remarks could not have caused the "shortfall" in applications but countered that "[a]ny statement that 'would discourage' a single prospective applicant violates Regulation B, regardless of whether the statement significantly impacts the lender's application volume."

c. That "circumstantial evidence also could support the conclusion that Townstone engaged in acts or practices … that discouraged" applicants from minority neighborhoods, specifically that: (1) Townstone received fewer mortgage applications from high-minority census tracts than group of unspecified "peers," and (2) Townstone had no race-conscious marketing to or hiring of blacks.

d. That CFPB should seek race-conscious remedies by settlement: loan subsidies "up to

5

$250,000," "financial-education programs" "up to $15,000," advertising "up to $30,000," "targeted recruitment of African-American" loan officers, incentive compensation "for generating applications from [black communities]," "radio shows" touting "Townstone's plan to increase its lending in African-American communities"; plus, a "penalty of $1,000,000." To explain the penalty amount, the memo calculated the maximum per-day civil penalty for a reckless violation ($28,906) times four years (1,460 days): $28,906 x 1460 = $42,202,760, and then stated $1 million would be "appropriate" because of "Townstone's small size." The $250,000 loan subsidies target also tied to the theory of a four-year calculation.

12. The "sue or settle" memo omitted to disclose and/or misstated:

a. Reg B reaches only "oral or written statement[s]" that "would discourage on a prohibited basis." 12 C.F.R. § 1002.4(b). To be actionable, statements must express an explicit racial preference. *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 912 (5th Cir. 2019) (ads stating landlord does not accept Section 8 vouchers not a violation because no explicit racial preference expressed; "the supposition that [] an ordinary reader would infer a racial preference … is entirely speculative and unwarranted"). The six identified statements did not communicate a racial preference.

b. If Reg B had been violated, damages would be limited to those caused by specific statements. *See Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 907-08 (2d Cir. 1993) (allowing $2,500, no punitives, for distress to each plaintiff who viewed ads with racial messaging). The memo recited no evidence that any person heard or was affected by the selected Townstone remarks.

    c. Outside Reg B, stray remarks disconnected from a credit decision do not constitute "direct evidence" of discrimination. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709-10 (7th Cir. 2013).

    d. Nor is a circumstantial case of racial discrimination alleged by pairing a statistical disparity in mortgage applications to isolated remarks that could not even be characterized as bigoted. Even if they could have been, "[b]igotry, *per se*, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse [ ] action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). No reported evidence tended to prove a causal connection between suspected bigotry and the loan application "shortfall."

    e. The tabulation of damages over a continuous four-year period was baseless — as was the assertion that Townstone merited a civil penalty for recklessness. The memo stated that Townstone's owner admitted to recklessness, but as described elsewhere, he in fact only admitted in retrospect a possibility that one or more remarks "could possibly" be offensive to blacks, not that the words were spoken with conscious disregard to the risk of giving offense at the time.

    f. Remedies in discrimination cases should be designed "to eliminate racial disparities through race-neutral means." *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015). Remedies "that impose racial targets or quotas might raise more difficult constitutional questions." *Id.*

13. Upon receipt of the memo, the Director asked what was known about the audience demographics of the radio station that aired Townstone's show and drove most of its loan applications. The Director also asked for guidance about race-conscious remedies. On May 31,

2019, investigators responded that they had no information about the demographics and did not assess the obvious possibility that that could explain Townstone's "application shortfall." Investigators reported that the race-conscious remedies were consistent with agency practice but again omitted to advise of Supreme Court guidance that they are to be avoided where possible.

14. On August 23, 2019, Townstone submitted 165 pages of detailed analysis of the allegations, a survey of black respondents by a consumer testing firm of the remarks CFPB singled out, and a statistical analysis by a mortgage industry compliance firm comparing Townstone's mortgage applications and originations to specified peers. Per the consumer survey, black respondents found no offense in the program remarks singled out by CFPB, and the statistical analysis concluded Townstone was not an outlier in lending activity concerning black applicants.

15. Two business days later, CFPB investigators dismissed Townstone's arguments without seriously engaging them. Most significantly, investigators devoted just three sentences and a footnote to Townstone's seven pages of argument that the CFPB's enforcement posture threatened Townstone's First Amendment interests. Despite observing from the beginning that "the content of [Townstone's] radio show is overtly political," investigators declared that it was "not protected" because it was "commercial speech." Citing only two cases from the 1980s, they failed to address 40 years of relevant First Amendment precedent, including *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 365 (2010) ("[T]he Government may not suppress political speech on the basis of the speaker's corporate identity."), *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579 (2011) (the government may not suppress truthful commercial speech just because it is controversial or not to the government's liking), and *Nat'l Inst. Of Family & Life Advocates v. Becerra*, 585 U.S. 755, 768-69 (2018) (rejecting category of "professional speech"; narrowing commercial speech to factual disclosures and regulation of professional conduct incidentally

involving speech) — all incompatible with that blanket assertion.

16. At a September 23, 2019 briefing, all of this prompted questions from the Director, as summarized in drafts of an agency response:

> The Director requested broader context regarding prior ECOA cases, including what types of evidence are typically relied on in those cases, what novel issues may be present here in an action against a non-depository lender, and more context about the "reasonable person" standard under Regulation B discouragement claims.

For the ensuing <u>seven</u> months (until late April 2020), Enforcement and Legal Division staffs wrote and circulated dozens of drafts of a response to these questions — but never to the Director.

17. CFPB employees saved captures of tweets posted by Townstone's owner in the course of unrest following the May 25, 2020 death of George Floyd. A pdf capture of the account profile page is filenamed "Townstone Fin Tweets BS posts that he was victim of police.pdf." Another capture, bearing a last modified date of June 8, 2020, and filenamed "Townstone tweet from June 2.pdf," features Townstone's owner expressing opposition to looting.

THE SUIT AGAINST TOWNSTONE

18. Without a resolution of the questions posed by the Director, on July 6, 2020, the Director of Enforcement advised other senior officials by email that he had "provided my recommendation that the Bureau should pursue an enforcement action in the Townstone matter," referencing an impending limitations deadline. On Friday, July 10 at 2:58 PM, he emailed again that he had advised the Director of CFPB that "I see no factual or legal impediment to proceeding to suit," and that the Director had "asked to listen to the Markham call."

19. Sixteen minutes later, the Director of the Office of Fair Lending and Equal Opportunity ("OFLEO") emailed the Director, complaining that the Townstone matter had "languish[ed]" since the Fall and that her office was "unable to obtain copies of any briefing or background materials" and urging "consider[ation of] authorizing Enforcement to file the Townstone lawsuit." (In

9

apparent contradiction, on April 15, 2020, at 4:19 PM, an Enforcement lawyer had emailed the draft memo circulating among Enforcement and Legal Division staff to the OFLEO Senior Counsel, who acknowledged receipt.) The Director responded to the OFLEO Director within 30 minutes, acknowledging her input to multiple senior agency leaders but not announcing any decision.

20. The following Monday, July 13, the Enforcement Director emailed senior Enforcement officials, "The Director has authorized us to file suit on Townstone …." CFPB sued Townstone on July 15.

21. The final four years of Townstone's saga are largely of record in this action.[2] Considering that record and the revelations in this declaration, the CFPB supports vacating the consent judgment, dismissing the claims, and permitting the agency to return to Townstone the civil penalty Townstone paid.

This 26th day of March, 2025.

_____
Dan Bishop

---

[2] Two more disclosures from agency records are relevant to the Court's review at this juncture and to restoring fairness. One year after filing suit, CFPB contracted to pay $1,380,420 to "consumer behavior experts" to survey consumers about Townstone's broadcast remarks. In March 2022, CFPB's Director established a "cross-cutting priority" of "racial equity" and communicated to the enforcement division that it was "endemic to all areas of our focus." The Townstone matter was tagged in that effort.